IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


JUAN CARLOS ALVAREZ                )
  Petitioner,                        )
                                   )
vs.                                )  CASE NO. 4:09-cv-03040
                                   )
RICK THALER,                       )
Director, Texas Department of      )  DEATH PENALTY CASE
Criminal Justice, Correctional     )
Institutions Division              )
  Respondent.                      )
_____)


_____

## PETITION FOR WRIT OF HABEAS CORPUS

_____


* Attorney-in-charge    Robert L. McGlasson*
                               Texas Bar No. 13634050
                               Admitted Pro Hac Vice
                               McGlasson & Associates, PC
                               1024 Clairemont Avenue
                               Decatur, Georgia 30030
                               (404) 314-7664 (phone)
                               (404) 373-9338 (fax)
                               rlmcglasson@comcast.net (e-mail)

                               Skyla V. Olds
                               California Bar No. 241742
                               Admitted *Pro Hac Vice*

Attorney at Law
819 Delaware Street
Berkeley, CA 94710
(510) 915-4168 (phone)
(510) 540-8442 (fax)
skyla.olds@gmail.com (email)

Attorneys for Petitioner

## I.  UNLAWFUL RESTRAINT

Petitioner is a prisoner of the State of Texas.  He is illegally and unconstitutionally confined at the Texas Department of Criminal Justice, Polunsky Unit, by Rick Thaler, Director, Texas Department of Criminal Justice, Correctional Institutions Division.

No prior federal action seeking a writ of habeas corpus has been instituted by petitioner relating to the unlawful detention and restraint and sentence complained of herein.

## II.    JURISDICTION AND VENUE

Petitioner is unlawfully confined pursuant to convictions and a death sentence imposed upon him by the 338th Judicial District Court of Harris County, Texas on October 7, 1999 (People v. Juan Carlos Alvarez, cause no. 787007, in the 338th District Court of Harris County, Texas).

This petition is properly and timely presented to this Court pursuant to its habeas corpus jurisdiction under 28 U.S.C. § 2254.

Venue is proper in the Southern District because Mr. Alvarez was convicted and sentenced to death in Harris County, which is located in the Southern District. 28 U.S.C. section 2241(d).

Petitioner's imprisonment is illegal and in contravention of rights guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their individual clauses and sections, as well as by the Vienna Convention on Consular Relations.

### III. PROCEDURAL HISTORY

Juan Alvarez was arrested on June 20, 1998 and charged in a felony complaint with capital murder on July 2, 1998. CR. 2[1]. Attorney John Denninger was appointed to represent Mr. Alvarez on August 19, 1998 and Barry Hards was appointed as second chair on December 18, 1998. CR. 322, 5. Frumencio Reyes was substituted as lead counsel on August 12, 1999 and Mr. Denninger remained on the case as second chair. CR. 512. Jury selection for Mr. Alvarez's case started on August 23, 1999, eleven days after lead counsel came into the case. The State commenced the presentation of its guilt phase case on September 13, 1999 and rested on September 21, 1999. The defense then presented its entire guilt phase case in less than two hours on September 21, 1999. CR. 546-47.

The jury returned a verdict on September 22, 1999 finding Mr. Alvarez guilty of capital murder. CR. 549. Mr. Alvarez's penalty trial started on October

---

[1] Citations in this Reply are as follows: "CR. _" refers to the "Clerk's Record" in this case; "_ R. _" refers to the Transcript in the trial of the case, No.787007 (also known as Reporter's Record), where the number before the R. is the volume number and the number following the R. is page number within that volume.

4, 1999 and concluded on October 7, 1999, when, after deliberating over lunch for two and half hours, the jury returned answers to the special questions such that Mr. Alvarez was sentenced to death. CR. 556.

R.P. Skip Cornelius was appointed to represent Mr. Alvarez on direct appeal on October 15, 1999. CR. 555. Mr. Alvarez's direct appeal was due on June 9, 2000. Appointed appellate counsel, however, did not file his appeal brief by that date. He was admonished by the Texas Court of Criminal Appeals ["CCA"] of the lateness of the filing. Thereafter, on June 21, 2000, appointed counsel Cornelius filed a request for and obtained an additional extension of time to file his opening brief. After additional extensions, Mr. Alvarez's direct appeal was filed on October 30, 2000. The State filed its response on April 26, 2001. Mr. Cornelius waived the right to present oral arguments in support of the appeal. The CCA denied Mr. Alvarez's direct appeal on October 30, 2002 in an unpublished opinion. *Alvarez v. State*, No. 73,648 (Tex. Crim. App. Oct. 30, 2002) (not designated for publication).

Meanwhile, Leslie Ribnik was appointed to represent Mr. Alvarez in his state habeas proceedings on December 14, 1999.[2] Counsel Ribnik filed an application for writ of habeas corpus on September 10, 2001. The State filed an

---

[2] Susan Crump, Mr. Ribnik's wife, was jointly appointed to represent Mr. Alvarez but appears to have never been involved in any aspect of Mr. Alvarez's case.

answer to the writ, on December 21, 2001.  The Mexican Consulate first learned of Mr. Alvarez's conviction and death sentence on February 1, 2000.  (Supp Br. at p. 4).

On February 25, 2003, the State filed a *Brady* Disclosure letter notifying counsel of possible issues with the DNA evidence in Mr. Alvarez's case related to problems discovered by an independent audit of the Houston Police Department Crime Lab.  The Court issued a discovery order related to the DNA issue on April 17, 2004, and the State subsequently attempted to have the DNA evidence retested in the presence of a defense expert.  On April 25, 2006, habeas counsel filed a Motion Requesting Discovery by Depositions and Interrogatories related to the DNA issue and the prosecution submitted an Opposition.  A hearing was held on May 12, 2006 on the discovery motion.  No ruling on this issue appears on the record.

On March 25, 2005, habeas counsel filed a Supplemental Brief Relating to Vienna Convention Claim Raised in Post-Conviction Application for Writ of Habeas Corpus.  Counsel for respondent objected that the supplemental brief was a successor writ.  This habeas court agreed, declaring the filing a subsequent application and forwarding it to the CCA.  *See* Tex. Code Crim. Proc. Art. 11.071 § 5.

On August 4, 2006, Counsel Ribnik was diagnosed with Parkinson's Disease; he had been experiencing conditions and effects from the disease for a number of years. As a result, the undersigned, attorney Robert McGlasson, was substituted as habeas counsel for Mr. Alvarez on October 11, 2006. Substitution Motion filed October 11, 2006. After reviewing case files and work conducted by prior habeas counsel Ribnik, on May 15, 2007, current habeas counsel filed a Motion to Withdraw Mr. Ribnik's application for writ of habeas corpus based on the fact that Counsel Ribnik had not been competent to represent Mr. Alvarez at the time of his appointment because of his un-medicated and undiagnosed Parkinson's Disease. As directed by the Court, counsel for respondent and Mr. Alvarez's current habeas counsel filed proposed findings of facts and conclusions of law on the same date. The State additionally filed an Opposition to the Motion to Withdraw a few days later.

On June 6, 2007, the CCA issued an order indicating that "the trial court erred in declaring the document [the aforementioned "Supplement"] a subsequent application" and clarifying that the Supplemental Brief noted above was in fact merely an addendum to the initial habeas filing and should be considered as a part of that filing, rather than being treated as a subsequent habeas corpus application. In response to the order, at a status conference held on July 2, 2007, the Court and

both parties agreed that in light of the CCA's directive to consider the authorities provided in the Supplement Brief, counsel for respondent should file a response. A deadline was set for the filing of a response. Counsel for respondent, apparently following an *ex parte* communication with a clerk at the CCA, then decided not to file a response to the Supplemental Brief.[3] This Court then set a deadline of February 7, 2008 for parties to file any supplemental filings.

On February 7, 2008, the State filed Respondent's Amended Finding of Facts. Petitioner filed a Motion for Evidentiary Hearing, Reply in Support of Application for Writ of Habeas Corpus and Motion Renewing Request for an Evidentiary Hearing to Resolve Controverted Material Facts, Motion Requesting Permission to Participate as Pro Hac Vice Counsel and Motion Supporting Applicant's Motion to Participate as Pro Hac Vice Counsel. The Trial Court did not rule on any of these filings.

The trial Court requested both parties to submit proposed findings of facts by April 24, 2008. Prior to that, Petitioner filed a Motion for Discovery and

---

[3] Undersigned counsel were notified by counsel for respondent by telephone conference, and later by both the Court and by respondent's counsel in a subsequent telephonic status conference in early December 2007, that either or both had communicated with a clerk of the CCA about the substance of the CCA's June 6, 2007 order, and based on that conversation, had apparently determined that a responsive answer would not be required after all. Undersigned counsel were not a party to any conversations or communications between CCA staff and either the Court or counsel for respondent or both. Should any substantive consequences flow from those *ex parte* communications, the undersigned respectfully requests a hearing to determine whether the state habeas corpus process was full and fair and complied with elemental standards of Due Process.

Preservation of Evidence on April 17, 2008. On April 23, 2008, Respondent filed Amended Proposed Findings of Facts and Petitioner filed Applicant's Incomplete Proposed Finding of Facts and Conclusions of Law on April 24, 2008.

On May 23, 2008, the habeas court issued Findings of Facts and Conclusions of Law and an Order sending all documents related to Mr. Alvarez's case, 787007-A to the Texas Court of Criminal Appeals pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

On September 24, 2008, in *Ex Parte Juan Carlos Alvarez*, WR-62,426-01, the Texas Court of Criminal Appeals issued an Order denying relief on Application for writ of habeas corpus Cause No. 787007 in the 338th District Court Harris County. The CCA adopted the trial court's findings of fact and conclusions of law, except for findings #47 through #73 and conclusions #14 through #19.

Pursuant to 28 U.S.C. 2244(d), Petitioner's federal writ of habeas corpus must be filed on or before September 24, 2009, to avoid possible application of a statute of limitations.

## III. EVIDENCE PRESENTED AT THE GUILT-INNOCENCE PHASE

Juan Carlos Alvarez was indicted for capital murder charging him with two homicides that were alleged to have occurred during separate transactions but pursuant to the same scheme or course of conduct. CR. 4. The indictment charged

him with the death of Michael Aguirre on June 6, 1998, which allegedly occurred during a drive-by shooting of a party located on Prestwood Avenue [hereinafter "Prestwood" incident], and the death of Jose Varela on June 17, 1998, which allegedly occurred in the parking lot of an apartment complex on Woodfair Avenue [hereinafter "Woodfair" incident]. CR. 4, 481.

The State's evidence on the Prestwood incident, centering on the testimony of a cooperating co-defendant who denied receiving any deal for his cooperation and testimony, basically provided that five cars of people drove by a party that was being held at an apartment on Prestwood and how individuals shot from the cars on the people outside the party. The line of cars turned around and shot toward the party as second time and then drove off. Two individuals, Michael and Adrian Aguirre, were killed and six others were injured. Mr. Alvarez was indicted for the murder of Michael Aguirre.

As noted, one of the individuals in the car, Miguel Reyes, cooperated with the prosecution testified for the State. He testified that the shooting was a gang-related and intended to target members of the La Primera gang. He identified Mr. Alvarez as the individual who used the assault rifle and indicated Mr. Alvarez had helped plan the shooting. XIX R. 174-213.

The State presented a video tape of a custodial statement given by Mr. Alvarez to the police. In the video tape, Mr. Alvarez indicated that he supplied one of the cars and the weapons, but indicated that the weapons were not his and that he was no longer in a gang. State's Trial Exh. 138.

HPD officers testified about interrogating Mr. Alvarez about his involvement in the Prestwood incident, and obtaining a consent to search from him (prior to providing him his *Miranda* rights) and from that search discovering an SKS assault rifle and a twelve gauge shot gun in his apartment. XXI R. 34-129; XXII R. 21-83.

Some of the ballistic evidence recovered from the Prestwood scene and the autopsy of Michael Aguirre were examined and found to be consistent with a weapon seized from Mr. Alvarez's apartment (other ballistic evidence came from another weapon that was apparently not recovered). Importantly, none of the fatal shots as described by the medical examiner that killed Michael Aguirre came from the assault rifle that Reyes had testified Mr. Alvarez used during the incident. Autopsy Report of Michael Aguirre, # 98-1567, State Trial Exh. 117; XX R. 71-73.

On the Woodfair incident, State's witnesses testified that a car pulled into a parking lot at an apartment complex on Woodfair. Two males left the car and

approached two other individuals – Jose Varela and Hugo Perez – who were in the parking lot. The men with weapons shot at Mr. Varela and Mr. Perez, killing them both. They returned to the car and drove off. Mr. Alvarez was indicted for the murder of Jose Varela.

The State's firearms specialist, Robert Baldwin, testified that casings found at the scene matched the SKS rifle seized from Mr. Alvarez's apartment and shotgun casings were consistent with the twelve-gauge Mossburg shotgun that was also seized from Mr. Alvarez's apartment. The autopsy report of Jose Varela identified the cause of death as a shotgun wound to the face and neck and a shotgun wound to the back. Autopsy of Jose Varela, #98-1692, State's Trial Exh. 168. In testimony that was entirely discredited years later, a HPD Crime Lab analyst testified that areas of both guns had blood whose DNA was consistent with the DNA of the victim Jose Varela.

State's witness Brandy Varela, the victim's sister, was in the parking lot when her brother, Jose Varela, was killed, although she did not witness his death. Although Ms. Varela had failed to identify Mr. Alvarez from photo lineups that she had reviewed with police shortly after the incident, and she had never before identified him as one of the gunmen at Woodfair, she was somehow able to identify him in the courtroom, claiming that he had made the statement "Southwest

Cholos, puto" during the shooting. Additionally, her testimony about the events at Woodfair was contradicted by the ballistic evidence. XVIII R. 131-189.

Brenda Herrera, one of the co-defendants' girlfriend, testified about the defendant and other codefendants returning to her apartment with the weapons after the Woodfair Incident. XXI R. 129-177

In the videotaped statement police obtained from Mr. Alvarez, he admitted being in the car during the Woodfair incident, but indicated two other individuals actually were responsible for the shootings. State's Trial Exh. 138.

## IV.    EVIDENCE PRESENTED AT THE PENALTY PHASE

At the penalty phase of trial, the State called twelve separate witnesses to present evidence relating to four unadjudicated offenses for which the State claimed Mr. Alvarez was responsible, and one witness to testify about victim impact. Among the unadjudicated offenses claimed by these witnesses was a shooting on the Gulf Freeway in Houston on May 31, 1998, a shooting on Keene Street in Houston also on May 31, 1998, a robbery from April 1998, and an assault from May of 1996. XXV R. 9 – XXVI R. 143.

For the defense at sentencing, trial counsel called a boot camp drill instructor, three of Mr. Alvarez's sisters, a brother-in-law, his mother, and Dr. Ramon Laval. XXVII R. 5-160. The entire defense presentation lasted five and a

half hours. (Docket entries in case No. 787007 indicated that the defense presented evidence on 10/6/99 from 9:15-11:40 am and 1:35-4:15 pm and on 10/7/99 from 9:45-10:10 am).

In closing argument, defense counsel only mentioned two pieces of mitigating evidence:  that Dr. Laval had indicated that Mr. Alvarez did not pose a future danger, and that Mr. Alvarez was young.  Defense counsel did not mention anything regarding his client's life story or background.


## V. CLAIMS FOR RELIEF AFFECTING MR. ALVAREZ'S CONVICTION AND DEATH SENTENCE


**CLAIM I:  TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL THROUGHOUT ALL PHASES OF THE PRE-TRIAL, TRIAL, AND POST-TRIAL PROCEEDINGS IN THIS CASE, HIS DEFICIENT PERFORMANCE FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, AND BUT FOR THIS DEFICIENT PERFORMANCE, THERE IS A REASONABLE PROBABILITY THAT THE OUTCOME WOULD HAVE BEEN DIFFERENT**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner's confinement is unlawful, in that his conviction and death sentence were unlawfully and unconstitutionally imposed in violation of the his

rights under the Fourth, Fifth, Sixth, Eighth and Fourteen Amendments to the

United States Constitution, specifically his rights to due process and a fair trial, to

counsel and to the effective assistance of counsel to present a defense, to confront

and cross-examine witnesses, and to reliable determinations of guilt and penalty.

The following United States Supreme Court decisions, *inter alia*, are

presented in support of this claim: *Powell v. Alabama,* 287 U.S. 45 (1932)

(indigent capital defendant has right to have effective counsel and to be heard

through counsel); *McMann v. Richardson,* 466 U.S. 668 (1970) (counsel as duty to

conduct reasonable investigation; under Sixth and Fourteenth Amendments, a

showing that counsel's acts fell outside the range of reasonable competence,

coupled with showing of prejudice, compels reversal; prejudice shown if there is a

reasonable probability, less than a preponderance, that counsel's errors affected the

outcome; these principles apply equally to guilt and sentencing phases of capital

trial); *United States v. Cronic,* 466 U.S. 648, 659 (1984) (Sixth Amendment

violated, and prejudice need not be shown, if counsel entirely fails to subject the

prosecution's case to meaningful adversarial testing); *Cuyler v. Sullivan,* 446 U.S.

335 (1980) (prejudice from ineffective assistance presumed when counsel labors

under conflict of interest); *Gardner v. Florida,* 430 U.S. 439 (1977) (due process

violation in capital proceeding where petitioner sentenced on basis of unreliable

information); and *Taylor v. Kentucky,* 436 U.S. 478 (1978) (cumulative effect of errors may violate due process); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Strickland v. Washington*, 466 U.S. 688 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000); and *Rompilla v. Beard*, 545 U.S. 374 (2005).

The performance of Mr. Alvarez's trial counsel during the guilt and penalty phases of his trial fell below the standard of care mandated by the federal Constitution, and it is at least reasonably probable that a more favorable outcome would have resulted had counsel performed in accordance with the Sixth Amendment standard of care. Counsel's deficiencies at Petitioner's trial were varied and numerous, and included the omissions and commissions set forth in the following paragraphs.

Encompassed within this claim of ineffective assistance of counsel are several major sub claims, any one of which could stand on its own evidence of trial counsel's ineffectiveness, but which together, in combination, reveal a breakdown of the adversarial process of sweeping magnitude.

More specifically, those claims of trial counsel's ineffectiveness include:

Trial Counsel's Failure to Provide Adequate Pre-Trial Representation. This sub-claim, in turn, includes, but is not limited to, trial counsel's failure to: avoid accepting a case that he had no time to adequately prepare for; assemble a proper

defense team; review documentary evidence; interview salient prosecution and defense witnesses; fully and completely investigate all aspects of the case for both phases of trial; file fact specific pretrial motions; and prepare for and conduct an adequate *voir dire* during jury selection.

Trial Counsel's Failure to Adequately Represent Petitioner at the Guilt Phase of Trial. This sub-claim, in turn, includes, but is not limited to counsel's failure to: investigate facts or call witnesses to rebut the State's vulnerable theory of the case, object to gang references and mischaracterizations elicited by the State; retain experts or otherwise investigate and rebut the unreliable and unsupported use of forensic evidence; object to improper arguments; effectively cross-examine prosecution witnesses; preserve in a proper manner, consistent with known and regularly applied procedural rules in Texas, all errors that occurred during the pre-trial, trial, and post-trial phases of the case; investigate, call or prepare various defense witnesses; present mental health and drug intoxication evidence regarding the shooting; and request proper jury instructions.

Trial Counsel's Failure to Adequately Represent Petitioner at the Penalty Phase of Trial. This sub-claim, in turn, includes, but is not limited to counsel's failure to: investigate penalty phase theories, evidence, facts, and claims, obtain penalty phase documents and conduct penalty phase interviews prior to trial and in

any event before the conclusion of Petitioner's guilt trial; request a continuance of Petitioner's penalty trial in order to prepare penalty phase evidence and arguments; obtain background records and evidence and interview any witnesses regarding the State's aggravating evidence; effectively cross-examine prosecution witnesses regarding aggravating evidence; challenge the State's misleading use of gang affiliation with a competent expert witness qualified to evaluation issues related to gangs; retain a social historian, mental health expert or penalty phase investigator; obtain and preserve life history documents, evidence, witnesses, and testimony; prepare a competent closing argument; object to improper jury instructions; request proper jury instructions.

Trial Counsel's Failure to Competently Investigate and Present Mental Health Evidence. This sub-claim, which is relevant to both the guilt trial and the sentencing trial, in turn, includes, but is not limited to counsel's failure to: investigate any aspect of Petitioner's family background; investigate and evaluate Petitioner's educational history; retain a mental health investigator or expert; his failure to uncover Petitioner's long-standing organic brain damage and post traumatic stress disorder; investigate Petitioner's drug-use; and uncover other documented evidence of Petitioner's cognitive and mental health problems.

In short, trial counsel, without justification, failed to make reasonable efforts to investigate, prepare, and present evidence on petitioner's behalf during the pretrial, guilt, and penalty phases of Petitioner's trial.

In support of this claim, Petitioner alleges the following facts, in addition to those to be presented after a full investigation, discovery, additional time, access to this Court's subpoena power, and an evidentiary hearing:

## PRETRIAL

### PETITIONER SUFFERED FROM A ROTATING CAST OF TRIAL COUNSEL, NONE OF WHOM HAD THE TIME AND RESOURCES TO ADEQUATELY PREPARE FOR TRIAL.

Three different lawyers provided representation to Mr. Alvarez prior to or during his capital trial.[4] Mr. Alvarez appears to have been without representation from the filing of the felony complaint on July 2, 1998 until August 19, 1998, when John Denninger was then appointed as Mr. Alvarez's counsel. CR. 322. Barry Hards was appointed as second chair on December 18, 1998. CR. 5. On August 12, 1999, about two weeks before voir dire commenced and five weeks before the first day of Mr. Alvarez's trial, attorney Frumencio Reyes substituted in

---

[4] There is brief mention in the record of another attorney, George O. Phillips, who filed a Motion to Withdraw, which was granted, on July 22, 1998. (CR. 321). It appears that Mr. Phillips may have been Mr. Alvarez's attorney in another matter and filed the motion to clarify that he was not representing Mr. Alvarez in the capital case. In any event, Mr. Phillips did nothing for Mr. Alvarez's capital case and there is no other mention of him in the entire case file.

as first chair and Mr. Denninger continued as second chair.  Barry Hards left the case entirely.

In his Motion to obtain attorney fees filed on August 25, 1999, Mr. Hards represented that he worked "in excess of 100 hours" preparing for trial and was requesting one-third of the second chair fee for completing over one-third of the work required to defend Mr. Alvarez.  He reported that his hours were spent reviewing the district attorney's open files; reviewing defendant's prior conviction files; and meeting with witnesses, including hiring a psychologist.  Motion of Barry Hards for Attorney Fees, Exh. 34.  The witness meetings appear to refer to his work with the psychologist and one or two meetings with some members of Mr. Alvarez's family.  Despite his characterizations of this as one-third of the work necessary to defend Mr. Alvarez, as explained further below, the paltry extent of his representation of Mr. Alvarez failed to scratch the surface of the work required by objectively reasonable standards to defend a capital client.

Mr. Denninger, Mr. Alvarez's lead counsel during most of the trial preparation, and second chair during trial, likewise failed to undertake even the preliminary investigation necessary to develop a reasonable strategy for Mr. Alvarez's defense.  His work for the case appears to have been composed primarily of reviewing the district attorney's files, corresponding with an investigator who

spent a total of **six hours** working on the case, corresponding with a psychologist whose entire focus was on the question of future dangerousness, meeting with the client a few times, and meeting with some members of his family. Additionally, Mr. Denninger and Mr. Hards filed ten boilerplate motions on February 2, 1999, another boilerplate motion on March 12, 1999, and another on July 8, 1999. None of these motions contained any facts specific to Mr. Alvarez's case.

Concerned that the court-appointed lawyers were not doing much to defend Mr. Alvarez, and concerned about language barriers between non-Spanish speaking attorneys and Mr. Alvarez, his family scraped together their savings and took out loans in order to hire attorney Frumencio Reyes to represent Mr. Alvarez. *See* Affidavit of Norma Patricia Marroquin, Exh. 26 at ¶ 30; Affidavit of Teresa Alvarez, Exh. 49 at ¶ 49; Affidavit of Francisco Alvarez, Exh. 47 at ¶ 37.[5]

Mr. Reyes was substituted as lead counsel on August 12, 1999. On August 24, 1999, a mere two weeks after Mr. Reyes first entered the case, the parties began to select a jury. Mr. Reyes participated in *voir dire* and was present in court every day throughout the process. Trial itself started on September 13, 1999. This was exactly thirty-one days after he entered the case, a complex capital murder

---

[5] For every affidavit or declaration written and authenticated in Spanish, an accurate and notarized translation in English is attached at the beginning of each Exhibit. Documents were translated by bilingual mitigation specialist Alicia Amezcua-Rodriguez, as each notarized English version indicates.

trial that involved multiple victims and several different crime scenes.  At the same

time, Mr. Reyes had several other matters pending, including another trial that was

set to continue on August 16, 1999.  CR. 50-52.  That trial had been continued in

July 1999, mid-stream, because Mr. Reyes required emergency surgery.  CR. 50-

52; Affidavit of Frumencio Reyes, Exh. 4.

### TRIAL COUNSEL REYES VIOLATED HIS PROFESSIONAL RESPONSIBILITIES BY ACCEPTING A CAPITAL CASE WITHOUT OBTAINING A CONTINUANCE OR HAVING THE TIME TO EFFECTIVELY REPRESENT PETITIONER

The record demonstrates that he did not have sufficient time even to perform

the most basic functions as a criminal defense attorney.  Both the ABA Model

Code of Professional Responsibility and the ABA Guidelines for Capital

Representation make clear that counsel should only take on representation for

which they will be sufficiently prepared and able to render competent assistance.

*See* ABA Model Code, DR6-101(A)(2) (attorney should not handle cases "without

preparation adequate in the circumstances."); ABA Guidelines 10.3 ("Counsel

representing clients in death penalty cases should limit their caseloads to the level

needed to provide each client with high quality legal representation in accordance

with these Guidelines"

Mr. Reyes, as lead counsel, had not even familiarized himself with the district attorney's file prior to or during trial, much less conducted a thorough investigation on Mr. Alvarez's behalf.  In fact, the prosecutor even pointed out to the judge in the midst of trial that Mr. Reyes had never reviewed the district attorney's office case file.  XIX R. 33.  (Prosecutor Ramirez stating "Let me state again for the record that all of this information was in the offense report which I know for a fact Mr. Denninger came over to my office several times to look at. And Mr. Reyes did not make it over to the office, but he had opportunities as well to look at that offense report.").  Mr. Reyes' lack of familiarity and attention to Mr. Alvarez's case throughout the trial was illustrated by his recurring failure to call witnesses by the proper name and to remember the name of the victims in arguments.  *See, e.g*., XXIV R. 42. (Counsel tries to explain to the jury which victim he is mentioning by saying "I can't remember his name—but the one that was with Ms Varela at the time he got shot").  As explored more fully below, Mr. Reyes' lack of preparation and basic understanding of the evidence presented against Mr. Alvarez prevented counsel from showing the jury the multiple ways in which the scientific evidence against Mr. Alvarez was unreliable and inconsistent with the State's theory of guilt.

The few weeks that Mr. Reyes had to prepare for trial did not allow him the time to form the kind of client-attorney relationship required to conduct the type investigation necessary to obtain difficult information critical to a competent mitigation presentation. Without putting in the time and effort to form a trusting relationship with Mr. Alvarez, Mr. Reyes was unable to work with him to develop a defense strategy suited to the case.

Particularly in light of the previous stream of defense attorneys that the petitioner saw come in and out of his case, lead trial counsel needed to have enough time to visit his client regularly in order to develop a trusting relationship. Records indicate instead that Mr. Reyes spent very little time with Mr. Alvarez. With a mere 2 weeks to learn about the case, counsel did not have enough time to get to know his client, much less begin to understand the critical areas of the case and when it was necessary to have difficult conversations with Mr. Alvarez.

## TRIAL COUNSEL FAILED TO ASSEMBLE A PROPER DEFENSE TEAM

Amidst the chaos of rotating defense attorneys, no trial counsel ever took responsibility for creating a complete and proper defense team. The ABA Guidelines[6] underscore the importance of assembling a core team to defend a

---

[6] The ABA Guidelines are an objective source that define the reasonable expectations for capital defense attorneys and offer the "objective standard of reasonableness, based on prevailing professional norms" that attorneys must meet in order to render effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), Wiggins v. Smith, 539 U.S. 510 (2003).

capital case at both the guilt and penalty phases of trial. The core team consists of two lawyers, an investigator, and a mitigation specialist, with one of those team members qualified to screen for mental health issues. *See*, e.g., ABA Guidelines, Guideline 1.1, History ("it is imperative that counsel begin . . . assembling the defense team as early as possible"); Guideline 4.1, "The Defense Team and Supporting Services" ("the defense team should consist of no fewer than two [qualified] attorneys . . . an investigator and a mitigation specialist."); Guideline 10.4, "The Defense Team." *See* also Commentary to Guideline 4.1, "The Team Approach to Capital Defense" (observing that "national standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate 'supporting services....' This need is particularly acute in death penalty cases.")

For more than the first year after Mr. Alvarez was arrested, there was no investigation conducted on his behalf and his various defense attorneys made no efforts to assemble the necessary defense team. The ABA Guidelines are clear about when counsel should undertake comprehensive investigation and preparation efforts. "[I]nvestigation[] should begin immediately upon counsel's entry into the case and should be pursued expeditiously." ABA Death Penalty Performance Guideline 11.4.1. Counsel may not "sit idly by, thinking that investigation would

be futile.' The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each. Without investigation, counsel's evaluation and advice amount to little more than a guess." ABA Death Penalty Performance Guideline 11.4.1 (Commentary).

It was not until three months before the start of jury selection, that trial counsel requested funds for a psychologist and an investigator. Counsel filed motions for funds for an expert witness and an investigator in June 1999; these were not filed *ex parte*. Motions for Authorization of Funds, Exhs. 36. The trial court approved the funds at a pretrial motions conference on June 25, 1999. II R. 12-13. Having waited until the eve of trial even to request funds for an investigator, let alone conduct any meaningful investigation, when the trial court responded with some uncertainty as to the procedure for authorizing the funds and proposed carrying the request over for 2 weeks, trial counsel responded, "We're perfectly willing to hold this off." (II R. 13); *see also* Motion to Authorize Funds for Investigator, Exh. 36 (handwritten notation). The Court approved a total of $600 for investigative funds at that time. II R. 13.

Rudy Vargas was retained as an investigator, but completed a mere 6 hours total of work for Mr. Alvarez's case. His total billing for the case failed to even use the allotted $600. He was essentially not even a case investigator in the sense

contemplated by the ABA Guidelines.  Mr. Vargas conducted a few elementary tasks but never undertook the factual development or robust interviewing of witnesses required by a capital defense investigator.

ABA Death Penalty Performance Guideline 11.4.1(D)(7) states that "counsel should secure the assistance of experts" when doing so would assist the attorney to adequately prepare or "present mitigation."  *See* also, ABA Death Penalty Performance Guideline 8.1 (Commentary) (stating "[c]ounsel . . . cannot adequately [investigate and present mitigating evidence] and other crucial penalty phase tasks without the assistance of investigators and other assistants.).

Counsel never retained a mitigation specialist to assist in Mr. Alvarez's defense.  In capital cases, the assistance of a specialist trained to gather sensitive information about difficult life history is imperative to preparing a competent mitigation case.  ABA Guidelines specify that a mitigation specialist is a necessary member of the defense team in addition to a case investigator. Guideline 1.1 (2003) (requiring counsel to "promptly obtain . . . at minimum the assistance of a professional investigator and a mitigation specialist, as well as all professional expertise appropriate to the case.") (emphasis added.)  *See also*, *id*. (Commentary) (observing that "[t]he assistance of an investigator who has received specialized training is indispensable . . . . [T]he prevailing national standard of practice forbids

counsel from shouldering primary responsibility for the investigation.)   In Mr. Alvarez's case, this oversight was particularly prejudicial.

As set forth more fully in the penalty phase section below, Mr. Alvarez was born in Mexico and lived there for many years before immigrating to Texas.  He experienced several acute traumas in his young life in Mexico, including the death of his father, terroristic harassment from the family responsible for his father death, destabilizing moves, and the disintegration and temporary abandonment by his close family members.  Many of the testimonial witnesses who could provide this information to a mitigation specialist are Spanish speakers and/or still live in Mexico.  It was critical in Mr. Alvarez's case that his defense team included a bilingual mitigation specialist who could competently conduct a multi-cultural investigation both in Texas and in Mexico.   Defense counsel failed to retain a mitigation specialist to conduct this investigation and never even attempted to interview the vast majority of family members and other individuals who could have provided this important mitigation.

As to the mental health expert, even when counsel retained a psychologist to evaluate Mr. Alvarez, they failed to retain someone to conduct the full range of neuropsychological testing that is standard for capital defendants.  ABA Guideline 4.1(A)(2) makes clear that the defense team " should contain at least one member

qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." None of the defense attorneys were qualified to make the necessary evaluations and they directed the psychologist they hired to undertake minimal testing related to assessing Mr. Alvarez's "future dangerousness," rather than evaluating him for mental or psychological disorders or impairments.

The defense's psychologist, Dr. Ramon Laval, administered only two personality tests in his evaluation. XXVII R. 150-52. There was no indication that defense attorneys requested an initial screening to determine what mental health issues may be present and which warranted further investigation. This failure to conduct even an initial screening proved seriously prejudicial, as there were indications that Mr. Alvarez suffered from both organic brain damage and severe emotional trauma. See Report of Ricardo Weinstein, Exh. 1; Forensic Trauma Assessment, Exh 2. These indications should have led competent counsel to conduct further investigation by consulting with additional experts and requesting a more extensive battery of tests from the one expert they consulted.

## TRIAL COUNSEL FAILED TO CONDUCT OR DIRECT AN ADEQUATE INVESTIGATION TO PREPARE A CONSTITUTIONAL DEFENSE FOR PETITIONER

Flowing directly from and closely related to trial counsel's failure to assemble the proper defense team was their failure to conduct an adequate investigation. A reasonable trial strategy must be predicated upon a thorough investigation. *Strickland v. Washington* (1984) 466 U.S. 668, 690-691 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"); *Wiggins*, 539 U.S. at p. 527 ("a reviewing court must consider the reasonableness of the investigation said to support [a trial] strategy").

The ABA Guidelines consistently reiterate that a thorough investigation of all guilt-innocence and penalty phase facts and issues is the foundation for competent representation of a capital defendant. Under ABA standards, defense counsel has a general obligation to investigate, which extends to documentary evidence, physical evidence, and witnesses. "An attorney representing the accused in a death penalty case must fully investigate the relevant facts." ABA Death Penalty Performance Guidelines 2003 (Commentary, Representation at Trial). (Emphasis added.) As a general matter, "[c]ounsel appointed in any case in which the death penalty is a possible punishment should . . . begin preparation for the case as one in which the death penalty will be sought . . . ." ABA Death Penalty Performance Guideline 11.3. (Emphases added.) What that means, in practical

terms, is that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." (Emphases added.)  ABA Death Penalty Performance Guideline 11.4.1(A).   Accord, ABA Model Code of Professional Responsibility DR6-101(A)(2) (attorney should not handle cases "without preparation adequate in the circumstances.").   "[P]roviding quality representation in [a] capital case[]" thus "requires counsel to undertake correspondingly broad investigation and preparation."  ABA Death Penalty Performance Guidlines 2003 (Commentary, Representation at Trial).  (Emphasis added.)  *See also*, ABA Death Penalty Performance Guideline 8.1 (Commentary) ("[P]retrial investigation and preparation are fundamental to attorney competence at trial," citing Gary Goodpaster, Effective Assistance of Counsel in Capital Cases (1983) 58 N.Y.U. L. Rev. 299, 344-45). This thorough investigation that is the starting point for any reasonable capital defense was absent from the Mr. Alvarez's representation at trial.

Mr. Alvarez's defense team undertook the most cursory factual investigation and preparation for trial.  The preparation consisted of a brief review of the district attorney's files by one attorney who was not the lead counsel at trial (that attorney never reviewed the district attorney's file)[7] and defendant's prior criminal history,

---

[7] Although district attorney Julian Ramirez seemed to testify at trial that Mr. Reyes and Mr. Denninger both reviewed the district attorney files, XXVII R. 194, he had previously explained

a few group meetings with members of Mr. Alvarez's family, the minor use of an investigator (Vargas, noted above) and engaging a psychologist to conduct a limited evaluation of the defendant. These minimal steps are in stark contrast to the robust examination of available police documents, review of multiple crime scenes, interview of eyewitnesses, family members, friends, and neighbors, and retention of qualified experts that an adequate investigation and defense required.

As outlined above, defense counsel obtained authorization of $600 in funds for an investigator on June 25, 1999. II R. 12-13. Even after waiting until the eve of trial to request funding, counsel made minimal use of the investigative resources authorized.

On July 3, 1999, counsel hired Rudy Vargas as the investigator and assigned him various tasks. *See* Denninger Letter to Vargas, July 3, 1999, Exh. 35. Mr. Vargas' bill submitted to the court on August 11, 1999, indicates that he performed the tasks he was asked to do by Denninger. The bill indicates Vargas spent a total of 6 hours of time. He billed the court at the rate of $55 per hour. He drove a total of twelve miles for the work performed. His entire bill in the case amounted to $358.44. The remaining $241.56 was never used by counsel for Mr. Alvarez for any other investigations.

---

to the judge that it was only Mr. Denninger who reviewed the files and never Mr. Reyes. XIX R. 33. It appears from Mr. Ramirez's testimony that Mr. Denninger reviewed the district attorney files on four or five days ("a month of Sundays"). XXVII R. 194.

To be sure, according to his bill, Mr. Vargas did what he was asked by counsel. He conducted four tasks: 1) obtained criminal background checks on the uncharged and charged co-defendants from the Prestwood incident; 2) contacted three places of business where Mr. Alvarez had worked; 3) ordered autopsies from the medical examiner's office; and 4) ordered certified copies of Mr. Alvarez's prior convictions. Bill of Rudy Vargas of August 11, 1999, Exh. 32

Counsel did not ask Mr. Vargas to investigate the facts and circumstances surrounding any of the crimes presented at the guilt or penalty phases, investigate Mr. Alvarez's extensive life history, gather facts for a complete and full social history, or make any attempts to gather client documents and records (beyond the prior convictions) that would have filled in Mr. Alvarez's life history. Counsel failed to undertake any of these steps and failed to direct anyone to conduct the required investigation in their place.

In essence, the defense relied on the prosecution to provide the facts of the case to them, and to control and direct the introduction of facts at both phases of the trial. Counsel should have carefully combed through the police incident reports to understand the prosecution's case and likely theory of the crimes, and then conducted an independent investigation to identify the weaknesses in the prosecution's case and to develop a strategy for defense.

The Harris County District Attorney's Office had an "open file" policy, of sorts, regarding discovery at the time of Mr. Alvarez's trial. In reality the policy was just that, namely, the prosecutor's office would open their police report files to defense attorneys to review only while at the DA's office or in court, but that they would not provide a copy of the materials to the defense or permit the defense to make a photocopy of the records. XXVII R. 192-93. District attorney Julian Ramirez testified about this policy and explained that the only witness statement given to the defense was a defendant's statement to the police. *Id.* at 193. As an initial matter, this discovery policy creates significant obstacles to defense attorneys' ability to understand the evidence against their client, a basic tenet of their duty. Nevertheless, as noted above, lead trial counsel in the case did not even avail himself of this opportunity prior to or during the trial.

In the face of such a policy, counsel should have at the outset challenged it as one that interfered with their client's Constitutional rights. The U.S. Supreme Court has made clear that "a criminal trial is fundamentally unfair if the [prosecution] proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). Short of successful litigation to get an actual copy of the police incident reports, defense counsel should have spent the

extensive time necessary in person at the district attorney's office to fully understand the evidence against Mr. Alvarez, taking copious, detailed notes about every document, report, statement, or other item of evidence in the file. Counsel failed to do this.

Although second chair John Denninger did make a few trips to the district attorney's office to review the police reports, he did not spend enough time there to carefully review the several hundred pages of reports detailing the police's investigation of the Prestwood and Woodfair Incidences, as well as the other crimes that the prosecution presented during the penalty phase. The first chair, Frumencio Reyes, did not once go to the prosecutor's office to review the documents. Such failing was so stark, that even the trial prosecutor, assistant district attorney Ramirez, felt the need to inform the judge of it in the middle of trial: "Let me state again for the record that all of this information was in the offense report which I know for a fact Mr. Denninger came over to my office several times to look at. And Mr. Reyes did not make it over to the office, but he had opportunities as well to look at that offense report." XIX R. 33.

A thorough review of the incident reports would have led to a long list of potential witnesses for defense counsel to interview. The Prestwood Incident took place at a party in an apartment complex and involved five cars full of supposed

co-defendants or witnesses. Among all of people present, it is likely that counsel would have discovered more information about who wielded which gun during the shooting, who was in which car, and other details of the incident that could have been used at trial to impeach the testimony of the codefendant who turned evidence, or presented the jury with an alternate understanding of the events and relative culpability of individuals.

There were several instances during the innocence-guilt phase of the trial where misleading or false forensic evidence was used to convince the jurors of Mr. Alvarez's guilt. Without a concrete understanding of the content of the police incident reports or another perspective on the evidence gained through preparation and investigation, counsel were unable to counteract the misleading use of forensic or other evidence.

Had counsel conducted the investigation and preparation require, they would have been able to show the jury that the ballistic evidence from both scenes did not support the prosecution's theory that Mr. Alvarez was a fatal shooter at each crime scene, and they could have refuted the bungled use of the DNA evidence associated with the weapons at the Woodfair scene. Counsel could have enabled the jury to better and more fully understand the unreliability of the testimony presented by Miguel Reyes, the state's key witness for the Prestwood incident, and

the unreliability of the testimony of Brandy Varela, the key witness for the Woodfair incident. Counsel could have presented evidence attacking the state's theory that the two incidents were allegedly both gang-related hits, which was the entire basis for making the prosecution against Mr. Alvarez a capital-eligible crime, instead showing at the very least that potential involvement by Mr. Alvarez in either incident, if any, did not in any event support the capital element in the case. In short, with adequate preparation and investigation, counsel could have presented an alternative theory of the crime and attacked the prosecution's case to such an extent that the jury would not have found Mr. Alvarez guilty of capital murder. See Claim XIII, incorporated herein by express reference.

The same lack of preparation and investigation into the penalty phase crimes and Mr. Alvarez's life history prevented defense counsel from developing the expert witnesses and lay witnesses necessary to help the jury understand why Mr. Alvarez deserved a life sentence instead of a death sentence. The wealth of mitigation information that would have been available to counsel had they undertaken the necessary investigation, including evidence of organic brain damage and extensive trauma throughout Mr. Alvarez's short but difficult life, is set forth below.

All three of Mr. Alvarez's attorneys, whether through incompetence, apathy, or focus on matters other than Mr. Alvarez's case, rendered ineffective assistance of counsel, owing in part to a lack of resources and assistance. They failed to conduct the reasonable investigation for either the guilt or sentencing phase that would have enabled them to make informed decisions about how to represent Mr. Alvarez and how to develop a trial strategy. Counsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his or her client. *Strickland v. Washington*, 466 U.S. 668, 691 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003). Mr. Alvarez's attorneys did virtually nothing to prepare for a complex capital murder trial with multiple murders and crime scenes.

No reasonable strategic justifications exist for counsels' failures in this regard, because counsel failed to conduct a "thorough investigation of law and facts relevant to plausible options." *Ex Parte Kunkle* 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). Strategic choices made after a less than complete investigation are reasonable to the extent that "reasonable professional judgment supports the limitation on investigation." *Id*. The applicable standards of care as embodied in the ABA Guidelines make plain that trial counsel here did not conduct an investigation sufficient to allow him to exercise appropriate professional judgment.

# TRIAL COUNSEL WERE INEFFECTIVE FOR INADEQUATELY LITIGATING PRE-TRIAL MOTIONS

Trial counsel filed several pre-trial motions.  However, as noted, most of the motions were boilerplate motions that often failed to provide the factual or legal basis necessary to obtain relief.  ABA Death Penalty Performance Guideline 11.5.1(B) states that "[c]ounsel should consider all pretrial motions potentially available, and should evaluate them in light of the unique circumstances of a capital case, including the potential impact of any pretrial motion or ruling on the strategy for the sentencing phase."  Generally, the motions failed to allege facts specific to Mr. Alvarez's case, including one where counsel even failed to replace the dates pertaining to a prior case with Mr. Alvarez's arrest date.  CR. 384.

More specifically, trial counsel filed a generic Motion to Suppress that failed to allege individualized facts detailing the circumstances of Mr. Alvarez's police statements, despite the availability of substantial evidence that supported the claim that Mr. Alvarez's statements were obtained in violation of his Fourth, Fifth, and Sixth Amendment rights.  The motion actually filed also included generic claims that had no foundation or relevance to Mr. Alvarez's situation.  CR. 17-24, 406.

As to the facts of the interrogation itself, Houston Police Officer Alderete testified that he read Mr. Alvarez his Miranda rights for the first time shortly after

midnight at 12:31 am and started interviewing Mr. Alvarez shortly after he waived

his rights on June 21, 1998. XVI R. 41. However, police reports, as well as

Officer Alderete's earlier testimony at the pre-trial hearing, and his testimony at

trial, indicate that he actually started the interrogation around 11:00 PM, an hour

and a half before he read Mr. Alvarez his rights. XVI R. 12. He had Mr. Alvarez

sign a consent to search his apartment prior to being Mirandized. Police reports

and Officer Halling's testimony at trial reveal that she also spoke to Mr. Alvarez,

for 30-40 minutes before the 12:31 AM first reading of Miranda rights to Mr.

Alvarez. XXII R. 30-33. Trial counsel failed to identify this significant

inconsistency, litigate it, or bring it, and Officer Alderete's unreliable testimony, to

the attention of the trial court or the trial jury. The trial court's refusal even to give

the jury an instruction on voluntariness may be viewed as in part the product of a

less-than-adequate defense on the part of Mr. Alvarez's attorneys in marshalling

the facts and law appropriate to the case and to this issue.

There were several factors which suggested that Mr. Alvarez did not give a

voluntary and intelligent waiver of his rights, all of which were overlooked by trial

counsel. These included a coercive detention of Mr. Alvarez's sister and mother

by the police in the police station following the discovery of the murder weapons

at the apartment that they shared with Mr. Alvarez. These factors provided

powerful evidence that any eventual waiver of rights by Mr. Alvarez was not voluntary and intelligent, and yet defense counsel failed to marshal them into a persuasive and effective Motion to Suppress.

Counsel likewise failed to investigate, prepare, and present evidence in support of a Fourth Amendment search and seizure motion, or in support of the statements suppression issue as poisonous fruits, showing that Mr. Alvarez's sister and mother did not voluntarily and intelligently sign the consent to search their apartment, although they elicited similar information from these witnesses during the guilt-innocence phase of trial. *See* XXIII R. 54-67, 83-96, 105. Teresa Alvarez testified at trial that two plain clothes police officers armed with pistols arrived at her apartment around 11:00 to 11:30pm on June 20, 1998. XXIII R. 58. They told her if she did not give them permission to enter, they would keep her there until a partner got permission. XXIII R. 70. Teresa Alvarez gave the two officers permission to enter because she felt bad that they had her surrounded and she was very nervous. XXIII R. 60. Six more uniformed police officers arrived later and entered the apartment. XXIII R. 60. Officer Suro arrived at 12:15am and stayed until 12:45am. After searching the apartment and finding the weapons, the plainclothes officers gave Teresa Alvarez the consent form. XXIII R. 63. She signed the consent form at 11:37pm. Her daughter, Maria Uribe, and son-in-law,

Luis Uribe, also signed the document and marked 11:45pm . XXIII R. 74. Teresa Alvarez testified that she did not read the permission form before signing and if she had read it, she didn't remember because she was very nervous. XXIII R. 79. Ms. Alvarez also testified that she did not have her glasses with her when signing the form, and that she cannot see without them. XXIII R. 79. She testified that she signed the form because she wanted the officers to leave because she was very scared. XXIII R. 80. The consent to search was obtained from petitioner at 11:18 pm, June 20, 1998. XXIV R. 47. All of these facts relate to the question of whether or not consent to search was freely given, and provide a strong basis for suppression based on coercion. Counsel failed to use these facts in the litigation of his suppression motion and failed to elicit the information during the hearing on the motion to suppress. It is likely that counsel was unaware of these circumstances until Ms. Alvarez testified at the trial.

Because Mr. Alvarez's statements to the police and the murder weapons found in the search of his apartment were critical components of the prosecution's case against Mr. Alvarez, and the seized weapons were critical components in the eliciting of his statement by police, had trial counsel successfully litigated a suppression motion it would have devastated the State's case. See Claims XIV and XV to this Petition, incorporated herein by express reference.

Likewise, with respect to trial counsel's litigation of a jury challenge based on underrepresentation of Hispanic persons, trial counsel failed adequately to cite relevant law in his motion, failed to investigate, develop and/or plead sufficient facts in support of the motion, and failed to argue effectively that the Harris County jury wheels as constructed violated Mr. Alvarez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. *Castaneda v. Partida*, 430 U.S. 482, 494-95 (1977); CR. 315-320; XVII R. 24-46. See Claim XII to this Petition, incorporated herein by express reference; Harris County Census Data, Exh. 50.

Trial counsel's litigation of his continuance motion, which was a critical motion under the circumstances in which he became involved in the case, was haphazard and lacking in thoroughness or persistence. As noted, Mr. Reyes substituted in as lead counsel on August 12, 1999. CR. 512. Although he had filed a continuance motion along with the substitution of counsel motion, he failed to obtain ruling on the motion. Instead, he indicated that he was ready to proceed with voir dire and then trial a few weeks later, (CR. 512), despite the fact that he had only recently met the client and his family and become engaged in the case.

As noted, counsel failed to litigate funding motions to obtain the basic resources necessary to engage an adequate investigator, a mitigation specialist, and other critically important experts.. *See* Affidavit of Frumencio Reyes, Exh. 4. He

41

did not retain an investigator beyond the six hours of work done by Rudy Vargas, who did nothing more than obtain a few court documents and contact some prior employers, and was therefore unprepared to conduct the thorough investigation constitutionally required. *Wiggins v. Smith,* 539 U.S. 510 (2003).

Counsel did not have the resources to, nor did he request or use resources for, not only an investigator, but also a mitigation specialist, nor did he conduct a mitigation investigation himself nor ensure that such was conducted by anyone. He also failed to seek funds for, or consider or explore the need for additional consultation with experts, despite the fact that he was aware of a significant history of childhood trauma experienced by Mr. Alvarez, and he was aware that the prosecution would focus heavily on his client's alleged gang involvement as an aggravating fact at both phases of the trial.

Trial counsel failed to conduct jury selection in a manner than comported with the standards for effective assistance of counsel. While the prosecutor used jury selection as a method for educating potential jurors about likely issues in the case and as the first step in framing his overall strategy for the jurors, in addition to probing for insight into juror's views, *see, e.g.* V R. 151-180, V R. 202-230, defense counsel squandered the opportunity. Trial counsel gave almost every juror the same soliloquy about how the twelve jurors are individuals, information about

the Fifth Amendment right not to testify, the definition of beyond a reasonable doubt, the importance of standing up for yourself and not doing violence to your conscience, information about coerced confession, and course of conduct. See, e.g. V R. 231-248, VI R. 77-112, IX R. 38-46. Trial counsel rarely asked probing questions designed to elicit more information than was available in the juror questionnaires, thus losing the opportunity to develop better information on which to select appropriate jurors. Indeed, with the topics that defense counsel chose to lecture the juries about, counsel raised expectations that part of defense strategy would include, for example, challenging Mr. Alvarez's statements as coercive,. Instead of meeting the expectations that counsel had raised, counsel then failed to develop the available evidence to pursue these defense strategies or present the jurors with evidence to make decisions favorable to Mr. Alvarez on the basis of these issues.

Trial counsel challenged several jurors for cause and the trial court denied the challenges. VI R. 101-103, VII R. 63, VII R. 133-34. Under Texas state law, however, in order to appeal a denied challenge for cause, the defendant must show that he exhausted all peremptory strikes, that he sought and was denied a request for additional peremptory strikes, and that the venire person he would have struck ended up on the jury. *Robison v. State*, 888 S. W. 2d 473, 479 (Tex. Crim. App.

1994).  Trial counsel used only nine of the available fifteen peremptory challenges.

Trial counsel was ineffective for failing to exhaust the defense peremptory strikes,

and that failure was prejudicial in that it resulted in a waiver of the objections that

counsel made at trial to potential jurors. See *Alvarez v. State*, No. 73,648, Opinion

at p. 11.

GUILT-INNOCENCE PHASE

TRIAL COUNEL WERE INEFFECTIVE IN THEIR REPRESENTATION OF
PETITIONER DURING THE GUILT-INNOCENCE PHASE OF TRIAL

Trial counsel rendered ineffective assistance of counsel during the guilt-

innocent phase of the trial.   These failures were particularly prejudicial as there

were several critical ways in which the scientific and testimonial evidence that the

prosecution presented at trial was unreliable or misleading.  Trial counsel should

have identified for the jury the weaknesses in the State's case that would have

created reasonable doubt as to Mr. Alvarez's guilt, cast considerable doubt on the

prosecution's theory of the case, and otherwise affected the outcome at either or

both phases of trial.

TRIAL COUNSEL WAS INEFFECTIVE IN THE PRESENTATION OF
OPENING STATEMENTS

Counsel, perhaps too unfamiliar with the facts of the case from the onset,

*failed to make an opening statement*, either following the prosecution's powerful

opening statement, or even at the beginning of the defense's presentation. XVII R. XX, XXVI, XXIII R. 53. In doing so, counsel set the general tenor for the remainder of the trial, in which the prosecution controlled the facts and the jury's understanding thereof, leaving the State's picture and theory largely unchallenged or unrefuted. Even jurors could discern this dynamic, as Juror Millspaugh attests: "Mr. Alvarez's lawyers did not seem prepared, nor did they seem all that concerned about the case." Affidavit of Joseph Millspaugh, Exh. 11 at ¶ 6.

The opening statement was the first lost opportunity for the defense to highlight for the jury the weakness of the prosecution's case, and begin to present them with a more humanized understanding of the Mr. Alvarez. Instead, by failing to make an opening statement, counsel sent the message to the jury that Mr. Alvarez had nothing to present in his defense. The jurors got this message loud and clear. *See* Affidavit of Cheryl Frierson, Exh. 10; Affidavit of Joseph Millspaugh, Exh. 11.

## TRIAL COUNSEL FAILED TO CHALLENGE WEAKNESSES AND FLAWS IN THE PROSECUTION'S CASE OR PRESENT A DEFENSE

Throughout guilt-innocence and penalty phases, trial counsel failed to object to inflammatory and prejudicial remarks by the prosecution and evidence elicited. *See, e.g.*, XVIII R. 40-89, 162; IXX R. 64. One particularly damaging example of

Mr. Reyes's failure properly to object and preserve legal arguments was trial counsel's response to the prosecutor's prejudicial use of racial animus and stereotypes in his comparison of the positive contributions that Asian immigrants made to the community, with derogatory racial implications of Mr. Alvarez as a Hispanic immigrant. The prosecution relied on the key role that gangs played in the prosecution's case and presented a stereotype of an immigrant gang member squarely before the jury. Compounding the negative impact of derogatory stereotypes of Hispanic immigrants, the prosecutor made egregious statements in his closing statement of the sentencing phase that encouraged the jury to use this negative stereotype of Mexican immigrants as a factor against Mr. Alvarez in support of a sentence of death:

> MR. O'BRIEN: […] I suppose perhaps what we're asked to take a look at in regards to the background is an immigrant family suffering the hardships that immigrant families suffer with one of the parents gone, and apparently gone violently many years earlier. How did we all start in this country? How are people in this country in this city right now starting as immigrants? I'm thinking of one population, the Asian population in this town. It's getting very large. But you know what, there's doctors, lawyers. There's priests. There's engineers at Compaq, scientists. And I remember their start.

> MR. REYES: Your Honor, I'm going to object to this line of argument. There is nothing in the record to support his argument.

> THE COURT: Overrule. But again the jury will decide this on what they hear from the evidence and the charge of the Court gives them.

MR. O'BRIEN: Many of the immigrants in our city now actually experienced a real war, didn't they? Some of us did. Many of those immigrants experienced a real war and members of their family they saw shot to death. Did they do what he did when he came? XXVIII R. 57-58.

Race and immigration status may not be used as a factor in criminal case.

Although trial counsel objected that "there was nothing in the record to support his argument" (XXVIII R. 58), counsel failed to object on the basis that the prosecution improperly injected race, and race bias, into the trial, thereby violating Mr. Alvarez's right to a fair trial and due process under the Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution. The courts must continue to "engage[] in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987). With these impermissible arguments, the prosecutor contrasted the positive stereotype of "productive" Asian immigrants as a way to prey upon anti-immigration biases and to disparage Mr. Alvarez with stereotypes of dangerous and undeserving immigrants. This argument evoked juror's possible biases against a stereotyped group of immigrants from "South of the Border" who are often portrayed as taking away American jobs and bringing gang violence into our communities. Coupled with the detailed use of gang stereotypes throughout the prosecution's presentation of the case against Mr. Alvarez, the misuse of racial/cultural stereotypes in the

prosecution's closing arguments at sentencing inappropriately injected race and racial animus into the case in a particularly prejudicial manner. "A death sentence based upon consideration of 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race … of the defendant' would violate the Constitutional. *Zant v. Stephens*, 462 U.S. 862, 885 (1983). Trial counsel should not have permitted this damaging and bigoted comment to have passed without a proper objection having been made on the record.

Mr. Alvarez was indicted for capital murder based on two deaths that occurred during separate transactions but pursuant to the same course of conduct. The indictment charged him with the death of Michael Aguirre on June 6, 1998, which occurred during a drive-by shooting of a party located on Prestwood [hereinafter "Prestwood Incident"], and the death of Jose Varela on June 17, 1998, which occurred in the parking lot of an apartment complex on Woodfair [hereinafter "Woodfair Incident"]. R. 4, 481.

The State's case against Mr. Alvarez had several significant problems. First, the evidence demonstrated that Juan Alvarez did not fire ***any*** fatal shots at the Prestwood incident. In fact, Mr. Alvarez is the only person who was sentenced to death for the killing Michael or Adrian Aguirre, despite the fact that the autopsy

evidence clearly shows that he did not fatally shoot either of these victims, and despite the fact that the State's case made plain that numerous other alleged gang members were present and were firing guns. The State appears to have been aware of this weakness in their case, at one point making a passing reference to the suggestion that even if Mr. Alvarez did not fire the fatal shots, he could still be found guilty (XXIV R. 16); the defense, however, appears to have been completely unaware of this weakness in the State's case, never even mentioning this fact during witness examination or arguments to the jury, and Mr. Reyes even admits that trial counsel did not have a complete understanding of the significance of the ballistic evidence at trial. See Affidavit of Frumencio Reyes, Exh. 4 at ¶ 8, 9.[8] Hence the jury was never informed by defense counsel that Mr. Alvarez did not kill anyone in the Prestwood incident. The ballistics demonstrate the underlying truth.

At Prestwood scene, the police found the following pieces of ballistics evidence: (10) 7.62x39mm shell casings; (1) .380 casing; and (1) colt model combat Serial number #FG41917. Supplemental Police Report of Prestwood Incident, Exh. 39. The Colt firearm belonged to one of the victims and was not

---

[8] In fact, a handwritten notation on the ballistic report from the district attorney's file indicates that trial counsel did not even view these documents until September 9, 1999, three days before trial started, when second chair counsel apparently reviewed the document. HPD Crime Lab Ballistics Report, Prestwood Incident, Exh. 39.

fired.  Additional bullets were obtained through the autopsy of the two fatal victims (Michael Aguirre and Adrian Aguirre).  There was one (1) lead bullet obtained from Adrian Aguirre's autopsy (Autopsy #98-1567, State's Trial Exh. 108); bullet labeled EB-1 on crime lab ballistics report #399-98,) and three (3) lead bullets obtained from Michael Aguirre's autopsy (Autopsy #98-1567, State's Trial Exh. 117; bullets labeled EB-2, EB-3, and EB-4 on crime lab report #399-98). HPD Crime Lab Report, Prestwood Incident, Exh. 39.  The autopsy report for Adrian Aguirre showed that the one bullet was the only gunshot wound and the cause of death.  Autopsy #98-1567, State's Trial Exh. 117.  The autopsy report for Michael Aguirre revealed that the three bullets were from gunshot wounds to the abdomen, and upper arm into the chest, and that there was one additional gunshot wound to the right forearm, for which no bullet was recovered.  Autopsy #98-1567, State's Trial Exh. 117.  The recovered bullet that first went through an arm, and then into the chest, hitting the lung, heart and aorta was described as the fatal shot. XX R. 71; State's Trial Exh. 117.  The bullet that went through the arm was identified during trial as not being a fatal shot.  XX R. 73; State's Trial Exh. 117.

The casings and the bullets retrieved from the bodies and the scene were compared to weapons the police obtained through the investigation, including the .380 Auto Lorcin Model L-380 Pistol, Serial #271123 that was found on

government informant witness Miguel Reyes on June 13, 1998 and the 7.62x39mm Norcino Model SKS Rifle Serial #20148916 that was found in Mr. Alvarez 's closet. The results of the comparisons were reported in HPD Crime Lab Ballistic Report, Prestwood Incident, Exh. 39. The ten 7.62x39mm shell casings from the scene matched the SKS Rifle from Mr. Alvarez's closet and the one .380 casing matched the informant Miguel Reyes' Lorcin .380 weapon. *Id.* All four of the bullets retrieved from the autopsies were fired from the same firearm and were consistent with a .38 Special or .357 Magnum caliber firearm, but did not match any weapon that the police had available to compare to. *Id.* Alvarez had reported to the police that one of the other participants in the drive by shooting had a .38. Transcript of Juan Alvarez's Statement to the Police, State's Trial Exh. 139.

Thus, a careful examination of the ballistic evidence establishes that Mr. Alvarez did not fire any of the shots that killed the Aguirre victims. State's witness Reyes testified that Mr. Alvarez used the SKS rifle that was found at his apartment during the Prestwood Incident. Since the shots that killed Adrian and Michael Aguirre were fired from a gun other than the SKS rifle, Mr. Alvarez was clearly not the person responsible for either death, even according to the State's own physical evidence and witness testimony.

Not only did trial counsel fail to clearly elicit this information from the ballistics examiner, but also they did not present these facts to the jury. As indicated earlier, trial counsel did not understand the ballistic evidence, as Mr. Reyes even acknowledged: "I did not realize that although Mr. Alvarez was portrayed as a shooter at the Prestwood incident, […] none of the bullets from either of the deceased matched the gun[] tied to Mr. Alvarez." Affidavit of Frumencio Reyes, Exh. 4 at ¶ 8. This was of course of crucial importance at either or both phases of trial, as it would have cast doubt on his guilt at the first phase, but equally important, it would have been a significant fact in mitigation as the jury considered the special issues during the penalty phase of trial and the extent of Mr. Alvarez's moral blameworthiness.

Similarly with respect to the Woodfair incident, the testimony of State's witness Brandy Varela provided the only evidence that Mr. Alvarez was a shooter in the Woodfair incident, yet her testimony was unreliable and riddled with unexplored weaknesses; most importantly here, it was also contradicted by scientific ballistic evidence. These facts too were missed by trial counsel, as he conceded in his affidavit. Affidavit of Frumencio Reyes, Exh. 4 at ¶9. Had he been better prepared for Ms. Varela's testimony with a complete understanding of the ballistic evidence, as well as information Ms. Varela had provided to the police

prior to trial, counsel could have effectively cross examined Ms. Varela to discredit her identification of Mr. Alvarez as a shooter.

The available ballistic evidence demonstrates that Brandy Varela's testimony was in error in crucial respects. She said she saw Mr. Alvarez shooting Hugo Perez on two occasions, once when he first walked up to them, and again as she was running to her apartment and turned to see someone shoot at Perez on the ground. XVIII R. 146-148. The forensic evidence demonstrates that the first shot she witnessed would have come from the SKS rifle (and in fact there were 2 shots) and the second shot was not an SKS wound, but rather a shotgun wound to the back. HPD Crime Lab Ballistic Report, Woodfair Incident, Exh. 40. Thus, her recollection of seeing Mr. Alvarez fire in both instances is refuted by clear forensic ballistic evidence.

Trial counsel's lack of familiarity with the evidence also undermined his ability to discredit Ms. Varela in other ways. For example, trial counsel, having not reviewed the prosecution's file, was not familiar with the facts of Ms. Varela's prior contacts with the police contacts. In one police interview shortly after the incident Ms. Varela failed to pick Mr. Alvarez out of a photo line-up; in fact she positively identified a different SWC gang member from that line-up. HPD Supplemental Police Reports Related to Varela Photo Line Up, Exh. 42. The jury,

however, was never made aware by trial counsel that Ms. Varela had in fact

positively identified this other SWC gang member in a photo line-up, and not Juan

Alvarez, as the person who shot her boyfriend Hugo Perez. IXX R. 48. *Id*; HPD

Supplemental Police Reports Related to Varela Photo Line Up, Exh. 42.

Absent Ms. Varela's unreliable in-court identification of Mr. Alvarez, the

only other account of his involvement was his own police statement that placed

him in the car away from the scene of the shootings. Videotape of Juan Alvarez's

Statement to the Police, State's Trial Exh. 138. Co-defendant Jessussita Trevino

corroborated Mr. Alvarez's statement, yet trial counsel failed to call her as a

witness, or, had she taken the Fifth, successfully use her statement to the police,

which supported Mr. Alvarez's contention that he remained in the car during the

incident. *See* Claim XI of this Petition, incorporated herein by express reference;

Statement of Jessussita Trevino to Police, XXXI R. 91, 92.

Even had the jury not believed that Mr. Alvarez remained in the car, as

noted above, the ballistic evidence indicates that two separate gunmen using two

separate weapons each fired shots at Hugo Perez. HPD Crime Lab Ballistics

Report, Woodfair Incident, Exh. 40. The jury was simply never provided with that

account, based on forensic evidence; instead, the prosecution controlled the

evidence, based upon the blatantly erroneous and highly discreditable testimony of

a victim's girlfriend (who was also the other victim's brother).  Moreover, these same pieces of evidence would have shown, had trial counsel understood the facts, that Mr. Alvarez would have had no involvement whatsoever in the shooting death of Jose Varela, the only victim for whose death Mr. Alvarez was capitally charged at the Woodfair scene, as he was shot only with the shotgun and never with the SKS rifle.

Finally, the prosecution focused on the close-up shot in the back to Mr. Perez as the more brutal and heinous of the shots fired at him that night.  XXIV Tr. 54.  Had trial counsel been more familiar with the facts, he would have been able to demonstrate to the jury that, whatever else was believed, this shot was not fired by Mr. Alvarez, a fact which at the very least would have mitigated whatever role the jury might have believed he played in the Woodfair incident.

Trial counsel likewise failed effectively to confront with all available evidence and information the State's theory of the case that both shootings were gang-related, and therefore that Mr. Alvarez committed crimes "during different criminal transactions but pursuant to the same course of conduct."  R. 4; 17 R. 19. While counsel did contest this issue at trial, they did so without full command of the facts and the available evidence on this issue.

The prosecution tried to connect the cases by alleging that "there was a gang war" going on between the SWC and La Primera, for which Mr. Alvarez was a "front line soldier." XVII R. 20. Although the theory was that these were both gang-related murders, other than testimony by Ms. Varela about a comment allegedly made during the shooting, there was actually very little evidence that the Woodfair Incident was in fact gang-related. As gang expert John Hagedorn explains, not all violence perpetrated by gang members is actually gang related, yet it is "common for any violence conducted by a known gang member to be characterized as gang violence, even if it is actually an unrelated personal dispute." Report of Gang Expert John Hagedorn, Ph.D., Exh. 3 at p.12. [Hereinafter "Gang Report"]. He explains that gang violence serves some purpose to the gang, even if it is just retaliation against rival gang members. *Id.* Although there was evidence that victims of the Prestwood Incident included rival gang members, witnesses testified that neither Hugo Perez nor Jose Varela were gang members. *See, e.g.*, XVIII R. 161. The lack of their gang affiliations lends credence to the theory that the Woodfair Incident was, rather than being gang-related violence, a personal dispute perpetrated by people who may have been associated with a gang, but who purpose was not gang-related during this incident.

For example, co-defendant Jessussita Trevino would have been available to provide testimony to disprove the prosecution's gang-related theory with respect to the Woodfair incident: "Although the prosecutors presented the Woodfair incident as a gang hit, as far as I knew, the apartments where it happened were not known as a hangout for members of the La Primera gang and it seemed more like a personal dispute." Declaration of Jessussita Trevino, Exh. 6 at ¶ 16.

Trial counsel also failed to preserve any misconduct or due process issue, or otherwise raise inferences of fact with the jury, arising from the fact that the prosecution pursued two completely different theories of the case at two different trials with respect to the Woodfair incident. At Mr. Alvarez's trial, the prosecution presented him as a shooter at the Woodfair incident. *See, e.g.*, R. 480-85; XXIV R. 42. A mere seven months earlier, however, at co-defendant Jessussita Trevino's trial, the same prosecutor presented evidence that Mr. Alvarez remained in the car, and instead claimed that co-defendants Jose Santos Flores a/k/a "Spooky" and Daniel Maldonado, a/k/a "Raton", were the shooters at that incident. Case File Excerpts, *State of Texas v. Jessussita Trevino*, Exh. 33, p. 3. The prosecution's theory was Flores and Maldonado "unlawfully, during the same criminal transaction, intentionally or knowingly cause the death[s] of H. Perez... ." *Id.* at p. 2. The prosecution did not uncover any additional information in the intervening

months to justify the change in this theory. Daniel Maldonado was never apprehended by the police and Jose Santos Flores was tried, after Mr. Alvarez's trial, for his role in the Prestwood Incident but not for his role in the Woodfair Incident. *See State v. Jose Santos Flores*, Cause #831300. (Flores was found guilty of murder on January 14, 2000).

The State's case against Mr. Alvarez was marred by the unrefuted presentation of unreliable evidence, and in particular, unreliable forensic evidence. This pattern of unreliable forensic evidence is epitomized by the mishandling of the gold standard of evidence in criminal case – DNA evidence. The supposed infallibility of DNA evidence strengthens the credibility of a prosecution which relies in part on the use of DNA evidence to convict a suspect. In light of that extra credibility, it is particularly important for trial counsel to closely examine the use of DNA evidence to ensure that is not misused or misconstrued.

Trial counsel failed completely in this duty in Mr. Alvarez's case. As a result of prosecutorial misconduct, discussed in Claim IV, and incorporated herein by express reference, the DNA evidence used against Mr. Alvarez was unreliable and worthless, plagued by serious errors and the work of the discredited Houston Police Department Crime Lab. The independent Bromwich investigation of the Crime Lab discovered "major issues in the DNA analysis performed by the Crime

Lab in four death penalty cases", one of which was Mr. Alvarez's case. Final
Report of the Independent Investigator for the Houston Police Department Crime
Laboratory and Property Room [hereinafter "Bromwich Final Report"], Exh. 56, at
p. 4. The DNA defense expert hired by state habeas counsel concluded that
because of the overall problems in the case and by the Houston Crime Lab, "it is
not possible to draw any valid or reliable conclusions on the significance of the
described [DNA] results." Dr. Chiafari Final Report, Exh. 57, at 4. The numerous
errors and failures of the Houston Crime Lab and use of DNA evidence in Mr.
Alvarez's case are set forth in Claims IV - VII and incorporated herein by express
reference.

Although it was the State's misconduct that introduced this unreliable and
misleading evidence into Mr. Alvarez's trial, defense counsel's failure to examine
closely and understand all of the forensic evidence, obtain an expert to help the
defense understand and identify problems with this evidence, and effectively cross
examine the State's witnesses who presented the unreliable evidence, constitute
ineffective assistance of counsel. Trial counsel would have been able to detect
some of the problems with the DNA evidence at an earlier stage and could have
taken efforts to prevent the State from convicting Mr. Alvarez in part based on
false and misleading evidence.

Indeed, rather than making efforts to rebut, minimize or reduce the credibility of damaging evidence introduced by the prosecution, trial counsel often aided the prosecution by eliciting additional bad facts during cross examination. During the cross examination of Sergeant Alderete, trial counsel opened the door to the introduction of extremely prejudicial information about an uncharged co-defendant identifying Mr. Alvarez. XXI R. 95. After trial counsel introduced questions about this uncharged co-defendant, Juan "Neto" Sibrian, the prosecutor elicited information, over the objections of trial counsel, that the co-defendant had identified Mr. Alvarez in a photo line-up. XXI R. 123. This information would never have been introduced without trial counsel asking, with no purpose or strategy, about the individual on cross.

## PENALTY PHASE

### TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL TO PETITIONER DURING THE PENALTY PHASE OF HIS CAPITAL TRIAL

Trial counsel's ineffectiveness sealed Mr. Alvarez's fate in the penalty phase of the capital murder trial. In the penalty phase, trial counsel's deficient performance resulted in an anemic presentation of a few family members and the testimony of one expert who limited his scope to one issue. This weak presentation stands in stark contrast to the wealth of compelling mitigation

evidence that was readily available to trial counsel, had they conducted even minimal investigation. The available mitigation evidence includes striking evidence of brain damage, severe trauma, and a social history narrative of Mr. Alvarez's life that would have enabled the jury to return a verdict of life without the possibility of parole rather than sentence him to death.

Like the rest of the trial, the penalty phase was directed and controlled by the prosecution. The prosecution presented un-rebutted evidence in aggravation, focusing on gang violence and engendering fear in the jury. In Mr. Alvarez defense, there was only a minimal, cursory presentation by the defense of a few witnesses, none of whom were prepared to provide the kind of information that would have caused the jury to show mercy at sentencing. As discussed above, counsel failed to retain a mitigation specialist, and failed to retain, consider retaining, or consult with other critical expert witnesses that could have provided critical and compelling mitigating facts and factors that would have persuaded the jury to return a life sentence instead of a death sentence.

Trial counsel would have utilized the resources and services to present the information below, as the information is fully consistent with counsel's theory of defense at either or both phases of trial. Affidavit of Frumencio Reyes, Exh. 4.

The prosecution put on thirteen witnesses at sentencing to present uncharged crimes and other aggravating evidence. For the defense presentation, trial counsel called six defense witnesses to the stand: a boot camp drill instructor, a mental health witness named Dr. Ramon Laval who focused almost entirely on the issue of future danger, and five family members (Mr. Alvarez's mother, three sisters, and one brother-in-law).

Dr. Laval essentially testified that that Mr. Alvarez did not pose a future danger. Dr. Laval pointed to Mr. Alvarez's general remorse and the results of two standard personality tests that he conducted in order to support the claim of not posing a future danger. Much of his testimony was only presented in voir dire by the prosecution, outside the presence of the jury.

The mother, sisters, and brother-in-law were asked very few questions, and all were of a general nature about Mr. Alvarez. They only provided limited information about Mr. Alvarez, basically stating that he had been nice and respectful to them and that he had helped them out. There was brief mention of the death of his father without any testimony regarding the circumstances of his murder or its impact on Mr. Alvarez or the family, and similarly brief mention of the more recent death of a friend who had been killed by a gang.

The sparse mitigation presented through the testimony of Mr. Alvarez's family members was conducted superficially and without meaningful witness preparation. All four of the family members who testified at trial make clear that trial counsel failed to conduct, or have conducted by an appropriate mitigation specialist, individualized or in-depth interviews of them to obtain information about Mr. Alvarez's life, and failed to prepare them in any manner to testify on Mr. Alvarez's behalf. *See* Affidavits of Teresa Alvarez, Norma Patricia Marroquin, Ana Rivero, Araceli Alvarez, Exhs. 49, 26, 44, and 45. They indicate that, to their knowledge, trial counsel's only effort to investigate Mr. Alvarez's life history was a cursory meeting or two with available siblings and the mother, where they were asked general questions about Mr. Alvarez as a group. *See* Affidavit of Teresa Alvarez, Exh. 49; and Affidavit of Norma Patricia Marroquin, Exh. 26.

Counsel failed to confront or rebut the aggravating evidence presented by the prosecution, despite the availability of evidence and information to do so. For instance, police officer Hazelwood testified about the assault incident that resulted in Mr. Alvarez's probation in 1996. XXVI R. 102-113. Counsel should have cross examined the witness with information from Mr. Hazelwood's own report in the district attorney's file that explained another side to the story, where Mr. Alvarez alleged that the victim was the original aggressor and that Mr. Alvarez got

involved to protect his friend who had been severely beaten up. *See* Bellaire PD

Incident Report Records, Exh. 43. Instead of limiting the damage, counsel

aggravated the testimony by eliciting prejudicial and unsubstantiated details from

another incident which occurred a few months before but had not been presented

by the State and had never resulted in a prosecution. XXVI R. 117.

These failings on the part of counsel were not due to a lack of substantial

available additional testimony, evidence, and expertise that would have been

consistent with the defense's overall strategy at either or both phases of trial, yet

was never investigated, developed, or presented at trial. *See* Affidavit of Trial

Counsel Frumencio Reyes, Exh. 4.

Set forth below is a summary of the wealth of compelling information

developed through consultation with and the engagement of experts, as well as a

mitigation specialist, that trial counsel would have uncovered had a proper penalty

phase investigation.

### EVIDENCE THAT TRIAL COUNSEL SHOULD HAVE PRESENTED DURING THE PENALTY PHASE, AND WHICH WOULD HAVE CHANGED THE OUTCOME OF THE TRIAL HAD IT BEEN PRESENTED.

### MR. ALVAREZ SUFFERED FROM ORGANIC BRAIN DAMAGE, WHICH IMPAIRED HIS JUDGEMENT AND DECISION MAKING ABILITIES.

Mr. Alvarez is brain damaged, and his physiological impairment directly affected his ability to exercise judgment, impulse control, and process information in a manner that would have allowed him to make decisions and choices in a mature and responsible way. The jury that sentenced him to die, however, never learned this information, because trial counsel failed to marshal the resources and investigate and develop the information necessary to present it to them. Had the defense counsel conducted an adequate investigation, assembled a proper defense team, and consulted with a neuropsychologist, as they should have, they would have discovered this critical evidence and presented it to the jury. Affidavit of Trial Counsel Frumencio Reyes, Exh. 4.

Neuropsychologist Ricardo Weinstein, Ph.D., conducted a full battery of neuropsychological testing on Mr. Alvarez and determined that he suffers from "demonstrable organic brain impairment with particular involvement of the frontal lobes and the left hemisphere." Neuropsychological Report of Dr. Weinstein, Exh. 1 at p. 5. Dr. Weinstein explains that Mr. Alvarez's brain damage causes serious deficiencies "in his executive functioning" and impairs his "judgment, impulse control, problem solving, planning, reflection, deliberation, social behavior and other cognitive functions." *Id*. This damage "significantly compromises Mr. Alvarez's capacity to foresee the consequences of his actions and behave in a goal

directed manner." *Id*. Mr. Alvarez suffered from these impairments at the time leading up to and during the crimes, as the damage was etiologically both "developmental" and "acquired," which means that it was caused by both prenatal conditions and later head trauma. Dr. Weinstein Report, Exh. 1 at pp. 5-6.

This is dramatic evidence of a serious condition which directly impaired Mr. Alvarez's brain functioning in ways that were relevant to the crime and to the degree of his culpability. Counsel neither obtained the resources to conduct, nor did he conduct, a thorough investigation of Mr. Alvarez's medical and mental health background, and failed to consider the engagement of appropriate expert services that would have resulted in this information being presented to the jury at trial.

Evidence of brain damage that impairs "judgment, impulse control, problem solving, planning, reflection, deliberation, social behavior and other cognitive functions" is directly relevant to Mr. Alvarez's culpability. *Id*. With testimony about the brain damage, defense counsel could have helped the jury understand how Mr. Alvarez's impaired judgment and other cognitive functioning contributed to his involvement in the crimes and mitigated such involvement.

Testimony from family members about Mr. Alvarez's birth and upbringing would have supported Dr. Weinstein's credibility. Mr. Alvarez's family came

from a poor rural area in Mexico. In additional to the generally negative effects of poverty on prenatal health, Mr. Alvarez's mother was run over by a horse-drawn cart a week before he was born. Affidavit of Maria Hilda Alvarez, Exh. 13, at ¶ 5. The cart ran directly over Mrs. Alvarez's pregnant belly and could have contributed to the developmental origins of the serious brain damage. Another relative recalled how one of the Banda women attacked Mr. Alvarez's mother while she was pregnant and beat her. Declaration of Agustina Alvarez, Exh. 15, ¶ 6. The conditions of deprivation and trauma, outlined in depth below, that Mr. Alvarez experienced throughout his young life can likewise explain the "acquired" nature of the impairment.

## TRIAL COUNSEL FAILED TO DEVELOP AND PRESENT SIGNIFICANT MITIGATION RELATED TO MR. ALVAREZ'S SOCIAL HSTORY

Trial counsel's failure to obtain the services of a mitigation specialist, and/or otherwise ensure that a mitigation investigation was completed and a full social history of the client prepared fell far below the standards for performance. This is so despite the availability not only of mitigation specialists to perform the services, but also a wealth of witnesses, evidence and information that, had the jury been presented with such, would have changed the outcome of trial at least at the sentencing phase.

Mr. Alvarez was arrested on March 20, 1998, when he was twenty-one years old.  For the penalty phase of the trial, a significant responsibility of his defense counsel was to help the jury understand, notwithstanding his possible involvement in the charged crimes, who Mr. Alvarez was and how his life experiences had brought him before them.  In order to demonstrate why Mr. Alvarez deserved mercy and to understand how the twenty-one years of his life offered compelling mitigation that merited a life sentence, counsel should have put a myriad of social history witnesses on the stand to testify on Mr. Alvarez's behalf.

The post-conviction defense team conducted the investigation that should have been conducted by Mr. Alvarez's trial attorneys.   The passage of years between the trial and post-conviction investigation made the process much more difficult than it would have been for trial counsel, with witnesses moving away and memories fading, but the post-conviction mitigation specialist and defense team was still able to compile a formidable list of thirty-three family members, friends, and teachers who could provide important details about Mr. Alvarez's life.

All of these witnesses were willing to testify on Mr. Alvarez's behalf and would have supplied the jury with a full understanding of the mitigating factors in Mr. Alvarez's background.  These witnesses are composed of extended family members both here and in Mexico, teachers from Houston and Mexico, and friends

who have known Mr. Alvarez throughout his life, all of whom provide detailed information about the multiple traumas and challenges experienced by Mr. Alvarez throughout his life. *See* Exh. 5-8, 12-31, 44-49, 52, and 53.

The affidavits of these witnesses were obtained by a mitigation specialist retained through the assistance of the Mexican Government in habeas corpus proceedings. Except for the family members who attended a group meeting with defense counsel, none of these witnesses were contacted by the defense, and none of the witnesses, even the family members, were appropriately interviewed by a mitigation specialist working for the defense or by defense counsel.

These witnesses would have enabled the jury to see Mr. Alvarez as the quiet and reserved but generous and caring person that he was prior to the retriggering of emotional trauma that lead to a heretofore uncharacteristic spate of tragic violence in the Spring of 1998. They would have helped the jury to understand the devastating events of Mr. Alvarez's life: growing up in poverty in the desert of Mexico where his father was senselessly murdered in a family feud, a feud which also claimed the lives of his uncle and grandfather a short time later; living a life subsumed with fear, sleeping on the roof of the house as a protection against violent attacks; a dramatic escape from their home village in the middle of the night in which Juan and his family were forced to flee for their own safety and

leave most of their belongings behind forever; being left behind in Mexico with no parental guidance or direction as first his mother, and then each of the older siblings, left the country to seek work to provide for the family and left him in the care of the remaining siblings, who were themselves still children; coming to Houston, years after his mother and most of his older siblings, and feeling the alienation and isolation of being a 14 year from another country who did not speak the language; being thrust into the violent and gang-dominated neighborhoods and schools of southwest Houston where the options available to young men like Mr. Alvarez are few and far between; and finally, being drawn into the only peer group available to provide a sense of safety, family, and community – the local neighborhood gang – and re-experiencing the debilitating trauma of standing by helplessly as a friend was senselessly murdered. *See* Juan Alvarez Social History, prepared by Mitigation Specialist Alicia Amezcua-Rodriguez, Exh. 1, Attachment A; Affidavits of Family Members, Friends, and Teachers, Exhs. 5-8, 12-31, 44-49, 52, and 53.

Specifically, these witnesses would have provided the following information to the jury:

MITIGATION RELATED TO HIS CHILDHOOD OF POVERTY, ABANDONMENT, LOSS OF LOVED ONES, VIOLENCE AND TERROR

## THE EARLY YEARS IN THE SMALL VILLAGE OF SAN GABRIEL, MEXICO

Mr. Alvarez's life began in the small village of San Gabriel, in the Mexican State of San Luis Potosi.  When Mr. Alvarez was around eleven years old, his family moved to the larger city of Monterrey.  The first years of his life in San Gabriel were led in rural poverty and marred by a violent family feud with another clan, which culminated in the murders of Mr. Alvarez's father, grandfather, and paternal uncle.  His remaining family was terrorized by harassment and intimidation until they finally fled San Gabriel in the middle of the night, headed for Monterrey.

Mr. Alvarez came from a large family.  He is the second youngest of nine children.  His oldest sibling, Lupe, is thirteen years older than him and his younger sibling, Patty, is one year younger.  He has six sisters and two brothers.  His family was close when they lived in San Gabriel before his father was murdered.  Mr. Alvarez's sister Hilda Alvarez recalls that "[u]p until the time when my father was tragically killed, we were poor by happy."  Affidavit of Maria Hilda Alvarez, Exh. 13, at ¶ 3.

Although the family was close, their early years in San Gabriel were not easy, even before their father's death.  The family struggled for a living among

conditions of deprivation and poverty. They lived in a small house with no bathroom. Affidavit of Norma Patricia Marroquin, Exh. 26, ¶ 5. Food was scarce and simple.

The family also experienced its share of domestic turmoil. Mr. Alvarez grew up in a home in the presences of domestic violence and infidelity. One of his sisters recalled a physical fight between their parents: "My father and mother were arguing because my father had a mistress. During the argument, my father pushed my mother down and my mother cut her elbow as she fell." Affidavit of Maria Hilda Alvarez, Exh. 13, at ¶ 8. Another sister recalled their father hitting their mother during their fights. Affidavit of Norma Patricia Marroquin, Exh. 26, ¶ 6.

The village of San Gabriel was home to the Alvarez family and many branches of distantly related Banda families. The Alvarez family and Mr. Alvarez's uncle, Cirilo Alvarez's family were the only families in the village who were not members of the Banda family. There was a history of violence and feuding in the village. Members of the Banda family harassed and picked on Mr. Alvarez's family and his uncle's family. Affidavit of Jose Alvarez, Exh. 14, ¶ 4. They would pick fights with Mr. Alvarez, his siblings, and his young cousins and start trouble. *Id.*

The feuding and harassment of the Alvarez families by the Banda families culminated in the murder of Mr. Alvarez's father in 1984, when Mr. Alvarez was about seven years old. Mr. Alvarez's father was shot by Audon Banda, a man who had harassed and resented the Alvarez family.

The death of Mr. Alvarez's father shattered the family. The entire Alvarez family was nearby when their father was killed and quickly arrived on the scene. Mr. Alvarez's siblings described the traumatic event:

> When my father was shot, the rest of us were at our restaurant about a kilometer away and heard the shots. We ran down the highway and found him dead. Juan, who was seven at the time, was running along with the rest of us and stepped on a large nail that went through his shoe into his foot. I had to pick Juan up and carry him the rest of the way to where our father had been shot. This was a very traumatic event for the entire family. Affidavit of Maria Hilda Alvarez, Exh. 13, at ¶ 9.

> [W]hen I got there, my mother was sitting with my father's head in her lap. My father's eyes were rolled up and his mouth had been destroyed by the bullet. I went to touch his stomach to see if he was still breathing, praying that he was just unconscious. But he was not breathing and his body was already starting to turn cold. Juan arrived at the scene, hopping on one foot because he had injured his foot. […] The whole scene was an unimaginable horror. Affidavit of Adelaida Uribe, Exh. 25, ¶ 10.

Mr. Alvarez, his mother, his siblings, and his cousins all arrived at the scene where his father's dead body lay on the ground. It was a scene that would have

traumatized adults and strangers and was even more horrifying to the young children, like Juan, his siblings and his cousins.  One cousin recalled:  "I saw my uncle lying dead on the ground.   There was a lot of blood and we were all crying and screaming.   It was [] horrible and traumatizing to see my uncle dead." Affidavit of Jose Alvarez, Exh. 14, ¶ 5.

The death of Mr. Alvarez's father deeply affected the entire family, including Mr. Alvarez.  His sister explained:

> After my father's death, everything changed.  I felt like life was coming to an end.  My faith in god was destroyed.
> Everyone in the family was changed by our father's death. My mother was constantly working to provide for our family and she often seemed desperate.  My older brother Francisco, who had left to find work, came back to our village to help take care of the family. Francisco became a much angrier person and would yell a lot.  Juan, on the other hand, became even more quiet and reserved than he had been before.   My younger sister Patty became very depressed and stopped eating.  My brother Carlos also became quiet.  Affidavit of Maria Hilda Alvarez, Exh. 13, at ¶¶ 10-11.

Other family members recalled the change in Mr. Alvarez in a similar fashion:  "Juan, who had always been somewhat quiet, became extremely quiet and shy after his father was killed.  He constantly seemed to be afraid of something. If someone arrived at the house, he would often run off and hide."  Declaration of Agustina Alvarez, Exh. 15, ¶ 7.

After their father's death, while the family was in mourning, the Banda family stepped up their harassment. The Alvarez family felt unsafe. As one of Mr. Alvarez's sisters explained, the family "lived on edge," with everyone "sad and angry" and any tranquility from their life in rural village "was destroyed with the death of [their] father." Affidavit of Adelaida Uribe, Exh. 25, ¶ 11. They struggled without their father around to care for them and to contribute financial support to the family.

In part in response to the violence, the local school closed down. The Alvarez children, including Mr. Alvarez, were sent to the village of Dieciseis de Septiembre, where they lived in a small two room house behind an uncle's home. The house did not have electricity, water, furniture or a bathroom. They had just lost their father and now they were separated from their mother, who they only saw on the weekends when they were able to walk the long distance home. Affidavit of Jose Alvarez, Exh. 14, ¶¶ 7-8. Mr. Alvarez's teacher at the time remembered him being fearful and distracted, as if his mind was always on something else. Declaration of Consuelo Campa de la Torres, Exh. 22, ¶¶ 7-9. He was left to face the fear and trauma of having recently seen his father's murdered body, not mention the loss of the father's daily presence in his life, without adults to protect

and comfort him. This was only to be the beginning of the struggle to grow up without parental guidance and protection.

About two years after Mr. Alvarez's father was killed, his grandfather and uncle were also murdered. Mr. Alvarez's uncle, Cirilo Alvarez, was shot outside his restaurant. No one was ever arrested for the shooting, but Mr. Alvarez's grandfather apparently knew who had killed him. A few days later, Mr. Alvarez's grandfather was also murdered. It was believed Audon Banda, the man who had killed Mr. Alvarez's father, was ultimately responsible for arranging both of these deaths as well. Affidavit of Fermin Banda, Exh. 28, ¶¶ 10-11.

The Alvarez family could not stay in San Gabriel after these two murders. As Mr. Alvarez's oldest brother related:

> After my uncle and grandfather were killed, our family fled San Gabriel in the middle of the night. It was not safe for us to live there any longer. We packed up as many of our belongings as we could fit into the car and left. Anything that did not fit into the car was left behind and forever lost. It was a sad loss to leave behind everything my father had worked so hard to create for the family.
>
> We went to Monterrey, Mexico, where my mother's sister lived. In the middle of the night that we left San Gabriel, our car broke down just outside of Matehuala. We could not fix the car in the dark so we had to wait until morning to fix it. The whole family had to sleep outside in the countryside of the dessert. Affidavit of Francisco Alvarez, Exh. 47, ¶ 21-22.

Although the Alvarez family was safe from the Banda family in Monterrey, the move to the new city brought its own set of challenges.

## MOVE TO MONTERREY, MEXICO

The next stage of Mr. Alvarez's life, the years he spent living in Monterrey, Mexico, were calmer in some respects but continued to be traumatizing in other respects. The immediate fear of retaliation and violence from the feuding family responsible for his father's death was eased. In exchange for that increase in physical security, however, Mr. Alvarez experienced a further disintegration of his close family and continual abandonment as the older members of his family left Monterrey for the United States in search of the economic means to support the family.

Mr. Alvarez's mother was the first to leave Mr. Alvarez and his siblings. Mr. Alvarez remained in Monterrey for about three years without his mother or a consistent adult guardian to raise him. He was passed around to various primary care givers, ranging from his older sisters, his aunt, a sister-in-law, and a sister-in-law's mother.

Mr. Alvarez's mother initially moved the family into her sister's house in Monterrey. She left shortly thereafter to find work in Texas to support her children. Declaration of Antonia Gallegos Medrano, Exh. 16, ¶ 3-4. Mr. Alvarez's

older siblings eventually followed their mother to Texas and even the aunt with whom he had been living immigrated to the U.S., so he moved in with one of his older sister's mother-in-law. *Id.* at ¶ 4.

Mr. Alvarez's older sister Hilda moved back to Monterrey with her husband Gilberto Rodriguez to watch her younger siblings for a time. Her husband recalled that "Not only had their mother left them to find work in Houston, but several of the oldest siblings soon followed her to the U.S., leaving the younger ones behind with little supervision." Affidavit of Gilberto Rodriguez, Exh. 12, ¶ 4.

Mr. Alvarez's mother eventually came to bring him back to Texas with her. He was anxious and fearful of moving to a completely new place and delayed the move for as long as he could. He only felt comfortable enough to move to Houston when his closest friend Raymundo Quiroz Sanchez agreed to move there with him. Declaration of Raymundo Quiroz Sanchez, Exh. 21, ¶ 15.

## MR. ALVAREZ WAS TRANSPLANTED TO HOUSTON TEXAS INTO A VIOLENT NEIGHBORHOOD WHERE GANG TIES RULED

When Mr. Alvarez finally immigrated to Houston, he was thrust into a disorienting and dangerous environment. He did not speak the language and his family could not afford to live in a safe neighborhood. He moved into a small apartment that was overcrowded with relatives but still had little supervision since

most of the parental figures worked long hours to support the family.  His mother and older sister worked as live-in domestics in wealthier neighborhoods and could only come home on the weekends.  The neighborhood was fraught with gang violence and Mr. Alvarez was largely left unprotected and vulnerable.  See, generally, Affidavits of family members and friends, Exhs. 12-13, 24-27, 44-49.

One of Mr. Alvarez's friends, Mr. Christian Monge, lived about five minutes from Mr. Alvarez and his family.  About the neighborhood, Mr. Monge recalled: "The area where we lived had a lot of gang members.  The neighborhood was pretty rough and violent."  Affidavit of Christian Monge, Exh. 7, ¶ 11.  Another friend, Griselda Perla, lived in the same neighborhood of Southwest Houston as Mr. Alvarez.  She described the neighborhood during that time as "very dangerous." Affidavit of Griselda Perla, Exh. 9 at ¶ 3.  She recalled:  "I would hear gunshots and helicopters all the time, and I did not feel safe walking around the neighborhood.  After a few years, things calmed down a bit but there were still gang members who lived in the neighborhood." *Id.*

Mr. Alvarez's high school math teacher, Danielle Williamson, recalled how vulnerable the children of immigrant families were to gang involvement.  Teaching the ESL math classes, Ms. Williamson saw "the difficult situation that kids of immigrant families often faced and the lack of real opportunity available to these

kids." Affidavit of Danielle Williamson, Exh. 5, ¶ 13. She described how "[m]any of the ESL students were not welcomed into the mainstream social setting of the school and were left vulnerable to the lure of gangs." *Id.* at ¶ 9.

Mr. Alvarez's friend Joaquin Cruz lived near him and could attest to the violence in the neighborhood as well as the vulnerability that he and Mr. Alvarez faced. He recalled:

> Not long after Juan arrived in Houston, he had a very bad experience that really affected him. There were a lot of tensions in our neighborhood, mostly between various racial groups. Black kids often fought with Hispanic kids, and you were always having to watch your back.

> While we were in Middle School, there was a group of high school Black boys who were always attacking younger Hispanic boys just to harass them, no other reason. Usually they would be hiding out waiting for the kids to come by after school.

> One day, probably about a year or less after Juan arrived from Mexico, he and I were walking home from school, and the gang of Black high school boys jumped us. I was able to run away and get across and down the street; Juan did not. There were at least three or four high school boys, and just Juan, who was always small and thin. One of the boys jumped on Juan, hit him to the ground, and then started kicking and punching him. Juan tried to get up and run away, but he couldn't get away from them, because there were too many of them and he was trapped. I was far enough away to be out of danger, but close enough that I could see the whole thing. But I couldn't do anything to help Juan except yell for help.

> Juan was crying and screaming for help too, but the pounding just continued. While one of the boys would be hitting or kicking on Juan, the others would stand around and laugh. There were also calling Juan

racist names that were directed at him because he was from Mexico. I was worried they were going to kill Juan, but eventually they just stopped and left him there on the sidewalk.

Juan got hurt real bad that day. He was bloody all over, especially his face. He had bad bruises on his face and all over the rest of his body. He was very scared after it was over.

Affidavit of Joaquin Cruz, Exh. 27, ¶¶ 11-16.

Mr. Cruz explained that they told the school about the incident but that no one at the school would or could do anything about it. Mr. Cruz explained that Mr. Alvarez especially, "learned very quickly after he got to Houston that it was dangerous for him, and that he could not count on persons in authority to protect him." *Id.* at ¶ 17.

After being thrust into the violent and gang-dominated neighborhoods and schools of southwest Houston where the options available to young men like Mr. Alvarez were few and far between, Mr. Alvarez was vulnerable to the lure and safety of the protection of a local gang.

Ms. Williamson witnessed a change in Mr. Alvarez as he got pulled into the social setting of the gang. She noticed that he "was having some difficulties" and appeared to "gradually drift away" while his grades declined and he became "withdrawn." Affidavit of Danielle Williamson, Exh. 5, ¶ 11. Ms. Williamson noticed that Mr. Alvarez's clothing style changed and surmised that he had been

pulled into gang involvement. *Id*. at ¶ 14. Even then, she witnessed no signs of "explosiveness or uncontrollable anger" and he continued to be respectful to her. *Id*. at ¶¶ 15, 6. Ms. Williamson knew Mr. Alvarez early in her educational career when she had less of an understanding of what his situation was and regretted that she did not to more to support him and help him try to avoid the gang involvement. *Id*. at ¶¶ 13, 19.

### MITIGATION RELATED TO THE DEATH OF MAURIZIO RIVAS

Mr. Alvarez was drawn into the only peer group available to provide a sense of safety, family, and community – the local neighborhood gang – and it was in the gang that he re-experiencing the debilitating trauma of standing by helplessly as someone close was senselessly murdered. A few months prior to the crimes that resulted in his capital prosecution, Mr. Alvarez's friend Maurizio Rivas was murdered. As trauma expert reports, the death of Mr. Alvarez's friend Maurizio Rivas was likely the triggering event that lead to the anomalous spate of violence that Mr. Alvarez was involved in and which culminated in this capital prosecution. Forensic Trauma Assessment, Exh. 2.

Mr. Alvarez's girlfriend, Jessusita Trevino, was living with him at the time of his friend's death and witnessed how the death affected him. Ms. Trevino recalled that she noticed "a significant change" in Mr. Alvarez "around the time

when one of Juan's close friends was killed and we went to the wake." Affidavit of Jessusita Trevino, Exh. 6, ¶ 11. She also noticed after the death that "people started coming around to ask him to drive them around" and she "suspected that his friends were using him for the car since they didn't come around much before." *Id*. She noticed that Juan seemed distracted all the time and "seemed to be bottling something up inside and was full of anger." *Id*. at ¶ 12. Ms. Trevino did not know about the violent deaths of his father, grandfather, and uncle that Mr. Alvarez went through when he was young or how the death of his friend was retriggering the older traumas.

Even Vanessa Campos, Ms. Trevino's young cousin that she and Mr. Alvarez babysat and spent time with, recognized that affect that this death had on Mr. Alvarez. Vanessa, who was only eight years old at the time, remembered "hearing him talk about his friend Paipa who was killed. He seemed depressed when he talked about Paipa." Affidavit of Vanessa Campos, Exh. 8, ¶ 10.

Although the jury heard in passing that Mr. Alvarez's friend had been killed shortly before the crimes, the jury did not have the context of Mr. Alvarez's experiences in Mexico and Houston that was necessary to understand the especially damaging impact his friend's death would have on him, and therefore why that death would provided a particularly mitigating factor at the point in Mr.

Alvarez's life. Trial counsel failed to understand the importance of this event and how it interacted with Mr. Alvarez's emotion trauma, and failed to help the jury understand Mr. Alvarez's involvement in a gang and the role that his friend's death played in the subsequent events.

MITIGATION RELATED TO MR. ALVAREZ'S CHARACTER

Throughout all of these personal upheavals, the repeated abandonments, rotating parental figures, a disorientation of being uprooted and starting a life in a new place, Mr. Alvarez was described as quiet, respectful and a good person. The people who knew him throughout each stage in his life describe him with a consistency that would have persuaded the jury who Mr. Alvarez was, outside the aberration of the spate of violence that they heard so much about.

Gilberto Rodriguez, one of Mr. Alvarez's brother-in-laws, spent time with him in Monterrey. He recalled Juan as a serious and quiet boy who stayed out of trouble. Affidavit of Gilberto Rodriguez, Exh. 12, at ¶¶ 5-6. He felt sympathetic for the young boy who had lost his father at such an early age and whose mother had left him to try to find work in the U.S. and could tell that Mr. Alvarez was someone who kept his difficulties to himself and had a hard time talking to others about what was on his mind. *Id*. at ¶¶ 6, 9.

Mr. Alvarez lived with his sister's mother-in-law, Antonia Gallegos Medrano after the rest of his family had left Monterrey to look for work in Texas. She described him as "very polite and well-behaved" and recalled that he "was bashful and never asked for anything" but "was also very generous." Declaration of Antonia Gallegos Medrano, Exh. 16, ¶ 5.

Mrs. Medrano's grandson, Raymundo Quiroz Sanchez, was one of Mr. Alvarez's closest friends in Monterrey. He described his friend:

> Juan was very quiet and barely spoke to adults, but he was a little more open with me and our other friends. To have fun we would do things like play soccer, play with marbles, or go out into the countryside to catch lizards. Juan was really good at playing marbles, but he was so bashful that when he won, he would get embarrassed.
>
> Juan was a calm person. He didn't get into trouble and wasn't someone who started fights. Back then, there were a lot of kids in our neighborhood who got in trouble by doing things like stealing or putting graffiti on walls, but Juan never got involved in those things. Declaration of Raymundo Quiroz Sanchez, Exh. 21, ¶¶ 6, 8.

In Houston, he developed a few strong friendships and got to know some of his teachers. They had this to say about his character:

Danielle Williamson was a math teacher at Bellaire High School and taught Mr. Alvarez in a remedial algebra class for ESL students around 1994 – 1996. Affidavit of Danielle Williamson, Exh. 5, ¶ 4. She described Juan as "polite and responsive" student who some of the other kids looked up to and who was always

85

respectful to her. *Id.* ¶¶ 6-7. Since being contacted for the first time by counsel in state habeas proceedings, Ms. Williamson has been in touch with Mr. Alvarez and values his advice to her on how to help her students avoid gangs. *Id.* at ¶ 21. She recognizes the same good natured person at his core that she knew from her first experiences with him, and believes that he has "the ability to contribute something beneficial to our society, even from prison." *Id.* at ¶ 24.

Jessusita Trevino was Mr. Alvarez's girlfriend for the year prior to the crimes and was a codefendant in one of the cases. She described Juan as "very quiet and soft spoken" and someone who became very important to her. Affidavit of Jessusita Trevino, Exh. 6 at ¶ 3. Before Mr. Alvarez was re-traumatized by the death of his friend, Ms. Trevino described his character as "loving and gentle" as well as "very serious". *Id.* at ¶ 8.

Ms. Trevino observed how good Mr. Alvarez was with her young cousin and his own nieces and nephews and the two of them talked about having a family together in the future. *Id.* at ¶¶ 5, 8, 8. She noticed his playful nature that came out with kids and remarked that Mr. Alvarez "seemed the most at ease and least withdrawn around his family when he was with his younger nieces and nephews. He played with them and joked around with them." *Id.* at ¶ 7.

Griselda Perla, Ms. Trevino's cousin who she lived with, also got to know Mr. Alvarez well. She described him thus:

> Whenever Juan would come over, he was calm and respectful. He was very quiet, but never in an anti-social sort of way. He was always nice to me and I never saw him lose his temper or be upset. Even if Jessica was frustrated and tried to provoke him into reacting, he would remain quiet and refuse to argue with her. I never saw Juan drink or do drugs. I could not have imagined Juan hurting a fly. Affidavit of Griselda Perla, Exh 9, ¶ 8.

Ms. Perla's daughter, Vanessa Campos, became close to her cousin Jessusita Trevino and to Mr. Alvarez. They took care of Vanessa when her mother worked and she got to know Mr. Alvarez well throughout the year that he and Ms. Trevino dated. Affidavit of Vanessa Campos, Exh. 8, at ¶ 4. She described Mr. Alvarez as "a great person" who was "sweet, quiet, and helpful but also a lot of fun." *Id.* at ¶ 5. She was only seven years old when she knew him, but even a decade later she remembered the times they spent and what they did. She recalled:

> I spent a lot of time with Jessica and Juan. Every weekend and usually at least twice during the week, they would take me to out to do fun things. They often took me to Bayland Park, Chuck E. Cheese, Peter Piper Pizza, or to the mall. At the park, we would all play volleyball or soccer. We would take funny pictures in the photo booth at the mall. I still have pictures of the three of us from those times. Sometimes he would play Monopoly or other games with us. *Id.* at ¶ 6.

Ms. Trevino and Ms. Perla both recalled how Mr. Alvarez was with Vanessa and talked about these trips to the park and the mall.  *See* Affidavit of Griselda Perla, Exh. 9, at ¶ 12; Affidavit of Jessusita Trevino, Exh. 6, at ¶ 5.  Ms. Perla, Vanessa's mother, believed that Mr. Alvarez was deserving of the ultimate trust. She explained:  " I am very careful about who I leave my daughter with and who I allow to spend time around her.  I always trusted that Vanessa would be safe when I left her with Jessica and Juan."  Affidavit of Griselda Perla, Exh. 9, at ¶ 12.

Vanessa was very affected by the loss of Juan and Jessica from her life after they were arrested.  She recounted that:

> When I thought about the possibility that I might never see Juan and Jessica again, I was devastated.  I cried a lot and had a lot of trouble sleeping.  It was really hard not knowing what was going on with them.  It was especially difficult for me on the weekends, when I was used to spending time with them.  I was crushed.  I would pray every night that it was some mistake or that the judge would eventually let Juan and Jessica go.  *Id*. at ¶ 12.

Mr. Alvarez became friends with a Christian Monge while he attended Bellaire High School.  Mr. Monge described him as one of  his closest friends, who was like a brother to him.  Affidavit of Christian Monge, Exh. 7, at ¶ 3.  He said "Juan was very quiet and shy", *id*. at ¶4, that he was "very generous, even though he did not have a lot himself".  *Id*. at ¶ 7.  He also described that "he was the kind of friend who would do anything for you." *Id*.  He described how Mr. Alvarez

would drive Mr. Monge's mother to do her shopping, loaned Mr. Monge clothes for a job interview, and drove him to his interview.  *Id*. at  ¶¶8-9.

The consistency of the testimony from the people who knew Mr. Alvarez throughout his entire life would have helped the jury understand the true nature of his character.  As terrible and tragic as it was, the spate of violence that Mr. Alvarez was involved in and which led to his capital prosecution was an anomaly. It was trial counsel's duty to help the jury understand both the circumstances and events which led to his participation in the violence, and also to understand who he was outside the context of the spate of the violence.  The consistent picture that his friends, teachers, and acquaintances all paint would have been the key to enabling the jury to understand Mr. Alvarez's true character.

MITIGATING EVIDENCE:  POST TRAUMATIC STRESS DISORDER

Juan Alvarez also suffers from Post-Traumatic Stress Disorder.  The jury that sentenced him to die was not provided with any information regarding this condition.  Dr. Frederic Sautter, an expert in trauma and its effects, evaluated Mr. Alvarez and determined that he met the DSM-IV criteria for post-traumatic stress disorder (PTSD), and that he had been suffering from PTSD since the age of about ten years old up through the present.  Dr. Sautter Report, Exh. 2 at p. 7.  Mr.

Alvarez was exposed to at least nine events that are appropriately classified as

DSM-IV Criteria A traumatic stressors:

1. Mr. Alvarez saw the dead body of his father just after he was murdered when Mr. Alvarez (age 7).
2. Mr. Alvarez was horrified and frightened for his life while he and his family were repeatedly threatened and harassed by the family of his father's murder for the two years following his father's murder (ages 7-9).
3. Mr. Alvarez was confronted with his uncle's murder by the same family that murdered his father (age nine).
4. Mr. Alvarez was confronted with his grandfather's murder, possibly by the same family that murdered his father (age nine).
5. Mr. Alvarez was assaulted by a number of older boys in an apparently racially-motivated attack after recently immigrating to Houston (age fourteen).
6. Mr. Alvarez witnessed the shooting of a friend in front of his apartment building and feared for his own life (age seventeen).
7. Mr. Alvarez saw the dead body of a friend who had been shot in the head (age eighteen).
8. Mr. Alvarez was confronted with the murder of his friend Mauricio Rivas in a gang attack (age twenty).
9. Mr. Alvarez was shot at and feared for his safety (age twenty).

Trauma Report from Dr. Sautter, Exh. 2 at pp. 5-6.

Dr. Sautter explains that "social and emotional support after trauma exposure is critical to the development of psychological resiliency and recovery from trauma-related psychological problems." *Id*. at p. 9. Dr. Sautter reports that instead of "being able to engage in a healing process with his mother ... after the murder of his father, uncle and grandfather" and being "terrorized by the family

that apparently was involved in his father's murder", Mr. Alvarez "was separated from his mother and sent to live in Monterrey, Mexico" where "he developed feelings of being isolated and abandoned, and his psychological state worsened." *Id*.

Dr. Sautter also reports that Mr. Alvarez's PTSD effects were most severe around the time of the crimes, when he was confronted by the death of his friend, and he was "flooded by intrusive memories of the murder of his father," which created an emotional state which stimulated anger and aggression. *Id*. at p. 8. Mr. Alvarez had established relationships with young Hispanic men and learned to "channel his anger into aggressive behavior" to make him feel less vulnerable and "regain control over his emotional suffering." *Id*. at 10.

Dr. Sautter concludes that "these trauma symptoms played an important role in his subsequent involvement in several violent acts that led to his conviction for capital murder and death sentence in 1998" and the PTSD "made it highly unlikely that he would be able to control his hyperarousal-fueled rage and engage in responsible behavior." *Id*. at pp. 8, 10. Dr. Sautter reports that Mr. Alvarez also meets all of the criteria for a DSM-IV Axis I diagnosis, Major Depressive Disorder. *Id*. at p. 8.

This is significant evidence that explained Mr. Alvarez's involvement in a spate of violence and placed it in the context of his own traumatic experiences. While it would not have excused his conduct, this information would have placed a seemingly inexplicable series of tragic and violent behaviors into a larger framework that would have helped the jury understand how and why Mr. Alvarez may have "snapped" at the time of his friend's brutal and violent death. As such, it would have given the jury a clear vehicle for answering the mitigation special issue to grant mercy and spare Mr. Alvarez's life. Absent this information, all the jury heard was that Juan Alvarez's father died when he was young, but knew nothing about the circumstances of the death, the impact upon this young boy, as well as all of the other trauma he experienced in his life before the events in question, which was neither developed nor presented to the jury by trial counsel. The PTSD diagnosis, especially combined with an Axis I diagnosis of Major Depression, meant that Mr. Alvarez was a damaged individual suffering from serious mental illness whose blameworthiness was not the same as someone not so damaged or impaired.

## MITIGATING EVIDENCE TRIAL COUNSEL SHOULD HAVE PRESENTED RELATING TO PETITIONER'S INVOLVEMENT IN GANGS

Trial counsel was ineffective in their effort to confront and rebut the prosecution's "expert" evidence regarding damaging aggravating factors, most notably the issue of gang violence that loomed large in the case. The State spent considerable effort at trial focused on the alleged gang aspects of the various incidents involved, and even presented testimony from supposed gang "experts" at the Houston Police Department, all designed to heighten the jury's sense of fear and danger as it viewed Mr. Alvarez and his conduct.

The prosecution's damaging portrayal of the Southwest Cholos gang, and Juan Alvarez's involvement in it, was misleading, over-exaggerated, and inconsistent with known facts and substantiated literature and research. The Southwest Cholos were a far less organized, or militaristic group than the prosecution claimed, and rather than acting as a "soldier" or hit-man for the gang, Juan Alvarez's membership in the gang and his role in it were more accurately understood as an expression of his own traumatic history, his need for safety, and his lack of familial supervision and support. These facts could have been readily developed and presented had trial counsel sought and obtained resources and assistance from individuals with true gang expertise who could have systematically taken apart the State's prejudicial portrayal of these issues at trial.

Gang expert John Hagedorn evaluated Mr. Alvarez and the use of gang evidence at his trial, as well as information regarding the gang to which Mr. Alvarez was alleged to have been involved, and his role in that gang. Dr. Hagedorn noted that the State did indeed mischaracterize the SWC, the nature of Mr. Alvarez's violence, his role in the gang, and that the defense failed to confront or rebut that mischaracterization, let alone proactively explain the mitigating nature of Mr. Alvarez's gang involvement and the implications for his lack of future dangerousness. Dr. Hagedorn Gang Report, Exh. 3.

Dr. Hagedorn explains that the prosecution presented an inaccurate portrait of the SWC, with stereotypes of an institutionalized gang engaged in organized criminal activity, rather than the neighborhood gang that it appeared to be. *Id*. at p. 4. Such neighborhood gangs are unsupervised peer groups with little formal structure that adolescents join out of the need for protection and acceptance in a peer group. *Id*.

Dr. Hagedorn also reviewed the conduct for which Mr. Alvarez stood trial and faced a possible sentence of death. Having done so, he concluded that Mr. Alvarez engaged in expressive, rather than instrumental violence, which grew out of deeply internalized emotional problems; this violence was a short-term emotional outburst rather than the more systematic and calculated "gangster" way

of life portrayed by the State.  *Id*. at p. 6.  Defining his research terminology, Dr. Hagedorn also noted that Mr. Alvarez fit the role of a "homeboy" in the SWC, instead of a "new Jack", since he retained (and violated) a traditional sense of moral values, rather than embodying the stereotypic idea of a gang member who was a remorseless, cold killer.  *Id*. at pp. 7-8.  The understanding of Mr. Alvarez's violence as expressive and of Mr. Alvarez as a "homeboy" support the theory that Mr. Alvarez did not pose a significant risk of future danger, and in any event painted a far-less aggravating picture of the entire gang issue in the case.  *Id*. at p. 9.

Dr. Hagedorn also explains the reasons why certain youths are vulnerable to gang involvement, how Mr. Alvarez's involvement fit the pattern, and how certain aspects of Mr. Alvarez's own gang involvement could have been explained to the jury as mitigating evidence.  Dr. Hagedorn explains how "Mr. Alvarez's history of family violence, the violence in his local environment, his loose ties to conventional institutions and the presence of a local 'barrio gang' make his gang membership as understandable as it proved to be tragic."  *Id*. at p. 12.

Trial counsel did not even consider, let alone seek and obtain resources to retain these kinds of experts, and he failed to seek out the assistance of these kinds of experts, let alone employ them in the defense effort.  Counsel was unaware of

the facts and factors underlying the conclusions of these experts, and so wholly failed to investigate, develop, let alone present this compelling and persuasive mitigation evidence at the sentencing hearing.

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN PRESENTING CLOSING ARGUMENTS

As a result of trial counsel's reliance on Dr. Laval's testimony about future dangerousness and failure to present evidence regarding other mitigation factors, closing arguments were likewise limited in scope. Defense counsel's closing arguments focused almost exclusively on the future dangerousness question, and did so in a deficient manner. Counsel argued that Mr. Alvarez would not be a threat to society if he received life since he would serve at least forty years (XXVIII R. 27); that Mr. Alvarez "knows he's a violent person" but that his violence was "part of a war" and that he was "avenging the death of his friends" (XXVIII R. 34-35); and, that he would not be a danger in prison (XXVIII R. 38). Not only do these issues focus entirely on only one factor that is relevant to the jury's deliberation, but they also reinforced the prosecution's depiction of Mr. Alvarez as a violent person engaged in a gang war. Mitigation evidence was available to correct this dangerous mischaracterization and to help the jury understand that aside from a short period of time in his life, Mr. Alvarez was the

antithesis of a "violent person" and that he was not a calculating cold player in a gang war.   In fact, not only did counsel fail to mitigate Mr. Alvarez's involvement in a gang, but in his closing argument, he even echoed the prosecution *aggravating* theme that painted Mr. Alvarez as an "soldier" in a gang war.  XXVIII R. 34. Even one of the jurors noted that "The story about the gangs and Mr. Alvarez being a member and everything was all from the side of the prosecution.  The defense did nothing to try to explain how or why Mr. Alvarez got involved in a gang.  If they had, I also think it would have made a difference to me."  Affidavit of Cheryl Frierson, Exh. 10, ¶10.

Trial counsel also made one generic anti-death penalty plea, urging the jury not to take another human life.  XXVIII R. 32.  The entire defense presentation for life, aside from Dr. Laval's testimony, lasted only about four and half hours.  R. 551-553.  (9:15-1:35 on October 6, 1999 and 20 additional minutes on October 7, 1999).

The jury retired at 1:21 PM on October 7?, 1999 and returned around 2:33 PM, barely an hour later, with answers to the special question that led to the imposition of death.  XXVIII R. 62.  It took the jury less time to sentence Mr. Alvarez to death than it took them to eat their lunch on the other days of trial. Counsel failed to provide them with evidence to persuade them to spare Mr.

Alvarez's life, and even failed to guide them with closing arguments how to give effect to the sparse mitigation offered.

By focusing only on future dangerousness, counsel spent virtually no time arguing for life based on a number of other mitigating factors, despite the availability of compelling evidence in other areas. The sole focus on future dangerousness was perhaps not surprising, given the lack of even minimal efforts to investigate Mr. Alvarez's life history and mental health.

The information the mitigation witnesses would have provided to the jury, detailed above, would have form the basis of the mitigation case for Mr. Alvarez's defense. The expert witnesses would have been able to pull details and facts out of the social history narrative developed by the lay witnesses to help the jury understand how the circumstances of Mr. Alvarez's life contributed to brain damage and post traumatic stress disorder, which in turn diminished the moral culpability of his actions and gave the jury reasons to spare his life and not sentence him to death.

With all of the information presented about what Mr. Alvarez experienced throughout his life and what his character was like, his defense attorneys would have been in a position to make a compelling mitigation argument for his life.

What trial counsel had a responsibility to do with the information these witnesses would have presented was pull out what is mitigating about Mr. Alvarez's past, mental health status, and character. Counsel should have pulled together facts details from the witnesses and made connections about Mr. Alvarez's life experiences and characters made a case for life.

Even the jury recognized that counsel failed in this regard. One juror commented about the few facts adduced during penalty phase:

> The problem with [the testimony of defense witnesses in the penalty phase] was that Mr. Reyes did not try to make any connection between bad things that may have happened to Mr. Alvarez when he was younger, and how he got involved in these crimes later on. If they had done something to explain some kind of relationship between his childhood problems and his later actions, that would have been important to me. Affidavit of Cheryl Frierson, Exh. 10, at ¶ 9.

Here, the juror is basically asking for trial counsel to present and argue mitigation, as was his duty. And Mr. Alvarez's childhood and life contained a veritable wealth of exactly the type of mitigation that the juror was hungry for. This was a juror who would have voted for life instead of death had she had all of the information about Mr. Alvarez's life and character available to her. It was trial counsel's responsibility to present that information to the jury and then help the jury understand how Mr. Alvarez's life presented a myriad of compelling mitigation factors to encourage them to vote for life.

Defense counsel should have helped the jury understand how the testimony of the thirty odd witnesses who would have testified at Mr. Alvarez's trial provided evidence of a number of mitigating factors, and how that mitigation, when weighed against the aggravating factors, would have lead them to impose a life sentence instead of a death sentence.   The mitigating factors that trial counsel should have explained for the jury in closing arguments included:

- The effects of poverty and deprivation of Mr. Alvarez's childhood;

- The traumatic violence that Mr. Alvarez witnessed as a young child and how it may have numbed him to the horrors of death;

- The feelings of hopelessness and lack of control resulting from the terrorization of him and his family by the people responsible for murdering his father, uncle and grandfather;

- The constant lack of stability in his young life and how it affected his development and ability to reason and make choices;

- The repeated abandonment Mr. Alvarez experienced by the adults in his family – beginning with the tragic deaths of his father and other male figures and continuing with his mother and older siblings leaving him in the care of a rotating serious of more and more distant relatives

as they left Mexico for the United States – and how it left him without parental guidance and support in his life;

- The impact on him when he was forced to leave whatever familiarity he was able to develop in Monterrey, Mexico and join his the family members who had left him – some of whom he had not seen in years – in Houston, Texas;

- The disorientation of arriving in a foreign country where he did not know the language or culture;

- The vulnerability of moving into a violent and gang-filled neighborhood without having parental supervision to protect him;

- The mitigating elements of his eventual involvement in the neighborhood gang;

- The triggering effect of the death of his friend a few months before the spate of violence;

- The impact that his post traumatic stress disorder had on his ability to make decisions; and

- The impact of his serious organic brain damage.

## TRIAL COUNSEL WAS INEFFECTIVE FOR SLEEPING THROUGH THE TRIAL

Finally, trial counsel was ineffective for sleeping through portions of Mr. Alvarez's trial. The law is clear in this Circuit that sleeping counsel in a capital case is tantamount to no counsel at all, and therefore deprives the defendant of the right to counsel and the right to effective counsel. *See Burdine v. Johnson*, 262 F.3d 336 (2001). In support of this claim are Affidavits of jurors who witnessed lead counsel Reyes sleeping repeatedly throughout the trial. *See* Affidavit of Cheryl Frierson, Exh. 10; Affidavit of Joseph Millspaugh, Exh. 11.

As one jury observed:

> The lead lawyer, Mr. Reyes, who did all the questioning of witnesses, shocked us jurors by repeatedly falling asleep during the trial. He did this on a number of occasions, when the State was presenting its case and witnesses, and he was clearly asleep and not hearing what the witnesses were saying. Affidavit of Joseph Millspaugh, Exh.11 ¶ 7.

Another juror corroborated these recollections of Mr. Reyes sleeping through portions of the trial:

> In fact, several times throughout the trial Mr. Reyes kept falling asleep. This was not a one-time occurrence; it happened repeatedly throughout the trial. He would definitely fall asleep, not just a head nod; he would be out. Affidavit of Cheryl Frierson, Exh. 10, ¶ 6.

Mr. Reyes' bouts of sleeping were both numerous and lasted for longer than a brief nodding off here or there. He would fall asleep for minutes at a time, causing him to miss significant portions of Mr. Alvarez's trial. A juror recalled:

During the times I saw Mr. Reyes sleeping, he would stay out for periods of several minutes, as long as five minutes or maybe even more on some occasions, two or three minutes or more on others. That doesn't mean he didn't sleep for longer periods than that; this is just what I observed on the numerous times when I noticed he had fallen asleep. Affidavit of Cheryl Frierson, Exh. 10, ¶ 7.

A lot can happen in the space of a few minutes in a trial. One detail from one witness can make a different. For example, the complexities of the forensic evidence in this case included several details that apparently escaped trial counsel's notice. Perhaps, for example, if Mr. Reyes had been awake and paying attention, he would have been able to adduce the information from the ballistic witness to show that Mr. Alvarez did not fire the fatal shots for charged murders as noted above. Mr. Reyes' bouts of sleeping also distracted the jurors from the main event. When they should have been paying close attention to the testimony of the witnesses in order to understand the complexities of the forensic evidence, their attention was districted by counting the number and length of Mr. Reyes' naps and their concern for what impact his sleeping may have had on Mr. Alvarez's representation.

The problem of Mr. Reyes falling asleep while he was supposed to be defending Mr. Alvarez and working to save his life was serious enough to merit the attention of the judge. Both juror Millspaugh and Juror Frierson recall at least one

occasion when the judge tried to wake Mr. Reyes up and in doing so, drew the attention of everyone in the courtroom. Juror Millspaugh related:

> There was at least one occasion where the judge had to wake Mr. Reyes up by repeating his name when it was his turn to question a witness; the courtroom broke out in laughter, but I would say it was mostly nervous laughter at the spectacle.
> Affidavit of Joseph Millspaugh, Exh. 11, ¶ 7

The sleeping was significant enough that it became a topic of discussion amongst the jurors and during deliberations. This was an event that raised the concerns of the jurors, making them question whether or not Mr. Alvarez was well represented, rather than focusing entirely on the evidence before them, as was their duty. One juror noted:

> When we got back to the jury room the jurors talked about how we couldn't believe that a lawyer like this in a capital case was falling asleep during the trial. It bothered us and we commented on it to one another, and it fit with our overall impression that the defense did not really do much of a job of defending their client.
> Affidavit of Joseph Millspaugh, Exh. 11, ¶ 8.

Another juror also recalled how the jurors discussed trial counsel's sleeping in deliberations and how many of the jurors were concerned about it. She said that "Mr. Reyes' lack of interest in general, and his repeated sleeping during the trial, were something we jurors talked about when we were deliberating." Affidavit of Cheryl Frierson, Exh. 10, ¶ 9.

Mr. Reyes slept through important aspects of Mr. Alvarez's trial. As trial counsel, his duty included protecting Mr. Alvarez's rights and interests during the State's presentation of its case and cross examining witnesses when it was necessary and appropriate to do so. Mr. Reyes was observed sleeping through the State's presentation of its witnesses. Juror Millspaugh observed Mr. Reyes sleeping "when the State was presenting its case and witnesses" and noticed that Mr. Reyes "was clearly asleep and not hearing what the witnesses were saying." Affidavit of Joseph Millspaugh, Exh. 11, ¶ 7. Juror Frierson also recalled that "Mr. Reyes would do most of his dozing while the prosecutors were questioning their witnesses." Affidavit of Cheryl Frierson, Exh. 10, ¶ 8.

Mr. Reyes' tendency to fall asleep during the trial contributed to the deprivation of Mr. Alvarez's guarantee of effective assistance of counsel and his basic right to counsel. *Burdine*, *supra*, collecting cases. *Burdine* makes plain that prejudice is to be presumed where, as here, an attorney in a capital murder trial repeatedly falls asleep during the State's presentation of its case to the jury, hence Mr. Alvarez need not show with more specificity precisely what impact counsel's sleeping had on his representation or on the trial outcome.

Nevertheless, it should be clear that the fact that Mr. Reyes was not even awake for some of the State's questioning of witnesses clearly contributed to the

sub-par job that was conducted in cross examining the witnesses. Without having paid keen attention to the details elicited on direct examination, Mr. Reyes was in no position to draw out possible inconsistencies in the testimony, impeach the witnesses, or elicit positive facts for his client. As Juror Frierson astutely noted: "I don't see how Mr. Reyes could have done a very good job of questioning those witnesses when he would be sleeping during their testimony." Affidavit of Cheryl Frierson, Exh. 10, ¶ 8.

Additionally, as Jurors Millspaugh and Frierson indicated, the juror's impression of the defense and the defendant was affected by their observation of trial counsel sleeping. The lack of concern implied by a defense attorney's inability to stay awake during a critical trial which will determine whether his client lives or dies makes a statement to the jurors about how worthwhile the defense attorney views his client. Sleeping through the trial communicated a lack of concern for and belief in Mr. Alvarez. This juror expressed her and other juror's concerns that "a young man, a boy, really, whose whole life was in front of him, indeed whose whole life was literally at stake in this trial, and his lawyer didn't even care enough to stay awake or aggressively fight for him." Affidavit of Cheryl Frierson, Exh. 10, ¶ 9. If his own defense attorney could not muster the respect

and interest for his life, why should the jurors place any value on it in their deliberations?

That fact the Mr. Reyes slept through sections of Mr. Alvarez's trial by itself should warrant reversal of Mr. Alvarez's conviction and sentence of death.

Even without knowing whether or not Mr. Reyes slept through those critical sections of the trial that would dictate an automatic reversal, the sleeping is indicative of an anemic, unconstitutional defense, one that was doomed from the beginning by an inadequate amount of time to prepare, a lack of resources, virtually no meaningful investigation, and a lack of the zealous representation required when the client's life in on the line.

Even the jurors could and did observe that Mr. Alvarez was not benefitting from adequate representation. One juror noted that Mr. Reyes "did not seem to care much for his client or what was happening during the trial." Affidavit of Cheryl Frierson, Exh. 10, ¶ 5.

## CONCLUSION

Throughout every stage of his trial, Mr. Alvarez was deprived of effective assistance of counsel. Standing alone, many of the deficiencies of trial counsel are serious enough to merit the reversal of Mr. Alvarez's conviction and death

sentence; when viewed cumulatively, the violation of his constitutional right to effective assistance of counsel is overwhelming.

Finally, and to the extent that the State asserts and the court may find that trial counsel and or appellate counsel failed to present, preserve, or properly object to, an issue, argument, or other matter at trial or during the post-trial and appellate process, such that state procedural bar will apply to otherwise bar merits review of the claim in federal court, Mr. Alvarez asserts that trial counsel and/or appellate counsel was ineffective and that the outcome would have been different but for their ineffectiveness.

## CLAIM II: TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO EFFECTIVELY LITIGATE AND OTHERWISE ADDRESS THE VIOLATION OF DEFENDANT'S RIGHTS UNDER THE VIENNA CONVENTION FOR CONSULAR RELATIONS

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when trial counsel was ineffective for

failing to effectively litigate and otherwise address the violation of defendant's rights under the Vienna Convention for Consular Relations.

Trial counsel was ineffective for failing to effectively litigate and otherwise address the violation of defendant's rights under the Vienna Convention for Consular Relations. In addition to claims arising directly from the violation of Mr. Alvarez's rights under the Vienna Convention, Mr. Alvarez's constitutional right to effective assistance of Counsel under the Sixth Amendment was violated by the deprivation of his right to consular assistance.

As Justice Ginsburg noted in her concurrence in *Sanchez Llamas*:

> "Furthermore, once Bustillo became aware of his Vienna Convention rights, nothing prevented him from raising an ineffective-assistance-of-counsel claim predicated on his trial counsel' failure to assert the State's violation of those rights." *Sanchez Llamas v. Oregon*, 548 U.S. 331, 350 n. 3

Following this path, the Seventh Circuit Court of Appeals in *Osagiede v. U.S.* vacated and remanded a sentence based on trial counsel's deficient performance in failing to invoke a defendant's right to consular access and remanded the case for the lower court to determine whether his consulate would have provided him assistance in order to satisfy the prejudice prong. *Osagiede v. U.S.*, 543 F.3d 399 (2008).

The *Osagiede* Court analysis of the ineffective assistance of counsel based on a violation of the Vienna Convention claim is useful. The central Sixth Amendment claim in the case "center[ed] on his lawyer's failure to raise an Article 36 violation" but, as in Mr. Alvarez's claim presented here, relief was sought "under the Constitution – not under the Convention." *Id*. at 406. The Court noted that "the assistance of an attorney cannot entirely replace the unique assistance that can be provided by the consulate." *Id*. at 403. The Court "reject[ed] the notion that *Sanchez-Llamas* forecloses foreign nationals from bringing ineffective assistance of counsel claims based on Article 36 violations" and noted that *Sanchez-Llamas* in fact "appears to express a preference for subsuming Vienna Convention claims in broader constitutional attacks, rather than basing relief entirely on the treaty itself." *Id*. at 407-08.

Mr. Alvarez's rights under the Vienna Convention and the State's violation of those rights are set forth in greater detail in Claim III and are incorporated herein by express reference.

Trial counsel was aware that Mr. Alvarez had rights under the Vienna Convention and he was aware that those rights had been violated. CR. 409. Trial Counsel filed a Motion to Suppress based on the Violation of International Treaty, citing Mr. Alvarez's rights under the Vienna Convention. *Id*. Although trial

counsel was aware of these rights, he failed both failed to litigate those rights properly, and he failed to contact the Consulate for assistance.

On August 23, 1999, the trial Court and the parties discussed defense's Motion to Suppress Violation of International Treaty. IV R. 17-19. Trial counsel informed the Court that Mr. Alvarez was from Mexico, but that Mr. Alvarez was not warned of his rights as to the treaty. IV R. 17-18. Trial counsel Reyes told the court "we're asking for the indictment to be quashed or set aside as a result of him not being a given the right to consult with his counsel (sic)" and requested that the Motion be carried with the Motion to Suppress. *Id*. The district attorney and the court pointed out the Motion did not seek to dismiss the indictment as Mr. Reyes had indicated that he intended. *Id*. at 19. Mr. Reyes replied "I'll amend this one, your Honor" and indicated that he would refile the amended motion later that day. *Id*. However, trial counsel failed to refile the motion, either as a motion to suppress evidence or as a motion to quash the indictment, and failed to obtain a ruling on the issue.

Other claims presented in this petition, including Claims II and III set forth arguments and motions that trial counsel should have filed in order to competently litigate the violation of Mr. Alvarez's rights under the Vienna Convention for

Consular Relations and other treaties. Those claims are incorporated herein by express reference.

Ironically, in addition to ineffectively litigating claims arising from the violation of Mr. Alvarez's rights under the Vienna Convention, trial counsel also rendered ineffective assistance of counsel for failing to notify the Mexican Consulate of Mr. Alvarez's arrest and prosecution, and for failing to request and obtain assistance for Mr. Alvarez from the Consulate. His attempt to present this issue to the trial Court indicated his familiarity with Mr. Alvarez's rights under the Vienna Convention.

Trial counsel's failure to act on the fact of Mr. Alvarez's Mexican nationality, his failure to notify the Mexican Consulate of Mr. Alvarez's arrest and prosecution, and his failure to litigate issues related to Mr. Alvarez's rights under the Vienna Convention violated Mr. Alvarez's right to effective assistance of counsel. If trial counsel had notified the consulate of Mr. Alvarez's case, Mr. Alvarez would have received immediate and far-reaching help that would have allowed him to raise numerous guilt phase and penalty phase defenses at his trial, thereby drastically affecting the outcome.

Although trial counsel Reyes at one point signed an Affidavit at the request of Assistant District Attorney Jane Scott that defended his own failure to contact

the Mexican Consulate on Mr. Alvarez's behalf[9], he realized the error in failing to

request consular assistance after he reviewed the results of such assistance. After

reviewing the results of the resources provided by the Mexican Consulate, trial

counsel stated:

> I did not contact the Mexican Consulate for assistance with Mr. Alvarez's case prior to or during the trial. If I had had access to the resources and experts that the Mexican Government has provided to Mr. Alvarez's habeas counsel, I would have employed all possible resources. The resources, expertise, and conclusions noted in this affidavit are all precisely the kind of information and evidence that would have been critical to me in my efforts for Juan Alvarez at either or both phases of the trial.
>
> I was approached by the Harris County District Attorney office sometime in March 2005 and asked about my contact with the Mexican Consulate on Mr. Alvarez's behalf. I informed them that I did not contact the consulate at the time of the trial and did not think that Mr. Alvarez was prejudiced as a result. I provided the District Attorney's office with an affidavit to that effect. I did so without being informed by the District Attorney's office, the consulate, or anyone else, of the nature and extent of the resources that would have been made available to me by the government of Mexico at the time of the trial. Now that I have seen the nature of the assistance that the Mexican Government could have provided, I realize that I was uninformed when I made the assessment that their assistance would not have made a significant difference at trial. As I understand the content of the reports of experts now being put forth by habeas counsel at the expense of the government of Mexico, the information provided in any one of the three reports alone could have made the difference to convince the jury to recommend a life sentence.

---

[9] Noting that "The fact that the issue of notice was not pursued by attorney, was based on the fact that given the status of the law at the time of trial, and based on the abundant amount of evidence against Mr. Alvarez, that Mr. Alvarez would not be prejudice Mr. Alvarez." (sic) Affidavit of Frumencio Reyes, Jr., filed February 21, 2003 in Cause No. 787007-A.

Affidavit of Frumencio Reyes, Exh. 4, ¶¶ 16-17.

As this claim alleges that Mr. Alvarez's trial counsel were ineffective, Mr. Alvarez must show by a preponderance of the evidence both that (1) counsel's representation fell below the objective standard of reasonableness, based on prevailing professional norms; and, (2) but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984).

Mr. Alvarez was represented by lawyers who, unsupported by the Government of their client's foreign nationality, failed to render objectively reasonable assistance of counsel, thereby depriving him of a constitutionally adequate defense. If Mr. Alvarez's Vienna Convention Art. 36 rights had not been violated, and had Mr. Alvarez's trial counsel properly asserted those rights, obtained the assistance of the Mexican Government and litigated the violation of his Vienna Convention rights, the Mexican Government would have provided substantial critical legal assistance and resources to Mr. Alvarez.

The Mexican Government's involvement in Mr. Alvarez's case would have transformed the quality of his defense by: 1) ensuring the provision of trial counsel who was fully prepared to render, and who would have rendered, constitutionally

effective assistance at all stages of the representation; and, 2) providing critical resources for experts, investigators, and other assistance.

The lack of contact with the Mexican Government prejudiced Mr. Alvarez's ability to obtain the services of an attorney capable of providing any representation, let alone effective representation, at trial. Had the Mexican Government been properly notified under the VCCR, it would have undoubtedly taken appropriate measures prior to trial, and certainly as the trial progressed, to ensure that one of its own nationals who was facing a possible death sentence was represented by counsel who, at the very least, was able to stay awake throughout the trial.

All of the evidence presented to show prejudice in Petitioner's claim that trial counsel rendered ineffective assistance of counsel throughout all pre-trial, guilt-innocence, and penalty phases for the basis of the prejudice prong here, as the Mexican Government would have provided assistance and resources in all of these areas so Claim I is corporate herein by express reference.

Finally, the Mexican Government's involvement in the case would have undoubtedly produced qualitatively better representation of Mr. Alvarez in the course of his direct appeal. Mr. Alvarez's direct appeal counsel, Skip Cornelius, filed a poorly prepared and deficiently litigated direct appeal brief. The brief

purported to raise thirty-nine claims of error, but the vast majority of these claims were presented in such a slip-shod and incomplete manner that they often failed to state a claim upon which relief could have been granted.  For example, counsel submitted a claim attacking the sufficiency of the evidence to prove that the murders were committed pursuant to the "same criminal transaction," *see* Appellant's Brief at pp. 87-90.  In point of fact, however, and as the CCA curtly pointed out in denying relief on this point of error, Mr. Alvarez was never indicted for crimes committed in the "same criminal transaction"; instead, he was indicted for "different criminal transactions but pursuant to the same scheme or course of conduct."  CCA Order Denying Mr. Alvarez's Direct Appeal in No. 73,648, (Nov. 2002) at p. 2 (unpublished).

Similarly, the CCA found numerous additional glaring errors in the brief, and repeatedly pointed out those issues in the opinion denying relief.  *Id.* at 4, 10, 12 14, 17, 34 (denying claims for reasons such as not presenting necessary facts, citing no authority in support of claims, failing to allege correct standard, such as abuse of discretion, objecting to evidence that was in fact never even introduced at trial, making "multifarious" errors by improperly basing them on more than one legal theory, failure to make offer of proof to support error).  Finally, counsel for Mr. Alvarez did not even bother to request oral argument, but instead waived it,

thereby losing the opportunity to discuss the issues with the CCA and respond to questions or concerns raised by members of the Court.

These failings were fundamental and basic errors in a direct appeal in which a person's life was a stake, thereby depriving Mr. Alvarez of effective representation on his direct appeal. Assistance of the Mexican Government would have ensured that Mr. Alvarez had a direct appeal brief filed on his behalf that at least presented viable, fully presented cognizable claims that could be adjudicated on their merits.

## CLAIM III: THE STATE VIOLATED MR. ALVAREZ'S RIGHT TO CONSULAR ASSISTANCE PURSUANT TO ARTICLE 37 OF THE VIENNA CONVENTION ON CONSULAR RIGHTS AND MR. ALVAREZ WAS PREJUDICED BY THE VIOLATION

The State of Texas and the United States have violated Mr. Alvarez's rights under the Vienna Convention of Consular Relations ("Vienna Convention"), a binding federal treaty whose core purpose is to provide protections for foreign nationals accused of crimes outside of their home country. The United States ratified the Vienna Convention in 1969. Article 36 of the Vienna Convention enables consular officers to protect the rights of nationals who are detained in foreign countries. Among other things, Article 36 requires the competent authorities of the detaining state to notify "without delay" a detained foreign

national of his right to request assistance from the consul of his own state and, if the national so requests, to inform the consular post of that national's arrest or detention, also "without delay." The Vienna Convention sets out the mechanism by which Mexico provides its nationals with consular assistance in criminal proceedings against them.

Mr. Alvarez's rights to consular assistance under the Vienna Convention were violated by Texas. He was not informed of his right to contact the Mexican Consulate. Consequently, he was deprived of the benefit of consular assistance, which would have aided in his defense and could have cured or ameliorated the constitutionally deficient defense from which he suffered.

For a foreign national facing criminal charges in the United States, the right to consular assistance can be critically important. It has been noted that "Consular functions are particularly significant during penalty proceedings in which courts determine whether capital punishment will be applied." John Quigley, LaGrand: A Challenge to the U.S. Judiciary, 27 YALE J. INT' L. 435, 435 (2002).

That Mr. Alvarez's rights to consular assistance under the Vienna Convention have been violated in this case cannot be disputed. Petitioner first brought the violation to the trial court's attention in a motion to suppress his statement. Ironically, although trial counsel was clearly aware of the violation,

neither trial counsel, nor anyone else involved in these proceedings, ever advised

Mr. Alvarez of his rights to seek consular assistance, nor did anyone notify the

Mexican consulate of his detention.  *See* Affidavit of Victor Emanuel Uribe, Exh.

51, Affidavit of Juan Carlos Alvarez Banda, Exh. 67.

Even the International Court of Justice has recognized that Mr. Alvarez's

Vienna Conventions rights were violated by the State of Texas.   On March 31,

2004, the International Court of Justice ("ICJ") handed down its judgment in

Avena and Other Mexican Nationals.  Case Concerning Avena and Other Mexican

Nationals (Mex. v. U.S.A.), 2004 I.C.J. 128 (Mar. 31, 2004) ("*Avena* Judgment").

The Court found that the United States had violated several provisions of Article

36 of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 596 UNTS 261

(hereinafter "Vienna Convention"), in Mr. Alvarez's case,  including Mr.

Alvarez's right to consular notification and access, and Mexico's corresponding

right to assist in his defense and arrange for his legal representation.

Mr. Alvarez has individually enforceable rights under the Vienna

Convention, and was prejudiced when those rights were violated.  28 U.S.C.

2254(a) specifically provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district
> court shall entertain an application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment of a State court
> only on the ground that he is in custody in violation of the

Constitution or laws **or treaties of the United States**. (emphasis added).

In *Breard v. Greene*, 523 U.S. 371, 376 (1998), the Court noted that Section 2254(a) provides federal courts with the authority to consider a treaty violation, specifically a Vienna Convention violation: "Breard's ability to obtain relief based on violations of the Vienna Convention is subject to this subsequently-enacted rule, just as any claim arising under the United States Constitution would be."

Under ICJ authority, Mr. Alvarez need not show any prejudice resulting from the violation of his Vienna Convention rights in order to be entitled to relief. Nonetheless, the prejudice to Alvarez was enormous. Because he was not given the required notification, Mr. Alvarez was left with a constitutionally ineffective counsel who failed to investigate and present a defense on his behalf. Without the benefit of consular assistance, which could have cured or ameliorated the striking injustices and deprivation of his constitutional rights, in addition to complementing an adequate representation with resources and information unique to Mexican nationals, Mr. Alvarez was convicted of capital murder and sentenced to death.

The United States Supreme Court has suggested that any claim under the Vienna Convention is subject to a prejudice requirement. *Breard v. Greene*, 523 U.S. 371, 377 (1998) (dicta suggesting that petitioner may only be entitled to relief

for Vienna Convention violation where violation had "some effect" on the fairness of the trial).   Other courts considering Vienna Convention claims have developed a three prong test for determining if a prisoner has demonstrated prejudice: "(1) the defendant did not know he had a right to contact his consulate for assistance; (2) he would have availed himself of the right had he known of it: and (3) it was likely that the consulate would have assisted the defendant." *Torres*, at 9 (citations omitted) (Chapel, J., concurring); *United States v. Rangel Gonzalez*, 617 F.2d 529 (9th Cir. 1980).  The prejudice to Mr. Alvarez caused by the violations of his Vienna Convention rights was so significant that he easily satisfies this burden.

The United States and State of Texas' failure to notify Mr. Alvarez of his right to consular notification and assistance violated these treaty-based rights and prejudiced his case.  He is entitled to the habeas corpus relief.

As detailed below, the Government of Mexico had an active and far-reaching program of consular assistance in 1999, the year Mr. Alvarez was convicted and sentenced to death.  During proceedings before the ICJ in *Avena*, the United States has acknowledged that Mexico's consular assistance program is "extraordinary." 1 Counter-Memorial of the United States of America (Mex. v. U.S.), 2003 I.C.J. Pleadings (Avena and Other Mexican Nationals) 186 (Nov. 3, 2003).  And Oklahoma's highest court has recently recognized that Mexico was

providing crucial assistance to its nationals facing the death penalty since at least 1989. In vacating the death sentence of a Mexican national in that state, the court observed:

> We cannot ignore the significance and importance of the factual evidence discovered with the assistance of the Mexican Consulate. It is evident from the record before this Court that the Government of Mexico would have intervened in the case, assisted with Petitioner's defense, and provided resources to ensure that he received a fair trial and sentencing hearing. . .We believe trial counsel, as well as representatives of the State who had contact with Petitioner prior to trial and knew he was a citizen of Mexico, failed in their duties to inform Petitioner of his right to contact his consulate. *Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002).

As discussed in detail below, because of the violation of his treaty-based rights, Mr. Alvarez did not know that he had the right to contact his Consulate and obtain consular assistance. Had the Mexican Consulate known of Mr. Alvarez's arrest and prosecution, it would have offered assistance and Mr. Alvarez would have availed himself of such assistance. The consular assistance would have made a significant difference at his trial.

The Vienna Convention requires a Party State to enforce the treaty in conformity with its "laws and regulations." Alvarez respectfully requests that this Court reverse his conviction for capital murder, vacate his sentence of death, and issue a writ of habeas corpus.

## STATEMENT OF RELAVANT FACTS TO VCCR VIOLATION

Upon his arrest, Mr. Alvarez was interrogated in both English and Spanish. The police were clearly aware of his foreign nationality: after a previous conviction on an assault charge, Mr. Alvarez had been transferred to INS custody to face possible deportation. Indeed, just three days after Mr. Alvarez's arrest on the murder charge, the Immigration and Naturalization Service commenced removal proceedings against him. Moreover, the prosecutor in this case referred repeatedly to Mr. Alvarez's status as a Mexican immigrant during closing arguments. *See infra*.

Despite this knowledge, the competent authorities failed to inform Mr. Alvarez of his right to seek consular assistance, and likewise failed to notify the Mexican consulate of Mr. Alvarez's arrest and detention. Mexican consular officers first learned of his detention on February 1, 2000, approximately four months after he had been sentenced to death, when they conducted their own investigation into Mexican nationals who were on death row. *See* Victor Emanuel Uribe, Exh. 51. By that time it was too late for Mexico to affect the quality of the defense preparation, which had disastrous consequences for Mr. Alvarez.

It is undisputed that neither the United States nor the State of Texas ever notified Mr. Alvarez, a Mexican national, of his right to consular assistance under

the Vienna Convention. And no one—not the Supreme Court, not the United States, not Mexico, not Texas—disputes that there is a binding international obligation to comply with the Vienna Convention.

Mr. Alvarez's trial counsel raised the Vienna Convention violation in a motion to suppress. He never notified the Mexican consulate, however, that Mr. Alvarez was in custody, and consular officers had no opportunity to assist in presenting evidence regarding the Article 36 violation, let alone in assisting the defense in representing Mr. Alvarez before and during his trial. *See Valdez, supra*, at 710 (finding trial counsel ineffective for failing to inform Mexican national facing death penalty that "he could have obtained financial, legal and investigative assistance from his consulate.").

On direct appeal, the Court of Criminal Appeals briefly acknowledged there had been a violation of Mr. Alvarez's Vienna Convention rights, but rejected the claim because there was no available remedy for the violation under Texas law. *See Alvarez v. State*, No. 73,648, slip op. at 9 (Tex. Crim. App. Oct. 30, 2002) (unpublished). In doing so, the Court relied upon its holding in *Rocha v. State*, 16 S.W.3d 1 (Tex. Crim. App. 2000), which held that suppression of evidence under Article 38.23 of the Texas Code of Criminal Procedure does not afford a state law remedy for a violation of the Vienna Convention. In *Rocha*, a slim margin of 5-4

reasoned that the "laws" contemplated by Texas Code of Criminal Procedure Art.

38.23 did not include treaty rights. *Id*. Thus, the Court in *Alvarez* and *Rocha*

considered these claims solely through the prism of Texas statutory provisions, and

left for another day the question of whether remedies must be provided pursuant to

federal law.

## THE UNITED STATES AND THE STATE OF TEXAS WERE REQUIRED BY ARTICLE 36 OF THE VIENNA CONVENTION AND THE SUPREMACY CLAUSE TO NOTIFY MR. ALVAREZ OF HIS RIGHT TO CONSULAR ASSISTANCE

In 1963, ninety-two (92) member nations of the United Nations adopted the

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 596

U.N.T.S. 261 ("Vienna Convention"). The United States formally ratified the

treaty in 1969. Codifying customary international law regarding the rights and

obligations governing the functions, powers, and immunities of consular personnel

and premises of member states,the Vienna Convention was designed to redress the

universally recognized problem that a national of one country who is arrested or

detained in another country faces special difficulties and due process concerns not

confronted by nationals of the arresting state. *See* Anthony N. Bishop, The

Unenforceable Rights to Consular Notification and Access in the United States:

What's Changed Since the LaGrand Case, 25 HOUS. J. INT'L L. 1, 2-7 (2002). In

an effort to remedy these inherent due process pitfalls, the Vienna Convention

provides foreign nationals with a right to consular notification and assistance.

Article 36 of the Vienna Convention provides in pertinent part:

1. With a view to facilitating the exercise of consular functions
relating to nationals of the sending State:
(a) consular officials shall be free to communicate with nationals of
the sending State and to have access to them.  Nationals of the sending
State shall have the same freedom with respect to communication with
and access to consular officers of the sending State;
(b) if he so requests, the competent authorities of the receiving State
shall, without delay, inform the consular post of the sending State if,
within its consular district, a national of that State is arrested or
committed to prison or to custody pending trial or is detained in any
other manner . . . The said authorities shall inform the person
concerned without delay of his rights under this sub-paragraph;. . .

2. The rights referred to in paragraph 1 of this Article shall be
exercised in conformity with the laws and regulations of the receiving
Slate, subject to the proviso, however, that the said laws and
regulations must enable full effect to be given to the purposes for
which the rights accorded under this Article are intended.

Vienna Convention, art. 36(1)-(2) (emphasis added).

Article 36 of the Vienna Convention mandates that detaining countries

notify detainees of their right to consular assistance.  This mandatory language was

intentional.  The right to consular assistance provided by the Vienna Convention is

crucial to protecting and honoring the foreign national's due process rights,

because various cultural and language barriers may prevent foreign nationals from

comprehending their legal rights.  As a result, consular assistance is an

indispensable complement to the usual trial rights and protections afforded by U.S.

courts to "level the playing field" for defendants who suffer the disadvantages of

dealing with a strange legal system, in a strange language, in a strange country.

Indeed, "diplomatic officials are often the only familiar face for detained nationals,

and the best stewards to help them through the ordeal of criminal prosecution."

*United States v. Li*, 206 F.3d 56, 78 (1st Cir. 2000) (Torruella, C.J., concurring and

dissenting) (*citing* William J. Aceves, "Murphy v. Netherland", 92 AM. J. INT'L

L. 87, 89-90(1998)).

For these reasons, 165 nations have ultimately ratified the Vienna

Convention, in a collaborative effort to redress many of the palpable disadvantages

suffered by foreign nationals.  Since becoming a signatory, the United States has

demanded that other State Parties promptly comply with the Convention's

notification requirement, terming it an obligation "of the highest order."  LUKE T.

LEE, CONSULAR LAW AND PRACTICE (2d ed. 1991) at 143 (quoting United

States Department of State File L/M/SCA; United States Department of State,

Digest, 1973, p. 161) ("Lee"); *see also Li*, 206 F.3d at 74-75 (State Department

insistence that "[i]n all cases, the foreign national must be told of the right of

consular access.") (Torruella, C.J., concurring and dissenting). The United States

must practice what it has preached, and provide the same protections to foreign nationals that it has demanded be provided to United States citizens detained in foreign countries.

The Supremacy Clause of the United States Constitution makes treaties, such as the Vienna Convention, "the supreme law of the land," binding "Judges in every State." U.S. CONST, art. VI, cl. 2; *see also Chapman v. Houston Welfare Rights Org*., 441 U.S. 600, 613 (1979) ("All federal rights, whether created by treaty, by statute, or by regulation, are 'secured' by the Supremacy Clause.") (emphasis added). Thus, "ratified treaties become the law of the land on an equal footing with federal statutes." *United States v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001).

Thus, the State of Texas was required by Article 36 of the Vienna Convention and the Supremacy Clause to notify Mr. Alvarez of his right to the assistance of the Mexican Consulate. As detailed above, this right to consular assistance is not just a meaningless procedural or technical formality; it is a substantive right designed to inform foreign nationals of legal rights that they might not otherwise comprehend and thereby protect their fundamental right to due process of law. The State of Texas had an affirmative obligation to inform Mr.

Alvarez of his right to consular assistance. It failed to do so, in clear violation of Mr. Alvarez's Vienna Convention rights.

### MR. ALVAREZ IS NOT REQUIRED TO SHOW PREJUDICE TO BE ENTITLED TO RELIEF UNDER THE VIENNA CONVENTION

Under international law, it is unnecessary to demonstrate prejudice flowing from a violation of the Vienna Convention; prejudice is inherent in such a violation. *F.R.G. v. United States*, 2001 ICJ 466 (June 27) ("*LaGrand*"). The ICJ's decision in *LaGrand* is clear: Mr. Alvarez need not demonstrate prejudice resulting from the violation of his Vienna Convention rights to be entitled to relief. LaGrand at ¶74 ("[W]hen the sending State is unaware of the detention of its nationals due to the failure of the receiving State to provide the requisite consular notification without delay . . . [i]t is immaterial . . . whether the [petitioner] would have sought consular assistance from [the sending state], whether [the sending state] would have rendered such assistance, or whether a different verdict would have been rendered.").

Mr. Alvarez only needs to demonstrate that he was unaware of his right to consular assistance due to the failure of the United States and State of Texas "to provide the requisite notification without delay." *Id.* If such a failure is shown, the

ICJ mandates that Mr. Alvarez be granted relief in a form recognized and employed by American courts.

It is undisputed that Mr. Alvarez was unaware of his right to consular assistance. It is also undisputed that neither the United States nor Texas ever notified Mr. Alvarez that he had the right to contact the Mexican Consulate, nor did they ever contact the Mexican Consulate regarding Mr. Alvarez's detention. Under *LaGrand*, these failures constitute a breach of Mr. Alvarez's Vienna Convention rights. Even in the absence of prejudice, those breaches entitle him to relief. *LaGrand* at ¶ 74.

Nonetheless, Mr. Alvarez was inherently prejudiced by the State's violation of his Vienna Convention rights. Indeed, it is universally recognized that a national of one country who is arrested or detained in another country faces special difficulties not confronted by nationals of the arresting state. See Anthony N. Bishop, The Unenforceable Rights to Consular Notification and Access in the United States: What's Changed Since the LaGrand case, 25 HOUS. J. INT'L L. 1, 2-7 (2002). While language is a tremendous barrier, *cf., e.g., Chacon v. Wood*, 36 F.3d 1459, 1464-65 (9th Cir. 1994), even if the foreign national can speak the language of the arresting state, he may know little if anything about "the laws on which his arrest is based, the procedures followed by the arresting state, his rights

under the arresting state's legal system, the choices available to him in dealing

with the local laws and authorities, or the risks attendant on these various choices."

*Lee* at 145 (*quoting* United States Dep't of State Telegram 40298 to United States

Embassy in Damascus 21 Feb. 1975). Even with Mr. Alvarez's prior experiences

with the criminal justice system (from an assault plea in 1996), the complex

procedure and particulars of a charge as serious as capital murder would have been

unfamiliar and disorienting to a foreign national.

The difficulties of confronting arrest and trial under an unfamiliar legal

system may be exacerbated by local variations in law and procedure within the

arresting country. While nationals of the arresting state can be expected to be

aware that such variations exist, foreign nationals may have no reason to know of

them. At the most basic level, a foreign national will often be unfamiliar with local

police customs and policies regarding interrogation and investigation of crimes,

even with some limited experience or exposure to them. *See* Victor M. Uribe,

Consuls at Work: Universal Instruments of Human Rights and Consular Protection

in the Context of Criminal Justice, 19 HOUS. J. INT'L L. 375, 376-77 (1997); S.

Adele Shank & John Quigley, Foreigners on Texas's Death Row and the Right of

Access to a Consul, 26 ST. MARY'S L.J. 719, 720 (1995). A foreign national may

also be unaware of the circumstances under which he is entitled to legal counsel in

the country of his arrest and is unlikely to know a skilled lawyer or even how to find one.

In cases where the foreign national is charged with a crime—particularly a serious crime carrying a severe penalty—consular assistance is an indispensable complement to the usual trial rights and protections afforded by U.S. courts to "level the playing field" for defendants who suffer the disadvantages of dealing with a strange legal system, in a strange language, in a strange country. "The consul is in a unique position to offer information to the detainee about the legal system in which he is detained in comparison to his home legal system." Linda Jane Springrose, Note, Strangers in a Strange Land: The Rights of Non-Citizens Under Article 36 of the Vienna Convention on Consular Relations, 14 GEO. IMMIGR. L.J. 185, 195 (1999). Even the State Department "has described the right of access as a 'cultural bridge,' which '[n]o one needs . . . more than the individual . . . who has been arrested in a foreign country.'" *Id*. (citation omitted). Indeed, "[c]onsular officials can eliminate false understandings and prevent actions which may result in prejudice to the defendant." *Ledezma v. Iowa*, 626 N.W.2d 134, 152 (Iowa 2001) (*citing* Springrose, 14 GEO. IMMIGR. L.J. at 195). As the Chief Judge of the First Circuit recently observed: "A consular official offers two things of utmost importance to detained nationals: (1) the familiar background,

language, and culture of the alien's homeland, and (2) a familiarity with the criminal system threatening to take away the alien's liberty." *United States v. Li*, 206 F.3d 56, 78 (1st Cir. 2000) (Torruella, C.J., concurring and dissenting). He concluded that, "[w]ithout these aids . . . we presume too much to think that an alien can present his defense with even a minimum of effectiveness. The result is injury not only to the individual alien, but also to the equity and efficacy of our criminal justice system." *Id.* Considering these benefits, "consular notification and access are absolutely essential to the fair administration of our criminal justice system" because "diplomatic officials are often the only familiar face for detained nationals, and the best stewards to help them through the ordeal of criminal prosecution." *Id.*

In short, the Vienna Convention was passed to redress the inherent prejudice signatory nations, including the United States, recognized that foreign nationals suffered when exposed to foreign legal systems. Mr. Alvarez faced all the disadvantages and prejudice typically faced by foreign nationals.

Because consular notification is a means of protecting foreign nationals from such prejudice, the State of Texas' failure to notify Mr. Alvarez of his rights to consular assistance resulted in the inherent prejudice that the Vienna Convention was enacted to prevent.

## EVEN IF THIS COURT REQUIRES MR. ALVAREZ TO DEMONSTRATE ACTUAL PREJUDICE RESULTING FROM THE VIOLATION OF HIS VIENNA CONVENTION RIGHTS, THE EVIDENCE SHOWS OVERWHELMING PREJUDICE

Even if this Court requires Mr. Alvarez to demonstrate that the State of Texas' violation of his Vienna Convention rights caused him prejudice, it is clear that he was severely harmed.  If Mr. Alvarez had been provided the opportunity to seek assistance from the Mexican consulate, the consulate would have provided the assistance necessary to fully and effectively investigate Mr. Alvarez's family history and neurological condition, both of which were necessary in order to provide Mr. Alvarez with a proper defense.  Texas' failure to advise Mr. Alvarez of his rights under the Vienna Convention left him with a constitutionally defective defense that consular assistance could have ameliorated or cured, in addition to providing a wide range of complementary resources to aid Mr. Alvarez.

## THE VIOLATION OF THE VIENNA CONVENTION CAUSED MR. ALVAREZ SUBSTANTIAL PREJUDICE THAT DEMANDS A NEW TRIAL

The International Court of Justice has called upon the courts of the United States to assess the consequences of the undisputed violation of the Vienna Convention in Mr. Alvarez's case.  Fortunately, the courts are not without guidance on how to evaluate such a claim.  The United States Supreme Court has suggested that any claim under the Vienna Convention is subject to a prejudice

requirement. *Breard v. Greene*, 523 U.S. 371, 377 (1998) (dicta suggesting that petitioner may only be entitled to relief for Vienna Convention violation where violation had "some effect" on the fairness of the trial). Courts considering Vienna Convention claims have developed a three prong test for determining if a prisoner has demonstrated prejudice: "(1) the defendant did not know he had a right to contact his consulate for assistance; (2) he would have availed himself of the right had he known of it: and (3) it was likely that the consulate would have assisted the defendant." *Torres*, at 9 (citations omitted) (Chapel, J., concurring); *United States v. Rangel Gonzalez*, 617 F.2d 529 (9th Cir. 1980). Mr. Alvarez easily satisfies this burden.

1. Mr. Alvarez Did Not Know He Had a Right to Contact his Consulate for Assistance.

Mr. Alvarez did not know, nor did anyone attempt to inform him of, his right to consular assistance. Affidavit of Juan Carlos Alvarez Banda, Exh. 67. Throughout all previous forums, in United States courts and in the International Court of Justice, the State has never contested the fact that Mr. Alvarez was not informed of his rights under the Vienna Convention, nor have they suggested that he had independent knowledge of his rights. There can be no credible debate as to whether Mr. Alvarez has satisfied this first element of the test.

2. Mr. Alvarez Would Have Contacted The Mexican Consulate Had He Been Apprised of His Rights

Had Mr. Alvarez been properly informed of his right to consular notification upon arrest - or at any time during his pre-trial detention - he would have sought out the consulate's help. *See* Affidavit of Juan Carlos Alvarez Banda, Exh. 67. There was no reason why Mr. Alvarez would have hesitated to apprise the Mexican consulate of his situation; quite the reverse, in fact. Mr. Alvarez had no criminal record in Mexico to conceal, and was not wanted there by the authorities on any charges. Furthermore, Mr. Alvarez has gratefully accepted the consular assistance offered to him in his post-conviction proceedings. This is evidence of Mr. Alvarez's willingness to work with the consulate and is entirely consistent with the experience of Mexican consular officers in cases involving serious criminal charges. *See* Affidavit of Barbara K. Strickland, Exh. 70, Affidavit of Jaime Paz y Puente Gutierrez, Exh. 75, and Declaration of Denise Young, Exh. 73.

There is nothing in the record in this case to support a finding that Mr. Alvarez would not have immediately invoked his right to consular notification. Furthermore, the State may not speculate that Mr. Alvarez would not have availed himself of the right based upon generalized comparisons to other foreign nationals. *See United States v. Rangel Gonzales*, 617 F.2d 529, 532 (9th Cir. 1980) (*citing*

*Missouri ex rel. Gaines v. Canada*, 305 U.S. 338, 350-51, 59 S. Ct. 232, 237, 83 L. Ed. 208, 214 (1938)) ("The right established by [the INS regulation affording the right to consular notification] and in this case by treaty is a personal one. . . The effect of its violation on one individual cannot be measured by the effect of its violation on others.  Personal rights cannot be abrogated simply because others do not exercise them.").

   3.  Mexico Would Have Provided Substantial Assistance to Mr. Alvarez

   At least one court has already recognized the "significance and importance" of the assistance provided by Mexican consular officials.  *Valdez*, 46 P.3d at 710; *See* Declarations of Peter Lopez, Denise Young, and Adrian Franco, Exhs. 72 - 74, Affidavit of Roseann Duenas Gonzalez, Exh. 77.  In the case of Mr. Valdez, who was arrested in 1990, the Oklahoma Court of Criminal Appeals found that "the Government of Mexico would have intervened in the case, assisted with Petitioner's defense, and provided resources to ensure that he received a fair trial and sentencing hearing."  *Id*.  (emphasis added).  *See also* Affidavit of Everard Kidder Meade, Exh. 76.

   Mr. Alvarez was tried in 1999, a decade after Mr. Valdez was arrested.  From 1989 to 1999, Mexico's involvement in the defense of its nationals only increased in intensity.  Several years before Mr. Alvarez's prosecution, for

137

example, consular officials in Texas were heavily involved in the defense of Ricardo Aldape Guerra, who was convicted and sentenced to death in Houston without the benefit of consular assistance.  Affidavit of Scott J. Atlas, Exh. 68, at 7. In the case of Mr. Aldape, the consulate's assistance quite literally made the difference between life and death, just as it would have in the case of Mr. Alvarez. *Id.*; *see also* Declaration of Michael Iaria, Exh. 71(describing assistance provided by Mexican government to national facing capital charges in Oregon which resulted, among other things, in the withdrawal of incompetent counsel and the appointment of a qualified capital defense attorney); Affidavit of Bonnie Goldstein, Exh 69 (describing assistance provided by Mexico during the 1992-1997 period to Mexican national on Texas's death row in habeas proceedings).  As early as 1988, the Mexican Ministry of Foreign Relations had designated a specific point-person charged specifically with monitoring legal cases of Mexican citizens in the United States.  Affidavit of Barbara K. Strickland, Exh. 70 at 2.  The Ministry was particularly interested in the cases of Mexican nationals facing the death penalty.  *Id*. at 4-6.  This emphasis persisted throughout the 1990's.  *Id*.  The fact that the Mexican government took an active interest in his case immediately upon learning of it, and promptly sought to take a vigorous role in his defense from that time forward belies any argument that the consulate would have ignored any

pleas for assistance from the client or his attorneys. In light of the extensive

consular assistance since provided to Mr. Alvarez and the void created by its

absence at trial, it is self-evident that the violation of Article 36 "harmed [Mr.

Alvarez's] interests in such a way as to affect potentially" his conviction or

sentence. *United States v. Rangel Gonzales*, 617 F.2d 529, 530 (9th Cir. 1980).

On the record before this Court, there can be no question that Mexico's

involvement in Mr. Alvarez's case would have transformed the quality of his

defense by (1) ensuring that trial counsel was effective and prepared; and (2)

providing critical resources for experts and investigators. To make this

assessment, the Court must consider the powerful assistance that Mexico has

provided to Mr. Alvarez since learning of his case-assistance it would have

provided at his trial, were it not for the violation. On the record before this Court,

the result is not fairly in doubt: were it not for the violation of the Vienna

Convention, Mr. Alvarez would not be on death row.

The Government of Mexico has been actively involved in Mr. Alvarez's

defense since learning about his case. Consular officials have maintained close

contact with Mr. Alvarez and with defense counsel, regularly informing them of

significant legal developments. Consular officials have visited Mr. Alvarez in

prison to discuss his case. Moreover, Mexico has invested substantial resources in

his defense. Mexico retained counsel to assist Mr. Alvarez's post-conviction lawyer in developing legal claims. *See* Affidavit of Victor Emanuel Uribe, Exh. 51. Mexico also retained a mitigation specialist who investigated Mr. Alvarez's social history, and provided resources for expert witnesses required by the defense to adequately present necessary information for Mr. Alvarez's case.

Had Mr. Alvarez been notified of his right to contact the consulate, the consular assistance would have affected the proceedings in Mr. Alvarez's case from start to finish, including (1) advising Mr. Alvarez of his rights prior to interrogation; (2) promoting negotiation of the case through a plea to life; (3) providing funds for experts and investigators to develop evidence relating to the guilt and penalty phases of trial; and (4) ensuring that trial counsel was competent and prepared, if necessary by retaining counsel to assist him or by obtaining substitute counsel.

Mexican consular assistance in capital cases is both comprehensive and continuous; that assistance is by no means confined to the development and presentation of mitigating evidence at the conclusion of a trial. Rather, Mexican consular protection officers are specially trained to understand and respond to the various stages of a capital case, including active intervention to facilitate plea agreements. *See* Affidavit of Victor Emanuel Uribe, Exh. 51; *see also* Affidavit of

Jaime Paz y Puente Gutierrez, Exh. 75 (describing the sending of Mexican foreign service officers to train in American law schools). As Mexico noted in its brief to the International Court of Justice in *Avena*,

> Consular officers play two critical functions in the delicate, often protracted negotiations that lead to a plea bargain. First, consular officers meet with prosecutors, or present written submissions, that contain crucial mitigating evidence. Often, consular officers will have gathered this evidence themselves, in Mexico, after learning of the defendant's detention. The consulate commonly searches all archives and databases in Mexico to determine whether the defendant has a prior criminal record, and provides documentation of that search to defense counsel. Other times, consular officers will obtain school and hospital records that provide proof of a defendant's mental or physical condition. Sometimes, consular officers can explain cultural factors that mitigate the defendant's culpability.

Memorial of Mexico (20 June 2003), para. 63.

In the last four and a half years alone, "Mexican consular officers and the Foreign Ministry have been involved in at least 66 cases in which prosecutors have agreed not to seek the death penalty." Affidavit of Victor Emanuel Uribe, Exh. 51. Consular officers were ready, willing and able to assist in plea negotiations in Mr. Alvarez's case, had they only been notified of his detention.

Second, the timely involvement of a consular representative would have had a prophylactic effect on Mr. Alvarez's extended and coercive interrogation, ensuring that his will was not overborne. *Id.*; *see also State of Ohio v. Ramirez*,

732 N.E.2d 1065, 1070-71(Ohio App. 3d. 1999) (noting that inadequate waiver of rights "would have been avoided" through compliance with Article 36 in Mexican national's case). Isolated from his consulate, Mr. Alvarez gave incriminating statements to the police following his arrest. In its closing argument to the jury, the prosecution placed heavy emphasis on the importance of Mr. Alvarez's videotaped statement to the authorities.

> At the time of Mr. Alvarez's arrest, Mexican consular officers were trained to immediately contact their nationals facing serious criminal charges and advise them in very clear terms that they should only speak to the police after first seeking the advice of a lawyer. The consulate stood prepared to ensure that Mr. Alvarez fully understood the legal implications of waiving his right to remain silent:
> [A]t the time of Mr. Alvarez's arrest, Mexican consular officers were trained to promptly contact Mexican nationals detained on serious charges, and to advise them not to speak to the police without first seeking the advice of a lawyer. They also routinely advised Mexican nationals of the importance of having a lawyer present during any conversations with the police. This is not something that many of our nationals fully comprehend, as I have already stated. Also, in Mexico the law places significant limitations on the admission of statements by the accused. As a result, many nationals mistakenly believe that their statements to the police will not be admitted at trial. Mexican nationals often persist in these beliefs, even after the police tell them of their so-called "Miranda" rights.

> Affidavit of Victor Manuel Uribe, Exh. 51.

As Mr. Alvarez has stated, he would not have given a confession if he had known he could ask the Mexican consulate for assistance. Affidavit of Juan Carlos Alvarez Banda, Exh. 67.

Third, consular officers would also have assisted in gathering critical evidence for the penalty phase. The Mexican Government assisted Mr. Alvarez in developing critical mitigation during his post conviction state habeas investigation. Consular assistance would have helped to develop the penalty phase evidence that trial counsel should have developed and presented, set forth more fully in Claim I and incorporated herein by express reference.

Defense counsel not only failed to adequately prepare an affirmative case for life, they failed to object in a full and proper manner, on Eighth and Fourteenth Amendment grounds, to a highly prejudicial and clearly improper argument in support of a death sentence which was predicated upon an unfavorable comparison between Mexican immigrants such as Mr. Alvarez and his family, to immigrants from other nationalities, racial and ethnic groups.

During the penalty phase, the defense presented evidence that Mr. Alvarez's father had been murdered before his eyes when Mr. Alvarez was only seven years old. The prosecution dismissed this evidence as irrelevant. During his closing argument, the prosecutor disfavorably compared Mexican immigrants such Mr.

Alvarez Banda and his family to Asian immigrants, who "are doctors, lawyers." XXVIII R. 57-58. He disparaged the defense claim that Mr. Alvarez had been deeply affected by the murder of his father, claiming that "other immigrants" had experienced "a real war" and had not killed anyone. *Id*. at 58. Incredibly, defense counsel's only objection to the prosecution's inflammatory rant was that "there was nothing in the record to support" it. *Id*. Counsel failed to object on the grounds that the prosecution was injecting ethnic bias into the courtroom, that the prosecution was exploiting biases about Mexican immigrants, and was encouraging the jury to base its life-or-death decision on impermissibly arbitrary and discriminatory grounds. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987) (noting that "the Constitution prohibits racially biased prosecutorial arguments"); *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000) (prejudicial generalizations about defendant's racial or ethnic groups violate Fifth Amendment right to a fair trial); *see also Riascos v. State*, 792 S.W.2d 754 (Tex. Ct. App. 1990); *Garcia v. State*, 683 S.W.2d 715, 718-19 (Tex. Ct. App. 1984) (prosecutorial appeals to national or racial bias are improper).

The presence of Mexican consular representatives at the trial would have either deterred the prosecution from disparaging Mr. Alvarez's origins and status altogether or would have resulted in prompt action by Mexico to cure this glaring

impropriety.  Consular officers ensure by their presence that a Mexican national facing capital charges is treated with fairness in the detaining state's judicial system.  Affidavit of Victor Emanuel Uribe, Exh. 51.  A consular official would have attended the trial of Mr. Alvarez and would have interceded promptly with the appropriate authorities, in response to the prosecutor's inflammatory remarks. *Id*.  A strong consular response in these circumstances would be neither unusual nor inappropriate: U.S. consuls are likewise instructed that their primary mission is to protect American citizens in custody abroad "against any abuse, mistreatment or discrimination."  U.S. Department of State telegram to all U.S. diplomatic and consular posts abroad concerning consular assistance for American nationals abroad, January 1, 2001, available at http://www.state.gov/s/l/16139.htm.

The post conviction investigation, invaluably aided by consular assistance, uncovered a wealth of mitigation information that was not investigated or presented by Mr. Alvarez's trial counsel.  This investigation discovered that Mr. Alvarez suffers from organic brain damage, present since birth and exacerbated by a life of trauma and deprivation, as well as severe post-traumatic stress disorder. These conditions combined to impair his judgment and mental capacity, and would have had an important bearing on both guilt-innocence and penalty phase issues in

Mr. Alvarez's case.  *See* Report of Ricardo Weinstein, Exh. 1; Forensic Trauma

Assessment, Exh. 2.

Additionally, the mitigation investigation uncovered many witnesses with

important information about Mr. Alvarez's life and character.  These witnesses

would have enabled the jury to see Mr. Alvarez as the quiet and reserved but

generous and caring person that he was prior to the retriggering of emotional

trauma that lead to his uncharacteristic spate of tragic violence in the Spring of

1998.  They would have helped the jury to understand the devastating events of

Mr. Alvarez's life: growing up in poverty in the desert of Mexico where his father

was senselessly murdered in a family feud, a feud which also claimed the lives of

his uncle and grandfather a short time later; living a life subsumed with fear,

sleeping on the roof of the house as a protection against violent attacks; a dramatic

escape from their home village in the middle of the night in which Juan and his

family were forced to flee for their own safety and leave most of their belongings

behind forever; being left behind in Mexico with no parental guidance or direction

as first his mother, and then each of the older siblings, left the country to seek work

to provide for the family and left him in the care of the remaining siblings, who

were themselves still children; coming to Houston, years after his mother and most

of his older siblings, and feeling the alienation and isolation of being a 14 year

from another country who did not speak the language; being thrust into the violent and gang-dominated neighborhoods and schools of southwest Houston where the options available to young men like Mr. Alvarez are few and far between; and finally, being drawn into the only peer group available to provide a sense of safety, family, and community – the local neighborhood gang – and re-experiencing the debilitating trauma of standing by helplessly as a friend was senselessly murdered. *See* Juan Alvarez Social History, prepared by Mitigation Specialist Alicia Amezcua-Rodriguez, Exh. 1, Attachment A; Affidavits of Family Members, Friends, and Teachers, Exhs. 5-8, 12-31, 44-49, 52, and 53. *See also* Claim I is incorporated herein by express reference.

Had the Mexican Government been notified of Mr. Alvarez's arrest and prosecution and thereby been positioned to offer all of this consular assistance, Mr. Alvarez's defense counsel would have made use of the information and resources provided. Mr. Alvarez's trial counsel, Mr. Reyes, himself attests that if he had access to the resources and experts that the Mexican Government would have provided, he would have used them, as they were precisely the kind of evidence that would have been critical to his efforts. *See* Affidavit of Frumencio Reyes, Exh. 4 at ¶ 16. After reviewing the information from the investigation conducted with the assistance of the Mexican Government, Mr. Reyes also readily

acknowledges that his prior affidavit provided by to respondent in these pleadings was incomplete, as he was "uninformed when [he] made the assessment that their [Mexico's] assistance would not have made a significant different at trial." *Id*. at ¶ 17.

## THE ICJ HAS CONFIRMED THAT THE UNITED STATES VIOLATED MR. ALVAREZ'S RIGHTS UNDER ARTICLE 36 OF THE VIENNA CONVENTION

1. The *Avena* Judgment

In early 2003, Mexico brought the *Avena* case against the United States in the ICJ. Mexico sought a remedy for violations of the Vienna Convention rights of 51 individual Mexican nationals—including Mr. Alvarez—who were then under sentence of death in the United States. Although the United States has vigorously insisted on strict compliance with Article 36 when Americans have been detained overseas, compliance by state and local officials in the United States itself has ranged from spotty to nonexistent. *See, e.g., Medellin v. Dretke*, 544 U.S. at 674 (noting the "vexing problem" of "individual States' (often confessed) noncompliance" with the Vienna Convention, which is "especially worrisome in capital cases").

The ICJ is "the principal judicial organ of the United Nations." UN Charter, art. 92. By ratifying the UN Charter—which is a treaty ratified by over 190

nations, including the United States and Mexico—"[e]ach member of the United Nations undertakes to comply with the decision of the International Court of Justice in any case to which it is a party." *Id*., art. 94(1). Moreover, all parties to the UN Charter "are ipso facto parties to the Statute of the International

Court of Justice," *id*., art. 93(1), which forms "an integral part of the [UN] Charter," *id*., art. 92. Indeed, in ratifying the UN Charter, the United States made explicit that it was also ratifying the ICJ Statute. See Proclamation of Ratification of UN Charter and ICJ Statute, 59 Stat. 1031, 1031 (1945). Under the terms of the ICJ Statute, judgments in cases submitted to the ICJ are "final and without appeal," ICJ Statute, art. 60, but are binding only "between the parties and in respect to [the] particular case," *id*., art. 59.

The ICJ's jurisdiction in any particular case depends entirely on the consent of the parties. Idˆ., art. 36(1). By ratifying the UN Charter and ICJ Statute, the United States agreed to abide by judgments in any case to which it was a party, but it did not consent to jurisdiction in any particular case. In the *Avena* case, Mexico invoked the Vienna Convention's Optional Protocol, to which both the United States and Mexico were parties. The United States fully participated in the *Avena* proceedings before the ICJ.

After extensive briefing and oral argument, the ICJ rendered a judgment that expressly adjudicated Mr. Alvarez's own rights and those of the other Mexican nationals whose cases were before the ICJ. Specifically, the ICJ held that the United States had breached Article 36(1)(b) of the Vienna Convention in the cases of 51 of the Mexican nationals, including Mr. Alvarez, by failing "to inform detained Mexican nationals of their rights under that paragraph" and "to notify the Mexican consular post of the[ir] detention." *Avena*, ¶¶ 106(1)-(2), 153(4). In 49 of those cases, including Mr. Alvarez's, the ICJ held that the United States had also violated its obligations under Article 36(1)(a) "to enable Mexican consular officers to communicate with and have access to their nationals, as well as its obligation under paragraph l(c) of that Article regarding the right of consular officers to visit their detained nationals." *Id.*, ¶¶ 106(3), 153(5)-(6). And in 34 cases, including Mr. Alvarez's, the ICJ held that the breaches of Article 36(1)(b) also violated the United States' obligation under Article 36(1)(c) "to enable Mexican consular officers to arrange for legal representation of their nationals." *Id.*, ¶¶ 106(4), 153(4), 153(7).

As to remedies, the ICJ first denied Mexico's request for annulment of the convictions and sentences. *Id.*, ¶¶ 123. However, recognizing that Article 36(2) of the Convention requires the laws of the signatory states to give "full effect" to the

purposes of the rights accorded by Article 36, the ICJ held that United States courts must provide review and reconsideration of the convictions and sentences of the 51 Mexican nationals as a remedy for the violations of Article 36(1) in their cases. *Id.*, ¶¶ 121-22, 153(9).

With regard to these proceedings, the *Avena* judgment establishes, first, that Texas authorities violated Mr. Alvarez's Vienna Convention rights, and second, that the courts must now provide review and reconsideration of his conviction and sentence in light of that violation, addressing the possible prejudice caused by the Article 36 violation on its own terms, not under the rubric of due process rights.

2. The United States' Efforts to Comply with the *Avena* Judgment

In light of the Supreme Court's pronouncement in *Medellin v. Texas*, 128 S.Ct. 1346 (2008), the executive and legislative branches of the federal government have been working diligently to fulfill the international law obligation of the United States.  A bill has been introduced to the U.S. House of Representatives, providing a remedy for those whose rights under the Vienna Convention have been violated.  And the Bush Administration reached out to the states for their voluntary compliance with *Avena*.  Indeed, some states have voluntarily complied.

Former President Bush's position was always that the United States

should give effect to the judgment in *Avena*.  Prior to the Supreme Court's

deciding *Medellín*, President Bush issued a Memorandum to the U.S. Attorney

General, providing:

> I have determined, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, that the United States will discharge its international obligations under the decision of the International Court of Justice in [Avena], by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision.
> *Medellín*, 128 S. Ct. at 1355 (alteration in original).

As the Supreme Court noted, the President clearly sought "to

vindicate United States interests in ensuring the reciprocal observance of the

Vienna Convention, protecting relations with foreign governments, and

demonstrating commitment to the role of international law.  These interests

are plainly compelling." *Medellín*, 128 S. Ct. at 1367.

Following the *Medellín* decision, the executive branch of the federal

government "continue[ed] to seek a practical and timely way to carry out our

nation's international legal obligation . . . ." Affidavit of Scott J. Atlas, Exh. 68, at

Attached Letter from Michael Mukasey, Attorney General, and Condoleezza Rice,

Secretary of State, to Rick Perry, Governor of Texas (June 17, 2008).  It

specifically called upon the State of Texas to help carry out the "international legal obligation of the United States." *Id*.

In light of the United States' "international law obligation," a bill was introduced in the House of the U.S. Congress. Avena Case Implementation Act of 2008, H.R. 6481, 110th Cong. (2008). The bill provided:

> SECTION 1. SHORT TITLE.
> This Act may be cited as the 'Avena Case Implementation Act of 2008'.
> SEC. 2. JUDICIAL REMEDY.
> (a) Civil Action.--Any person whose rights are infringed by a violation by any nonforeign governmental authority of article 36 of the Vienna Convention on Consular Relations may in a civil action obtain appropriate relief.
> (b) Nature of Relief.--Appropriate relief for the purposes of this section means--
> (1) any declaratory or equitable relief necessary to secure the rights; and
> (2) in any case where the plaintiff is convicted of a criminal offense where the violation occurs during and in relation to the investigation or prosecution of that offense, any relief required to remedy the harm done by the violation, including the vitiation of the conviction or sentence where appropriate.
> (c) Application.--This Act applies with respect to violations occurring before, on, or after the date of the enactment of this Act.
>
> H.R. 6481, 110th Cong. (2008).

The Avena Case Implementation Act of 2008 came undoubtedly from the recognition of the United States' "international law obligation" by the judicial and executive branches of the U.S. federal government. Although Congress ended

their session without passing the bill, the possibility of implementing legislation may still play a role in the *Avena* history. If Congress passes such enabling legislation, it will provide an alternative path to a remedy for the violations of his rights to consular assistance that Mr. Alvarez suffered at prior to and during his trial. Whether such a path becomes available to Mr. Alvarez through enabling legislation does not impair the claims he presents here.

Some states, recognizing the dual yet united nature of our government, have complied with the judgment in *Avena* and independently fulfilled the "international law obligation" of the United States to act in accordance with the *Avena* judgment. *See, e.g., Medellín*, 128 S. Ct. at 1375, n.4 (Stevens, J., concurring) ("Responding to *Avena*, the Oklahoma Court of Criminal Appeals stayed Torres' execution and ordered an evidentiary hearing on whether Torres had been prejudiced by the lack of consular notification. *See Torres v. Oklahoma*, No. PCD-04-442, 2004 WL 3711623 (May 13, 2004), 43 I.L.M. 1227."). Although Texas, regrettably, is not among those states, Mr. Alvarez should not be deprived of his rights under the Vienna Convention and the *Avena* judgment just because he happens to have been tried in a State that refuses to comply with the dictates of international and treaty law. This is particularly so when the U.S. government has attempted to comply

with the *Avena* judgment by undertaking the actions outlined by the Supreme Court.

## MR. ALVAREZ'S CLAIMS RELATED TO THE VIOLATION OF HIS VIENNA CONVENTION RIGHTS UNDER THE CONSTITUTION AND U.S. TREATIES ARE NOT PRECLUDED BY SUPREME COURT PRECEDENT IN MEDELLIN V. TEXAS, BREARD, OR SANCHEZ LLAMAS

The Supreme Court has considered cases involving the Vienna Convention on Consular Relations several times, most recently with the March 25, 2008 opinion in *Medellin v. Texas*. These cases are often misunderstood and misconstrued to preclude a wide spectrum of remedies and consideration of violations of Vienna Convention claims. Mr. Alvarez's case presents a factual and legally distinct case from cases decided by the Supreme Court. Given the limited holdings of *Medellin*, *Sanchez Llamas*, and *Breard*, the relief that Mr. Alvarez seeks has not been foreclosed.

1. *Medellin v. Texas* presents no bar

On March 25, 2008, the United States Supreme Court issued its decision in *Medellin v. Texas*, 128 S.Ct. 1346. Mr. Medellin is one of the 51 Mexican nationals named in the ICJ's *Avena* decision. *Id.* at 1351. Mr. Medellin sought to have the Court enforce the ICJ's *Avena* holding despite preemptory state laws. *Id.* In doing so, Mr. Medellin relied on the memorandum issued by President George

W. Bush that directed the State courts to give effect to the *Avena* decision. *Id.* The Court declined to provide Mr. Medellin with relief. *Id.*

The limited questions that the Court considered in *Medellin* and the resultant limited holding do not apply to the claims Mr. Alvarez presents. The *Medellin* Court considered two questions: First, is the ICJ's judgment in *Avena* directly enforceable as domestic law in a state court in the United States? Second, does the President's Memorandum independently require the States to provide review and reconsideration of the claims of the 51 Mexican nationals named in *Avena* without regard to state procedural default rules? *Id.* at 1353.

The Court answered each of these questions in the negative. *Id.* In so doing, the Court left open the question of whether domestic remedies could be provided for violations of the Vienna Convention or for constitutional claims related to the Vienna Convention.

The Court's holding in *Medellín* was narrowly framed because of the procedural posture of the case. *Medellín* first raised his Vienna Convention claim in his first application for state post-conviction relief, and the state trial court held that the claim was procedurally defaulted because *Medellín* had failed to raise it at trial or on direct review. *Id.* at 1354.

The procedural posture of Mr. Alvarez's case is decidedly different. There is no issue in this case as to whether the *Avena* judgment pre-empts state filings on successive habeas petitions because there is no procedural bar or successive habeas petition issue here. Unlike *Medellin*, the record in this case shows that Mr. Alvarez raised his Vienna Convention claim at trial and on direct appeal, as well as in his state habeas petition. Thus, there is no state procedural bar preventing the review and reconsideration of Mr. Alvarez's conviction and sentence dictated by the ICJ's judgment in *Avena*.

Mr. Alvarez seeks a remedy for the violation of his rights under the Vienna Convention and for the violations of Constitutional claims, namely Sixth Amendment Claims, related to the Vienna Convention violation. Although the *Avena* judgment is relevant to Mr. Alvarez's claims, Mr. Alvarez does not seek to have the Court directly enforce the *Avena* judgment as domestic law, unless and until the U.S. Congress passes enabling legislation directing courts to enforce the judgment.

The Court in *Medellin* left open the possibility that domestic remedies could be provided for violations of the Vienna Convention or for distinct constitutional claims in some manner related to the Vienna Convention. On more than one

occasion, the Court noted that the merits of Mr. Medellin's claims did not have to

be considered because of the procedural problems he faced:

> "In light of our disposition of this case, we need not consider whether
> Medellin was prejudiced in any way by the violation of his Vienna
> Convention rights."
> *Medellin*, 128 S.Ct. at 1355 n. 1.
> "[I]t is unnecessary to resolve whether the Vienna Convention is itself
> 'self-executing' or whether it grants Medellin individually enforceable
> rights." *Id.* at 1357 n. 4.

Mr. Alvarez has individually enforceable rights under the Vienna

Convention, and was prejudiced when those rights were violated. He raised his

Vienna Convention claims at trial and through appeal. Those claims have been

properly preserved, they are ready for review, and can now be decided by a federal

court of competent jurisdiction.

28 U.S.C. 2254(a) specifically provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district
> court shall entertain an application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment of a State court
> only on the ground that he is in custody in violation of the
> Constitution or laws or treaties of the United States.

In *Breard v. Greene*, 523 U.S. 371, 376 (1998), the Court noted that Section

2254(a) provides federal courts with the authority to consider a treaty violation,

specifically a Vienna Convention violation, "Breard's ability to obtain relief based

on violations of the Vienna Convention is subject to this subsequently-enacted

rule, just as any claim arising under the United States Constitution would be."

Furthermore, in *Sanchez-Llamas*, 548 U.S. 331, 364 (2006), the Court noted:

If [a defendant] raises an Article 36 violation at trial, a court can make appropriate accommodations to ensure that the defendant secures, to the extent possible, the benefits of consular assistance.

Justice Ginsburg's concurrence agreed:

Furthermore, once Bustillo became aware of his Vienna Convention rights, nothing prevented him from raising an ineffective-assistance-of-counsel claim predicated on his trial counsel' failure to assert the State's violation of those rights. *Id.* at 364 n. 3.

In addition to being deprived of the other elements of consular assistance,

Mr. Alvarez was prejudiced by ineffective trial counsel's failure to provide the jury

with a full mitigation presentation. Mr. Alvarez's claim of error based on the

violation of his rights to consular assistance under the Vienna Convention both

allege that the court should fashion remedies – namely, reversal of his death

sentence and guilty conviction, and order a new trial – for the violation of the

VCCR and also Mr. Alvarez's Sixth Amendment right to effective assistance of

counsel was violated by the violation of his Vienna Convention rights. The

prejudice caused by trial counsel's failures to adequately investigate and to present

psychological, cultural, and family background evidence, are part of the Vienna

Convention claim, and are properly before this court on the merits.

2. The Supreme Court's Opinion in *Sanchez-Llamas v. Oregon* Presents No
   Bar to Mr. Alvarez's Petition

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) presented the consolidated

cases of a Mexican national, Moises Sanchez-Llamas, as well as a Honduran

national, Mario Bustillo. Sanchez-Llamas argued that his incriminating statements

to police in an attempted murder case should have been suppressed, as he was not

informed of his Vienna Convention rights to have the Mexican Consulate notified

of his detention. *Id*. at 339. Bustillo made a similar argument; however, he raised

his Vienna Convention claim for the first time in his habeas petition and the

Virginia courts found that the claim was procedurally defaulted. *Id*. at 340-41.

The Supreme Court affirmed the judgment against Bustillo on the grounds of

procedural default. *Id*. at 360. With respect to Sanchez-Llamas, the Supreme

Court reasoned that suppression of evidence was not an appropriate remedy

because the link between the lack of consular notification and the remedial

objectives of the exclusionary rule was too thin.

There are two important points from the Court's opinion that must be kept in

mind. First, "[i]n most circumstances, there is likely to be little connection

between an Article 36 violation and evidence or statements obtained by police." *Id.* at 348 (emphasis added). The Court did not foreclose the possibility that such a connection might be demonstrated in certain cases. Second, assuming that the Vienna Convention created judicially enforceable rights, the scope of these rights must be determined by domestic law. *Id.* at 343. Under the laws of the

United States, a foreign alien "is entitled to an attorney, and is protected against self-incrimination." *Id.* at 350. When such rights are violated, "[a] defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police." *Id.*

Although Mr. Alvarez presents claims of error related to the voluntariness of his confession, his suppression motion, which included issues related to the Vienna Convention (Claim XIV, incorporated herein by express reference), and claims of ineffective assistance of counsel, including those related to errors in properly litigating some of these issues at trial (Claim I, incorporated herein by express reference), Mr. Alvarez's claims based on the violation of the Vienna Convention are broader challenges than that which is foreclosed by *Sanchez Llamas*.

Mr. Alvarez argues that the lack of consular notification was but one failure in a chain of multi-point instances of flawed legal conduct which led to his conviction. As discussed above, the violation of Mr. Alvarez's rights under the

treaty and of his Constitutional rights related to the treaty are proper bases for relief.  Mr. Alvarez presented detailed evidence of how consular assistance would have changed the outcome of his case.  This claim is distinct from *Sanchez Llamas'* case, in which the defendant requested suppression of his confession as a automatic remedy for the Vienna Convention violation without engaging in the fact specific inquiry of how the violation prejudiced his case.

Cases addressing whether a private cause of action exists under the Vienna Convention are irrelevant in the habeas context; the cause of action arises under the "treaties of the United States" provision of 28 USC 2241(c)(3), not under the treaty itself.  Treaties may be invoked as a defense without the need to show the treaties expressly grant individuals any right of action.  *See, e.g., Cook v. United States*, 288 U.S. 102, 121-122 (1933) (treaty violation could be asserted by affected defendant and deprived the trial court of personal jurisdiction); *Kolovrat v. Oregon*, 366 U.S. 187 (1961) (treaty successfully used as a defense to escheat proceeding under Oregon law); *Patsone v. Pennsylvania*, 232 U.S. 138 (1914) (Court recognized the defensive use of a treaty in a criminal case, but ultimately held that there was no conflict between the treaty and state law); *see also Dominguez v. State*, 90 Tex. Crim. 92, 99, 234 S.W. 79, 83 (1921) (treaty obligations represent the supreme law of the land and are "binding upon state

courts and available to persons having rights secured or recognized thereby, and may be set up as a defense to a criminal prosecution established in disregard thereof.").

The majority of courts to address the issue have concluded that Article 36 confers justiciable rights on individuals. *See, e.g., Jogi v. Voges*, 425 F.3d 367, 382 (7th Cir. 2005); *United States v. Rangel-Gonzales*, 617 F.2d 529, 532 (9th Cir. 1980); *Hernandez v. United States*, 280 F.Supp.2d 118, 124 (S.D.N.Y. 2003); *United States ex rel. Madej v. Schomig*, 223 F. Supp. 2d 968, 979 (N.D. Ill. 2002); *People v. Preciado-Flores*, 66 P.3d 155, 161 (Colo. App. 2002); *Madej v. Schomig*, No. 98-C-1866, 2002 WL 31386480, at *1 (N.D. Ill. Oct. 22, 2002); *Standt v. City of New York*, 153 F. Supp. 2d 417, 427 (S.D.N.Y. 2001); *United States v. Superville*, 40 F. Supp. 2d 672, 678 (D.V. I. 1999); *United States v. Alvarado-Torres*, 45 F. Supp. 2d 986, 989 (S.D. Cal. 1999); *United States v. Chaparro-Alcantara*, 37 F. Supp. 2d 1122, 1125 (C.D. Ill. 1999); *United States v. Briscoe*, 69 F. Supp. 2d 738, 747 (D.V.I. 1999); *United States v. Torres-Del Muro*, 58 F. Supp. 2d 931, 932-33 (C.D. Ill. 1999); *United States v. Hongla-Yamche*, 55 F. Supp. 2d 74, 77-78 (D. Mass. 1999); *United States v. Rodrigues*, 68 F. Supp. 2d 178, 183 (E.D.N.Y.1999); *United States v. $69,530.00 in United States Currency*, 22 F. Supp .2d 593, 594 (W.D. Tex. 1998); *Torres v. State*, 120 P.3d 1184 (Okla.

Crim. App. 2005); *State v. Miranda*, 622 N.W.2d 353 (Minn. App. 2001); *State v. Reyes,* 740 A.2d 7 (Del. 1999); *see also Medellin v. Dretke*, 125 S.Ct. 2088, 2103-2104 (O'Connor, J., dissenting); *Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998) (Butzner, J., concurring); *United States v. Li*, 206 F.3d 56, 71 (1st Cir. 2000) (Torruella, C.J., concurring in part; dissenting in part); *People v. Madej*, 739 N.E.2d 423, 431 (Ill. 2000) (McMorrow J., concurring in part and dissenting in part); *cf. Medellin v. Texas*, 128 S.Ct. 1346, 1257 n. 4 (U.S. 2008) (assuming that Article 36 grants foreign nationals "an individually enforceable right to request that their consular officers be notified of their detention, and an accompanying right to be informed by authorities of the availability of consular notification.")

Finally, the Mexican Government's involvement in the case would have undoubtedly produced qualitatively better representation of Mr. Alvarez in the course of his direct appeal.  Mr. Alvarez's direct appeal counsel, Skip Cornelius, filed a poorly prepared and deficiently litigated direct appeal brief.  The brief purported to raise thirty-nine claims of error, but the vast majority of these claims were presented in such a slip-shod and incomplete manner that they often failed to state a claim upon which relief could have been granted.  For example, counsel submitted a claim attacking the sufficiency of the evidence to prove that the murders were committed pursuant to the "same criminal transaction," *see*

Appellant's Brief at pp. 87-90. In point of fact, however, and as the CCA curtly

pointed out in denying relief on this point of error, Mr. Alvarez was never indicted

for crimes committed in the "same criminal transaction"; instead, he was indicted

for "different criminal transactions but pursuant to the same scheme or course of

conduct." CCA Order Denying Mr. Alvarez's Direct Appeal in No. 73,648, (Oct.

2002) at p. 2 (unpublished).

Similarly, the CCA found numerous additional glaring errors in the brief,

and repeatedly pointed out those issues in the opinion denying relief. *Id.* at 4, 10,

12 14, 17, 34 (denying claims for reasons such as not presenting necessary facts,

citing no authority in support of claims, failing to allege correct standard, such as

abuse of discretion, objecting to evidence that was in fact never even introduced at

trial, making "multifarious" errors by improperly basing them on more than one

legal theory, failure to make offer of proof to support error). Finally, counsel for

Mr. Alvarez did not even bother to request oral argument, but instead waived it,

thereby losing the opportunity to discuss the issues with the CCA and respond to

questions or concerns raised by members of the Court.

These failings were fundamental and basic errors in a direct appeal in which

a person's life was a stake, thereby depriving Mr. Alvarez of effective

representation on his direct appeal. Assistance of the Mexican Government would

have ensured that Mr. Alvarez had a direct appeal brief filed on his behalf that at

least presented viable, fully presented cognizable claims that could be adjudicated

on their merits.

**CLAIM IV: THE STATE VIOLATED PETIONER'S CONSTITUTIONAL RIGHT UNDER BRADY V. MARYLAND AND RELATED CASES AND AUTHORITIES BY FAILING TO DISCLOSE SERIOUS PROBLEMS WITH THE HOUSTON POLICE DEPARTMENT CRIME LAB AND THE DNA EVIDENCE USED AGAINST PETITIONER**

All other claims and allegations in this Petition are incorporated into this

Claim by this express reference.

Petitioner was denied his right to a fair trial and to present his defense, to

due process, the effective assistance of counsel, to be free from cruel and unusual

punishment, and to equal protection of the laws, as guaranteed under the Fourth,

Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because

of the pervasive prosecutorial misconduct that occurred during trial.

Aspects of this claim was generally presented as claim XV in the direct

appeal (Petitioner's Direct Appeal, pp 45-47), and is presented in full in the

successive writ of habeas corpus that will be soon filed in the 388th district court

for Harris County Texas. Much of the claims in this section are newly discovered

facts, developed subsequent to the State's Brady Disclosure letter of February 25,

2003, which was provided after Petitioner's original state writ of habeas corpus

was filed and therefore is properly presented in a successive writ in state court. Petitioner requests that this Court grant a stay of the litigation of this case, or at least on this issue, and hold this case in abeyance while this issue is litigated in state court so that he may fully exhaust these claims prior to federal habeas review.

The government's constitutional duty to gather, preserve and disclose evidence to a defendant in a criminal prosecution is set forth in *Brady v. Maryland*, 373 U.S. 83, 83 (1963). In *Brady*, the court held that a prosecutor must disclose all exculpatory evidence to the accused. "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473

U.S. 667, 682 (1985).  The evidence is material if, given the failure to disclose material evidence, the verdict is not worthy of confidence.

In *Strickler v. Greene*, the Supreme Court framed the essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668 at __ (2004) (quoting *Strickler v. Gree*n, 527 U.S. 263, 281-82, (1999)).

A prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

DNA evidence was used in the capital case against Mr. Alvarez.  The evidence was material to the guilt phase, as it played an important role in giving scientific validity to the State's case, and consequently to the sentencing phase as well, as it served to underscore the State's case for Mr. Alvarez's individual involvement in the crimes for which he was charge.  The evidence was also irreparably tainted by sloppy and incompetent analysis and ultimately worthless as evidence.   The State had reason to know about the problems with the Houston Police Department Crime Lab, which resulted in the serious errors in analyzing and

testifying about the DNA evidence, and failed to disclose those conditions and problems to the defense.

The legitimacy of the scientific DNA was crucial, for it was this evidence upon which the prosecution relied to connect Mr. Alvarez to the murder of Mr. Jose Varela. Without the DNA, the evidence against Mr. Alvarez consisted primarily of unreliable testimony of witnesses and a statement by Mr. Alvarez which was hotly contested in terms of voluntariness and reliability.

Due to problems of proof and possible unreliability of witness testimony, the State used the DNA evidence at issue here in its effort to establish that Juan Alvarez actually shot Jose Varela during the Woodfair incident. More specifically, the State relied on DNA evidence, purportedly Jose Varela's blood, allegedly obtained from a gun found in Mr. Alvarez's apartment, in an attempt to more directly connect Mr. Alvarez to Mr. Varela's death. It was this DNA evidence that, in the State's view, sealed the case against Mr. Alvarez in the shooting death of Jose Varela.

To be sure, the State introduced other evidence attempting to link Mr. Alvarez to Mr. Varela's death. For example, the State introduced ballistic evidence as to this offense, but it was weaker and more confusing as it related to this crime. For example, the shotgun pellets obtained during Mr. Varela's autopsy

were *consistent* with a shotgun, but could not be positively identified and matched as coming from the *actual* shotgun retrieved from Mr. Alvarez's aparment; and, importantly, there were no rifle bullet retrieved from the autopsies. State's Trial Exh. 168, XXX R. 90.

The State also tried to portray Mr. Alvarez as the actual shooter who killed Mr. Varela through eyewitness testimony, XXIV R. 60-61. However, as noted elsewhere throughout this Petition, the only evidence suggesting that Mr. Alvarez was the person who used the Mossburg shotgun that killed Mr. Varela was the demonstrably unreliable in-court identification of the victim's sister, Brandy Varela. As discussed above, Ms. Varela had never before been able to identify Mr. Alvarez as the shooter with the shotgun, despite having been provided a photo line-up containing his picture. Moreover, she did not even witness her brother's death. She also gave testimony that was not consistent with the other ballistic evidence. In light of these problems with the other evidence, a fair reading of the record makes plain that the State relied on the DNA blood analysis from the shotgun in its effort to connect Mr. Alvarez to Mr. Varela's death.

Years later, after the jury had already convicted Mr. Alvarez of capital murder and he had been sentenced to death and had been on Texas' death row, and after Mr. Alvarez had already filed his state post-conviction appeal, on February

25, 2003, the State finally disclosed to then-state habeas counsel for Mr. Alvarez that an audit of the Houston Crime Lab had revealed "several areas of non-compliance with DNA lab procedures established by the Federal Bureau of Investigation." Brady Disclosure, Exh. 60. This disclosure led to a reexamination of the DNA evidence against Mr. Alvarez noted above, and its use at Mr. Alvarez's trial. That reexamination led to the conclusion that because of the serious problems at the HPD Crime Lab, the DNA evidence was unreliable in this case and could not be used, and should not have been used, to show that blood on the weapons was in fact Mr. Varela's blood. Based upon this reexamination, it is now fair to say that a key aspect of the State's case for Mr. Alvarez's involvement in any shooting death during the Woodfair incident has been completely undermined.

## ORIGINAL HPD TESTING

Christi Kim, a HPD Lab analyst since 1983, was the person who conducted the original DNA testing in this case. The audit and independent investigation of the HPD Crime Lab later identified significant problems with much of Ms. Kim's work. On June 22, 1998, Ms. Kim received two guns – a Mossburg shotgun and an SKS rifle – taken from Mr. Alvarez's house. Ms. Kim claimed to have identified blood on four areas of the SKS rifle, on the clip, and on the Mossburg

shotgun.  HPD Report on DNA Evidence, Exh. 61, at 2.108; HPD Report on Blood

and Guns, Exh. 63, at 2.032.

On August 10, 1998, Ms. Kim received stain cards with blood samples of

two victims, Jose Varela and Hugo Perez and extracted DNA from them. HPD

Report on DNA Evidence, Exh. 61, at 2.107. Ms. Kim reported three findings:

> The DNA patterns detected on the rifle and the shotgun are consistent
> with those of blood stain (ML 98-1692) [Jose Varela] and one other
> donor.

> The DNA patterns detected on the rifle and shotgun do not match that
> of blood stain (ML 98-1694) [Hugo Perez]

> The DNA pattern of Jose Varel (sic) (ML 98-1692) can be expected
> to occur in 1 out of 694,000 people in Hispanic population.

HPD Report on DNA Evidence, Exh. 61, at 2.108.

These findings, memorialized in the forensic report generated in the overall

police investigation, and provided to the State and to the defense for review, were

later shown to be incorrect, as will be explained more fully below.  But it is

noteworthy at the outset that, even on their face, they reveal a lack of precision and

attention to detail, as the victim's name is consistently misspelled.  Significantly

too, they also differ from the testimony that Ms. Kim provided at trial.

USE OF DNA AT MR. ALVAREZ's TRIAL

172

On September 20, 1999, at Mr. Alvarez's trial, HPD Crime Lab analyst Chirsty ??[let's spell her name correctly!] Kim testified about her work on the DNA evidence in Mr. Alvarez's case. She explained the process of extracting and amplifying DNA from samples and comparing known profiles to unknown profiles. 24 R. 83-109. Ms. Kim testified that she received a stained card labeled Medical Legal No. 98-1692, which became State's Exhibit No. 146, broke the seal, removed a portion of the stain card, and placed it in a vial for DNA extraction, and extracted DNA from it. 24 R. 95-96. She testified about examining the shotgun and rifle in the case and finding blood on both weapons and extracting DNA from them. 24 R. 101, 104-06. Ms. Kim testified that the "DNA pattern from assault weapon in five different places and DNA pattern from the Mossberg shotgun is consist with the DNA pattern of the stain card that came from the morgue, Medical Legal No. L98-1692. [the Varela card]" 24 R. 107. Ms. Kim testified that the FBI population data indicated that the pattern of the stain card (which she then referred to as Jose Varela's blood without a proper basis of knowledge) "can be expected to occur in one out of 694,000 people in Hispanic population." 24 R. 108. Ms. Kim then agreed that the prosecutor's question was correct when he asked "Does the blood found in Medical Legal No. 98-1692 on the stain card that comes up once in 694,000 occurrences in the Hispanic population also come up in the blood on slide

barrel ejector once out of 694,000 times?" 24 R. 108. Later, on cross examination, Ms. Kim explained that "I'm not saying that only one person on this earth would have only this type of DNA. I'm saying one out of every 164,000 people will have that DNA." 24 R. 111. She later corrected her figure to match her earlier answer of 694,000. 24 R. 113. She also testified in response to a question on cross examination that one out of 114,000 whites might have left that sort of DNA on the gun and that it was about six times more likely in white populations than in Hispanic populations. 24 R. 116-17. Ms. Kim also testified that "in areas that – of chromosomes that I tested have the same DNA as the morgue blood" 24 R. 118. Ms. Kim *never* testified, discussed, or mentioned that the DNA profile she developed from the weapons was a mixture profile, which is reflected in the report, as distinguished from the profile of a single individual; nor did Ms. Kim ever discuss or explain how the mixture finding affected, or could have affected, the statistics or the supposed match with the known stain card. HPD Report of DNA Analysis, Exh. 61.

The defense objected to Ms. Kim's testimony regarding her analysis of the blood stain card and the guns, based on the lack of authentication of where the blood stains came from, the lack of a proper predicate, and the general inadmissibility of the evidence. 24 R. 97. The judge allowed the testimony in on

the condition that it was "proved up" and told the defense that the Court would

"honor a Motion for a Mistrial" if the evidence was not proved up. 24 R. 99-100.

The defense also objected that there was no showing that the comparison of the

blood stain and the blood from the weapons was "reliable" or of "any scientific

value," and the Court overruled the objection. 24 R. 106-07.

It was only much later, after the problems with the HPD Crime Lab were

brought to light, that it became clear that this evidence was never truly "proved

up", and that, as counsel for the defense sought to show, that it was of no scientific

validity or reliability. Particularly considering how significant the problems were

with the HPD Crime Lab, and given how important this forensic evidence was at it

was used against Mr. Alvarez, the Court should honor the trial Court's promise to

grant a mistrial and reverse the conviction in Mr. Alvarez's case.

As noted, the State used the DNA evidence to connect Mr. Alvarez to the

second drive by shooting at the Woodfair apartment complex. During closing

arguments, the prosecutor initially tried to connect Mr. Alvarez to the crime by

suggesting the spots on the shirt he wore the night of the shootings was the blood

of Varela, but since the State didn't have the shirt, the defense objected and moved

for mistrial, which was overruled. Then the State argued:

> Let's talk about analysis. You want to talk about blood
> analysis? Hey, we've got that, too, on both of these guns. Blood swabs

were taken and compared from the body of Joey Varela. And guess what. His blood was on both of these weapons. Where were these weapons found? In this man's closet. Not just anywhere, in this man's closet where he keeps his personal belongings, his clothing. That's how you know that the defendant, Juan Carlos Chuco Alvarez, is a principle in the Woodfair case, that he's the shooter in that case. XXIV R. 60-61.

## BRADY DISCLOSURE

Mr. Alvarez was convicted of capital murder and sentenced to death in October 1999. Mr. Alvarez's initial state post conviction attorney, Leslie Ribnik, filed the state Habeas Writ on September 10, 2001 and the State filed its reply on December 12, 2001. The independent audit of the HPD Crime Lab, which signaled the beginning of the lab scandal, was conducted a year later on December 12 and 13, 2002. The State filed their Brady Disclosure letter more than two months after that, on February 25, 2003. The Brady Disclosure notified the Defense and the Court that "the investigation in this case included some involvement by the Houston Police Department's Serology/DNA Laboratory" and that "an independent audit of the DNA/Serology section of the Houston Police Department Crime Laboratory revealed several areas of non-compliance with DNA lab procedures established by the Federal Bureau of Investigation." Brady Disclosure, Exh. 60. This set in motion the litigation and factual development that forms the basis of this claim.

## STATE COURT LITIGATION AND RESTESTING OF THE DNA

Following the Brady Disclosure letter, the district attorney's office indicated their intent to have the DNA in Mr. Alvarez's case sent out for retesting. Subsequent to receiving the Brady Disclosure, state habeas attorney Leslie Ribnik filed a series of motions.

Prior to the district attorney's notifying the state trial court and defense counsel of any possibility of retesting, the HPD Crime Lab, apparently acting under the direction of Captain Holland, released the DNA evidence to Identigene laboratory on March 7, 2003, and on March 13, 2003, sent an order form requesting that Identigene the DNA evidence. Report of Identigene Laboratory, Exh. 64 at 2. Christy Kim, the analyst who caused the errors in the original testing, was the HPD personnel listed on the chain of custody form who handed the evidence over to Identigene. *Id.* A week or so later, the district attorney's office informed Mr. Ribnik of their intent to have Identigene retest the DNA material, as well as their intent to file a Release of Evidence motion in court, even though HPD had in fact already released the evidence to Identigene.

The defense objected to the State releasing the evidence at all, and specifically to having Identigene do the retesting at the State's request. Mr. Ribnik filed his opposition to the release of evidence (even before the State filed their

motion), a supplemental Brady discovery motion, a motion to abate proceedings, and a motion to preserve evidence, all on and around April 3-7, 2003. Identigene, however, unbeknownst to Mr. Ribnik, had already began conducting the retesting of the DNA samples from HPD on April 2, 2003.

On April 4, the Court granted the State's motion to release the weapons to Identigene for retesting, over defense's objections. Identigene sent HPD the results of the retesting on April 8, 2003. Report of Identigene Laboratory, Exh. 64 at 2. A few days later, on April 14, 2004, the district attorney sent Identigene a letter directing them to not begin the retesting (which had already been concluded), per the Court's order. On April 14, Mr. Ribnik filed a brief in support of his Supplemental Brady Discovery order, which the judge granted on April 17. [accomplishing what?]

The State eventually produced the raw data from the HPD original testing and the Identigene retesting to the defense. On April 17, Mr. Ribnik requested and the Judge granted funds for a DNA expert to review the testing and retest the DNA if necessary. These appear to be the only two motions that the Judge granted for the defense among the series filed in April. There was no ruling on the rest of the motions.

By way of explanation, it may be helpful to define some of the terms used in this claim. Raw material refers to the unprocessed biological evidence, such as blood. The first stage of DNA analysis, extraction, is where the raw material is processed and the strands of DNA are isolated, or extracted and placed into vials. There are four stages of processing for the type of DNA analysis done in Mr. Alvarez's case and the final result of the processing is a DNA profile. Once an analyst has developed the DNA profile of from the unknown source, that profile is then compared to the DNA profile of a known source (which is derived from the same four step process). If there is DNA present in an unknown from more than one source, the DNA profile is considered a mixture.

Identigene did not retest the raw material from the weapons in Mr. Alvarez's case. The HPD Crime Lab had used up all of the raw material from the guns, so they sent Identigene the extracted DNA that analyst Christy Kim had already processed from the blood on the guns. Report of Identigene Laboratory, Exh. 64 at 2. Identigene's examination concluded that, contrary to Ms. Kim's original findings, the blood from the gun did not contain a mixture of DNA. Based on the DNA extractions conducted by Christy Kim, Identigene reported that:

> A full male DNA profile was obtained from the extracted DNA from the wood stock of the rifle, […] the barrel of the rifle, […] and the Mossberg shotgun. …[T]his DNA profile matches the DNA profile obtained from the blood stain card represented as being from Jose

Varel…. The frequency of the profile from the extracted DNA from the guns (matching that of Jose Varel) for an unrelated individual from the population at large is less than 1 in 2.11 x $10^{15}$ in African American, Caucasian, and Hispanic populations. Report of Identigene Laboratory, Exh. 64 at 2.

## DR. CHIAFARI, THE DEFENSE'S EXPERT

In mid-May 2003, Ribnik retained BRT Labs in Maryland, and specifically the Director of Molecular Technology, Dr. Francis Chiafari, to be his DNA expert. After negotiations between the district attorney, defense, and the two labs, Dr. Chiafari flew to Houston on September 15 and 16, 2003 to observe, per court order, the attempt by Identigene lab to retest the weapons in order obtain an additional blood sample from which to extract a new DNA profile. Identigene was unable to obtain any additional DNA from the weapons. Thus, the only retesting ever conducted was based on the DNA extracted by HPD.

Dr. Chiafari reviewed all the documents related to HPD's original testing and Identigene's retesting. In the beginning of October 2005, Dr. Chiafari requested a specific piece of raw data from HPD for which he needed a better copy in order to finish his review. Dr. Chiafari Fax Requesting Documentation, Exh. 66. Mr. Ribnik requested the necessary photographic quality copy from ADA Dulevitz on October 5, 2005 and after a significant delay, the DA finally produced the copy.

On January 4, 2006, the Fourth Bromwich Report was issued and included information about the serious errors in Mr. Alvarez's case. Bromwich Fourth Report, Exh. 55, at 42. As explained more below, the Bromwich report identified a weak allele call by Analyst Christy Kim as being the cause for concluding that the DNA sample from the weapons had a mixed profile, and relied on the Identigene retesting, which found only the single profile of the victim matching the DNA from the guns, as evidence of HPD's serious mistakes. Bromwich Fourth Report, Exh. 55, at 42.

On January 9, 2006, Dr. Chiafari sent Mr. Ribnik his official report identifying fifteen errors in how the HPD Crime Lab handled and tested the DNA. Chiafari Official Report, Exh. 57. Dr. Chiafari noted the dismal state of the HPD work:

> HPD provided copies of hand modified documents, with uninitialed, undated, and obliterated changes. They were incomplete, unformatted, without table of contents, and outwardly disheveled. They did not leave the reader comfortable about the organization, abilities, or functionality of the lab or the staff. Additional alleles seen in some evidence samples (in comparison to re-tests) could be indicative of significant contamination and process control problems. Chiafari Official Report, Exh. 57, at 3.

He concluded that the HPD results were unreliable, "substantially flawed" and because Identigene's retesting was based on the DNA extracted from the

weapons by HPD rather than a new sample from the weapons, the retesting was unreliable as well. Chiafari Official Report, Exh. 57, at 4. Dr. Chiafari cautioned that the possibility of contamination at HPD was significant enough to render both DNA testing invalid.

Dr. Chiafari sent a follow-up clarification letter to Mr. Ribnik on May 4, 2006, apparently in response to an inquiry. In the clarification letter, Dr. Chiafari explained that his findings of problems with DNA evidence used against Mr. Alvarez "included deficiencies in documentation, testing results, and interpretation of data by HPD" and examples "where documentation was incomplete or shoddy, reported calculations that were incorrect, and re-tested extracts yielded qualitatively different results." Dr. Chiafari Clarifying Letter, Exh. 58. He explained that given the different results between the HPD and Identiene analyses, "contamination is one mechanism that must be considered to explain the result disparity" and that "the HPD results indicate that contamination may have occurred at some point in the testing process and call into question all samples handled in this case." *Id.* Furthermore, since the "Identigene conclusions are based on extracts created by HPD," he considered "their results to be potentially flawed (and invalid) as well" and both of the results are "unreliable." *Id.*

After Ribnik received Dr. Chiafari's official report in January 2006, he shared that report with the State.  On April 25, 2006, Mr. Ribnik filed  a motion for discovery by Deposition and Written Interrogatories to memorialize conversations he had with Identigene personnel and HPD employees in anticipation of filing a Habeas Claim on the DNA issue.  The State filed their opposition in May 2006, after they had seen the results of Dr. Chiafari's second follow-up report.  The state habeas court never rulied on this motion.

### THE DNA HOUSTON POLICE DEPARTMENT SCANDAL

The serious problems with the competency and reliability of the forensic evidence handled and analyzed by the Houston Police Department Crime Lab began to come to the public's attention with the audit of the HPD Lab conducted by the FBI on December 12-13, 2002.  Pursuant to the DNA Identification Act of 1994, the FBI issued guidelines in 1998 and 1999 to implement quality assurance standards for use by forensic DNA testing laboratories and forensic DNA databasing laboratories.  Quality Assurance Audit, Exh. 54, at 3.  The audit of the HPD Crime Lab conducted in December 12-13, 2002 was intended to assess the quality of the practices and performance of the lab and to determine whether the lab was in compliance with the FBI Standards.  *Id*.

The FBI audit identified thirty-nine different Quality Assurance Standards for which the HPD Crime Lab was not in compliance. *Id.* at 45-48. The auditors also issued an additional fourteen recommendations of how the Lab should improve their procedures. The areas in which the HPD Crime Lab was not in compliance with the Quality Assurance Standards included serious problems, such as:

- The HPD quality assurance manual did not cover certain requirements, such as personnel qualifications, corrective action, reports, or safety, as required (QA Standard 3.11);

- Processes detailed in the HPD quality assurance manual were not followed. (QA Standard 3.1);

- Calibration of equipment was not being performed (QA Standard 4.1(a)

- Information was not available for all staff in the DNA/Serology section to verify that examiners met the educational requirements, and other trainings and qualifications (QA Standards 5.1, 5.1.2)

- Examiners were not attending required continuing education trainings and the quality assurance manual did not address the continuing education requirements and documentation (QA Standards 5.1.3 and 5.1.3.1(f))

- Examiners either were not conducting or properly documenting qualifying tests and non-probative case work sample testing required for validation study was not conducted (QA Standards 5.3.3 and 8.1.3.1(a))

- The laboratory was not designed to minimize contamination. In fact, the auditors were informed that a roof leaked on evidence. (QA Standard 6.1)

- The lab did not employ practice aimed at conserving evidence and samples were being used up unnecessarily (QA Standard 7.2)

- Evidence in storage freezers were not properly sealed and conditions causing contamination and/or deleterious changes to the evidence needed immediate attention (QA Standard 7.1.3)

- A well established mechanism for resolution of discrepant conclusions between analysts and reviewers has not been established and understood by all analysts. (QA Standard 12.1.1).

Quality Assurance Audit, Exh. 54, at 45-48.

The identified failures of the HPD Crime Lab were expansive in scope. The FBI Audit revealed a Crime Lab with unqualified and untrained staff members analyzing forensic evidence used to send people to prison, or even to their deaths, who would unnecessarily use up all available evidence (such as in the present case), operate with procedures that could cause contamination or break down the evidence, and fail to conduct calibration and testing to ensure that their results were reliable. Or, as the New York Times put it: "the audit of the Houston laboratory […] found that technicians had misinterpreted data, were poorly trained and kept shoddy records. In most cases, they used up all available evidence, barring defense lawyers from refuting or verifying their results. Even the

laboratories building was a mess, with a leaky roof having contaminated evidence." NYT Article, Exh. 59, at A12.

The reports of problems at the Lab were so serious that in January 2003, all genetic testing at the Lab was suspended until the problems could be addressed. NYT Article, Exh. 59 at A12.

The City of Houston and the HPD commissioned Michael Bromwich of Fried, Frank, Harris, Shriver & Jacobson LLP to conduct an independent investigation of the HPD Crime Lab and Property room following the serious questions about quality that were raised by the FBI audit and subsequent problems. Bromwich Investigation Final Report, Exh. 56, at 1. Among other goals of the investigation, they were to "identify potential cases of injustice resulting from flawed or misleading forensic science work performed in the past by the Lab" and "thoroughly examine and assess the scientific and administrative problems related to the Lab's work across all of its sections, focusing primarily on cases worked during the 1998-2004 period but extending more broadly with respect to certain forensic disciplines, especially serology". Bromwich Final Report, Exh. 56, at 1.

While the Bromwich investigation discovered very few problems with the toxicology, firearm, and questioned documents sections of the lab, the team discovered very serious problems with the DNA and serology departments:

By stark contrast with the overall quality of work performed in these sections of the Crime Lab, the Lab's historical serology and DNA work is, as a whole, extremely troubling. We found significant and pervasive problems with the analysis and reporting of results in a large proportion of serology and DNA cases. The Crime Lab's substandard, unreliable serology and DNA work is all the more alarming in light of the fact that it is typically performed in the most serious cases, such as homicides and sexual assaults. On the whole, this work did not meet the generally accepted forensic science principles that existed at the time and posed major risks of contributing to miscarriages of justice in extremely significant cases, including death penalty cases.   Bromwich Final Report, Exh. 56, at 4.

The Bromwich Team reviewed the 135 DNA cases that were analyzed by the Crime Lab between 1990 and 2002 and found major issues with 32% of them. *Id*. at 4.   Of the 18 death penalty cases that involved DNA evidence, they identified major issues in four of the cases, including Mr. Alvarez's case.  *Id*.

The Bromwich investigation summarized the wide range of serious problems with the DNA section thus:

The Crime Lab's historical DNA casework reflects a wide range of serious problems ranging from poor documentation to serious analytical and interpretive errors that resulted in highly questionable results being reported by the Lab. The profound weaknesses and flawed practices that were prevalent in the Crime Lab's DNA work include the absence of a quality assurance program, inadequately trained analysts, poor analytical technique, incorrect interpretations of data, the characterizing of results as "inconclusive" when that was not the case, and the lack of meaningful and competent technical reviews. Furthermore, the potential for the Crime Lab's analysis of biological evidence to result in a miscarriage of justice was amplified exponentially by the Lab's reported conclusions, frequently accompanied by inaccurate and misleading statistics, that often

suggested a strength of association between a suspect and the evidence that simply was not supported by the analyst's actual DNA results. *Id*. at 5.

In addition to the problems of poor technical work, possible contamination, questionable interpretation or results, misleading reporting of statistical significance of DNA profiling results in mixed cases, is the specter of a nefarious motive in the work. Disturbingly, the Bromwich Team was unable to rule out this possibility in the problems they discovered at the HPD Crime Lab. Thus the Report states:: "It is not clear whether this pattern and practice of avoiding the reporting of DNA typing results that were not consistent with a victim or known suspect is attributable to the DNA analysts' lack of confidence in their ability to obtain reliable results or to **a more sinister manipulation of analytical results**." Bromwich Fifth Report, Exh. 65 at p. 5-6 (emphasis added).

That they could not rule out the possibility that state employees such as Christy Kim were intentionally manipulating the results of the DNA testing in order to support the police and prosecution's theory rather than objectively analyzing evidence to seek the truth destroys any credibility or faith in the good will that a crime lab may otherwise be afforded. The Bromwich Investigation further explained:

It is apparent, however, that DNA analysts in many cases tended toward reporting only those results that, from their perspective, were

"safe" in the sense that they were consistent with other evidence in the case or with the investigators' expectations. This sometimes meant that analysts suppressed potentially exculpatory RFLP results in favor of reporting less reliable or less discriminating PCR-based typing results that appeared to reflect an association between the suspect and evidence in the case. When such selective reporting was coupled with the Crime Lab's systematic overstatement of the statistical significance of these weaker PCR results, a very significant potential for injustice was created. Bromwich Fifth Report, Exh. 65, at 6.

The breadth of incompetence - or worse - documented by the Bromwich report is stunning. For a Lab tasked with analyzing some of the most important evidence used to send defendants to prison or to their death to be riddled with such staggering problems completely undermines the reliability of evidence coming out of that lab.

The Bromwich Team reexamined the DNA case against Mr. Alvarez, reviewing whatever documentation was available from the HPD analysis as well as the retesting information conducted by Identigene Lab. They concluded that:

The DNA testing performed by Ms. Kim in connection with the capital case of Juan Carlos Alvarez provides another example of conclusions drawn based on weak results. In the Alvarez case, Ms. Kim performed DQ Alpha, Polymarker, and D1S80 testing on DNA extracted from separate bloodstains located on firearms evidence -- on the stock of a rifle, on the barrel of a rifle, and on a shotgun. The only reference samples that Ms. Kim ran were those of two victims, Jose Varel and Hugo Perez. No known suspect DNA reference sample was run. Ms. Kim reported that the "DNA patterns detected on the rifle and shot gun are consistent with those of [Jose Varel] and one other donor." This mixture finding was based on Ms. Kim's decision to call the "C" allele of the GC locus in Polymarker for one evidence sample

and the "24" allele of the D1S80 typing system for three of the evidence samples. Our review found that these allele calls were weak and that Ms. Kim's decision to report a mixture containing the profiles of Mr. Varel and an unknown person was questionable. On April 8, 2003, the outside laboratory that re-tested samples extracted from the rifle and shotgun determined, through STR testing, that only Mr. Varel's DNA profile was present in the evidence samples. Bromwich Fourth Report, Exh. 55, at 42.

The findings of the Bromwich Team do not contradict Dr. Chiafari's conclusions. In fact, after setting forth their concerns in the Alvarez case, the Bromwich report explained "We are concerned that the multitude of alleles that HPD Crime Lab analysts often identified through their PCR testing might, in some case, be attributable not only to poor techniques but also to possible contamination." Bromwich Fourth Report, Exh. 55, at 42.

Given the pervasive problems at HPD, it is entirely plausible that there were errors at more than one stage of the DNA examination. There are various ways that one can create isolated DNA to make it look like there is a match, including cross contaminating samples or transferring biological materials from one item to another. For example, as a consequence of the dismal documentation and lack of adherence to the standard procedures, there is no way to determine whether Ms. Kim processed the known and unknown samples separately. If not, there may have been accidental or intention physical contact between with the known sample and

the unknown samples at the extraction or another phase, which would of course completely invalidate any findings based on those samples.

It cannot be conclusively proven whether or not there was contamination at the initial extraction stage or if by some remarkable chance, the only errors made by the unqualified examiner were the weak allele call identified by the Bromwich report and the misleading and incorrect statistical data. However, it is well established that the conditions at the lab were conducive to contamination. Not only the egregious condition of a leaky roof ruining evidence[10], but, as the FBI audit concluded, the lab "was not designed to minimize contamination" and there existed "conditions that caused contamination." Quality Assurance Audit, Exh. 54, at 45-48.

Because the protocols for the HPD lab were not properly documented, it is impossible to know what the analyst was *supposed to do*, and because the documentation for the analysis is so poor, it is impossible to know exactly what the analyst *did do*. As a result of these documentation problems, there is no way to identify how many different problems, or which problems, were at play in Mr.

---

[10] The Bromwich Report details that the City and HPD were aware of problems with the roof at the police station headquarters building before the Crime Lab moved into the facility in 1997 and how Tropical Storm Allison flooded the Crime Lab, and boxes containing biological evidence became soaked and the evidence likely contaminated. Even after that, the roof leaks continued unabated in a scientific laboratory responsible for processing sensitive biological evidence for use in criminal matters and were not addressed until 2003, after the crisis enveloped the Crime Lab. Bromwich Final Report, Exh. 56, at 8 n.6.

Alvarez's case.  The only safe, and undeniable conclusion that can be drawn from the work is that the DNA analysis and testimony Mr. Kim provided for Mr. Alvarez's trial was unreliable and invalid.

Dr. Chiafari noted that "The HPD report states that the statistical likelihood of finding a match to the population databases of the Jose Varel(a) profile.  Instead, the report should comment on the frequency of finding a match to the evidence.  Since samples #1, 2 and 3 are mixtures, the likelihood of a mixture profile match is smaller and less significant."  Chiafari Official Report, Exh. 57, at 3.

In addition to the HPD Crime Lab's analysis of the DNA evidence being unreliable and invalid, there were also serious problems with the statistical data presented by Ms. Kim in Mr. Alvarez's case.  The problems in Mr. Alvarez's case were symptomatic of more common problems with Crime Lab.  There was a documented "failure to properly calculate and communicate the meaning of statistics in scientific reports and courtroom testimony in order to accurately convey the significance of test findings."  Bromwich Fourth Report, Exh. 55, at 81.

The problem with the statistical data was raised in Mr. Alvarez's direct appeal (Claim XV).  The Court of Criminal appeals likewise addressed concerns over the validity of the statistical data that Ms. Kim presented at trial and overruled the concerns because the evidence was the type of facts "reasonably relied upon by

experts in the particular field in forming opinions or inferences on the subject."
CCA Opinion at 17. As the statistical evidence that Ms. Kim presented was
factually incorrect and part of a pattern of incorrect and misleading testimony by
HPD Crime Lab employees, it does not merit the deference given to it by the
CCA. Defense counsel's objections at trial and the errors in the data warrant
reversal on this issue as well.

It is abundantly clear from the reviews by the FBI audit, the Bromwich
Investigation, Identigene Labs, and BRT Labs that the HPD Crime Lab procedures
in general and specifically their handling and analysis of the evidence in Mr.
Alvarez's case were fundamentally flawed, and therefore that Mr. Alvarez was
convicted of capital murder based on faulty and unreliable science.

In determining the admissibility of scientific evidence, both Texas Rule 702
(which mirrors the Federal Rule of Evidence) and Kelly v. Texas 824 S.W.2d 568,
572 posit "If scientific, technical, or other specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education, may
testify thereto in the form of an opinion or otherwise." *Kelly v. Texas* 824 S.W.2d
568, 572 (1992). *See also* Texas Rule of Evidence 702 (evidence should be
admitted, "[i]f scientific, technical, or other specialized knowledge will assist the

trier of fact to understand the evidence or to determine a fact in issue."). *Kelly* requires that the "the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results," because "[u]nreliable . . . scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue." *Kelly v. Texas* 824 S.W.2d 568, 572 (1992). The scientific evidence presented at Mr. Alvarez's trial was inadmissible since it does not even satisfy the reliability requirement.

The State's case against Mr. Alvarez was marred by the un-refuted presentation of unreliable evidence, and in particular, unreliable forensic evidence. This pattern of unreliable forensic evidence is epitomized by the mishandling of the gold standard of evidence in criminal case – DNA evidence. The supposed infallibility of DNA evidence strengthens the credibility of a prosecution which relies in part on the use of DNA evidence to convict a suspect.

As a result of prosecutorial misconduct the DNA evidence used against Mr. Alvarez was unreliable and worthless, plagued by serious errors and the work of the discredited Houston Police Department Crime Lab. The confluence of all the various problems that riddled the Houston Crime Lab lead to a complete undermining of the forensic evidence related to Mr. Alvarez's case that the Lab handled. As Dr. Chiafari concluded, because of the overall problems in the case

and by the Houston Crime Lab, "it is not possible to draw any valid or reliable conclusions on the significance of the described [DNA] results." Dr. Chiafari Final Report, Exh. 58, at 4.

## CLAIM V: MR. ALVAREZ'S CONSITUTIONAL RIGHTS WERE VIOLATED WHEN THE PROSECUTOR KNOWINGLY ALLOWED CHRISTY KIM TO FALSELY TESTIFY.

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to a fair trial and to present his defense, to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the prosecution allowed Christy Kim to testify in a false and misleading manner. Mr. Alvarez's Due Process rights were violated since "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. State of Kansas*, 317 U.S. 213 (1942). Particularly relevant to Mr. Alvarez's case is the premise that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois* 360 U.S.

264, 269 (1959) (*citing Alcorta v. State of Texas*, 355 U.S. 28 (1957)).  *See also Giglio v. U.S.* 405 U.S. 150 (1972).

HPD Crime Lab analyst Christy Kim testified at Mr. Alvarez's trial about her examination and processing of the DNA evidence in the case. She ultimately testified that the blood stain card from ML 98-1692 (which was later established to be from the victim Jose Varela) was consistent with the DNA profile extracted from the weapons introduced at trial, the SKS rifle and the Mossberg shotgun. 24 R. 83-119. The police reports obtained from the district attorney's files during state habeas litigation include Ms. Kim's forensic report on her analysis. HPD Report of DNA Analysis, Exh. 61. This report reveals that Ms.Kim made three findings in her analysis of the evidence:

> The DNA patterns detected on the rifle and the shotgun are consistent with those of blood stain (ML 98-1692) [Jose Varela] and **one other donor.**

> The DNA patterns detected on the rifle and shotgun do not match that of blood stain (ML 98-1694) [Hugo Perez]

> The DNA pattern of Jose Varel (sic) (ML 98-1692) can be expected to occur in 1 out of 694,000 people in Hispanic population.

> HPD Report on DNA Evidence, Exh. 61, at 2.108.

Ms. Kim <u>never</u> testified that the DNA profile she developed from the weapons was a mixture profile consistent with Jose Varela **and one other donor**, rather than the profile on a single individual. Nor did she discuss how the mixture finding affected the statistics or the supposed match with the known stain card. HPD Report of DNA Analysis, Exh. 61. This information would have been important at trial, as it could have supported a defense theory that the other donor was one of the other uncharged co-defendants in the case.

As the police report with these results was produced by the State, and was in the custody of the prosecutor, and he did not elicit any clarifying or corrective testimony from Kim, he thereby allowed false testimony to go uncorrected in violation of *Napue v. Illinois*, and so violated Mr. Alvarez's right to a fair trial, effective representation, due process, and to be free from cruel and unusual punishment, all as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

Furthermore, since Ms. Kim was an employee of the Houston Police Department, she was a member of law enforcement and a State Actor. Since she was a member of law enforcement, her false testimony and knowledge that her testimony was false can be imputed to the district attorney. Effectively, the district attorney, through its agent, Ms. Kim, presented false testimony.

**CLAIM VI: MR. ALVAREZ'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY PROSECUTORIAL MISCONDUCT DUE TO THE MALFEASANCE OF CHRISTY KIM, THE DNA ANALYST WHO EXAMINED THE EVIDENCE IN MR. ALVAREZ'S CASE AND TESTIFIED FALSELY AT HIS TRIAL**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to a fair trial and to present his defense, to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, because prosecution "expert" witness Christy Kim falsified evidence and testified falsely at Mr. Alvarez's trial.

Christy Kim, the employee of the DNA and Serology Department of the HPD Crime lab who conducted the analysis of the DNA evidence in Mr. Alvarez's case, had an extensive history of performing incompetent work for the HPD Crime Lab. The Bromwich Investigation attempted to interview her concerning the significant errors they discovered in her work, but she would not agree to meet with the team. Bromwich Fourth Report, Exh. 55, at 8.

In the cases that the Bromwich Investigation reviewed, they identified several instances of serious errors or questionable analysis in Ms. Kim's work. In

fact, "Ms. Kim and Mr. Bolding personally performed the analytical work in many of the most problematic cases" they reviewed. Bromwich Fifth Report, Exh. 65, at 1. In addition to Mr. Alvarez's case, the other defendants include:

- Charles Eura Hodge (Ms. Kim's testing excluded the suspect but she reported him as a possible contributor none the less). Bromwich Fourth Report, Exh. 55 at 5.

- Frank Alix (Ms. Kim's identification of the defendant as a contributor was considered unreliabile since photographs of the tests provided no evidence that she ran the negative controls that she claimed to have run). Bromwich Fourth Report, Exh. 55 at 8.

- Gordon Wayne Hairrell (Ms. Kim reported the misleading conclusion that the suspect could not be eliminated as a possible semen donor by neglecting to mention that no potential semen donors could be excluded and the results were meaningless). Bromwich Fourth Report, Exh. 55 at 19-22.

- Robert Cantrell (Ms. Kim's allele calls and documentation were questionable). Bromwich Fourth Report, Exh. 55, at 47.

- Roland Salazar (Ms. Kim failed to report probative and potentially exculpatory evidence in a sexual assault and murder case). Bromwich Fifth Report, Exh. 65, at 28.

The problems with Ms. Kim's work extended back to her stint in the Serology Department in 1986. By the time she analyzed the DNA evidence in Mr. Alvarez's case, she had been tainting criminal cases with faulty science for over twelve years. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993), Ms. Kim should not have been permitted to provide testimony in Mr. Alvarez's case.

Like many of the problems with the HPD Crime Lab, the incompetence or malfeasance perpetrated by Ms. Kim was either known or knowable by supervisors or other State actors. Ms. Kim herself was a State actor, and therefore knowledge of her malfeasance is attributable to the prosecution. Moreover, with full knowledge of her taint, the district attorney, behind the back of the defense, used Ms. Kim in its effort to sanitize her faulty work in this case. As noted elsewhere in other claims in this Petition, Ms. Kim not only analyzed the DNA evidence used in Mr. Alvarez's case, but she also was the individual who transferred the DNA extractions and other materials to Identigene for retesting to verify to her own work.

The Bromwich Investigation was unable to rule out whether some analysts' failures were due to more sinister reasons than mere incompetence. As David Dow, a University of Houston law professor, told the New York Times: "There

were two different problems in the crime lab – scientific incompetence and corruption." NYT, Review of DNA From Houston Police Crime Lab Clears Man Convicted of Rape, Exh. 59, at A12. For purposes of this *Brady* claim, the motivation does not change the duty to disclose the information, but it is important to know what else may have been going on with the prosecution of Mr. Alvarez's case. The Bromwich Report documents that "Grievances and Internal Affairs Division ("IAD") complaints between and among analysts and supervisors, some of which were quite petty, were commonplace." Bromwich Final Report, Exh. 56 at 9. If there were grievances and internal affairs division complaints lodged against Ms. Kim or anyone else working on Mr. Alvarez's case, these materials should have been disclosed to the defense team.

**CLAIM VII: THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT IN MAINTAINING, UTILIZING, AND RELYING UPON EVIDENCE FROM, A GOVERNMENT AGENCY LAB, THE HOUSTON POLICE DEPARTMENT PROPERTY ROOM, THE CONDITIONS OF WHICH WERE DEPLORABLE AND THEREFORE THE PRODUCT OF WHICH INHERENTLY UNRELIABLE, IN VIOLATION OF MR. ALVAREZ'S CONSTITUTIONAL RIGHTS**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to a fair trial and to present his defense, to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, where the prosecution used the Houston Police Department and the Houston Crime Lab for collecting, storing, testing, analyzing, and reporting on any physical or forensic evidence relied upon in Mr. Alvarez's case.

Related to concerns about contamination are concerns about the storage and handling of evidence. The Bromwich Investigation reported that "In 2004, HPD disclosed that evidence from 8,000 criminal cases had been improperly stored and inventoried in the Property Room. As a result, evidence from at least 33 cases was inadvertently destroyed." Bromwich Final Report, Exh. 56, at 24. The Bromwich Investigation concluded that "The conditions at the Property Room are a threat to the public safety and to the safety of Property Room employees, and they threaten to undermine the ability of Houston law enforcement agencies to perform their missions." *Id*.

The conditions of the Property Room, as well as the inability of the Bromwich Team to exclude the possibility of corruption or motive in the mishandling of evidence, raise greater concerns for Mr. Alvarez's case beyond the

problems with the DNA evidence.  Other evidence presented at Mr. Alvarez's trial was stored in the HPD Property Room.  HPD Firearms Submission Form, Exh. 63. The ballistics evidence, stored for some time prior to its analysis, was critical in the case against Mr. Alvarez.  The ballistic evidence and firearms were compared from several different crime scenes.  The lack of security and possibility of tampering with evidence is significant enough that the reliability of all the evidence stored in the Houston Police Department's Property Room in Mr. Alvarez's case should be considered suspect.

The State was aware of the security issues for some time, including during the period of time when Texas was prosecuting Mr. Alvarez, and they did nothing to address this very serious situation.  The Bromwich Team reported that "[m]any of the issues that we observed and have reported on in the past related to the storage and retrieval of evidence have been well known to HPD for at least ten years."  Bromwich Final Report, Exh. 56, 24.

The Crime Lab was known to use up evidence and to store it in a manner that led to their deterioration or destruction, thus precluding as here, defense-sponsored examination, testing, or analysis.  The Bromwich Team noted that the "[s]torage of biological evidence has been an ongoing problem for the Property Room" in part because of "the lack of sufficient temperature-controlled space for

storing such material." Bromwich Final Report, Exh. 56, at 25. In April of 1998, the Property Room began storing biological evidence in the general storage area, instead of in the freezers or even an air-conditioned area. *Id*. This causes problems because biological material "is much more likely to degrade in a high humidity, high temperature environment." *Id*.

The storage at the Crime Lab is further plagued with the archaic systems to track chain of custody and use of a variety of containers for the evidence, such as paper bags and boxes, which create the risk that "evidence can be lost or stolen, create a hazard, or become contaminated when removed from its container." *Id*. at 27.

As Mr. Alvarez objected to in Claim XV in his direct appeal, there were problems related to the chain of custody and authentication of the evidence at trial. *Alvarez v. State*, Direct Appeal Brief of Appellant at pp. 45-47. Sarah Katanis made a stain card of Jose Varela's blood from the autopsy (ML 98-1692), which was marked at State's Exh. 146. 22 R.10-13. This card was sent to Robin Freeman, a DNA analyst at the Harris County Medical Examiner's Office. *Id*. The card was then picked up by HPD Officer Beth Kreuzer-Halling and taken to the HPD Crime Lab to Christy Kim. 22 R. 22-25, HPD Report on DNA Evidence, Exh. 61. Analyst Kim then did analysis on the Stain card. 22 R. 101. Defense

counsel objected to the evidence submitted by Ms. Kim based on a lack of predicate, 22 R. 97-99, and that the DNA evidence was not scientifically valid, 22 R. 106. Robin Freeman was not called to testify regarding her involvement in the DNA Chain of custody.

The Court of Criminal Appeals disposed of the concerns over the chain of custody by stating that "Without evidence of tampering, most questions concerning care and custody of a substance go to the weight given to, rather than to the admissibility of, the evidence; appellant makes no claim of tampering. *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App.), cert. denied, 522 U.S. 917 (1997)." *Alvarez v. State*, CCA Opinon at 17. It is clear from the problems discovered by the FBI audit and the Bromwich investigation that there are concerns of tampering with evidence and a very significant concern about the competency of work at the HPD Crime Lab generally. The procedures to protect the validity of evidence and paperwork are all questionable. In light of these concerns, the questions over the care and custody of the stain cards takes on significant importance. With the evidence uncovered subsequent to the Brady Disclosure letter, these concerns that the defense counsel raised at trial, and that appellate counsel presented on direct appeal, merit new attention and reversal of Mr. Alvarez's conviction, particularly

when viewed cumulatively with the other errors in handling the scientific evidence in this case.

The concerns about the Crime Lab's tendency to use up all material in evidence played out in a predictable manner in Mr. Alvarez's case. The state habeas defense attorney wanted their defense expert to have access to the DNA evidence used against Mr. Alvarez, but there was an insufficient amount of material left for retesting. Although there was some extracted material for Identigene to do the initial retesting with, there was no raw material. As a result, even Identigene's retesting would be unreliable evidence for use in a trial against Mr. Alvarez, since it relied entirely on the previous work in extraction done by the incompetent analyst, Christy Kim. Whether it was a *de facto* policy of the Lab to use up the material in order to prevent defense teams from recognizing their incompetence or be in a position to retest and challenge their results, the effect of using up the material does just that. The actions of the state actors at the Crime Lab completely prevent Mr. Alvarez from discovering what the DNA evidence in his case actually would prove or not prove.

Given the problems with the Property Room and the State's knowledge and neglect of those problems, the evidence that was stored in the Property Room and used to convict Mr. Alvarez should be excluded, or at the very least, the State

should disclose information about these problems to the defense team, and Mr.

Alvarez should be granted a retrial in which he can present these concerns over the

reliability of the evidence to a jury. Mr. Alvarez's conviction, based upon a

variety of evidence handled by and analyzed by the Houston Crime Lab, is

unreliable and should be overturned.

**CLAIM VIII: THE TRIAL COURT'S REFUSAL TO CONDUCT ANY PRE-TRIAL RELIABILITY DETERMINATION REGARDING EVIDENCE OF UNCHARGED, UNADJUDICATED, AND/OR OTHER "BAD ACT" EVIDENCE ALLEGEDLY COMMITTED BY MR. ALVAREZ, AND THE ADMISSION OF SUCH EVIDENCE, ESPECIALLY ABSENT ANY REQUIREMENT FOR A STANDARD OF PROOF, AT THE SENTENCING PHASE OF MR. ALVAREZ'S CAPITAL TRIAL VIOLATED HIS CONSTITUTIONAL RIGHTS**

All other claims and allegations in this Petition are incorporated into this

Claim by this express reference.

Petitioner was denied his right to due process, effective assistance of

counsel, to be free from cruel and unusual punishment, and to equal protection of

the law, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments to the U.S. Constitution, when the trial court admitted into evidence,

over objection, allegations of multiple uncharged offenses and other criminal or

"bad act" conduct, at the sentencing phase of Mr. Alvarez's capital murder trial,

and while doing so, refused both to conduct any pre-trial review of such evidence

to determine reliability, or require the State to prove the existence of such evidence beyond a reasonable doubt prior to the jury's consideration of such evidence in support of a sentence of death.  *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring); *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977); *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988); *McMillan v. Pennsylvania*, 477 U.S. 79 (1986).

At the sentencing phase of Mr. Alvarez's trial, the State introduced evidence of numerous uncharged offenses and other "bad act" conduct purportedly committed by Mr. Alvarez.  This evidence included:  evidence of a murder on the gulf freeway, aggravate assault on Keene street, and an armed robbery on a basketball court.

Prior to the sentencing phase of trial, trial counsel asked the court to prohibit the State from doing so, and asked the trial court for a pre-trial hearing regarding such evidence to ensure it met constitutional standards of reliability.  Trial counsel also sought to require the State to meet a standard of proof, namely, beyond a reasonable doubt, with respect to such evidence as a pre-condition to jury

consideration of such evidence in support of a sentence of death. The trial court rejected all such requests by trial counsel. XXV R. 7-8.

As a result, the State was allowed to spend several days presenting testimony and other evidence about allegations of bad conduct, including other uncharged or untried crimes such as robbery and murder, in support of a death sentence, even though such evidence had never been subjected to adversarial process, and even though Mr. Alvarez had never been convicted of any crime in connection with these allegations.

For example, the State was allowed to present evidence at the sentencing phase of Mr. Alvarez's trial alleging that he had committed another homicide, this one while driving along the Gulf Freeway at the end of May 1998. Police officers and lay witnesses were allowed to testify that Mr. Alvarez was riding as a passenger in a car along the freeway when he allegedly shot and killed a person in a car next to him. The State was permitted to present, *inter alia*, a videotape of the scene of the alleged crime, photographs of the scene, spent shell casings, the autopsy of the deceased, photos of the body of the deceased taken during the autopsy, and the testimony of the cousin of the victim who was riding along in the car with the deceased when he was shot. XXV R. 9-98. Mr. Alvarez was never tried for this crime and the jury was never required to subject this evidence to any

standard of proof prior to giving it whatever weight they saw fit in making their sentencing decision in a capital murder trial.

Similarly, the State was allowed to present evidence and testimony regarding a shooting that occurred in late May 1998 in which two individuals were shot and injured on Keene Street in Houston, Texas. Here, the State was allowed to present the testimony of a police officer who responded to the scene at the time, but who had never actually interviewed the victims. He could not even remember their names. The State also presented the testimony of the two victims in the shooting incident, neither of whom could even identify the alleged shooter, and third witness, who, despite the fact that this occurred at night and the alleged shooter was 30 feet away, claimed to have been able to identify Mr. Juan Alvarez as the shooter. The State also was allowed to present the testimony of a firearms expert whom had compared shell casings between those found at the scene in this incident, to those recovered from the Gulf Freeway incident, and testified that in his expert opinion they all came from the same weapon, namely, one recovered from Mr. Alvarez's home the night he was arrested. The State was allowed to introduce diagrams and photos of the crime scene, a recovered shell casing, a photo of a BB gun with apparent blood on it from the scene, and photos of the victims taken at Ben Taub Hospital. One victim was holding internal organs against his

stomach which had ruptured during the shooting.  XXV R. 98-129; 130-202; XXVI R. 5-38.  Mr. Alvarez was never tried for any crime in connection with this incident, and the jury was never required to measure the State's evidence against any standard of proof prior to giving it full, weighty consideration at the sentencing phase of a capital murder case.

In yet another example, the State was allowed to present evidence and testimony at Mr. Alvarez's capital sentencing trial that he had allegedly robbed an individual at gun point in April 1998.  The State presented the testimony of the alleged victim of the robbery, a young man who was himself at the time of his testimony serving a 4-year sentence for assault with a deadly weapon, as well as a police officer who investigated the robbery. XXVI R. 39-60; 124-143.  Again, Mr. Alvarez was never tried for any crime in connection with this incident; moreover, the testimony and evidence was never subjected to a burden of proof before the jury was allowed to give it full consideration in deciding whether Juan Alvarez should live or die.

Yet again, through the testimony of a probation office records clerk, and a former Bellaire police officer, the State was allowed to present evidence of Mr. Alvarez's prior conviction for aggravated assault against another high school classmate stemming from an incident near Mr. Alvarez's high school in May 1996.

During that testimony, however, the State slipped into the clerk's testimony that Mr. Alvarez had been arrested for another aggravated assault while he was on probation for the first one, despite the fact that he had never been convicted of that assault and his probation had never been revoked. XXVI R. 61-133. Mr. Alvarez has never been tried for any crimes in connection with anything but the one aggravated assault case, for which his probation had never been revoked. Despite this fact, the jury was allowed to give this evidence full consideration in making its capital, life or death sentencing determination.

In *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), the Court acknowledged that facts submitted during a sentencing proceeding could be a "tail which wags the dog of the substantive offense" where the punishment drastically increases upon finding of such fact. *McMillan*, 477 U.S. at 87-88. If ever there was a case where the sentencing tail wagged the dog, this case is it.

A full understanding of the importance of this issue starts with the recognition that "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The United States

Supreme Court has repeatedly emphasized the principle that because of the exceptional and irrevocable nature of the death penalty, "extraordinary measures" are required by the Eighth and Fourteenth Amendments to ensure the reliability of decisions regarding both guilt and punishment in a capital trial. *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). *See also Beck v. Alabama*, 447 U.S. 625, 637-38 (1980); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); and *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977).

One such measure is the heightened need for reliability in all capital sentencing determinations. "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (citations omitted). For this reason, it is well established that when a defendant's life is at stake, a court must be "particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). This heightened standard of reliability is "a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

With these propositions as starting points, it is easy to appreciate how the State's reliance upon uncharged, unadjudicated "bad acts" of the defendant in a capital sentencing proceeding, especially absent some required standard of proof, wholly undermines confidence in the reliability of any subsequent jury decision on the question of life or death. The record in this case, where the sentencing phase was filled with testimony about allegations of bad conduct with which Mr. Alvarez had either never been charged with at all, or at the very least had never been convicted of, most certainly does not inspire confidence in the reliability of the outcome. This is especially true where the jury is provided no guidance about what weight to give such evidence or what standard of proof against which it should be measured before relying upon it to make the grave life or death decision at issue.

As noted, the Court in *McMillan*, a non-capital case even, readily conceded that sentencing facts could overshadow the facts of the underlying criminal case, and noted that special care would need to be taken to ensure a defendant's right to fair sentencing determination. *McMillan*, 477 U.S. at 87-88; *see also U.S. v. Watts*, 519 U.S. 148, 156-57 (1991). Although those cases did not present the situation here, three points are of relevance in support of the position espoused herein: first, in both, the sentencing evidence relied upon was subjected to *some* standard of proof, albeit one less than beyond a reasonable doubt. Second, the Court noted in

both cases that "in extreme circumstances, relevant conduct that would dramatically increase the sentence" may well require an even more exacting standard of proof. *Id*. Third and finally, neither were capital cases, and thus neither were subject to the even greater constitutional protections and assurances of heightened reliability the Supreme Court has made abundantly clear must apply in a capital case, at least since *Woodson*.

Similarly, in *U.S. v. Mergerson*, 4 F.3d 337, 344-45 (5th Cir. 1993) *cert. denied*, 510 U.S. 1198 (1994), a non-capital case, the Fifth Circuit "recognize[d] a growing number of cases decided by courts in other circuits in which a higher standard of proof has been suggested or required when a finding of a particular fact relevant to sentencing dramatically increases the sentencing options of the court to the disadvantage of the defendant." *Id*. at 343. The *Mergerson* court also observed that "numerous lower courts have required that sentencing facts must be found beyond a reasonable doubt in the capital sentencing context." *Mergerson*, 4 F.3d at 344-45; *see also, e.g., People v. Heishman*, 753 P.2d 629 (Cal.), *cert. denied* 488 U.S. 948 (1988) (requiring specific reasonable doubt instruction); *State v. Taylor*, 818 P.2d 1030 (Utah 1990), *cert. denied* 503 U.S. 966 (1992) (same); Stephen P. Smith, *Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phase of Capital Trials*, 63 Colum. L. Rev. 1249 (1993).

As has been cogently put, the use of evidence of unadjudicated crimes becomes a ploy that "allows the state to secure a conviction on a strong murder case, then seek the death penalty by providing a weak case before a jury which is undeniably prejudiced. This opens the door to death penalty recommendations upon a level of proof lower than proof beyond a reasonable doubt." *State v. McCormick*, 397 N.E.2d 276, 280 (1979).

As a general matter, the U.S. Supreme Court has long recognized that such evidence can cause an erosion of constitutional rights "of avalanche proportions, burying beneath it the integrity of the fact finding process." *Burgett v. Texas*, 389 U.S. 109, 117-19 (1967) (Warren, C.J., concurring) ("[t]o expect that the jury could wipe this from its memory and decide the petitioner's guilt only on the basis of [valid] evidence ... is to place too much faith in a jury's ability to detach itself from reality."); *see also People v. Zachowitz*, 172 N.E. 466 (1930) (Cardozo, C.J.). An informal survey of state jurisdictions throughout the country has turned up that Texas is one of only two states (the other is Georgia) permitting sentencer consideration of and reliance upon unadjudicated offenses and bad act evidence at the sentencing phase of a capital trial in the absence of any standard of proof. Many states simply prohibit the use of such evidence altogether. For example, the Supreme Court of Pennsylvania has concluded:

> In a capital case where a man's life is at stake, it is imperative
> that the death penalty be imposed only on the most reliable
> evidence. Prior convictions of record, and constitutionally
> valid admissions and confessions of other crimes meet this
> standard of reliability; piecemeal testimony about other crimes
> for which [the capital defendant] has not yet been tried or
> convicted can never satisfy this standard.

*Commonwealth v. Hoss*, 283 A.2d 58, 69 (1981). The majority of other state court decisions to consider the issue have refused to allow the use of unadjudicated crimes in capital sentencing. *Cf. State v. Debler*, 856 S.W.2d 641 (Mo. 1993) (*en banc*) (reversing death sentence where state relied upon un-charged offense evidence and failed to give notice to defense). Other state courts at the very least require that the alleged bad acts or unadjudicated crime be proven either "beyond a reasonable doubt" or by "clear and convincing evidence."

More recent Supreme Court authority confirms that the failure at least to require the jury to find the existence of any fact or factor that may increase the chance that Mr. Alvarez may receive a sentence of death must be proven by the State beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that jury cannot constitutionally be relieved of its duty to find, beyond a reasonable doubt, all facts which "increase[] the penalty for a crime beyond the prescribed statutory maximum"); *Ring v. Arizona*, 536 U.S. 584 (2002) (holding that aggravating factors in a capital case are sentencing elements and

therefore subject to variety of due process protections).

Although the federal courts reviewing this issue in Texas and Georgia have yet to hold expressly in favor of the defendant's position, the day has come in cases such as this, where the issue is properly presented and preserved for review:

> Assertions by the State at a capital sentencing hearing that the defendant committed crimes for which he has not been convicted are inherently suspect. ...  On the other hand, the State has an important interest in presenting to the sentencing jury all relevant evidence regarding the defendant's character. ...  The American justice system typically balances these competing concerns by requiring the State to present evidence sufficient to satisfy an applicable standard of proof and the court to instruct the jury as to that standard. ...  Just as it is necessary to instruct the jury as to the standard by which the State must prove the elements of the primary crime [i.e., by proof beyond a reasonable doubt] in order to guarantee a fundamentally fair guilt-innocence proceeding, so too the jury must be instructed as to the standard by which a State must prove unadjudicated criminal conduct to be used as a[n] ... aggravating circumstance in order to guarantee a fundamentally fair sentencing proceeding.

*Devier v. Zant*, 3 F.3d 1445, 1467 (11th Cir. 1993) (Kravitch, J., concurring, joined by Clark, S.J.), *cert. denied*, 513 U.S. 1161 (1995).  In *Devier*, the defendant had failed to request a standard of proof instruction on the unadjudicated offense evidence, and the *per curiam* decision denied relief based upon that fact.  3 F.3d at 1464-66; *see also, id*. at 1466 (two judge concurring opinion characterizing basis of majority holding).  Thus while the *per curiam* opinion did not settle the merits

issue presented here, a majority of the panel held that, had the merits been reached, the result would have been that sought by Mr. Alvarez's trial counsel in the present case: "the trial judge in capital cases should instruct the sentencing jury as to the standard by which the State must prove the defendant committed the [unadjudicated] crime. Failure to provide such an instruction would impermissibly impinge on the defendants' right to a reliable and fundamentally fair sentencing determination." *Id*. at 1467.

Other courts across the country, in both state and federal jurisdictions, have agreed with this position. The Supreme Court itself has recognized the problem. On at least five occasions, two Justices have urged the Court to resolve this issue in a manner consistent with the defendant's position. *See Williams v. Lynaugh*, 484 U.S. 935 (1987) (Marshall, J., joined by Brennan, J. dissenting from denial of certiorari); *Devier v. Kemp*, 484 U.S. 948 (1987); *Sharp v. Texas*, 488 U.S. 872 (1988); *Miranda v. California*, 486 U.S. 1038 (1988); *Robertson v. California*, 493 U.S. 879 (1989). At least four Supreme Court Justices have opined that, in the right case presenting the issue free of procedural impediments, the relief sought here should be granted. *See Gray v. Netherland*, 518 U.S. 152 (1996) (majority opinion rejecting claim on procedural grounds; dissenting opinion recommending relief on merits).

**CLAIM IX: THE PROSECUTOR COMMITTED REPEATED ACTS OF MISCONDUCT THROUGHOUT THE PRE-TRIAL, TRIAL, AND POST-TRIAL PHASES, WHICH WHEN CONSIDERED INDIVIDUALLY OR COLLECTIVELY DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, because the prosecution committed repeated and egregious misconduct throughout the pre-trial, trial, and post-trial phases of the case. *See Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *Darden v. Wainwright*, 477 U.S. 168 (1986); *Doyle v. Ohio*, 426 U.S. 610 (1976); *Griffin v. California*, 380 U.S. 609 (1965); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Gardner v. Florida*, 430 U.S. 349, 362 (1977); *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Berger v. U.S.*, 295 U.S. 78 (1935).

Throughout the pre-trial and trial portions of this case the prosecution engaged in repeated misconduct. The instances of misconduct set forth herein are not exhaustive, but merely serve to demonstrate that, when considered individually

or in the aggregate, it is clear Mr. Alvarez did not receive a fundamentally fair trial. *See Darden*, *supra*./

For example, during the guilt phase of the trial the prosecutor sought to inflame emotions by showing a witness on the stand, the sister of a deceased victim who had been shot to death, a gruesome picture of her dead brother. The witness, understandably, recoiled in horror, crying out, "Oh my God!", and was led out of the courtroom in a shattering display of utter anguish. Even the trial judge recognized the shamelessness of the prosecutor's manipulative antics: "I don't approve of this at all," he replied. Nevertheless, he refused to grant a mistrial. XXVIII R. 162-166.

In a similarly manipulative display, during the re-direct examination of Houston Police Sergeant Alderete, the prosecutor elicited from the witness testimony, completely unsubstantiated, that a person named Juan Sibrian had apparently identified Mr. Alvarez in a photo line-up. This was important to the overall outcome, because the State's primary witness in the case, Brandy Varela, had not been able to identify him from the same line-up. In fact the record facts make clear that the jury was never presented with evidence of any identification by Juan Sibrian and instead the prosecutor merely sought to inject false information to prejudice the defendant. These actions were inappropriate and demonstrably prejudicial. XXI R. 88-137.

During the sentencing phase of the trial, the prosecutor attempted, in full view of the jury, to introduce into evidence the bloody clothing of Hugo Perez, a deceased individual for whose killing Mr. Alvarez had never been charged. XXII R. 145-153. Although the trial court sustained an objection, due to the clear irrelevance and inflammatory nature of the evidence, it again refused to grant a mistrial. *Id.* In another instance of prejudicial and inflammatory actions, during the cross examination of two penalty phase witnesses, the district attorney asked questions suggesting that Mr. Alvarez had killed five people and shot and injured eight others, a claim contradicted by evidenced discussed elsewhere in this petition or completely unsupported by the record. XXVII R. at 24-25 and 71-72.

During the sentencing phase of the trial the prosecutor also elicited improper hearsay testimony from a witness who was the cousin of a victim of a homicide allegedly committed by Mr. Alvarez. In that testimony, the prosecutor asked the witness if he had any conversation with his cousin prior to his death, and before the defense could object, the witness had blurted out that his cousin had said he had seen a rifle before he was shot (thereby linking this shooting incident to the prosecution's over-arching theory that Mr. Alvarez had owned and used a rifle in the other cases with which he had been charged). XXV R. 40-41. This testimony was all the more damning, because the witness otherwise could not identify the person who had shot

his cousin.  The trial court sustained an objection, but here again, refused to grant a mistrial.  *Id.*

The prosecution also committed repeated misconduct during arguments to the jury at both phases of the trial. From the outset, during opening, the prosecutor inappropriately sought to portray the defendant as a member of a loathsome category of people.  XVII R. 22.  Having conditioned the jury to this shameful, anti-group mentality, at the end of the trial during the closing argument at sentencing, the prosecution returned to the theme in full force, arguing in support of a death sentence that Mr. Alvarez was a member of an immigrant group that compared disfavorably to more productive, law-abiding immigrant groups such as Asians. XXVIII R. 58.  A defense objection was overruled.  Such contemptible conduct has no place in ordinary discourse, let alone in a court of law where a person's life hangs in the balance.  *See also* Claim I at pp.48-51, incorporated herein by express reference.

During the closing argument at the guilt-innocence phase of trial, the prosecution personally attacked the professional integrity of the defense counsel in a variety of ways, including suggesting their incompetence and attacking their ethical grounding and even their rationality. XXIV R. 48-60.

Also during the guilt-innocence phase closing argument, the prosecutor threatened the jury with sequestration by urging them to take as little time as possible deliberating about Mr. Alvarez's guilt or innocence. XXIV 7-8. Even after an objection to the improper argument was sustained by the trial court, the prosecutor again returned to the same theme, completely ignoring the trial court's ruling. A motion for mistrial was, again, denied. *Id.*

The prosecutor also sought to arouse and inflame the emotions and fears of the jurors during this same argument by telling them they should fear for their safety if they were ever walking in a particular area of Houston while wearing a certain color of clothing. XXIV R. 53.

During the closing argument at the punishment phase, the prosecutor also maligned the character of the defendant's expert, a medical doctor with unquestionable credentials, calling him a "hired gun" and thereby suggesting that character was at issue and his testimony was manufactured, manipulated, and patently frivolous. XXVIII R. 53.

These various incidents, meant to be illustrative, but not exhaustive, of the numerous ways in which the prosecutor sought to deprive Mr. Alvarez of a fair trial, each individually undermined that right, and when viewed collectively and cumulatively, clearly deprived Mr. Alvarez of his fair trial rights.

While a prosecutor may prosecute with vigor, his or her primary duty is to seek justice. He or she should never use improper methods calculated to produce wrongful convictions. *Berger*, 295 U.S. at 85-88. This includes instances where a prosecutor inserts or injects his or her own personal opinions or views into the case. *Id*. at 88 ("improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none").

When, as here, the various instances of misconduct, individually or collectively result in a fundamentally unfair trial, reversal is required. *Darden*, 477 U.S. at 181-82.

**CLAIM X: THE TRIAL COURT'S REFUSAL TO ALLOW THE DEFENSE TO PRESENT RELEVANT, CONSTITUTIONALLY PROTECTED MITIGATING EVIDENCE AT HIS CAPITAL SENTENCING PROCEEDING DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court refused to permit him to

present relevant mitigating evidence through his psychological expert, Dr. Laval, at the sentencing phase of trial.

During the sentencing phase of Mr. Alvarez's trial, the defense called psychologist Raymond Laval, Ph.D., to testify as to his expertise in clincal and forensic psychology and his evaluation of Mr. Alvarez. Dr. Laval had met with Mr. Alvarez on several occasions for purposes of evaluation, and he had reviewed his criminal history and record. The defense sought to introduce testimony from Dr. Laval regarding Mr. Alvarez's relative youth (he was 21 years old at the time of the crime) and its relationship to the special issues, especially in mitigating the issue of future danger to society. XXVII R. 153-157. The State objected, and the trial court sustained the objection, preventing the testimony entirely. This prohibition on the presentation by defense counsel, and therefore the consideration by the jury, of Mr. Alvarez's age and its impact on the aggravating and mitigating factors the jury was required to consider under Texas law (and, with respect to mitigation, under the constitution), violated Mr. Alvarez's rights to a fair and reliable capital sentencing determination.

The penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and

capricious manner.  *Furman*, supra., *Gregg v. Georgia*, 428 U.S. 153 (1976) and

*Godfrey v. Georgia*, 446 U.S. 420 (1980).

Texas has a troubled past as regards allowing capital jurors to receive,

consider, and give affect to mitigating evidence during the sentencing phase of

trial.  No fewer than ten times[11] has the United States Supreme Court reviewed

theses issues as regards Texas, and in most instances found Texas' capital

sentencing procedures wanting.

In *Jurek v. Texas*, 428 U.S. 262 (1976), the then-new statute was found

constitutional based upon the premise that the Texas Court of Criminal Appeals

would interpret the future dangerousness question "so as to allow a defendant to

bring to the jury's attention whatever mitigating circumstances he may be able to

show.  Thus, the Texas law essentially requires that...in considering whether to

impose a death sentence, the jury may be asked to consider whatever evidence of

mitigating circumstances the defense can bring before it."  428 U.S. at 272-273.

In approving the Texas statute in *Jurek*, the court relied upon the notion that

the special issues would "`guide and focus the jury's objective consideration of the

---

[11]  *Jurek, supra*; *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Adams v. Texas*, 448 U.S. 38, 46 (1980); *Graham v. Collins*, 506 U.S. 461 (1993); *Johnson v. Texas*, 509 U.S. 350 (1993); *Penry v. Johnson*, 532 U.S. 782 (2001); *Tennard v. Dretke,* 542 U.S. 247 (2004); *Smith v. Texas*, 543 U.S. 37 (2004);  *Abdul-Kabir v. Quarterman*, 550 U.S. ___, Slip Op. No. 05-11284 (April 25, 2007).

particularized circumstances of the individual offense and the individual offender.'" *Spivey*, 661 F.2d at 471, *quoting Jurek v. Texas*, 428 U.S. 262, 274 (1976).

Ten years later, however, the court again considered the Texas statute and found it wanting in that the special questions gave juries no mechanism whereby they might give effect to mitigating circumstances offered by the defense. *Penry v. Lynaugh*, 492 U.S. 302 (1989). In *Penry I*, the court struck down the Texas statute, explaining that the individualized sentencing required by *Lockett* and *Eddings* must "reflect a reasoned moral response to the defendant's background, character and crime." *Id*. at 308-309, 322-326. Because the two special issues did not allow jurors to consider any mitigation other than that relevant to deliberateness and future dangerousness, the Texas statute failed to allow such consideration of the defendant's individual characteristics.

In response to *Penry I*, the state legislature eventually reworked the Texas statute to include a special issue on mitigation. Juries are now asked "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death

sentence be imposed." Tex. Code Crim. Proc. art. 37.071(2)(e)(3)(d). This statute went into effect on September 1, 1991.

The statute remains constitutionally infirm, as set forth elsewhere in this Petition. In this case, however, the trial court compounded the general statutory problem, by specifically and expressly disallowing the very kind of mitigating evidence that the Supreme Court has repeatedly made clear must be available for jurors in capital cases to review and consider before making their life-death decision.

The Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, **as a mitigating factor**, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986). Furthermore, the jury must be "specifically instructed to consider, as mitigating evidence" evidence of the defendant's background, character, and crime. Only such instruction "satisf[ies] the dictates of the Eighth Amendment." *Blystone v. Pennsylvania*, 494 U.S.299 (1990).

Critically here, the Supreme Court has made clear that one such mitigating factor that a capital juror must be allowed to consider in making the life-death

decision is that of youth. Indeed, it was in Texas cases where this principle was made express. *See Graham v. Collins,* 506 U.S. 461 (1993)*; see also Johnson v. Texas,* 509 U.S. 350 (1993).

Here, the trial court's express prohibition against allowing Mr. Alvarez, through counsel, to present the very factor identified as a constitutionally protected one, namely age, to his capital sentencing jury, undoubtedly violated *Lockett* and its long and consistent legacy of precedents.

It is important here to remember that the death penalty is qualitatively different from any other criminal punishment; "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). "In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases." *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C.J., concurring). "Because sentences of death are 'qualitatively different' from prison sentences, this Court has gone to extraordinary measure to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring)

(citation omitted). Hence, the Supreme Court has repeatedly condemned sentencing procedures that inject unreliability into jury deliberations in capital cases. *See, e.g., Johnson v. Mississippi*, 486 U.S. 578 (1988); *Caldwell v. Mississippi,* 472 U.S. 320 (1985); *Gardner v. Florida*, 430 U.S. 349 (1977); *Woodson*, 428 U.S. 280 (1976).

Throughout the era of the modern death penalty, the United States Supreme Court has insisted that the ultimate punishment must not be meted out in an "arbitrary and capricious manner." Rather, there must be a "meaningful basis for distinguishing the cases in which it is imposed from the many in which it is not." *Gregg v. Georgia*, 428 U.S. 153 (1976), *Chenault v. Stynchcombe*, 581 F.2d 444, 448 (5th Cir. 1978).

To insure that the ultimate penalty is not meted out arbitrarily, the Court has established a series of principles to guide courts in instructing the jury at sentencing--that terms must be clearly defined[12], that jurors must be required to consider mitigation[13], that jurors should be instructed as to the consequences of

---

[12] *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). *See also Profitt v. Florida*, 428 U.S. 242, 253 (1976).

[13] *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S. Ct. 2954 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Penry v. Lynaugh*, 492 U.S. 302 (1989),

their verdict[14], and that no instruction can be given to undermine the jury's sense of responsibility for the imposition of a death sentence.[15]

In the aftermath of the Supreme Court's holding in *Furman v. Georgia*, 408 U.S. 238 (1972), that the death penalty as then practiced in the United States violated the Eighth Amendment, the states wishing to reinstate capital punishment developed two types of statutes: mandatory and guided discretion. In 1976, the Supreme Court approved the guided discretion statutes from Texas, Georgia, and Florida, and rejected mandatory sentencing schemes from North Carolina and Louisiana.[16] Clearly, the court preferred to resolve the problem of arbitrariness by establishing rules by which the jury would exercise its discretion rather than by taking away the jury's discretion altogether and mandating death for all capital crimes (so called "guided discretion" statutes).

This process of guiding the discretion of the jury has evolved into a doctrine of "individualized sentencing." *Woodson v. South Carolina*, 428 U.S. 280, 304

---

[14] *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994); *Shafer v. South Carolina*, 532 U.S. 36, (2001) (the South Carolina Supreme Court "incorrectly limited" the holding in *Simmons v. South Carolina,* 512 U.S. 154 (1994), when it mischaracterized "how the State's new [capital sentencing] scheme works").

[15] *Caldwell v. Mississippi,* 472 U.S. 320 (1985).

[16] *Jurek v. Texas*, 428 U.S. 262 (1976). *Gregg v. Georgia*, 428 U.S. 153 (1976). *Proffitt v. Florida*, 428 U.S. 242 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976). *Roberts v. Louisiana*, 428 U.S. 325 (1976).

(1976), *Lockett v. Ohio*, 438 U.S. 586 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).

**CLAIM XI: THE TRIAL COURT'S REFUSAL TO ADMIT THE CUSTODIAL STATEMENTS OF CO-DEFENDANT JESSICA TREVINO INTO EVIDENCE DURING THE CROSS-EXAMINATION OF THE POLICE OFFICER WHO OBTAINED THEM FROM HER, ESPECIALLY WHEN SUCH STATEMENTS WERE HIGHLY PROBATIVE ON ISSUES OF GUILT, CULPABILITY, AND OTHER RELATED MATTERS, VIOLATED MR. ALVAREZ'S RIGHT TO A FAIR TRIAL**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court refused to allow the defense to cross-examine State's witness and HPD officer Kruezer-Halling regarding statements made by Jessica Trevino about Mr. Alvarez's involvement (and lack thereof) in either or both shootings for which he was charged capitally.

During the guilt-innocence phase of the trial Officer Kruezer-Halling testified that Jessica Trevino, Mr. Alvarez's girlfriend who was arrested and taken into custody with him, had provided more than one statement while in custody regarding both the Prestwood and the Woodfair shooting incidents. The defense

sought to question Officer Kruezer-Halling about the content of Ms. Trevino's statements, and also sought to introduce those statements into evidence during the cross-examination. The prosecution objected, and the trial court sustained the objection. XXIII R. 107-116; XXXI R. 91, 92. As a result, the jury was not permitted to know or review the content of Ms. Trevino's statements regarding these incidents.

Even a quick review of these statements shows their demonstrable probative value on the issue of Mr. Alvarez's involvement, and the nature thereof, in either or both of the shooting incidents for which was he on trial. In the first statement, Ms. Trevino completely exonerates Mr. Alvarez from any involvement in either offense. Importantly, however, in terms of its reliability and therefore its arguable admissible despite its status as hearsay, Ms. Trevino does implicate herself in supplying the guns, driving the perpetrators to the scene, and after shots were fired from her car, driving back to the scene for more shooting, then driving away from the scene after the shooting had ended, and covering up facts surrounding the incident at the apartments on Woodfair. XXXI R. 91.

In her second statement, Ms. Trevino acknowledges lack of complete honesty in the first, but continues to implicate herself as noted above in the second, Woodfair shooting incident. Importantly too, for Mr. Alvarez, the second

statement, while it contains information of an inculpatory nature toward Mr. Alvarez with respect to the earlier Prestwood incident (he wanted to watch the news on the night of the incident because "they did a drive by"), it continues to exonerate, or at least minimize his role in the second and later Woodfair incident. XXXI R. 92. Notably, in the second statement, Ms. Trevino indicates that Mr. Alvarez played no role, gang-affiliated or otherwise, in any intentional shootings, but rather remained in the car with her when two other individuals did the shootings. *Id*.

These statements were thus of critical importance to Mr. Alvarez in presenting his defense to the jury. In the first place, at least one statement exonerates him completely. Moreover, both statements make plain that his role in the second was not intentional, and therefore, at the very least, not as a willing participant or assistant in a gang-related killing. On this point, the statements would have at the very least served to undermine or discredit the capital aspect of the prosecution's theory of murder, *see* Claim XIII, incorporated herein by express reference.

The U.S. Supreme Court has made plain that in a capital trial, rules of evidence may not be used against a capital defendant to bar admission of evidence necessary to ensure the defendant a fair trial and sentencing determination. In

*Green v. Georgia*, 442 U.S. 95 (1979), the Court reviewed a trial court's exclusion of a witness's testimony as hearsay that a third party told the witness that he killed the victim after sending the defendant out on an errand. *Id*. at 96. The Supreme Court held, "Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment." *Id*. at 97. The Court continued, "The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial and substantial reasons existed to assume its reliability." *Id*. (internal citations omitted). The Court concluded, "In these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.'" *Id*. (quoting *Chambers v. Mississippi*¸410 U.S. 284, 302 (1973)).

For these reasons, it was error of constitutional magnitude to prohibit Mr. Alvarez from introducing reliable, exculpatory and otherwise highly probative evidence into his trial.

**CLAIM XII: MR. ALVAREZ WAS INDICTED BY A GRAND JURY WHOSE COMPOSITION UNDERREPRESENTED HISPANIC PERSONS, AND THE PROCESS FOR WHICH WAS FLAWED BY RACIAL BIAS AND DISCRIMINATION, IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, a fair jury drawn from a fair cross section of the community, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court refused to quash the indictment, where the indictment had been handed down by a grand jury that had been selected in a racially discriminatory manner, by a process relied upon in Harris County, Texas that unconstitutionally excluded minority individuals, and where the grand jury lists and actual jury did not represent a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 527 (1975); *Alexander v. Louisiana*, 405 U.S. 625, 635-37 (1972)(Douglas, J. dissent)(relying on *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970); *Brown v. Allen*, 344 U.S. 443, 474 (1953)).

Prior to trial Mr. Alvarez challenged the constitutional validity of the indictment based upon the claim that the grand jury which issued it was under-representative of Hispanic persons, and the process by which grand juries in Harris County were being comprised, which included a jury commission that personally selected grand jurors and had no Hispanic members on the commission, was

discriminatory and disproportionately excluded Hispanic individuals from service in the jury selection process in Harris County. CR. 315-20; 420-439; IV R. 23-53. After hearing the motion, the trial court denied relief. *Id*.

In this claim, Mr. Alvarez invokes his rights under the Sixth and Fourteenth Amendments to the United States Constitution to challenge the process which brought about his indictment, and thus the indictment itself. Specifically, the Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury . . .." This language has been interpreted to require that the panels from which petit juries are selected be drawn from a "fair cross section" of the community in which the proceedings are held. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975)(citing *Brown v. Allen*, 344 U.S. 443 (1953)); *Alexander v. Louisiana*, 405 U.S. 625, 635-37 (1972)(Douglas, J. dissent)(relying on *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970); and *Brown v. Allen*, 344 U.S. 443, 474 (1953)); *Machetti v. Linahan*, 679 F.2d 236, 239 (11th Cir. 1982), *cert. denied*, 457 U.S. 1127 (1983).

In addition to the Sixth Amendment fair cross section requirement, the equal protection clause of the Fourteenth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results. *Castaneda v. Partida*, 430 U.S. 482,

494 (1977). *See also, e.g., Alexander v. Louisiana*, 405 U.S. 625 (1972); *Turner v. Fouche,* 396 U.S. 346 (1970).

Since an applicant need not be a member of the underrepresented group in question to have standing to raise a Sixth or Fourteenth Amendment claim, there is no dispute that Mr. Alvarez, a Hispanic male, has standing to mount these challenges. *Campbell v. Louisiana*, 523 U.S. 392 (1998); *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975)(male raising gender claim). *See also Duren v. Missouri*, 439 U.S. 357, 359 n.1 (1979); *Peters v. Kiff*, 407 U.S. 493 (1972)(white male raising claim of Blacks' absence from jury); *Powers v. Ohio*, 493 U.S. 1068 (1991); *Dobbs v. Kemp*, 790 F.2d 1499, 1510-11 (11th Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987)(male defendants have standing to raise equal protection claim that women were underrepresented on grand jury).

Proof of a *prima facie* claim of either the equal protection or the fair cross section claims require virtually the same showing. For the equal protection claim, a litigant must show:

- the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied";
- underrepresentation of the group in the grand jury process *over a significant period of time*; and
- a selection procedure "that is susceptible to abuse **or** is not racially neutral."

*Castanedan v. Partida,*, 430 U.S. 482, 494 (1977)(emphasis added).[17]

    For a fair cross section claim, a litigant must show:

- that the group alleged to be excluded is a "distinctive" group in the community;
- that the representation of the group in *venires* from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
- that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).[18]

    In the present case Mr. Alvarez can demonstrate a *prima facie* case of discriminatory underrepresentation, under both the Sixth and Fourteenth Amendments, of Hispanics as grand jury panelees in Harris County.

---

[17] Under the equal protection clause, the claimant must also prove intentional discrimination, *see Duren supra*, 439 U.S. at 368 n.26, while the Sixth Amendment fair cross section requirement "forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory." *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986), *cert. denied*, 479 U.S. 1084 (1987).

[18] Under this standard, "systematic" is defined by showing that the pattern recurred over time and was "inherent to the particular jury selection process utilized." *Id*. at 366.

1. Hispanics Are a Distinct Class In The Community Which Merits Constitutional Protection

Detailed below, the process by which Harris County selects a grand jury underrepresents Hispanics. Hispanics have long been recognized by the courts as a "distinct class" -- the exclusion of whom from possible jury service and the rest of the criminal justice system is constitutionally suspect. *See Castaneda v. Partida*, 430 U.S. at 495; *Hernandez v. Texas*, 347 U.S. 475 (1954). Thus Mr. Alvarez satisfies the first prong of his Sixth and Fourteenth Amendment claims.

2. Hispanic Are Underrepresented

Although the Supreme Court has "never announced mathematical standards for determining the significance of underrepresentations," *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972), the Fifth Circuit and the Texas Court of Criminal Appeals have employed a statistical approach involving "standard deviation." *See Ovalle v. State*, 13 S.W.3d 774 (Tex. Crim. App. 2000); *McGinnis v. Johnson*, 181 F.3d 686 n.6 (5th Cir. 1999); *Boykins v. Maggio*, 715 F.2d 995 (5th Cir. 1983).

Under this statistical analysis, the court must first compare the actual number of Hispanics on grand juries with the expected number based on total population over a significant portion of time. The measure of the predicted fluctuations from the expected value is the standard deviation, defined as "the square root of the product of the total number in sample ... times the probability of selecting a [Hispanic] times the probability of selecting a [non-Hispanic]." *Ovalle*,

13 S.W.3d at 778, n.15 (quoting *Castaneda*, 430 U.S. at 496 n. 17).  In instances where the "difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id*. (quoting *Castaneda*, 430 U.S. at 496 n.17).  Such situations establish a *prima facie* case of discrimination.

In Harris County, in the ten years prior to Mr. Alvarez's trial, only 447 of 3614 grand jury panelees were Hispanic.[19]  The mean Hispanic population for the

---

[19] This figure was derived from comparing the surnames of grand jury panelees with the United States Census Bureau's 1990 Spanish Surname List of Heavily Hispanic Surnames and using Robert W. Buechley's orthographic structure.  These voluminous documents have not been attached but are available on request by the Court.  This approach was validated by the United States Supreme Court in *Partida, supra.* Attempting to limit or expand the list of Hispanic grand jurors by adding or eliminating those with Hispanic surnames due to marriage could not be accomplished because neither the Department of Vital Statistics nor the United States Census Bureau keeps such statistics.  *See* Exhibit 68 (Letter from Texas Department of Health, dated October 11, 2001).

same time period was approximately 21.52%.[20] Thus, one would expect to find about 778 Hispanics on Harris County grand jury lists between 1987 and 1996.[21]

Employing the statistical method outlined by the Fifth Circuit and the Texas Court of Criminal Appeals, the standard deviation is 24.70.[22] As *Partida* and *Ovalle* make clear, if the difference between the expected number and actual number of Hispanics on Harris County grand juries is less than three standard deviations, no prima facie case is established. Thus, the number of Hispanics on the grand jury lists in Harris County would have to exceed 704 to meet constitutional muster.[23] It does not.

Clearly, the grand jury selection process in Harris County falls well below the constitutional standard. Between the years of 1987 and 1996 a paltry 447

---

[20] The 21.52% figure (mean Hispanic population for the years 1987-1996) was obtained by utilizing population data available from the U.S. Census Bureau and the Texas State Data Center. The percentages of the Harris County population that were comprised by Hispanics for the years 1987, 1988, and 1989 were obtained by extrapolating 1980 U.S. Census data (Ages 20-64), and 1990 U.S. Census data (Ages 18-64). The source of the data for the year 1990 was the U.S. Census Bureau (Ages 18-64). The source of the data for the 1991, 1992, 1993, 1994, 1995, and 1996 years was the Texas State Data Center's Estimates for the Population for Harris County (Ages 18-65). When the U.S. Census Bureau's Estimates for the Population for Harris County are utilized for the years 1991, 1992, 1993, 1994, 1995 and 1996 (Ages 20-64) in lieu of the Texas State Data Center's Estimates for the Population of Harris County for the same years, the mean Hispanic Population for 1987-1996 period is 21.49%. See, e.g., Harris County Census Data, Exh.***. Population data for each year is available upon request.

[21] Number of grand jurors (3614) multiplied by the percentage of Hispanics in the eligible pool (21.52%) = 777.73.

[22] Determined by the square root of the product of the total sample (3614) multiplied by the probability of selecting a Hispanic (.2152) multiplied by the probability of selecting a non-Hispanic (.7848).

[23] 778 - (24.70 x 3) = 703.9

Hispanics were on the grand jury lists, a result that exceeds **13 standard deviations**.[24]

This result would come as no surprise to most close observers of the Harris County Criminal Courts. Indeed, on November 24th, 1996, the Houston Chronicle studied the Harris County grand juries of 1995 and found a 14% absolute disparity between the Hispanic population and their service on grand juries. *See* Houston Chronicle, Texas-style Justice/Some Call Grand Juries a Tool of Prosecutors, Bob Sablatura, Nov. 24, 1996. Robert Hirschhorn, an attorney who specializes in jury selection, confirmed that "for sure, on the issue of representation of Hispanics, it is not a cross section." *Id* at 9A. State District Court Judge Krocker also expressed concern with the Harris County system, stating "obviously we need to work on the Hispanic participation." Houston Chronicle, A Question of Fairness/ Grand Jurors Typically are Affluent, Middle-aged Anglos, Bob Sablatura, Nov. 24, 2001.

3. This Underrepresentation Is The Product Of An Unconstitutional Selection Process.

   a. The Grand Jury Selection Process

Harris County continues to use a "key man" system to select its grand juries. Under this system, the presiding district court judge selects between three and five grand jury commissioners. These commissioners in turn select a group of fifteen

---

[24] (778 - 447) / 24.70 = 13.40

to forty grand jury panelees, from whom the judge qualifies the first twelve to make up the actual grand jury and two alternates.

The minimum legal qualifications for a grand juror in Texas are:

1) citizen of state and county and qualified to vote therein;

2) of sound mind and good moral character;

3) able to read and write;

4) no felony or theft convictions or current indictments;

5) not related within the third degree of consanguinity or second degree of affinity to any other person selected to serve;

6) not have served as a grand juror or commissioner within the last year;

7) not be a complainant in any matter heard before the grand jury.

TEX. CRIM. PROC. ANN. §19.08 (Vernon 2001).

    b. **The Grand Jury Selection Process is Susceptible to Abuse Because the Judges Are Allowed to Pick Commissioners and Forepersons They Know, and Commissioners Pick Panelees Whom They Know.**

This selection process is susceptible to abuse in two respects. First, judges and commissioners are predisposed to select only persons of their acquaintance, depriving the grand jury panel of a true representation of the community. Second, commissioners have unfettered discretion and little supervision in their selection of potential grand jurors, allowing them to

apply their own criteria in selection and thus providing them with a "clear and easy" opportunity to discriminate. *Alexander v. Louisiana, supra*, 405 U.S. at 630.

Historically, Texas counties' implementation of the "key man" system has been vilified by the federal courts. *See, e.g., Castaneda, supra,* 430 U.S. at 449 (though facially constitutional, "key man" system is "susceptible to abuse as applied"); *Hernandez v Texas*, 347 U.S. 475, 480; *Cassell v. Texas*, 339 U.S. 282 (1950); *Akins v. Texas*, 325 U.S. 398 (1945); *Smith v. Texas*, 311 U.S. 128 (1940). Within a constitutional system that requires fair representation of all groups in the community, the "key man" system employed by Harris County shares the flaw of the systems employed in these cases -- it allows unfettered discretion on the part of the presiding judge and commissioners. As shown, these actors exercised their discretion to produce a grand jury that grossly underrepresents Hispanics at constitutionally significant stages of the process.

The principle flaw in the Harris County system is that actors are allowed to select people based on the subjective fact that they know the person and believe him/her to be qualified. Judges, who select the commissioners and forepersons, and commissioners, who selected panelees, are allowed to choose only those people with whom they are personally familiar. As the Supreme Court has

repeatedly recognized, such a system is chronically susceptible to abuse because people tend to associate with others of similar backgrounds. *See Alexander v. Louisiana, supra*, 405 U.S. 625; *Guice v. Fortenberry*, 722 F.2d 276, 281 (5th Cir. 1984). In addition, since judges and the commissioners know only a fraction of the eligible population, they necessarily have a limited population of people from which to select potential jurors. In Harris County, this sampling by association results in blatant underrepresentation of certain groups and inappropriate over representation of others.

One of the deleterious results of the Harris County system is the frequent selection of the same people. For example, and ironically, Mr. Frumencio Reyes, trial counsel for Mr. Alvarez, was selected as a grand jury commissioner seven times in a ten-year period: May 1986 in the 248th Court; November 1988 in the 177th; November 1989 in the 351st; February 1990 in the 184th; August 1990 in the 248th; August 1992 in the 208th; and November 1993 in the 248th. Even over a ten year period, if a random process was employed in lieu of the "key man" system, the chances of the same person being reselected 7 times out of a county with a population over 3 million persons, are infinitesimal.

The repeated selection of the same people was not limited to grand jury commissioners. Jessie Campos was selected on the grand jury lists 4 times in a ten year period: August 1987 in the 176th Court; August 1990 in the 248th Court;

November 1993 in the 248th Court; and May 1995 in the 177th Court. Primo Acosta was also selected four times in ten years: August 1987 in the 176th; May 1988 in the 248th; November 1989 in the 351st; and May 1990 in the 208th. The under-diversification caused by this repetition violates "the gravamen of due process . . . that a fair cross-section of the community **must** be represented on grand juries. . .." *Stanley v. State*, 678 S.W.2d 80, 81 (Tex. Crim. App. 1984).

Moreover, this repetition and close-mindedness particularly adversely affects members of minority groups. Even when Hispanics were selected, the commissioners' tendency to choose the same people over and over further deprived **all** Hispanics of their chance to serve. As in the examples above, with the "key man" process, certain Hispanics were picked more than once, to the detriment of those who were never selected. Thus, not only were there fewer Hispanics than there **should have** been on grand jury panels, but even within this low percentage of Hispanics sitting, the discretion-driven repetition means that there were fewer Hispanics than there **could have** been on grand jury panels.

**c.** Discretion-driven jury selection further reduces representation of the entire community because judges and commissioners are allowed to choose persons based on subjective, unreviewable criteria.

Not only do judges and commissioners select persons only of their own community of acquaintances, but they are allowed to decide the qualifications of persons according to subjective criteria which further limits the community

representation in grand jury panels.  Such a process cannot survive constitutional scrutiny.  *See Johnson v. Puckett*, 929 F.2d 1067, 1072 (5th Cir. 1991)(A selection process "in which the circuit judge appoints the foreman on the basis of his own subjective criteria after having access to data concerning the race and sex of the [potential candidates] ... is subject to abuse."  *Id.* at 1072 (*citing Guice v. Fortenberry*, 661 F.2d 496, 503 (1981)(en banc), *reh'g denied*, 726 F.2d 752 (1984)).

Jury commissioners in Harris County are instructed to pick panelees with only the basic legal qualifications as guidelines.  Because of the lack of guidelines and judicial supervision, jury commissioners invariably are allowed to use personal, subjective criteria to select panelees, including racial, political, and social motives.  Indeed, the instruction to choose persons of sound mind and good moral character, without any further guidance, encourages commissioners to rely on their own, possibly biased, moral judgments.

As seen above, the commissioners' notions of who was "qualified" in the community often overlaps, further limiting the breadth of the pool of minority panelees.  A commissioner's lack of exposure to Hispanics and other minorities in positions of prominence can lead to selection of the same, few members of these groups as "token" representatives over and over again.

In sum, when commissioners are allowed to apply such subjective criteria to their selections, the ideal of a grand jury panel representing a cross section of the community is mocked. This system is subject to abuse because it was "easily capable of being manipulated" when commissioners "'invoke their subjective judgment rather than objective criteria.'" *Gibson v. Zant,* 705 F.2d 1543, 1548 (11th Cir. 1983).

Through the choosing of grand jury commissioners and panelees on a personal basis and with unreviewable criteria and little supervision, Harris County produces a system that is susceptible to abuse such that Hispanics are severely under-represented throughout the grand jury process. Mr. Alvarez has thus met the third prong of his Sixth and Fourteenth Amendment claims.

## CLAIM XIII: THE TRIAL COURT'S REFUSAL TO CHARGE THE JURY ON THE LESSER INCLUDED OFFENSE OF MURDER VIOLATED MR. ALVAREZ'S RIGHT TO A FAIR TRIAL

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court refused to give the jury a charge on the lesser included offense of murder. *See Beck v. Alabama*, 447 U.S.

625, 637, 643 (1980).

In *Beck v. Alabama*, 447 U.S. 625, 637, 643 (1980), the U.S Supreme Court recognized that a capital murder conviction is constitutionally unreliable where it is the product of a proceeding in which a jury was forced to an all-or-nothing choice between liability for a capital offense or an acquittal. The *Beck* court, therefore, struck down Alabama's capital sentencing scheme in which juries were precluded from determining a capital defendant's culpability for lesser included offenses. *Id.*

Subsequent to *Beck,* courts have recognized that a jury could be precluded from considering an accused's liability for a lesser offense in two distinct ways. One, a statute or instruction barring consideration of liability for a lesser offense could prevent a jury from giving any significance to evidence at trial that supported a finding of guilty for something other than capital murder. *Hopper v. Evans*, 456 U.S. 605, 611-12 (1982). Two, a statute that forbid consideration of non-capital culpability could also function to prevent a defendant from developing and ultimately presenting evidence of such lesser liability in the first instance. *Hopper v. Evans*, 456 U.S. at 613. But for the operation of the statute, "a defendant might make a plausible claim that he would have employed different trial tactics ---for example, that he would have introduced certain evidence or requested certain jury instructions. . ." *Id. Accord Bracewell v. State*, 475 So.2d 616, 621 (1984) ("[B]ut for the preclusion clause, [an accused] might have changed his trial tactics and

introduced other evidence . . . to support lesser included offense instructions.").

In the present case, trial counsel sought an instruction on the lesser-included offense of murder. XXIII R. 123-124. The trial judge refused to give the requested charge. *Id*.; XXIV R. 5.

Under Texas law, plain murder cannot be punished by death absent a finding of some specified aggravating circumstance. Here, Mr. Alvarez was charged with the murder of two different individuals "during different criminal transactions, but pursuant to the same scheme and course of conduct." Tex. Penal Code §`9.03(a)(7)(B). This charge upgraded a non-capital murder case to one of capital murder. *Id*.

The record makes clear the issue of whether Juan Alvarez's conduct actually satisfied the elements of capital murder with which he was charged, rather than plain murder, was a contested issue during the trial. Indeed, the State expressly acknowledged this fact in their brief on direct appeal. *See* State's Brief on Appeal at p. 59 ("Appellant's gang membership related to a contested issue at the guilt stage of the trial."). The trial record comports with the State's characterization.

At trial, the alleged gang-related nature of both of the two shooting incidents, that created the basis for the capital element of different criminal transactions, was addressed at the outset of trial before the jury was brought in. XXVII R. 5-10. In this discussion, the prosecution outlined its theory that the

"same scheme and course of conduct" element of the capital murder charge would be proven by a demonstration that both homicides, the first at the apartment complex on Prestwood, and the second at the complex on Woodfair, were gang-related incidents. There was ample evidence to show that the Prestwood incident was gang-related. In support of the theory that the Woodfair incident was also gang related, the State focused the trial court's attention on two pieces of evidence: (A) the content of Juan Alvarez's videotaped statement, and (B) testimony from a witness (later shown to be Brandy Varela) that Mr. Alvarez's involvement in the second incident, at the Woodfair appartments, was also gang-related.  Later in the trial, the State introduced through the testimony of Ms. Varela that Mr. Alvarez supposedly walked up to her boyfriend Hugo Perez and said "Southwest Cholos, puto", a reference to the gang the State alleged Mr. Alvarez was a member of at the time of both shooting incidents.  XVIII R. 131-67.  The State later elicited through their re-direct of the medical examiner who conducted the autopsy on Hugo Perez, that the wounds were consistent with a person who had walked up to the victim and said, "Southwest Cholos, puto".  XXII R. 196.  (This witness failed to explain how medical science could ascertain what words, if any, were spoken at the time of Mr. Perez's death).

After the close of the evidence at the guilt-innocence phase of the trial, the defense sought a lesser-included offense instruction for murder.  As noted, the trial

court denied the instruction. Not content with having won his argument against a lesser-included offense instruction before the trial court, the prosecutor continued to press the point before the jury during the closing argument at the guilt-innocence phase of the trial. XXIV R. 12-14.

Both pieces of evidence linking the two shooting incidents, at Prestwood and at Woodfair, as part of the same scheme or course of conduct had significant weaknesses. The first, a statement by the defendant, was, as claimed elsewhere in this Petition, *see* Claim XIV, incorporated herein by express reference, itself at least clouded by the circumstances in which it was given. The testimony of Ms. Varela was highly discredited in terms of her veracity, her ability to recall, and her capacity to observe the events on the night in question. The record indicates that the State relied heavily on the statement of Mr. Alvarez: the prosecutor specifically argued during its guilt-innocence closing argument that the best evidence of the capital nature of the murder, namely, the assertion that both homicides were a part of "the same scheme and course of conduct," was Mr. Alvarez's videotaped statement. XXIV R. 61-62. Shortly after this argument, the jury asked for a copy of the videotaped statement, underscoring its importance to the issue of capital murder. *Id.* at 67.

For its part, the defense sought to discredit Mr. Alvarez's ongoing gang affiliation in an effort to undermine the State's theory of capital murder. It did so

in a number of different ways.  For example, the defense attempted (albeit unsuccessfully) to keep out photos of Mr. Alvarez (and co-defendant Trevino) allegedly making gang signs or gestures.  *See* Claim XVII in this Petition, incorporated herein by express reference.  The defense also sought to introduce the custodial statements of co-defendant Trevino in their cross-examination of HPD officer Kruezer-Halling, again unsuccessfully, in which Ms. Trevino makes clear that, at least with respect to the second, Woodfair shooting, Mr. Alvarez's role in that offense was non-intentional and therefore in no way a gang-induced incident, at least from his perspective. XXIII R. 107-115.  As noted, the defense attempted to vigorously cross-examine Ms. Varela, contesting her consistency, her ability to observe events that night, her recall of the events, her inability even to identify Mr. Alvarez until the day she saw him in court, etc.  *See* XVIII R. 167-189.  Finally, Mr. Alvarez's statement itself puts the gang connection at issue, as he makes plain that while he may have been in a gang in the past, he was no longer involved at that time.  Videotaped Statement of Juan Alvarez, State's Trial Exhs. 138 and 139

This record makes plain that, as the State has acknowledged and argued at trial and on appeal, the question of whether the crimes were committed in the same course of conduct was at the very least at issue during the trial. It was contested by the parties, and arguable that the evidence pointing toward Mr. Alvarez's role in both crimes as one of gang-affiliation was neither wholly creditable nor

overwhelming, and therefore, that a lesser-included offense instruction was required.

## CLAIM XIV: THE TRIAL COURT'S REFUSAL TO SUPPRESS MR. ALVAREZ'S VIDEOTAPED STATEMENT VIOLATED HIS CONSTITUTIONAL RIGHTS, AND THE COURT'S REFUSAL TO PROPERLY INSTRUCT THE JURY WITH RESPECT TO THE STATEMENT ALSO VIOLATED MR. ALVAREZ'S CONSTITUTIONAL RIGHTS

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner, a foreign national from Mexico, was denied his right to due process, effective assistance of counsel, and equal protection of the law, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, and under the Vienna Convention on Consular Rights, when the trial court admitted into evidence at trial a custodial statement allegedly made by Mr. Alvarez before he was properly advised of his rights either under *Miranda* or under the Vienna convention, and under circumstances that rendered it involuntary and coerced, and when Mr. Alvarez was subjected to extensive interrogation by multiple police officers prior to being provided his *Miranda* warnings, and when the trial court refused to instruct the jury on the issue of voluntariness as a question of fact.  *See Miranda v. Arizona*, 384 U.S. 436 (1966); *Spano v. New York*, 360 U.S. 315 (1959); *Dickerson v. United States*, 520 U.S. 428 (2000); *U.S. v. Patane*, 542 U.S. 630 (2004); *Missouri v. Seibert*, 542 U.S. 600

(2004); *Crane v. Kentucky*, 476 U.S. 683 (1986); *Escobedo v. Illinois*, 378 U.S. 478 (1964); *Jackson v. Denno*, 378 U.S. 368 (1964); *Wong Sun v. U.S.*, 371 U.S. 471 (1963).

In the present case trial counsel filed a pre-trial motion to suppress any custodial statements allegedly made by petitioner to the police after his arrest or any evidence recovered as a result of his arrest. CR. 17; counsel also sought to suppress his statement and as a violation of his rights under the Vienna Convention, and assert his right to an attorney from the consul, as guaranteed by the Vienna Convention, Art. 36, 21 U.S.T. 100-101, 596 U.N.T.S. at 292; CR. 409. The trial court heard the motions and denied the motion to suppress. XVI R. 143. Trial court was informed that Petitioner was a Mexican national and that he had not been warned of his rights under the Vienna convention, but counsel ultimate withdrew his Vienna convention motion without obtaining a ruling. Defense counsel objected when the State sought to present the video statement at trial, renewing his motion to suppress at that time. XXI R. 61. Trial court again denied the motion. Furthermore, the trial court refused to instruct the jury regarding the issue of voluntariness, despite the fact that Mr. Alvarez had raised the matter prior to trial. XXIII R. 125.

At the pre-trial hearing on the motion to supress, Todd Miller, an HPD homicide detective, testified that he arrested Mr. Alvarez at 10:00 pm. XXVI R.

71. Mr. Alvarez was driving a red Nissan Altima with girlfriend, Jessica Trevino, in the car. XVI R. 73. A number of marked police cars made the stop and an HPD officer Brown put the handcuffs on Mr. Alvarez. XVI R. 73, 80. He was taken directly to the Police Station, not to a Magistrate, and his car was impounded and towed. XVI R. 86. Police officers testified that Mr. Alvarez was arrested with the intent to interrogate him about this case. XX R. 152-153.

HPD officer Beth Kreuzer-Halling, who was working in the homicide section at the time, testified that she began interrogating Mr. Alvarez at 10:30 PM, June 20, 1998, while HPD Sgt. George Alderete was questioning his girlfriend, Jessica Trevino; after 30 minutes they switched. XXI R. 41-43. Mr. Alvarez refrained from talking about anything related to his arrest during the interrogation conducted by Offier Kreuzer-Halling. XXI R. 47. After some period of time, the officers allowed Mr. Alvarez and Ms. Trevino to be alone together in a room with a closed door; during that time Ms. Trevino was upset and crying. XXI R. 49.

HPD homicide detective George Alderete testified that the switch between Trevino and Alvarez occurred at 10:55 PM on June 20, 1998, when he first began interrogating Mr. Alvarez. XVI R. 39. Despite the fact that this was a custodial interrogation, Detective Alderete testified that he did not inform Mr. Alvarez of his Miranda rights until 12:31 AM on June 21, 1998, more than two hours after he had been arrested and questioned by HPD officers. XVI R. 41. A consent-to-search

form relating to Mr. Alvarez's home was obtained from Mr. Alvarez at 11:18 PM on June 20, 1998, XVI R. 47, prior to the police having informed Mr. Alvarez of his rights under *Miranda*. Despite the fact that he had been asking what he was being charged with, Mr. Alvarez was not taken before a Magistrate. XVI R. 47.

At some point during the evening HPD officers told Mr. Alvarez that they had recovered guns from his home, and that his girlfriend, Ms. Trevino, had implicated herself. XVI R. 45. It was at this point that the officers arranged to have Mr. Alvarez and Ms. Trevino be together, alone, in a room at HPD, and it was during this time that Ms. Trevino was crying and upset. XVI R. 49.

Finally, after several hours of custodial interrogation, and only after informing him that his girlfriend had implicated herself, that weapons had been seized from his home, and after Mr. Alvarez and Ms. Trevino were placed alone together, Mr. Alvarez was *Mirandized* and agreed to provide a videotaped statement to police. XVI R. 59. This was some time after 4:00 AM on June 21, 1998. XVI R. 57.

The constitution requires that before a suspect may be interrogated consistent with the constitution, he must be advised of his constitutional rights pursuant to *Miranda*. *Dickerson, supra.* The fact that Mr.Alvarez was extensively interrogated prior to being advised of his right under Miranda alone warrants reversal of Mr. Alvarez's conviction and sentence.

In addition, the constitution also requires that any statements made to law enforcement officers while Mr. Alvarez was in custody must have been "the product of an essentially free and unconstrained choice by [their] maker." *Columbe v. Connecticut*, 367 U.S. 568, 602, (1961).  Because the statement was not made voluntarily, admission of the statement at trial violated Mr. Alvarez's right to due process of law guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, *see Jackson v. Denno*, 378 U.S. 368 (1964). Moreover, to the extent the statements were obtained as a result of an unconstitutional search and seizure, they must be suppressed as the poisonous fruits of the tree.  *See Wong Sun v. U.S.*, 371 U.S. 471 (1963); *see also* Claim XV to this Petition, incorporated herein by express reference.

Whether the State has met its burden of proof that a confession was made voluntarily is determined by the totality of the circumstances.  *Clewise v. Texas*, 386 U.S. 707 (1976).  The constitutional admissibility of a confession turns on whether it was made voluntarily, a consideration that is made based upon the totality of the circumstances.  In short, the State has the burden of proving that the statement has not been coerced by another by the slightest hope of benefit or remotest fear of injury or other harm. Any statements made to law enforcement officers or agents of the law enforcement officers while Mr. Alvarez was in custody that were not "the product of an essentially free and unconstrained choice

by [their] maker" are not admissible. *Columbe v. Connecticut*, 367 U.S. 568, 602 (1961).

Case law concerning voluntariness and the admissibility of a criminal defendant's custodial statement(s) is admittedly complex, and the jurisprudential path carved out by the U.S. Supreme Court is not without ambiguity. What is clear, however, is that a proper assessment of these issues requires a detailed, factual inquiry into the specifics of each case and each defendant. Indeed, under existing precedents, the "totality of the circumstances" surrounding the alleged waiver of Miranda warnings and any resulting custodial statement must be considered by both the Court, in the context of ruling on relevant pre-trial motions, including motions to suppress, and by the jury, in determining the factual issue of voluntariness. *See Haynes v. Washington*, 373 U.S. 503 (1963). In recent years the Supreme Court has focused on the element of police overreaching as a necessary component of a successful challenge to the voluntariness of a custodial statement. *See Colorado v. Connally*, 479 U.S. 157 (1986). For this reason, careful attention should also be paid to the actions of the police in obtaining a statement from a criminal defendant. *See generally, LaFave, Israel, King*, CRIMINAL PROCEDURE, 2nd Ed., Vol. 2 at Chapter 6.2(c), p. 447-465 ("[T]he Supreme Court has undertaken over the years a continuing re-evaluation of the facts of each case" in assessing the "totality of the circumstances" surrounding each confession).

Courts have found a variety of facts and circumstances relevant and material to the "totality of the circumstances" determination. At the outset a careful assessment of the conduct of law enforcement in obtaining a confession is mandated. Of obvious relevance would be facts indicating or suggesting the use of physical force by law enforcement, *see Brown v. Mississippi*, 297 U.S. 278 (1936), or the threat of such force, *see Arizona v. Fulminante*, 499 U.S. 279 (1991). Threats made about or against not only the defendant, but also members of his or her family or loved ones are also of relevance in assessing the totality of the circumstances. *See, e.g., Rogers v. Richmond*, 365 U.S. 534 (1961); *Lynumm v. Illinois*, 372 U.S. 528 (1963). Likewise, facts involving efforts by the police to "overbear the will" of the defendant in obtaining a confession are of relevance to the inquiry. *Fulminante, supra*. These would include the withholding of food, *Brooks v. Florida*, 389 U.S. 413 (1967), water, *id.*, or sleep, *Reck v. Pate*, 367 U.S. 433 (1961), or requiring a defendant to remain in isolation or otherwise in a state of discomfort for some period of time, *Brooks, supra; see also, Davis v. North Carolina*, 384 U.S. 737 (1966).

Also, evidence of any promises made by law enforcement to Mr. Alvarez would be of relevance in assessing the voluntariness of his custodial statement. Thus any evidence that the police suggested possible lenient treatment, *Lynumm, supra*, the reduction or dropping of some charges, *Williams v. United States*, 328

F.2d 669 (5th Cir. 1964), medical treatment, *Commonwealth v. Magee*, 423 Mass. 381 (1996), or a lesser sentence, *Johnson v. State*, 238 Ga. 27 (1976), in order to induce Mr. Alvarez to talk, would be of relevance to the admissibility of his statement and thus subject to disclosure at this time.

Police trickery and deception, though on perhaps less solid legal footing than other noted aspects of police behavior, have been held to undermine the voluntariness of a custodial statement in some circumstances. For example, any suggestion that the statement being extracted from Mr. Alvarez may not be used against him, *see Linares v. State*, 266 Ga. 812 (1996), or that it would be kept confidential, *Ponticelli v. State*, 593 So.2d 483 (Fla. 1991), would undermine its admissibility.

Courts also look to the particular characteristics and history of individual defendants in assessing the totality of the circumstances and in judging the defendant's ability to resist police pressures. Of notable concern here are cases taking into account a defendant's physical fatigue, *Ashcraft v. Tennessee*, 322 U.S. 143 (1944), mental frailty and emotional distress, *Fikes v. Alabama*, 352 U.S. 191 (1957); *Thompson v. State*, 548 So,2d 198 (Fla. 1989); *State v. Pickar*, 453 N.W.2d 783 (N.D. 1990), abnormalities caused by drug use or alcohol, *Townsend v. Sain*, 372 U.S. 293 (1963), education level, *Clewis v. Texas,* 386 U.S. 707 (1967), and lack of significant prior involvement in the criminal justice system, *compare Stein*

*v. New York*, 346 U.S. 156 (1953) (defendant had prior experience with police), *with Haynes v. Washington*, *supra* (no prior experience).

Also relevant in this case is Mr. Alvarez's Mexican citizenship and cultural background. As some courts have noted, "some foreign detainees may be more likely to make statements to police officers because of a heightened fear of police brutality developed in their home countries." *Osagiede v. U.S.*, 543 F.3d 399, 403 n.1 (7th Cir. 2008).

The facts presented here demonstrate that Mr. Alvarez did not confess of his own free will, but rather that his will was overborn by a carefully orchestrated series of pressures placed upon him by law enforcement. First, his will was broken by hours of interrogation by different officers switching off, in four separate interrogations.

Second, before being read his *Miranda* rights, police obtained a consent-to-search form from him, searched his home, found weapons, and confronted him with their finding.

Third, he was then informed by police that his girlfriend, whom he saw was crying and upset, had implicated herself.

Fourth, the police then carefully orchestrated a private meeting between his girlfriend and Mr. Alvarez.

Finally, Mr. Alvarez was a foreign national, and subject to the protections of

the Vienna Convention. He was raised until adolescence in another country, and could not be understood to have had more than passing familiarity with the legal system in the United States. Yet he was never even advised of his rights under the Convention to meet with his consulate and to have his consul notified of his circumstances. *See* Claim III, incorporated herein by express reference.

That his will was overborn by all of these circumstances is perhaps best exemplified by the trajectory of his responses to interrogations from beginning to end. Clearly Mr. Alvarez did not wish to speak with the police when he was brought to the police statement for interrogation. As Officer Kreuzer-Halling testified, he did not wish to talk to her about anything of substance relating to his case. It was only after extensive interrogation, in four different sessions, by more than one police officer, and only then after an arranged, private liaison with his distraught girlfriend, that Mr. Alvarez "agreed" to speak to police.

Prolonged interrogation alone can be found to be coercive, whether continuous, or in intervals. *See Clewis v. Texas*, 386 U.S. 707 (1967). Another important factor is the conduct of the police. If the sole purpose of an arrest is to secure a confession, as it was admittedly here, the taint of probable coercion is amplified; here Officer Miller testified that he arrested Mr. Alvarez with the sole intent of interrogating him about this case. XX R. 152-153.

Mr. Alvarez's statements were not admissible even though law enforcement

officials eventually apprised him of his rights under *Miranda v. Arizona*, absent proof that he thereafter affirmatively waived his right against self-incrimination and his right to counsel. "The mere giving of the *Miranda* warnings, no matter how meticulous, no matter how often repeated, does not render admissible any inculpatory statement thereafter given by the accused. The giving of the warnings is only the first step. To render the statement admissible the State must take the second step and prove that the rights of which the accused has been *Miranda*-warned were thereafter waived --intelligently, knowingly and voluntarily." *Jones v. State*, 461 So. 2d 686, 696 (Miss. 1984) (emphasis added).[25] Even where "warnings and advice" regarding the accused's *Miranda* rights have been "fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver. That burden is proof beyond a reasonable doubt." *Id.* at 697. *Accord McCarty v. State*, 554 So. 2d 909, 911 (Miss. 1989); *Moran v. Burbine*, 475 U.S. 412, (1986). To meet its burden, the state must affirmatively prove not only that Mr. Alvarez was advised of all of his rights, that he subsequently waived those rights, and that the waiver was voluntary and constituted a "knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. at 482 (*citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). *See also Tague v. Louisiana*, 444 U.S. 469, 470, (1980). "[C]ourts must

---

[25]It should be noted that this is a subjective, not an objective, inquiry.

indulge every reasonable presumption against the loss of constitutional rights."
*Illinois v. Allen*, 397 U.S. 337, 343 (1970); *Smith v. Illinois*, 469 U.S. 91 (1984)
(ambiguous statements not sufficient to justify waiver).

Moreover, as claimed elsewhere in the Petition, *see* Claim XV, incorporated
herein by express reference, the use of the weapons seizure as a means of coercing
Mr. Alvarez to talk renders any statements obtained invalid.  This is true both
because the eventual statement was the fruit of the poisonous tree, namely the
illegally seized evidence, *see Wong Sun*, *supra*, and because it was unlawful for
police to use this seized evidence as a means of pressuring Mr. Alvarez to speak,
before he had been provided his *Miranda* warnings, as occurred here.  *See
Missouri v. Seibert*, 542 U.S. 600 (2004).

Finally, it was constitutional error for the trial court to refuse to instruct the
jury on the issue of voluntariness.  Where, as here, the defendant raised a number
of facts and circumstances tending to demonstrate the possibility at least, if not the
probability, that his will was overborn by the tactics of prolonged interrrogation,
and the other circumstances reflecting on whether his waiver of *Miranda* rights
were voluntary, knowing, and intelligent, he had a constitutional right, despite the
trial court refusal to suppress the statement outright, to require the jury to makes its
own factual determination on the issue of voluntariness prior to relying upon his
statement as evidence. *See Crane v. Kentucky*, 476 U.S. 683 (1986) (defendant has

constitutional right to contest, before the jury, the issue of voluntariness despite pre-trial finding of such by trial court).  The refusal of the judge to grant the jury instruction thus robbed Mr. Alvarez of his right to present a defense.  *Id.*

The prosecution underscored the error by arguing to the jury at the guilt-innocence phase of the trial to make sure they were aware that there was no issue of voluntariness.  He did so by noting to them that they would not even be instructed on the issue of voluntariness.  XXIV R. 12-14.

**CLAIM XV: THE TRIAL COURT'S REFUSAL TO SUPPRESS ILLEGALLY SEIZED EVIDENCE, TAKEN FROM MR. ALVAREZ'S HOME WHILE HE WAS IN CUSTODY BUT BEFORE HE HAD BEEN READ HIS RIGHTS, VIOLATED MR. ALVAREZ'S CONSTITUTIONAL RIGHTS**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, effective assistance of counsel, and equal protection of the law, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court admitted into evidence weapons that were seized from Mr. Alvarez's home, such seizure then being used to coerce Mr. Alvarez to provide a statement to police.  *See Miranda v. Arizona*, 384 U.S. 436 (1966); *Spano v. New York*, 360 U.S. 315 (1959); *Dickerson v. United States*, 520 U.S. 428 (2000); *Escobedo v.*

*Illinois*, 378 U.S. 478 (1964); *Jackson v. Denno*, 378 U.S. 368 (1964); *Wong Sun v. U.S.*, 371 U.S. 471 (1963).

Shortly after Mr. Alvarez was arrested and taken into police custody some time after 10:00 PM on June 20, 1998, and prior to being informed of his rights under *Miranda*, the police sought and obtained his signature on a consent-to-search form respecting Mr. Alvarez's home. HPD Sergaent George Alderete testified that he first saw Mr. Alvarez at 10:55 PM on June 20, 1998, and immediately began interviewing him. XXVI R. 39. This was after previous attempts to interrogate Mr. Alvarez by other law enforcement had failed. Alderete testified that he did not give Appellant his warnings until 12:31 am on June 2l, 1998. XXVI R. 41. However, Mr. Alderete obtained a consent to search Mr. Alvarez's home at 11:18 PM, June 20, 1998. (R. XXVI: 47), more than an hour before Mr. Alvarez was first read his Miranda rights.

Mr. Alvarez's mother, Teresa Alvarez, testified that the police came to her home, which is also where Mr. Alvarez was living, on the evening of June 20, 1998, asking for permission to search the house. She also testified, however, that the police informed her that they would come in and search the house whether or not she consented. XXIII R. 60. She also further testified that the police were scaring her, speaking aggressively toward her, and that she would not have let them come in or let them take anything from the house but for the fact of their

behavior toward her and the fact that they indicated they would come in whether or not she gave consent.  XVI R. 138.

HPD officer S. A. Suro testified that he searched the home and recovered a 12 gauge shotgun and a S.K.S. assault rifle from a closet at the home.  XXI R. 179-180.  Both guns were positively identified by HPD firearms examiner Robert Baldwin to be the murder weapons in the case in chief, and other testimony indicated they may have had the blood of one of the victims on them. (This evidence about the victim's blood was later determined to be unreliable.  *See* Claim IV of this petition, incorporate herein by express reference.)

Mr. Alvarez filed a pre-trial motion to suppress the seized weapons based upon the illegality of the search and seizure.  CR. 17; XVI R. 140.  The trial court denied the motion without making written findings of fact.  XVI R. 143.

Under the Fourth Amendment to the United States Constitution, *Wong Sun v. U.S.*, 371 U.S. 471 (1963) an arrest or search is unreasonable unless based on probable cause.  Here, at the time of the seizure, probable cause did not exist, nor had a warrant been obtained to search the home.  The only possible basis for the search, therefore, was the alleged consent to search by Mr. Alvarez or his mother.  The facts establish that neither provided voluntary consent, however, and the weapons found as a result of the search of his home were therefore inadmissible.

**CLAIM XVI: THE TRIAL COURT'S REFUSAL TO ALLOW THE DEFENSE TO CROSS-EXAMINE STATE SNITCH WITNESS CENTRAL**

**TO THE PROSECUTION'S CASE ON THE PRESTWOOD CRIME REGARDING PRIOR INCONSISTENT STATEMENTS, PRIOR RECORD, PLEA MATTERS, AND OTHER IMPORTANT ISSUES VIOLATED MR. ALVAREZ'S RIGHT TO A FAIR TRIAL AND TO PRESENT A DEFENSE**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to a fair trial and to present his defense, to confront and cross-examine witnesses, to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court prohibited the defense from cross-examining State's snitch witness Miguel Reyes regarding his prior inconsistent statements and his propensity for bias as evidenced in his plea negotiations. *See Davis v. Alaska*, 415 U.S. 308 (1974).

At the guilt-innocence phase of the trial in this case, the State presented the testimony of snitch witness Miguel Reyes. Reyes testified that he was a gang member in the Southwest Cholos, that Mr. Alvarez was also a gang member, and that Mr. Alvarez had assisted in the planning and carrying out of the drive-by shooting incident on Prestwood Avenue. in Houston, Texas. XIX R. 174-213; XX R. 8-14. He was thus an important witness for the State, in that he was an alleged eyewitness to Mr. Alvarez's direct participation in the Prestwood shooting. Toward the end of his testimony he claimed that he had been charged with being

engaged in organized crime and with aggravated assault, but that he was not receiving any reduction in his sentence as a result of his cooperation with the police. *Id;* XX R. 12, 14.

On cross-examination, Reyes continued to deny any receipt of benefit or promise of leniency in connection with his testimony for the State. *Id.* at 14, 18, 19, 20, 21, 22, 23, 59. To challenge this testimony and otherwise discredit the witness generally with respect to his testimony regarding the events at the Prestwood incident, the defense sought to introduce a variety of evidence. First, the defense sought to introduce prior a inconsistent statement that Reyes had made regarding the Prestwood incident. XX R. 49-59. The trial court prohibited the defense from presenting that statement to the jury. XX R. 135-137. Second, the defense sought to introduce evidence of various pleadings and motions in the case for which the witness denied any plea agreement in the case. One such motion was for a sentence of probation. XX R. 133. The trial judge prohibited the defense from introducing these papers to the jury. *Id.* Third, the defense again sought to introduce other prior inconsistent statements of the witness, and again the trial court prohibited the defense from doing so. XX R. 135-37.

In *Davis v. Alaska*, 415 U.S. 308 (1974), the U.S. Supreme Court held it a violation of the Confrontation Clause of the U.S. constitution for the trial court in a criminal case to refuse to permit cross-examination of state's witness, Richard

Green, a juvenile, for bias arising from the fact that he was on juvenile probation. The Court reasoned that the defense had a right to confront the witness, and that such confrontation right included questioning in areas that might give rise to indication of witness bias in favor of the prosecution. It should be noted that in that case the defense had made it clear that the purpose for such cross-examination was not general impeachment of the witness as to bad character, but was specifically addressed to the issue of witness bias, namely, that the witness might be inclined to tailor his testimony in the State's favor knowing that the State held over his head his probation status.

Mr. Reyes certainly had bias and an interest in tailoring his testimony. As briefly mentioned during his testimony, Mr. Reyes was arrested and charged with possession of a weapon. XIX R. 174 -213. That same weapon, introduced at Mr. Alvarez's trial as State's Trial Exh. 103, was matched with the ballistic evidence found at the Prestwood Incident. XIX R. 174 -213, HPD Crime Lab Ballistics Report, Prestwood Incident, Exh. 39, State's Trial Exh. 44. In light of this information, the credibility of his testimony, in which he claimed that other individuals used the gun for which he was arrested, is highly suspect and subject to bias.

The U.S. Supreme Court has made plain that in a capital trial, rules of evidence may not be used against a capital defendant to bar admission of evidence

necessary to ensure the defendant a fair trial and sentencing determination.   In

*Green v. Georgia*, 442 U.S. 95 (1979), the Court reviewed a trial court's exclusion

of a witness's testimony that a third party told the witness that he killed the victim

after sending the defendant out on an errand as hearsay.  *Id*. at 96.  The Supreme

Court held, "Regardless of whether the proffered testimony comes within

Georgia's hearsay rule, under the facts of this case its exclusion constituted a

violation of the Due Process Clause of the Fourteenth Amendment."  *Id*. at 97.

The Court continued, "The excluded testimony was highly relevant to a critical

issue in the punishment phase of the trial and substantial reasons existed to assume

its reliability."  *Id*. (internal citations omitted).  The Court concluded, "In these

unique circumstances, 'the hearsay rule may not be applied mechanistically to

defeat the ends of justice.'"  *Id*. (*quoting Chambers v. Mississippi*¸410 U.S. 284,

302 (1973)).

For these reasons, it was error of constitutional magnitude to prohibit Mr.

Alvarez from introducing evidence in the cross-examination of the State's central

witness, a snitch cooperating with the government, which tended to show (a) that

he could not reliably recall the events in question; (b) that he had given prior

inconsistent statements to the police, had signed those statements, and then when

confronted with them and the inconsistencies pointed out, the witness claimed the

police officer got it wrong; and, (c) despite his denials, the witness was in fact

receiving, expecting to receive, and did receive favorable treatment in exchange for his testimony against Mr. Alvarez.

## CLAIM XVII: THE TRIAL COURT'S ADMISSION OF PHOTOS ALLEGEDLY OF MR. ALVAREZ MAKING SO-CALLED "GANG SIGNS" DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, when the trial court permitted the prosecution to present as evidence during the guilt-innocence phase of the trial photos purportedly of Mr. Alvarez making "gang signs" or gestures.

During the guilt-innocence phase of the trial, the defense objected to the admission of several photos purportedly depicting Mr. Alvarez and his girlfriend, co-defendant Jessica Trevino, making gang-related gestures. Some of the photos were of Mr. Alvarez only, some were of his girlfriend only, and some were of the two of them together. These photos were found on the floorboard of the car in which Mr. Alvarez and Ms. Trevino were arrested. The State argued, at trial and on appeal, that the photos were admissible because they related to a contested issue at the trial, namely, whether Mr. Alvarez was a member of a gang at the time of

both shootings and whether both were connected in the same scheme or course of conduct, an element of the capital offense with which he was charged. The trial court admitted the photos into evidence over objection. XX R. 183-189.

The admission of these photos deprived Mr. Alvarez of a fair trial. They were prejudicial, inflammatory, cumulative as to the issue of gang affiliation and gang motive for both killings, and at least some of them had nothing to do with Mr. Alvarez at all, instead being pictures solely of his girlfriend.

Mr. Alvarez had a constitutional right to have a jury determine his liability unfettered by exposure to unfairly prejudicial material and to inferences that he was involved in other, uncharged and unadjudicated, criminal activity, where as here, such allegations are not relevant to charged offenses. *Estelle v. McGuire*, 502 U.S. 62, n.5, (1991); *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993) (where evidence about defendant's fascination with and prior use of weapons was not relevant to homicide, its introduction violates due process and fair trial rights). *See also Estelle v. Williams*, 425 U.S. 501 (1981); *Scales v. United States*, 367 U.S. 203, 224-25 (1961) (Harlan, J.).

**CLAIM XVIII: THE APPLICATION OF THE TEXAS CAPITAL SENTENCING STATUTE TO THE AGGRAVATING AND MITIGATING FACTORS IN THIS CASE, IN NARROWLY DEFINING WHAT CONSTITUTES A MITIGATING FACTOR, DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING**

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, by the application of Texas' capital sentencing statute at his trial.

At trial counsel filed motions challenging the constitutionality of the Texas capital sentencing scheme in a number of respects. These motions were denied by the trial court. CR 325, 356; IV R. 8-9. The issue set forth here stems from those motions, which were raised and rejected on the merits on direct appeal.

At Mr. Alvarez's trial, the jury was instructed in accordance with the Texas capital sentencing statute concerning the three "special issues":

Article 37.071, Sec. 2

(e)  The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(f)  The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1)  shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree.

The Supreme Court of the United States has held that "[a]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die."  *Gregg v. Georgia*, 428 U.S. 153, 190 (1976).  The validity of the Texas scheme therefore rises or falls based on the following principle:

> What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must deteremine.  Texas law clearly assures that all such evidence will be adduced.

*Jurek v. Texas,* 428 U.S. 262, 275 (1976).

Art. 37.071 §2(f)(4) defines mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness."  When read in conjunction with the Texas Court of Criminal Appeals' interpretation of Art. 37.071 § 2(e) violates the Eighth and Fourteenth Amendments to the United States Constitution.  In *Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999) the Court of Criminal Appeals said:

> [I]n order for mitigating evidence to have relevance beyond the scope of special issues, there must be relevance between the mitigating evidence and the  circumstances surrounding the

> crime that tends to excuse or explain the criminal act, so as to
> make that particular defendant less deathworthy.

*Goff v. State*, 931 S.W.2d 537, 556 (Tex. Crim. App. 1996) *cert. denied,* 520 U.S. 1171, 117 S. Ct. 1438, 137 L. Ed. 2d 545 (1997).  Although Article 37.071, section 2(e) allows the consideration of background and character evidence in addition to the personal moral culpability of the defendant, section 2(e) does not necessarily permit the introduction of any evidence that the defense believes may sway a jury to render a life verdict.  *Prystash*, 3 S.W.3d at 534-535.

The Court of Criminal Appeals is in effect limiting mitigating evidence to that which relates to a defendant's moral culpability.  This unconstitutionally limits the mitigating evidence a defendant can offer to save his life.

This interpretation of Art. 37.071 impermissibly instructs jurors to disregard mitigating evidence that is unrelated to a defendant's moral blameworthiness.  The instruction unconstitutionally narrows the jury's discretion in sentencing, to factors that concern only moral blameworthiness.  *Brewer v. Quarterman,*__ U.S. __, 2007, No. 05-11287, April 25, 2007.

The jury must, in effect, weigh any mitigating evidence against a defendant's "moral culpability."  Following this "weighing" process, the jury must find "sufficient" evidence to warrant a sentence of life.  The only mitigating that the jury can give effect to is that which exceeds his or her moral culpability.

Culpability is defined by, *The American Heritage Dictionary of The English Language*, 3rd Edition as "deserving of blame or censure, as being wrong, evil, improper or injurious." By placing this into the instruction a "super burden is placed upon a defendant. The State has by then already proved that he is legally culpable beyond a reasonable doubt. In order to overcome this "culpability," he must establish mitigation in a degree greater than "beyond a reasonable doubt."

As noted elsewhere in this Petition, *see* Claim XXII, incorporated herein by express reference, this results in a constitutionally impermissible shifting of burden from the state to the Defendant. The fact that the State is given the burden by Art. 37.071(2)(c) and it is then shifted to a Defendant by Art. 37.071(e)(1) has been condemned during the guilt phase in *Francis v. Franklin*, 471 U.S. 307 (1985), *Yates v. Aiken*, 484 U.S. 211 (1988) and *Yates, v. Evatt*, 500 U.S. 391 (1991), and should be condemned no less during the punishment phase of a capital trial.

*Black's Law Dictionary*, 5th Edition defines "culpability" as "blameworthiness." Texas, which professes to be a "non-weighing state," is in fact requiring the jury to "weigh" the mitigating evidence against the guilt evidence again. It is not a "*de novo*" assessment by the jury, it is merely an exercise to determine if the mitigating evidence is of such a magnitude that it can overcome the finding of guilt (beyond a reasonable doubt) that has already been made by the

jury. The burden is not only shifted to a Defendant, but it has been extrapolated into a "super burden," exceeding the burden of beyond a reasonable doubt.

In order to satisfy the requirements of the United States Constitution, a death penalty scheme must allow consideration "..as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" Lockett v. Ohio, 438 U.S. 586 (1978).

The language of Art. 37.071 §2(e)(1) can only reasonably be interpreted as an impermissible and unconstitutional limitation on what constitutes a mitigating circumstance. Otherwise, if the clause is not read as a limitation on what mitigating evidence can be considered it is rendered completely superfluous when read in conjunction with Art 37.071 §2(e)(1). "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause and word of a statute so that no part thereof be rendered superfluous or inoperative." *Spence v. Fenchler*, 107 Tex. 443, 457 (Tex. 1915). The only way to give effect to Art. 37.071 §2(f)(4) without rendering it superfluous is to read it as a limitation on Art 37.071 §2(e)(1).

The Eighth and Fourteenth Amendments to the United States Constitution require that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (overruled in part on other grounds) (*quoting Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion of Burger, C.J.)); *Smith v. Texas,* 543 U.S. 37, 37 (2004).

The Supreme Court of the United States found the Texas death penalty statute to be constitutional on the basis of guarantees that sentencing juries would be able to consider "whatever mitigating circumstances" the defendant might be able to show. *Lockett*, 438 U.S. at 607 (*citing Jurek v. Texas*, 428 U.S. 262 (1976)).

The Court held that these mitigating circumstances were necessary to ensure that the death penalty was not imposed in an arbitrary or capricious manner. This belief was based on the principle that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (*overruled on other grounds*).

It is therefore well established that a sentencer "may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings*, 455 U.S. at 114); *Abdul-Kabir v. Quarterman*, 550 U.S. __, Slip Op. No 05-11284 (April 25, 2007), 2007 WL 1201582 (2007) (holding that jurors must be instructed to "consider fully"

mitigation evidence as it bears on the extent to which a defendant is undeserving of a death sentence) (citations omitted).  Relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 124 S. Ct. 2562, 2570 (2004), *Nelson v. Quarterman,* 472 F. 3d 287, 287 (2006).

The Supreme Court of the United States has further ruled that once the "low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence."  *Tennard*, 124 S. Ct. at 2570 (quoting *Boyde v. California*, 494 U.S. 370, 377-378 (1990)).  It is therefore unconstitutional for a state to exclude or limit a defendant's ability to present relevant mitigating evidence.

A restriction on the mitigating evidence that can be considered by jurors in the sentencing phase of this trial is therefore unconstitutional, and also renders whatever, if any, sentence to be delivered unreliable since it is not certain that all relevant factors have been considered.

In determining whether to impose a sentence of death the jury "can do little more – and must do nothing less – than express the conscience of the community on the ultimate issue of life or death."  *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).  The conscience of the community can only be reliably expressed by a jury that has access to all mitigating evidence to make an informed decision.

This statute is unconstitutional because it fails to *require* that mitigation be considered. A juror is required to consider and give effect to all mitigation. *See Smith v. Texas*, 127 S.Ct. 1686, 1692 (2007) ("[J]ury instructions [must] ensure adequate consideration of […] mitigating evidence."); *Penry v. Lynaugh*, 492 U.S. 302, 323 (1989) (holding that jury instructions should "clearly direct the jury to consider fully [the Defendant's] mitigating evidence as it bears on his personal culpability"). After the juror has *considered* the mitigation, it is then up to the juror to determine what effect to give the mitigation. Failure to *mandate* consideration of mitigating evidence makes this statute unconstitutional in violation of the Eighth Amendment. *Penry v. Johnson*, 532 U.S. 782 (2001).

In the final analysis, it is important here to remember that the death penalty is qualitatively different from any other criminal punishment; "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). "In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases." *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C.J., concurring). "Because sentences of death are 'qualitatively different' from prison sentences, this Court has gone to extraordinary measure to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much

as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982) (O'Connor, J., concurring) (citation omitted). Hence, the Supreme Court has repeatedly condemned sentencing procedures that inject unreliability into jury deliberations in capital cases. *See, e.g., Johnson v. Mississippi*, 486 U.S. 578 (1988); *Caldwell v. Mississippi,* 472 U.S. 320 (1985); *Gardner v. Florida*, 430 U.S. 349 (1977); *Woodson*, 428 U.S. 280 (1976).

Throughout the era of the modern death penalty, the United States Supreme Court has insisted that the ultimate punishment must not be meted out in an "arbitrary and capricious manner." Rather, there must be a "meaningful basis for distinguishing the cases in which it is imposed from the many in which it is not." *Gregg v. Georgia*, 428 U.S. 153 (1976), *Chenault v. Stynchcombe*, 581 F.2d 444, 448 (5th Cir. 1978).

To insure that the ultimate penalty is not meted out arbitrarily, the Court has established a series of principles to guide courts in instructing the jury at sentencing--that terms must be clearly defined[26], that jurors must be required to consider mitigation[27], that jurors should be instructed as to the consequences of

---

[26] *Maynard v. Cartwright*, 486 U.S. 356 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). *See also Profitt v. Florida*, 428 U.S. 242, 253 (1976).

[27] *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Penry v. Lynaugh*, 492 U.S. 302 (1989),

their verdict[28], and that no instruction can be given to undermine the jury's sense of responsibility for the imposition of a death sentence.[29]

In the aftermath of the Supreme Court's holding in *Furman v. Georgia*, 408 U.S. 238 (1972), that the death penalty as then practiced in the United States violated the Eighth Amendment, the states wishing to reinstate capital punishment developed two types of statutes: mandatory and guided discretion.  In 1976, the Supreme Court approved the guided discretion statutes from Texas, Georgia, and Florida, and rejected mandatory sentencing schemes from North Carolina and Louisiana.[30]  Clearly, the court preferred to resolve the problem of arbitrariness by establishing rules by which the jury would exercise its discretion rather than by taking away the jury's discretion altogether and mandating death for all capital crimes (so called "guided discretion" statutes).

This process of guiding the discretion of the jury has evolved into a doctrine of "individualized sentencing."  *Woodson v. South Carolina*, 428 U.S. 280, 304

---

[28]  *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994);  *Shafer v. South Carolina*, 532 U.S. 36, (2001) (the South Carolina Supreme Court "incorrectly limited" the holding in *Simmons v. South Carolina,* 512 U.S. 154 (1994), when it mischaracterized "how the State's new [capital sentencing] scheme works").

[29]  *Caldwell v. Mississippi,* 472 U.S. 320 (1985).

[30]  *Jurek v. Texas*, 428 U.S. 262 (1976). *Gregg v. Georgia*, 428 U.S. 153 (1976). *Proffitt v. Florida*, 428 U.S. 242 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976).  *Roberts v. Louisiana*, 428 U.S. 325 (1976).

(1976), *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).

The Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, **as a mitigating factor**, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).

Furthermore, the jury must be "specifically instructed to consider, as mitigating evidence" evidence of the defendant's background, character, and crime. Only such instruction "satisf[ies] the dictates of the Eighth Amendment." *Blystone v. Pennsylvania*, 494 U.S.299 (1990).

The Texas capital sentencing statute and its application has been reviewed at least ten times[31] by the United States Supreme Court to insure that it permits such individualized sentencing. In *Jurek v. Texas*, 428 U.S. 262 (1976), the then-new statute was found constitutional based upon the premise that the Texas Court of Criminal Appeals would interpret the future dangerousness question "so as to allow a defendant to bring to the jury's attention whatever mitigating

---

[31] *Jurek, supra*; *Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Adams v. Texas*, 448 U.S. 38, 46 (1980); *Graham v. Collins*, 506 U.S. 461 (1993); *Johnson v. Texas*, 509 U.S. 350 (1993); *Penry v. Johnson*, 532 U.S. 782 (2001); *Tennard v. Dretke*, 542 U.S. 247 (2004); *Smith v. Texas*, 543 U.S. 37 (2004); *Abdul-Kabir v. Quarterman*, 550 U.S. ___, Slip Op. No. 05-11284 (April 25, 2007).

circumstances he may be able to show.  Thus, the Texas law essentially requires that...in considering whether to impose a death sentence, the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it."  428 U.S. at 272-273.

In approving the Texas statute in *Jurek*, the court relied upon the notion that the special issues would "'guide and focus the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender.'"  *Spivey*, 661 F.2d at 471, *quoting Jurek v. Texas*, 428 U.S. 262, 274 (1976).

Ten years later, however, the court again considered the Texas statute and found it wanting in that the special questions gave juries no mechanism whereby they might give effect to mitigating circumstances offered by the defense.  *Penry v. Lynaugh*, 492 U.S. 302 (1989).  In *Penry I*, the court struck down the Texas statute, explaining that the individualized sentencing required by *Lockett* and *Eddings* must "reflect a reasoned moral response to the defendant's background, character and crime."  *Id*. at 308-309, 322-326.  Because the two special issues did not allow jurors to consider any mitigation other than that relevant to deliberateness and future dangerousness, the Texas statute failed to allow such consideration of the defendant's individual characteristics.

In response to *Penry I*, the state legislature eventually reworked the Texas statute to include a special issue on mitigation. Juries are now asked "whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Tex. Code Crim. Proc. art. 37.071(2)(e)(3)(d). This statute went into effect on September 1, 1991. However, as noted herein, this version of the statute is no less infirm than its predecessors.

For these reasons, the statute as it was applied to Mr. Alvarez was unconstitutional.

## CLAIM XIX: THE APPLICATION OF THE TEXAS CAPITAL SENTENCING STATUTE TO THE AGGRAVATING AND MITIGATING FACTORS IN THIS CASE, IN PARTICULAR RESPECTING THE REQUIREMENT OF TEN VOTES ON ONE OF THE THREE SPECIAL ISSUES IN ORDER FOR A LIFE SENTENCE TO BE IMPOSED, DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth

Amendments to the U.S. Constitution, by the application of Texas' capital

sentencing statute at his trial.

At trial counsel filed motions challenging the constitutionality of the Texas

capital sentencing scheme in a number of respects. These motions were denied by

the trial court. CR. 325, 356; IV R. 8-9. The issue set forth here stems from those

motions, which were raised and rejected on the merits on direct appeal.

At Mr. Alvarez's trial, the jury was instructed in accordance with the Texas

capital sentencing statute concerning the three "special issues":

Article 37.071, Sec. 2

(e) The court shall instruct the jury that if the jury returns an
affirmative finding to each issue submitted under Subsection (b) of
this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the
circumstances of the offense, the defendant's character and
background, and the personal moral culpability of the defendant, there
is a sufficient mitigating circumstance or circumstances to warrant
that a sentence of life imprisonment rather than a death sentence be
imposed.

(f) The court shall charge the jury that in answering the issue
submitted under Subsection (e) of this article, the jury:

(1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and
may not answer the issue "yes" unless 10 or more jurors agree.

In this case the jury was instructed that they were not permitted to

answer either special issue 1 or special issue 2 (the "aggravating" special

issues) "No" unless ten (10) or more jurors agreed with that answer. The jury was similarly instructed with respect to the third, "mitigating" special issue.

As such, Art. 37.071 violates the Eighth and Fourteenth Amendments to the United States Constitution in that there is an expressed requirement (which itself misrepresents the law, *see* Claim XX in this Petition, incorporated herein by express reference) that 10 or more jurors must agree to properly answer either the "aggravation" special issues or the "mitigation" special issue. *McCoy v. North Carolina,* 494 U.S. 294 (1990)*; Mills v. Maryland*, 486 U.S. 367 (1988); *see also U.S. v. Jones*, 132 F.3d 232 (5th Cir.1998); *Jeffries v. Blodgett*, 5 F.3d 1180 (9th Cir.1993). Such instructions, on their face, would disallow the imposition of a life sentence *even if* ten or more jurors agreed that a life sentence was appropriate, unless ten or more could agree as to which special issue answer was the proper basis for that life sentence. In short, then, the 10-vote for life requirement is essentially two votes shy of the unanimity requirement found unconstitutional in *Mills* and *McCoy*. Texas 10-vote requirement meant that unless ten jurors could specifically agree on either the non-existence of aggravators, or the existence of the mitigating evidence as expressly and narrowly defined in the third special issue, a sentence of death was required.

As noted elsewhere in Claim XX in this Petition, incorporated herein by express reference, these instructions are also, in fact, not truthful. The law in Texas requires that if the jurors could not have agreed to the answer on *any* of the special issues on which they were instructed, Mr. Alvarez should have been automatically sentenced to Life. The ten-vote rule, in effect, has no consequential significance to the actual outcome at the sentencing phase of a capital trial, but it undoubtedly has an enormous *impact* on that outcome. Insofar as whether a capital defendant is sentenced to life or death, there is nothing significant to ten (10) jurors other than an arbitrarily high number chosen by the Texas Legislature to mislead each juror, and to discourage and effect the intimidation of minority holdout jurors so that the number of death verdicts returned in the State are maximized. This, of course, cannot be sqaured with the constitution.

For these reasons, the statute as it was applied to Mr. Alvarez was unconstitutional.

## CLAIM XX: THE APPLICATION OF THE TEXAS CAPITAL SENTENCING STATUTE TO THE AGGRAVATING AND MITIGATING FACTORS IN THIS CASE, IN FAILING TO PROVIDE THE JURY WITH ACCURATE INFORMATION ABOUT THE CONSEQUENCES OF THEIR SENTENCING PHASE DETERMINATIONS, DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, by the application of Texas' capital sentencing statute at his trial.

At trial counsel filed motions challenging the constitutionality of the Texas capital sentencing scheme in a number of respects. These motions were denied by the trial court. CR. 325, 356; IV R. 8-9. The issue set forth here stems from those motions, which were raised and rejected on the merits on direct appeal.

At Mr. Alvarez's trial, the jury was instructed in accordance with the Texas capital sentencing statute concerning the three "special issues", that with respect to the first two "aggravating" special issue, they were not permitted to answer either special issue 1 or special issue 2 "No" (resulting in a life sentence) unless ten (10) or more jurors agreed with that answer. The jury was similarly instructed with respect to the third special issue regarding mitigation. Thus the jury was told that it would take the agreement of ten jurors on at least one of the three special issues to render a life sentence for Mr. Alvarez.

As noted, the result of 10 jurors voting "yes" on the mitigation issue is a life verdict under Art. 37.071(2)(g). However, that same section (g) goes on to say that

if the jury "... is unable to answer any issue submitted under Subsection (b) [future

dangerousness and parties] or (e)" [mitigation] then the result is a life verdict.  In

other words, a life verdict is reached if the jury "hangs" by a lone juror voting "no"

on the future dangerousness issue.  However, the jury is told at the same time that

at least 10 must agree on a "no" vote before a life verdict is authorized.

Furthermore, the jury is instructed that in order to answer the *Penry* issue

affirmatively (that would result in a life sentence), 10 must agree.  Again, if only

one juror holds out and refuses to vote "no" on the *Penry* issue then, pursuant to

Art. 37.071(2)(g), a defendant is sentenced to life.

The trial court in this case refused to tell the jurors the truth.  It refused to

inform the jury that, despite the instruction and wording of the verdict form, in fact

one juror hold-out for life would result in a life sentence.  The trial court's refusal

to so instruct the jury violated Mr. Alvarez's fundamental due process, equal

protection, and Eighth Amendment rights.

The court's refusal to inform the jury of all their options provided by the law

rendered the capital sentencing process irrational and unreliable under the Eighth

and Fourteenth Amendments, and allowed for a wanton and freakish application of

the death penalty.  The making of such a material omission of applicable law in the

Charge to the jury denied jurors both the equal protection and due process of law,

because it it subverted and distorted each juror's right to freely participate in the

criminal justice system. The Judge, the prosecutors, defense counsel, and even the bailiff, likely knew the effect of a holdout juror; the jurors themselves deserved, and should have received fair and equal treatment under the law based on full and accurate information about the consequences of their sentencing decision.

The Supreme Court granted relief in *Penry v. Johnson*, 532 U.S. 782 (2001) because the jurors were required to give false answers in their verdict in order to give effect to mitigating circumstances. Here too, the trial court's instruction gave jurors cause to give a false answer only because a juror would feel it impossible to convince nine (9) other jurors to vote with him or her. *See also Simmons v. South Carolina*, 512 U.S. 154 (1994) (requiring truth in capital sentencing).

This hiding of the consequences of a singular vote for life violates all of the guarantees provided to Mr. Alvarez by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U. S. Constitution. It also evinces am unseemly, death-skewed intent on the part of the lawmakers to make the imposition of death "automatic", or at least more likely, which itself violates Due Process and the Eighth Amendment to the U. S. Constitution. *Woodson v. North Carolina*, 428 U.S. 280 (1976).

The overt camouflaging of the effect of a "singular vote" on the life of a capital defendant is compounded by the language that prohibits anyone from telling a juror of the effect of failure to agree on the issues. Art. 37.071(2).

Counsel for the defendant are instructed not to clarify what is a conflict in the language.  The jurors are then faced with the language of Art. 37.071(2)(f)(1) that says that they shall answer "yes" or "no" and at the same time in order to answer "yes" on the Penry issue ten jurors must do so, and 10 must do so to answer "no" on the future dangerousness issue.  The effect (and obviously the intent of the legislature) is that the hold out jurors, not realizing that they have any individual empowerment, will be coerced into joining with a more vocal and hostile majority that vote for death.

The Texas Court of Criminal appeals has said that "There is no constitutional prohibition to concealing from the jurors the consequences of their deliberations, so long as they are not mislead into believing that ultimate responsibility for the verdict rests elsewhere."  *Prystash v. State*, 3 S.W.3d 522 (Tex.Cr.App.1999).  (Presumably this is because the Court was aware that the U.S. Supreme Court had held long ago that doing the latter violated the constitution, *see Caldwell v. Mississippi*, 472 U.S. 320 (1985)).  In other words, it is permissible to mislead a capital jury in every area except one, that being "who shoulders the ultimate responsibility for the verdict."  This premise certainly flies in the face of those United States Supreme Court decisions cited herein that mandate a heightened responsibility on the court to guide a jury to a reliable decision that

imposes death on a narrow class and in a manner that is neither arbitrary or automatic.

The language of Article 37.071 does not even pass the questionable test enunciated in *Prystash, supra*. The jurors are misled into believing that the verdict of life rests with 10 of them, when in fact, it rests with only one. Further, this concealment from the jurors does not deal with the "consequences of their deliberations." It conceals from each juror his or her right to vote her conscience based upon the evidence heard. Thus it violates the very *Caldwell* principle articulated in *Prystash*.

The impact and effect of mitigating evidence is lost on jurors when each does not realize that a single vote for life will result in life sentence. *McCoy v. North Carolina,* 494 U.S. 294 (1990)*; Mills v. Maryland*, 486 U.S. 367 (1988); *see also U.S. v. Jones*, 132 F.3d 232 (5th Cir.1998), *Jeffries v. Blodgett*, 5 F.3d 1180 (9th Cir.1993).

The Constitution requires that jurors in capital sentencing proceedings be accurately and thoroughly informed about their role, duties, and responsibilities in making the decision whether a person should live or die. The U.S. Supreme Court has reversed scores of capital cases where lower courts, or prosecutors, or state laws, have failed to inform, or prevented the jury from receiving and considering all reliable but relevant information about the nature and consequences of their

sentencing decision. Whether it be an interference with the development, presentation and consideration of relevant evidence, *see e.g. Tennard v. Dretke*, 124 S.Ct. 2562 (2004), or the failure to allow defense confrontation of aggravating evidence, *see Gardner v. Florida*, 430 U.S. 349 (1977), or the diminution of the jury's sense of responsibility for the very real and definitive consequences of its sentencing verdict, *Caldwell v. Mississippi*, 472 US 320 (1985), or any of the other numerous ways in which capital juries have been misled or misguided about their decision and its consequences, the U.S. Supreme Court has repeatedly found constitutional error where capital juries are not provided fair and accurate information in accordance with longstanding Eighth and Fourteenth Amendment jurisprudence.

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Court addressed an issue regarding the provision of false or misleading information to a capital sentencing jury about the "true meaning" of its sentencing choices and decisions. There the matter at issue involved the capital defendant's request that the jury be informed that a vote for a life sentence in the case would mean a sentence for which the defendant would not be eligible for parole. Though an accurate statement about the consequences of such a verdict, the trial court nevertheless refused to so instruct the jury or allow argument or evidence regarding such.

In finding reversible constitutional error, the Court began with the fundamental principle that "the Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *quoting Gardner v. Florida,* 430 U.S. 349 (1977). In a capital sentencing proceeding, "due process requires that the jury be informed" about the truth regarding the sentencing decision it is required to make. *Shafer v. South Carolina*, 532 U.S. 36 (2001).

Here, the jury was not provided the truth about its sentencing decision. In fact the court's instructions served to mislead the jury, telling it that a a vote of at least ten jurors was required while at the same time failing even to mention that this is not true, and that a sentencing decision would nevertheless have been reached even if the jury could not have agreed by a vote of ten or more jurors as to each of the special issues.

Courts in other jurisdictions with similar statutory provisions regarding the consequences of non-unanimity in capital jury sentencing have held that the jury must be informed of that fact in order to avoid the arbitrary and capricious imposition of the death penalty based on speculation as to what the consequences of deadlock might be. "[B]y allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court fail[s] to suitably direct and limit the jury's discretion so as to minimize

the risk of arbitrary and capricious action." *State v. Williams*, 392 So.2d 319, 634-35 (1980). "To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence." *State v. Ramseur*, 106 N.J. 123, at 311 (1987).

As Justice Souter has noted, "[W]henever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been 'arbitrarily or discriminatorily' and 'wantonly and . . . freakishly imposed.'" *Simmons v. South Carolina*, 512 U.S. 154, 172-73 (1994) (Souter, J., concurring) (citations omitted).

For these reasons, the statute as it was applied to Mr. Alvarez was unconstitutional.

## CLAIM XXI: THE APPLICATION OF THE TEXAS CAPITAL SENTENCING STATUTE TO THE ISSUE OF THE LAW OF PARTIES THAT APPLIED AT THE GUILT-INNOCENCE PHASE OF THE TRIAL, BUT SHOULD NOT HAVE APPLIED AT SENTENCING, DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of

the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, by the application of Texas' capital sentencing statute at his trial.

At trial counsel filed motions challenging the constitutionality of the Texas capital sentencing scheme in a number of respects. These motions were denied by the trial court. CR. 325, 356; IV R. 8-9. The issue set forth here stems from those motions, which were raised and rejected on the merits on direct appeal.

At Mr. Alvarez's trial, the jury was instructed in accordance with the Texas capital sentencing statute concerning the three "special issues":

<u>Article 37.071, Sec. 2</u>

(e) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

(1) shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree.

In addition, the jury was instructed on special issue two, in accordance with Article 37.071 Section 2(b) regarding the "law of parties", which had been applied during the guilt-innocence phase of the trial. (In fact, the prosecution relied heavily upon the law of parties issue, arguing in closing that whether or not they had proven that Juan Alvarez had personally killed anyone did not matter, as he was guilty under the law of parties in any event, XXIV R. 12-14, 48-51, 64-66).

The Section 2(b) sentencing instruction sought to re-define the issue in accordance with constitutional guidelines respecting when and whether a person is eligible for the death penalty depending upon the individual's personal responsibility for the crime. In this case, the jury was instructed to answer the following special issue:

> Do you find from the evidence beyond a reasonable doubt that Juan Carlos Avlarez, the defendant himself, actually caused the death of M. Aguirre and J. Varela, on the occasion in question, or if he did not actually cause the death of M. Aguirre and J. Varela, that he intended to kill M. Aguirre and J. Varela, or that he anticipated that a human life would be taken?

Verdict Form, CR. 491-503.

The penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. *Furman*, supra., *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed2d 859 (1976) and *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

The non-triggerman instruction did not comply with constitutional requirements. The language in the instruction was overly broad and thus allowed the jury to sentence Mr. Alvarez to death even if he only anticipated that a life would be taken. This does not comport with *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987) (mere "anticipation" of violence is an insufficient *mens rea* for rendering a criminal defendant liable for capital punishment).

The error was compounded in a case such as this, where there were two separate homicides and the capital charge required a finding of two separate homicides linked by a common scheme or course of conduct. The special issue instruction conflates the two separate and distinct criminal transactions (the language of the indictment) into one "occasion", even though the facts clearly did not support this joinder of alleged criminal incidents. Jurors so instructed would have been confused, at the very least, as to their constitutionally imposed duty to determine that Mr. Alvarez actually intended that death would occur in each separate incident, a finding belied by the defense's version of events during the first phase of the trial.

Moreover, joining what should have been two separate *Tison* findings into one completely undermined the unanimity requirement contained within the special issue, in that it was completely possible under this erroneous instruction

that some jurors (though not all) believed Mr. Alvarez had the requisite *Tison* intent as to the first homicide, while others (though not all) believed he had the requisite intent only as to the second. Thus under the court's instruction to the jury, it was never required to find, unanimously, and beyond a reasonable doubt, that the answer to the second special issue was "Yes." Yet this is precisely what the statute, as expressed in the verdict form, required. Basic due process was thereby denied by this instruction/verdict form.

For these reasons, the statute as it was applied to Mr. Alvarez was unconstitutional.

## CLAIM XXII: THE APPLICATION OF TEXAS CAPITAL SENTENCING STATUE DEPRIVED MR. ALVAREZ OF A FUNDAMENTALLY FAIR TRIAL AND CAPITAL SENTENCING PROCEEDING

All other claims and allegations in this Petition are incorporated into this Claim by this express reference.

Petitioner was denied his right to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, by the application of Texas' capital sentencing statute at his trial

At trial counsel filed a motion challenging the constitutionality of the Texas capital sentencing scheme in a number of respects. That motion was denied by the

trial court. CR. 356; IV R. 8-9.  The issue set forth here stems from that defense

motion.

At Mr. Alvarez's trial, the jury was instructed in accordance with the Texas

capital sentencing statute concerning the three "special issues":

Article 37.071, Sec. 2

(e)  The court shall instruct the jury that if the jury returns an
affirmative finding to each issue submitted under Subsection (b) of
this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the
circumstances of the offense, the defendant's character and
background, and the personal moral culpability of the defendant, there
is a sufficient mitigating circumstance or circumstances to warrant
that a sentence of life imprisonment rather than a death sentence be
imposed.

(f)  The court shall charge the jury that in answering the issue
submitted under Subsection (e) of this article, the jury:

(1)  shall answer the issue "yes" or "no";

(2) may not answer the issue "no" unless it agrees unanimously and
may not answer the issue "yes" unless 10 or more jurors agree.

This statute offends the due process requirements of both the federal

and state constitutions in that it impermissibly shifts the burden of proof on

mitigation to the defendant.  Once the defendant has been found eligible for

the death penalty, through an affirmative answer to the first special issue, the

statute places the burden upon the defendant to demonstrate the existence of

mitigating evidence "to warrant that a sentence of life imprisonment rather

than a death sentence be imposed." This violates the constitutional

requirement of individualized sentencing in that the presumption is that any

defendant found eligible for the death penalty will in fact be sentenced to

death. The defendant is burdened with rebutting this presumption. If the

defendant offers no evidence, the default is the death penalty. The Supreme

Court has long held that there can be no circumstance in which imposition of

the death penalty is mandatory or automatic.

The death penalty is qualitatively different from any other criminal

punishment; "there is a corresponding difference in the need for reliability in the

determination that death is the appropriate punishment in a specific case."

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell,

and Stevens, JJ.). "In capital cases the finality of the sentence imposed warrants

protections that may or may not be required in other cases." *Ake v. Oklahoma*, 470

U.S. 68, 87 (1985) (Burger, C.J., concurring). "Because sentences of death are

'qualitatively different' from prison sentences, this Court has gone to extraordinary

measure to ensure that the prisoner sentenced to be executed is afforded process

that will guarantee, as much as is humanly possible, that the sentence was not

imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455

U.S. 104, 117-18 (1982) (O'Connor, J., concurring) (citation omitted). Hence, the

Supreme Court has repeatedly condemned sentencing procedures that inject

unreliability into jury deliberations in capital cases. *See, e.g., Johnson v. Mississippi*, 486 U.S. 578 (1988); *Caldwell v. Mississippi,* 472 U.S. 320 (1985); *Gardner v. Florida*, 430 U.S. 349 (1977); *Woodson*, 428 U.S. 280 (1976). Throughout the era of the modern death penalty, the United States Supreme Court has insisted that the ultimate punishment must not be meted out in an "arbitrary and capricious manner." Rather, there must be a "meaningful basis for distinguishing the cases in which it is imposed from the many in which it is not." *Gregg v. Georgia*, 428 U.S. 153 (1976), *Chenault v. Stynchcombe*, 581 F.2d 444, 448 (5th Cir. 1978).

This impermissible shift of the burden to a defendant is made more unconscionable by the language of Tex. Code Crim. Proc. art. 37.071(2)(f) which provides that the jury shall not answer the mitigation issue "yes" (resulting in a life sentence) unless 10 or more jurors agree. A defendant, according to the instructions to the jury, must then offer sufficient mitigating evidence to not only overcome the "moral culpability" that has already been established in the eyes of the jury, but 10 or those jurors must be convinced of the sufficiency of that evidence.

For these reasons, the statute as it was applied to Mr. Alvarez was unconstitutional.

## XI. PRAYER FOR RELIEF

WHEREFORE, petitioner respectfully requests that this Court:

1. Issue a writ of habeas corpus to have petitioner brought before it to the end that he might be discharged from his unconstitutional confinement and restraint or relieved of his unconstitutional sentence of death;

2. Stay the trial court's judgment of death until final determination of this petition;

3. Permit petitioner, who is indigent, to proceed without payment of costs and fees;

4. Grant petitioner additional funds to secure expert testimony and conduct further investigation as necessary to prove the facts alleged in this petition;

5. Order respondent to answer why petitioner is not entitled to the relief sought;

6. Order the Harris County District Attorney to discover all files in petitioner's case;

7. Grant petitioner the authority to obtain subpoenas for witnesses and documents which are not obtainable by other means;

8. Grant petitioner the right to conduct discovery, including depositions, request for  admissions, and interrogatories and the means to preserve the testimony of witnesses;

9. Order an evidentiary hearing at which petitioner will offer this and further proof in support of the allegations herein;

10. Permit petitioner an opportunity to supplement the petition to include claims that become known as the result of further investigation and information which come to light;

11. Order respondent to lodge the complete record of all prior state court proceedings;

12. After full consideration of the issues raised in this petition, vacate the judgment and sentence imposed upon petitioner in the 338th Judicial District for Harris County, Cause Number 787007; and

13. Grant petitioner such further relief as is appropriate and just in the interest of justice.

DATED: September 17, 2009

Respectfully Submitted,

__/s/ Robert L. McGlasson_____

* Attorney-in-charge        Robert L. McGlasson*
                            Texas Bar No. 13634050
                            *Admitted Pro Hac Vice*
                            Attorney at Law
                            McGlasson & Associates, PC
                            1024 Clairemont Avenue

Decatur, Georgia 30030

(404) 314-7664 (phone)

(404) 373-9338 (fax)

rlmcglasson@comcast.net

(e-mail)


Skyla V. Olds

California Bar No. 241742

Admitted *Pro Hac Vice*

Attorney at Law

819 Delaware Street

Berkeley, CA 94710

(510) 915-4168 (phone)

(510) 540-8442 (fax)

skyla.olds@gmail.com (email)

Attorneys for Petitioner

# INDEX OF EXHIBITS

## Federal Application for Writ of Habeas Corpus
## Juan Carlos Alvarez v. Rick Thaler, No. 4:09-mc-00436

| EXHIBIT NAME | EXHIBIT NO. |
|---|---|
| Report of Ricardo Weinstein, Ph.D. | 1 |
| Forensic Trauma Assessment, Frederic J. Sautter, Ph.D. | 2 |
| Report of Gang Expert John Hagedorn, Ph.D. | 3 |
| Affidavit of Frumencio Reyes, Trial Counsel | 4 |
| Affidavit of Danielle Williamson | 5 |
| Declaration of JessussitaTrevino | 6 |
| Declaration of Christian Monge | 7 |
| Affidavit of Vanessa Campos | 8 |
| Affidavit of Griselda Perla | 9 |
| Affidavit of Cheryl Frierson | 10 |
| Affidavit of Joseph Millspaugh | 11 |
| Affidavit of Gilberto Rodriguez | 12 |
| Affidavit of Maria Hilda Alvarez | 13 |
| Affidavit of Jose Alvarez | 14 |

| EXHIBIT NAME | EXHIBIT NO. |
|---|---|
| Declaration of Agustina Alvarez | 15 |
| Declaration of Antonia Gallegos Medrano | 16 |
| Declaration of Arturo Sanchez Oliva | 17 |
| Declaration of Juana Maria Cisneros Leija | 18 |
| Declaration of Luis Uribe | 19 |
| Declaration of Paulino Fuentes Sosa | 20 |
| Declaration of Raymundo Sanchez | 21 |
| Declaration of Consuelo Campa de la Torre | 22 |
| Declaration of Hermila Alvarez | 23 |
| Affidavit of Ruben Uribe | 24 |
| Affidavit of Adelaida Uribe | 25 |
| Affidavit of Norma Patricia Marroquin | 26 |
| Affidavit of Joaquin Cruz | 27 |
| Affidavit of Fermin Banda | 28 |
| Affidavit of Maria del Socorro Banda | 29 |
| Affidavit of Martha Rodriguez | 30 |
| Affidavit of Juana Banda | 31 |
| Bill of Rudy Vargas | 32 |

| EXHIBIT NAME | EXHIBIT NO. |
|---|---|
| Case File Excerpts, *State v. Jessussita Trevino,* Harris County Cause No. 786173 | 33 |
| Motion to Approve Attorneys Fees Expense Claim, *State v. Alvarez,* Harris County Cause No. 787007 | 34 |
| Letter of John Denninger to Rudy Vargas, 7/3/1999 | 35 |
| Motion for Authorization of Funds for an Investigator, *State v. Alvarez*, Harris County Cause No. 786172 | 36 |
| Motion to Authorize Expert Witness Expense, *State v. Alvarez*, Harris County Cause No. 786172 | 37 |
| Supplemental Houston PD Police Report, Recovered Evidence, Prestwood Incident, 6/6/98 | 38 |
| Houston PD Crime Lab Ballistics Report, Prestwood Incident | 39 |
| Houston PD Crime Lab Ballistics Report, Woodfair Incident | 40 |
| Affidavit of Alicia Amezcua-Rodriguez | 41 |
| Supplemental Houston PD Police Reports re: Photo Line-up with Brandy Varela, 7/10/98 | 42 |
| Bellaire PD Incident Report Records | 43 |
| Affidavit of Ana Rivero | 44 |
| Affidavit of Araceli Alvarez | 45 |
| Affidavit of Aurora Alvarez | 46 |

| EXHIBIT NAME | EXHIBIT NO. |
|---|---|
| Affidavit of Francisco Alvarez | 47 |
| Affidavit of Maria Guadalupe Uribe | 48 |
| Affidavit of Teresa Banda | 49 |
| Harris County Census Data | 50 |
| Affidavit of Victor Emanuel Uribe | 51 |
| Affidavit of Carlos Alvarez | 52 |
| Declaration of Demisio Alvarez | 53 |
| Quality Assurance Independent Audit of Houston Crime Lab | 54 |
| Bromwich Fourth Report | 55 |
| Bromwich Final Report | 56 |
| Dr. Chiafari Final Report | 57 |
| Dr. Chiafari Clarifying Letter | 58 |
| NYT Article - Reivew of DNA Evidence in HPD Crime Lab Cases | 59 |
| Brady Disclosure | 60 |
| HPD Report on DNA Evidence | 61 |
| HPD Report on Blood and Guns | 62 |
| HPD Firearms Submission Form | 63 |
| Report of Identigene Laboratory | 64 |

| EXHIBIT NAME | EXHIBIT NO. |
|---|---|
| Bromwich Fifth Report | 65 |
| Dr. Chiafari Fax Requesting Documentation | 66 |
| Affidavit of Juan Carlos Alvarez Banda | 67 |
| Affidavit of Scott J. Atlas | 68 |
| Affidavit of Bonnie Lee Goldstein | 69 |
| Affidavit of Barbara K. Strickland | 70 |
| Declaration of Michael Iaria | 71 |
| Declaration of Peter Lopez | 72 |
| Declaration of Denise Young | 73 |
| Declaration of Adrian Franco | 74 |
| Affidavit of Jaime Paz y Puente Gutierrez | 75 |
| Affidavit of Everarde Keater Meade | 76 |
| Affidavit of Roseann Duenas Gonzalez | 77 |

# CERTIFICATE OF SERVICE

I, ROBERT L. MCGLASSON, attorney for Petitioner Juan Carlos Alvarez, do hereby certify that a true and correct copy of the above and foregoing Writ of Habeas Corpus and Exhibits Attached Thereto, have been served through the electronic case filing system for the U.S. District Court of the Southern District of Texas, to:

> Stephen M. Hoffman, Esq.
> Edward Larry Marshall, Esq.
> Assistant Attorneys General
> Texas Attorney General's Office

Date: September 17, 2009

/s/ Robert L. McGlasson
_____
ROBERT L. MCGLASSON
Attorney for Petitioner