

**Tulane University**

SCHOOL OF MEDICINE
Department of Psychiatry and Neurology
1440 Canal St., TB48
New Orleans, Louisiana 70112
(504) 988-5405  Fax (504) 988-4270
www.psychneuro.tulane.edu

## FORENSIC TRAUMA ASSESSMENT

**Patient's Name:**            Juan Alvarez
**Age:**                       30 years
**Gender:**                    Male
**Date of Evaluation:**        1-8-08
**Location of Examination:**   Polunsky Unit, Texas Department of Criminal Justice
**Examining Psychologist:**    Frederic J. Sautter, Ph.D.


**Tests Administered:**  Structured Clinical Interview for Axis I DSM-IV Disorders (SCID); Clinician Administered PTSD Scale (CAPS); Structured Interview of Reported Symptoms (SIRS); PTSD Checklist; Unstructured Clinical Interview.

**Materials Reviewed:**   MMPI-2 Extended Score Report (09/10/99)
MCMI-II Profile Report (09/10/99)
Transcript court testimony of Dr. Laval
Transcript court testimony of defendant family members
Transcript court testimony of prosecution witnesses at sentencing
Preliminary Social History
Life Chronology
Education Records
Defendant Criminal History Records
Family Criminal History Records
Other Relevant Official Records


**Behavioral Observations and Background:**   A Trauma Assessment was conducted with Mr. Juan Alvarez, a capital murder defendant who is currently on death row in Texas, on January 8, 2008. This examination had been requested by Mr. Alvarez's attorney, Robert McGlasson. The purpose of the assessment was to determine if Mr. Alvarez had been exposed to traumatic events during his lifetime and to identify any psychological problems that he may have developed as a consequence of his trauma exposure. If trauma-related psychological problems were identified, I was requested to determine if those problems may have affected his behavior in 1998 during the events that led to his conviction for capital murder and death sentence.

Ms. Alicia Rodriguez, the mitigation specialist for Mr. Alvarez's defense team, was present during the trauma assessment. She did not interact with Mr. Alvarez unless

requested to do by the examiner. I asked Ms. Rodriguez to be present during the examination to assist with any communication problems between the examiner, who does not speak Spanish, and Mr. Alvarez. During the examination, Mr. Alvarez communicated effectively with the examiner and appeared to understand all of the examiner's questions.

Mr. Alvarez was cooperative throughout the procedure. He was able to attend to all of the assessment procedures, and he was oriented for time and place. Mr. Alvarez displayed a restricted range of emotion throughout the examination. Even when asked about painful trauma that he has endured during his life, he showed a lack of emotion when describing the events. This is significant because "emotional numbing" is a symptom of post-traumatic stress disorder. However, he did appear somewhat sad as he described his childhood and the murder of his father, his uncle, and his grandfather. In addition, Mr. Alvarez appeared upset when he described a recurrent nightmare in which he remembers his weeping mother throwing herself on his father's casket at his father's funeral. He also described feelings of resentment and loneliness as he described his relocation to Monterrey, Mexico around 1986, after his mother had moved to Houston to establish a home in the United States for their family. Clearly his five years in Monterrey were a time of psychological hardship as he described his perception that he had been abandoned by his family when he was experiencing psychological difficulties after the murders of his father, uncle, and grandfather. In describing emotions that he had felt in the past, he often appeared emotionally numb while describing those past emotions.

Significantly, Mr. Alvarez was unable to recall many events that occurred around the time of the murders of his family members. There were numerous indications of memory problems when he tried to recall past traumatic events. Significant periods of time during his childhood are difficult for him to recall. He indicated that he has often wondered why he is unable to recall significant aspects of his past. This is significant because loss of memory about past trauma is an indicator of post-traumatic stress disorder.

Mr. Alvarez described three periods in his life. The first period was when he was a young boy growing up in San Gabriel, Mexico, with his parents, and eight siblings. This period of his life ended when his father, his uncle, and his grandfather were murdered by members of a family that also lived in San Gabriel, and which was involved in a series of conflicts with his family. After his father and other family were murdered, the remaining Alvarez family was continually threatened and harassed. Juan responded to these traumatic events by developing trauma-related psychological problems. Finally, the family left San Gabriel.

The second life epoch described by Mr. Alvarez occurred from the time that he was 10 through the age of fourteen. During this time period, his mother moved to Houston to prepare a place for her family to relocate. Juan was left in Monterrey, Mexico, with his siblings who were gradually relocated to Houston. Juan was experiencing significant

psychological difficulties and required the support of his mother to recover from these trauma-related challenges. Because of his mother's absence, that support was not provided. Juan felt lonely and abandoned. He is described by family members as becoming increasingly withdrawn, preoccupied, and isolated. These behaviors suggest the emergence of trauma-related psychological problems, a possibility that was validated by Juan's description of increasing depression, anxiety, and trauma symptoms.

The third life epoch described by Mr. Alvarez occurred in Houston Texas, where he located at the age of fourteen to live with his mother and siblings. While, Juan reported that he was happy to rejoin his family, he also described feelings of fear and apprehension when discussing his move to Houston. Mr. Alvarez described feeling isolated and "different from the other kids." He indicated that he felt that he was better understood by other young Hispanic males that had also experienced violence and trauma in their young lives, than by other people in his family or social environment. These young men included members of a local gang. He described involvements in numerous fights and instances when he was threatened and assaulted. Mr. Alvarez indicated that at the age of 20 a friend named Mauricio Rivas, a gang member, was killed by a rival gang member. This stimulated many of his memories of his family members being murdered when he was a young boy. This event stimulated an exacerbation of his trauma-related symptoms, and these symptoms began to dominate his thoughts, feelings, and behaviors. Over the following four months he was involved in three violent altercations which further escalated his trauma symptoms. Then on June 17th, 1998, he was involved in the homicides for which he was convicted and sentenced to death.

## ASSESSMENT FINDINGS

**Assessment of Malingering**: Before the findings of this assessment can be used to determine if Mr. Alvarez was exposed to traumatic events or if he suffers from trauma-related mental disorder, it must be established that he was truthful in his reporting of psychological symptoms and traumatic events during the assessment. The Structured Interview of Reported Symptoms (SIRS) is a test that was designed to measure the exaggeration or distortion of symptoms (i.e. "malingering") in forensic populations. It contains 8 primary scales that are designed to identify individuals who manufacture responses that are unlikely to be reported by individuals who have a valid psychological disorder. Seven of eight of Mr. Alvarez' scale scores fell within the "Honest" range. The other scale fell within the "Indeterminate Range" and does not indicate the presence of malingering. These data confirm the validity of the assessment findings and show that Juan Alvarez was not malingering or distorting his responses to the questions posed to him during this assessment.

His Primary Scale Scores on the SIRS were as follows:

Rare Symptom Scale: 1
Symptom Combination Scale: 2

Improbable/Absurd Symptom Scale: 1
Blatant Symptom Scale: 4
Subtle Symptom Scale: 6
Selective Symptom Scale: 10
Severity Scale: 2
Reported vs. Observed Symptoms: 0

The SIRS also contains a number of Supplementary Scales that provide additional information about honesty of responding, exaggeration and minimization of psychiatric symptoms, and response style. On the Supplementary Scales, Mr. Alvarez showed a statistically significant elevation on the "Defensive Symptoms" Scale. The "Defensive Symptoms" Scale measures "defensive responding" about common everyday problems. A low score indicates that the client is "defensive" and denies common everyday problems, while a high score indicates that the client acknowledges everyday problems. Mr. Alvarez's score on this scale indicates that he acknowledges a high number of common everyday problems. This finding, together with the findings from the Primary Scale Scores, suggests that Mr. Alvarez is not defensive in his responses to testing, and that it is likely that he has responded honestly to questions posed to him during the assessment.

His Supplementary Scale Scores were as follows:

Direct Appraisal of Honesty: 1
Defensive Symptoms: 17
Symptom Onset: 0
Overly Specified Symptoms: 0
Inconsistency of Symptoms: 0

Summary: Data from the SIRS indicates that Mr. Alvarez was honest in his responses to questions during the psychological assessment. There is no evidence of exaggeration of psychological problems or malingering. This is consistent with the fact that Mr. Alvarez did not report a preponderance of psychological problems. In fact, at times he appeared to minimize his psychological problems. The finding that Mr. Alvarez did not malinger is also consistent with Dr. Ramon Laval's testimony at Mr. Alvarez's murder trial that data from the Minnesota Multiphasic Personality Disorder (MMPI) and the Millon Multiaxial Inventory (MMI) indicated that Mr. Alvarez did not malinger during psychological testing. Finally, corroborative information from other sources, primarily family members, friends, and teachers throughout Mr. Alvarez's childhood, further support a finding of candid and honest disclosure.

**Exposure to Traumatic Events:** Mr. Alvarez was assessed with the Clinician Administered PTSD Scale and a clinical interview to determine if he had been exposed to traumatic events meeting PTSD Criterion A, as identified in the Diagnostic and Statistical Manual-Fourth Edition (DSM-IV) of the American Psychiatric Association. According to the DSM-IV, events meet Criterion A for a PTSD Traumatic Event if they meet the following criterion: (1) the person

experienced, witnessed, or was confronted with an event or events that involved the actual threat or threatened death or serious injury, or a threat to the physical integrity of self or others, and (2) the person's response involved intense fear, helplessness, or horror. Research has shown that events that meet Criterion A for a "traumatic stressor" are sufficiently stressful as to cause posttraumatic stress disorder. Data from the clinical interview and Clinician Administered PTSD Scale were corroborated by examination of the social history prepared by Mr. Alvarez's mitigation specialist, as well as the wealth of supporting affidavits from relevant persons in Mr. Alvarez's life. Data from the social history were used in identifying traumatic stressors if they were consistent with Mr. Alvarez's responses during the examination.

Mr. Alvarez was exposed to the following DSM-IV Criterion A traumatic stressors:

(1) At the age of seven, Juan Alvarez's father was murdered by another man in the small town where they lived. Juan immediately heard that his father had been murdered and he saw the body of his murdered father a short time after the murder was committed. Numerous research studies have documented that viewing dead bodies is a traumatic event that may cause PTSD. In this case, the fact that Juan Alvarez's father was murdered when he was a young boy, and Juan witnessed the murdered body of his own father, indicates the presence of a severe traumatic stressor. The fact that this high level of traumatic stress occurred when Juan was seven years old suggests that it would have a powerful impact on his mental health, and make him increasingly vulnerable to posttraumatic stress disorder if exposed to further traumatic stress during his lifetime.

(2) Between the ages of seven and nine, Juan Alvarez and his family were repeatedly threatened and harassed by the family that Juan had been told was responsible for his father's death. Mr. Alvarez responded to these threats with a sense of horror and fear as he thought that he might be killed as his father had been killed.

(3) At the age of nine, Juan Alvarez was confronted with the fact that his uncle had been murdered. He was told that his uncle had been murdered by a member of the same family responsible for his father's murder.

(4) At the age of nine, two days after learning of his uncle's murder, Juan Alvarez was confronted with the fact that his grandfather had been murdered. Once again, he was told that his grandfather had been murdered by a family member from the same family that had murdered his father and uncle.

(5) At the age of fourteen, Juan was assaulted by a number of older boys in an apparently racially-motivated incident after recently immigrating to Houston.

(6) At the age of seventeen, Juan Alvarez witnessed the shooting of a friend in front of his apartment building. He responded to this event by fearing for his own life.

(7) At age of eighteen, Juan Alvarez saw the dead body of a friend that had been shot in the head.

z
z

Page 6 of 11

(8) At the age of twenty, Juan Alvarez learned that one of his friends, Maurcio Rivas, was shot and killed in a gang shooting. Because of his close relationship with the deceased, and because he also feared attack by a rival gang, this event stimulated great fear and anxiety. It also stimulated memories of his learning that his father, uncle, and grandfather had been murdered by a rival family when he was very young.

(9) At the age of twenty, Juan Alvarez and his girlfriend were exposed to incoming gunfire. Their automobile was struck by bullets. Juan feared for his own safety and the safety of his girlfriend.

In addition to being exposed to the previously described traumatic stressors, Juan Alvarez was involved in fights and attacks in his neighborhood when he was eighteen and nineteen, and he was charged with aggravated assault for his participation in these conflicts. It is clear from the reports of these numerous traumatic events that Mr. Alvarez has been exposed to an extremely high level of traumatic stress during his lifetime. Further, research has shown that repetitive exposure to traumatic stress, exposure to traumatic stress during early life or childhood, and very intense levels of trauma exposure (e.g., exposure to the body of a murdered father) greatly increase the chances of an individual developing posttraumatic stress disorder. Given the extremely high levels of traumatic stress experiences by Juan Alvarez, it is the conclusion of this examiner that he has been at extremely high risk for the development of posttraumatic stress disorder, and other trauma-related psychological problems. He has been exposed to a traumatically stressful event of sufficient severity as to meet DSM-IV Criterion A for PTSD.

**Assessment of Post-Traumatic Stress Disorder**: Mr. Alvarez was then assessed to determine whether he met the DSM-IV criteria for post-traumatic stress disorder (PTSD). In order for an individual to meet DSM-IV criteria for PTSD, he or she must have been exposed to a traumatic event that meets DSM-IV criteria for traumatic stress (Criterion A), and they must show symptoms of re-experiencing of the trauma (Criterion B), avoidance of stimuli that remind the individual of the trauma (Criterion C), and hyperarousal (Criterion D).

Data from the assessment indicate that Juan Alvarez was exposed to numerous traumatic events during his childhood and adolescence. These traumatic events include hearing that his father had been shot and killed and seeing his dead body when Juan was seven years-old. Between the ages of seven and nine, Juan's family was constantly harassed and threatened by the family of his father's killer, and Juan feared for his life on many occasions. Then, when Juan was nine years old, his Uncle and Grandfather were shot and killed. Other trauma include being badly beaten at the age of fourteen, being physically assaulted at the age of eighteen, witnessing the death of a close friend at the age of twenty, and being fired upon at the age of twenty. These traumatic experiences meet DSM-IV Criterion A for "traumatic stressors".

Data from both the Structured Clinical Interview for DSM-IV (SCID), and the Clinician Administered PTSD Scale (CAPS), show that Mr. Alvarez evidenced PTSD

Reexperiencing symptoms. At the time of the assessment, Juan experienced intrusive distressing memories of the trauma. This indicates that he met DSM-IV Criterion B for PTSD at the time of the assessment. The data further indicate that during his lifetime Mr. Alvarez has experienced intrusive distressing memories of traumatic experiences, nightmares of trauma, and both physical and psychological discomfort when confronted with reminders of the trauma. This indicates that in the past he has shown relatively high levels of PTSD reexperiencing symptoms.

Data from both the Structured Clinical Interview for DSM-IV (SCID) and the Clinician Administered PTSD Scale (CAPS) indicate that Mr. Alvarez showed a number of PTSD Avoidance symptoms at the time of the psychological assessments. These avoidance symptoms included avoidance of thoughts and feelings that remind him of the trauma, an inability to remember important aspects of the trauma, feelings of detachment from others, restricted range of affect and a sense of a foreshortened future. Mr. Alvarez' avoidance symptoms are severe, as he exhibited all of the avoidance symptoms that are characteristics of PTSD at the time of the assessments. These symptoms have been present for all of Mr. Alvarez's adult life. In addition, when Juan Alvarez was younger he avoided places that reminded him of his past trauma. This data indicates that he met DSM-IV Criteria C for PTSD at the time of the assessment and earlier in life, including prior to and at the time of the crimes and trial.

Data from both the Structured Clinical Interview for DSM-IV (SCID) and the Clinician Administered PTSD Scale (CAPS) indicate that at the time of the psychological assessment Juan Alvarez showed the following PTSD hyperarousal symptoms: hyperstartle response, irritability, concentration problems, and insomnia. Earlier in Juan's life he experienced high levels of hypervigilance as he always felt that his life was in danger. These data indicate that at the time of this assessment Mr. Alvarez exhibited the hyperarousal symptoms that are characteristic of PTSD, and that he has exhibited all of these symptoms for all of his adult life. These data indicate that Mr. Alvarez met DSM-IV Criteria D for PTSD at the time of the assessment and earlier in life, including prior to and at the time of the crimes and trial.

Clinical data from the CAPS and the SCID show that Juan Alvarez currently meets DSM-IV criteria for post-traumatic stress disorder (PTSD). Data from the CAPS show that his PTSD severity score at the time of the assessment was 57, placing Juan in the "Moderate Range" of PTSD severity. The data from the CAPS show that Mr. Alvarez began to show symptoms of PTSD at the age of ten, and that they reached their highest level of sustained intensity at the time of the homicide of which he was accused. Data from the CAPS indicate that when Mr. Alvarez committed the homicide his CAPS PTSD severity score was at least 78, suggesting that his PTSD severity at that point in his life was in the "Extreme Range".

Data from the PTSD Checklist are similar to data from the CAPS and SCID. The PTSD Checklist indicated that Juan showed elevations at or above the "moderate level" for intrusive memories, avoidance of thoughts and feelings, memory problems, emotional numbing, detachment, loss of interest in enjoyable activities, insomnia, concentration problems,

hyperstartle response, and irritability. Mr. Alvarez' score on the PTSD Checklist was 47, further validating the finding that he meets DSM-IV criteria for posttraumatic stress disorder.

**Summary**: Mr. Alvarez suffered from PTSD at the time of the evaluation and earlier, including at the time prior to the crimes and thereafter and during his subsequent capital murder trial. Data from the Clinician Administered PTSD Scale (CAPS), Structured Clinical Interview for DSM-IV, and PTSD Checklist show that Juan Alvarez met DSM-IV criteria for PTSD, and data from the CAPS and SCID suggest that his PTSD was more severe at the time of the homicide than it is at the current time. The testing data indicate that he has daily intrusive memories that remind him of the murder of his father, his uncle, and his grandfather (i.e., PTSD "reexperiencing" symptoms). These memories stimulate PTSD "hyperarousal" symptoms which cause Mr. Alvarez to become agitated, hypervigilant, and irritable. PTSD hyperarousal has been shown to predict aggressive behavior in numerous research studies. Juan Alvarez responds to these aversive memories and feelings by avoiding reminders of his traumatic past, and by avoiding feelings and "numbing" his emotional state (i.e., PTSD "avoidance" symptoms). These avoidance symptoms allow traumatized people to create "psychological distance" between their current life experience, and their traumatic past and all of the painful memories and feelings associated with it. Prior to the homicide for which Mr. Alvarez was sentenced to death, a friend was murdered. This painful event overwhelmed his previous avoidance of his memories of his own tragedies, and he was flooded by intrusive memories of the murder of his father. These intrusive memories created an emotional state which stimulated anger and aggression, and which made it extremely difficult for him to behave responsibly. These trauma symptoms played an important role in his subsequent involvement in several violent acts that led to his conviction for capital murder and death sentence in 1998.

**Assessment of DSM-IV Axis I Disorders:** The Structured Clinical Interview for DSM-IV Axis I Disorders (SCID) was administered to Juan Alvarez to assess for the presence of Axis I disorders that may be related to his exposure to traumatic stress. Data from the SCID indicated that he has experienced significant depression in his past, as well as at the current time, and that his depressive symptoms meet current criteria for a major depressive disorder. Mr. Alvarez reports that he began to experience feelings of sadness, insomnia, psychomotor agitation, feelings of worthlessness, inability to concentrate, and a preoccupation with death at the approximate age of ten years of age. He reports that he experienced depression frequently from the ages of 10 through 12, and that he experienced depressive symptoms intermittently since the age of 14. He reports that these depressive symptoms have increased in severity over the last several years and that he currently meets all of the criteria for DSM-IV Major Depressive Disorder. The interview indicated that many of his current depressive symptoms are related to his trauma memories, and are also a reflection of his feelings of hopelessness regarding his current legal situation.

Data from the SCID indicated that Mr. Alvarez did not show symptoms of mania, nor did he indicate the presence of psychotic symptoms. There were not any indications of a comorbid anxiety disorder. He did not meet DSM-IV criteria for an alcohol or substance abuse or dependence disorder.

## SUMMARY

Testing data show that Mr. Alvarez was honest in his responding to questions during the trauma assessment, as the Structured Interview for Reported Symptoms (SIRS), universally considered the "Gold Standard" for the detection of malingering, and strongly established that he was not exaggerating his psychological symptoms. This is consistent with a previous psychological evaluation conducted for Juan Alvarez's homicide trial showing that Mr. Alvarez did not malinger during that evaluation. These results are not surprising given the fact that during this assessment Mr. Alvarez consistently minimized his own psychological suffering and denied the presence of symptoms that are most commonly regarded by the public as reflecting "mental illness". For example, he consistently denied experiencing psychotic symptoms such as hallucinations. These testing data mean that it is possible to reach valid conclusions regarding his mental state using the information that he provided during this assessment.

The data from the assessment indicate that the murder of his father, and Juan's exposure to the murdered body of his father when he was seven years old led to the development of posttraumatic stress disorder (PTSD). His PTSD was also stimulated by the murders of his uncle and grandfather which occurred when Juan was nine years old. The finding that these events stimulated DSM-IV posttraumatic stress disorder (PTSD) is based upon data from three assessment instruments: (1) the Clinician Administered PTSD Scale (CAPS), (2) the PTSD Checklist (PCL), and (3) the Structured Clinical Interview for DSM-IV (SCID). This means that Mr. Alvarez meets DSM-IV criteria using both a self-report measure (PCL) and clinician administered measure of PTSD (CAPS), as determined by two instruments with excellent psychometric properties which were designed specifically for the measurement of PTSD. The CAPS is considered the "Gold Standard" for PTSD assessment. The SCID was used to validate the PTSD diagnosis, and to measure depression. These data show that by the time Juan was ten years-old, he suffered from a severe case of PTSD, and that he also experienced significant symptoms of depression secondary to his PTSD.

Research has shown that social and emotional support after trauma exposure is critical to the development of psychological resiliency and recovery from trauma-related psychological problems. Unfortunately, Juan Alvarez was not provided with that support after the murder of his father, uncle and grandfather, and his family was terrorized by the family that apparently was involved in his father's murder. Instead of being able to engage in a healing process with his mother, he was separated from his mother and sent to live in Monterey, Mexico. In Monterey he developed feelings of being isolated and abandoned, and his psychological state worsened. He desperately required the support, feeling of safety, and emotional validation required by a young boy who has been directly confronted with the murder of three close family members. Instead, he was psychologically isolated from the support and reassurance that would have enabled him to recover from his trauma wounds.

z
z

Page 10 of 11

After five years in Monterey, Juan Alvarez was relocated to Houston where he reunited with his mother and siblings. Juan indicated that he no longer felt reassured by family, and continued to feel depressed, traumatized, and vulnerable. However, when he established relationships with young Hispanic men who had overcome their exposure to violence, he experienced a sense of emotional validation and rejuvenation. Mr. Alvarez indicated that he learned from these peers that becoming angry and channeling anger into aggressive behavior made him feel strong and less vulnerable. It is this examiner's opinion that other Hispanic youth, especially gang members, filled an important psychological void and allowed Juan Alvarez to develop ways to regain control over his emotional suffering. He became psychologically dependent on these relationships, and they served an important role as substitute family figures that helped him modulate his feelings of vulnerability and powerlessness.

When Mr. Alvarez's close friend and gang member, Mauricio Rivas, was shot and killed by a rival gang member months before Mr. Alvarez's involvement in the crimes which led to his conviction, it was experienced by Juan Alvarez as a psychological reminder of his prior original trauma of the murder of his father and other close family members. It is entirely predictable that this event would stimulate all of his PTSD symptoms. Juan Alvarez attempted to modulate these destabilizing emotions by engaging in violent behaviors that allowed him to feel powerful and in control of his life. His trauma-related hyperarousal fueled his aggressive behavior and made it difficult for him to control himself. Within the four months of Mauricio's murder, Juan had become involved in several violent events, and as his trauma-related memories and emotions increased, his behavior spiraled out of control. In June of 1998, Mr. Alvarez was involved in the crimes for which he was convicted of capital murder and sentenced to death. It is the opinion of this examiner that his behavior at the time of the crimes was strongly influenced by his exacerbated PTSD, that his ability to solve problems and modulate his emotions was greatly compromised. Without question, Juan Alvarez's post-traumatic stress disorder had a very strong impact on his aggressive behavior during the crimes, and made it highly unlikely that he would be able to control his hyperarousal-fueled rage and engage in responsible behavior.

If Mr. Alvarez had been afforded mental health treatment for his PTSD earlier in his life, it is likely that the symptoms which fostered the angry behavior that accounted for the homicide would have been treated and allowed Juan Alvarez to develop better controls over his feelings. It is possible that the homicide would not have occurred. There are a number of evidence-based PTSD treatments currently available, and they were available in the 1990's when they could have provided Juan with the tools that he required for regaining control over his life. The fact that his PTSD has dramatically decreased in intensity while he has been incarcerated over the last few years, suggests that he is psychologically resilient and that when he is in a controlled environment his problems may improve. In all likelihood, his previous psychological examination for the courts did not detect his PTSD because a specialized PTSD assessment, which should include instruments such as the CAPS and PTSD Checklist which are specifically designed to detect PTSD, was not administered to Mr. Alvarez. It is this expert's opinion that

continued incarceration would allow Mr. Alvarez to continue to recover from PTSD, and it is not likely that he would pose a threat to those around him.

Mr. Alvarez was not evaluated for PTSD prior to trial. The tests conducted by Dr. Laval were not intended to make a PTSD diagnosis. Had someone trained in trauma assessed Mr. Alvarez and administered the tests I administered, the information contained in this report could have been presented at his sentencing trial. Given the traumatic events mentioned during the sentencing phase of his trial, there were indications that Mr. Alvarez should have been assessed for trauma exposure and its consequences.

_____
Frederic Sautter, Ph.D.


Clinical Associate Professor

Department of Psychiatry and Neurology

Tulane University Health Sciences Center

New Orleans, Louisiana