## REPORT OF JOHN HAGEDORN ON GANG ISSUES IN *STATE V. ALVAREZ*

### INTRODUCTION

I was asked by Mr. Alvarez's habeas counsel, Robert McGlasson, to consult with him regarding Juan Alvarez, a capital murder defendant who is currently on death row in Texas. Specifically Mr. McGlasson asked me to provide expertise concerning Mr. Alvarez's gang membership and activities, in an effort to determine, based upon facts known about such matters, whether and to what extent there exist mitigating circumstances involving Mr. Alvarez's character, background, and the circumstances of the events at issue. Mr. McGlasson also asked me to examine transcripts of trial testimony and lawyer arguments, to assess how these gang-related issues were treated by the parties during Mr. Alvarez's trial, and to determine whether and to what extent those issues could have been treated differently and in a manner les prejudicial to Mr. Alvarez. In particular, Mr. McGlasson sought to ascertain whether an expert with my particular background and field of study would have been helpful had the defense sought out one and utilized him or her at trial. In the course of this work I reviewed: transcripts and other materials from the trial of Juan Carlos Alvarez; written and video-taped statements of Mr. Alvarez to the police; and, a complete social history compiled by Mr. Alvarez's defense team. In addition, I interviewed Mr. Alvarez, visited the crime scenes and Mr. Alvarez's neighborhood, and reviewed additional materials related to gangs in general and in the relevant areas of Houston, Texas.

### SUMMARY OF FINDINGS

My review of the relevant trial documents and other information, when coupled with my own expertise and the facts I learned in the course of my exploration of these issues, makes clear that the jury was provided a one-sided, highly prejudicial understanding of gangs and gang activity in general and Juan Alvarez's involvement in such in particular. The failure of the trial counsel to consult with and retain a gang expert left the jury without any alternative or complete view of these issues. This failure permitted the prosecution to rely on common stereotypes and fears about gangs, instead of hard evidence and facts. A gang expert would have enabled Mr. Alvarez's attorneys to use research and facts to counter the prosecution's damaging myths and mischaracterizations of the specific gang that Mr. Alvarez was involved with, the nature of the violence alleged at trial, Mr. Alvarez's role in the gang structure, and the implications that the gang involvement had for his likely future dangerousness. Additionally, in terms of mitigating evidence, a gang expert would also have been available to explain to the jury at the sentencing phase Mr. Alvarez's gang involvement in the context of a larger cultural picture and an understanding of what drives individuals like him to these often unfortunate associations and activities.

CREDENTIALS

I am an Associate Professor of Criminal Justice and a Senior Research Fellow at the Great Cities Institute of the University of Illinois-Chicago, with over twenty years of experience gang research.  I am a Distinguished Alumnus of the University of Wisconsin-Milwaukee, where I earned a Ph.D in Urban Studies in 1993, a M.A. in Sociology in 1987 and a B.S. in 1985.  I was presented the Hans Mattick Award for Distinguished Achievements in Criminology by the Illinois Academy of Criminology in 2006.

I have written numerous academic and popular articles, authored two books, and edited two anthologies on gangs.  My first book, *People and Folks: Gangs*, *Crime, and the Underclass in a Rustbelt City*, has been a standard work of reference on gangs for scholars and policymakers since it was published in 1988 (with a revised second edition in 1998).  My forthcoming book, *A World of Gangs: Armed Young Men and Gangsta Culture,* examines gangs from a global perspective.  My work has been funded by grants and contracts from various sources, including foundations, universities, private research groups, and federal, state and municipal governmental agencies.

I have served as a mentor for the U.S. Department of Justice for academics doing government-funded policy research.   Most of my comprehensive research on gangs and gang violence has focused on Milwaukee and Chicago, but I have compared my findings to gangs in many other U.S. cities.  In the last decade I have expanded my knowledge base internationally and have participated in several international comparative studies of gangs, including a ten-nation study of youth in organized armed violence and a Social Science Research Council working group on youth in armed conflicts.

I have served as an expert witness on gangs in cases in both state and federal courts across the U.S., most of them being capital cases.  In these cases I have used my expertise to present a research-based context for the understanding of gangs.  My attached CV sets forth my additional experiences and qualifications.

DETAILED FINDINGS

I.       THE PROSECUTION'S PREJUDICIAL MISCHARACTERIZATION OF
         THE SOUTHWEST CHOLOS AND MR. ALVAREZ'S ROLE IN THE
         GANG

In Juan Alvarez's trial the prosecution presented an inaccurate and unchallenged portrait of Mr. Alvarez's involvement in the Southwest Cholos ["SWC"], relying on stereotypical ideas of an institutionalized gang to invoke fear in an effort to persuade the jury to convict Mr. Alvarez

and sentence him to death.  The prosecution's theory of the case was that both murders that Mr. Alvarez was charged with were part of a reign of terror of the senseless gang violence that plagued Houston at the time.  As the prosecutor described in his opening statement, Mr. Alvarez was portrayed as a "frontline soldier" in an ongoing gang war between La Primera and SWC (17 Tr. 20).  Through Officer Purl, a self-reported gang expert, the prosecution presented testimony about the gang Mara Salvatrucha 13 (MS 13) and its affiliation with SWC.  Officer Purl also testified that SWC was a big gang with a lot of associated gangs and "900 members on the west side alone." (18 Tr. 39). Another prosecution witness proffered as testimony the stereotype that gang members treated women poorly.  18 Tr. 12.  The cumulative effect of this evidence created a misleading understanding of the SWC and Mr. Alvarez's role within the gang.

## A.  ORGANIZATIONAL STRUCTURE OF THE SWC GANG

My research shows that there are two primary types of gangs: institutionalized gangs and informal neighborhood-based gangs.  This categorization is consistent with nearly all contemporary gang research, like that of Malcolm Klein, that distinguishes long standing, semi-permanent gangs from the more common spontaneous, unsupervised peer groups.  The differences between these two categories are significant and the failure of Mr. Alvarez's defense counsel to provide an expert who could explain the differences and talk about SWC within this context was damaging.  The common stereotype that the general public holds about gangs usually describes the institutionalized category of gangs.  These gangs are often characterized by their formal hierarchical structure, the organized and commercialized nature of their activities, their involvement in politics, and the militarized nature of violence they perpetrate.  When the prosecutor referred to Mr. Alvarez as a "soldier," he implied membership in a gang army and invoked the stereotype of the institutionalized gang, like MS-13 or the Latin Kings.  However, it appears more likely that the SWC was instead a neighborhood gang, similar to other unsupervised peer groups around the country. That SWC was at that time a neighborhood gang rather than an institutionalized gang has particular relevance to the weighing of Mr. Alvarez's culpability *as a gang member* and in understanding the mitigating circumstances related to his gang associations.

Institutionalized gangs often have a formalized hierarchical structure, with foot soldiers at the bottom, taking orders from gang members with official positions of power at different levels.  Sometimes these gangs are militarized, both in that their organizational structure functions like an army, and in the nature of the violence.  Violence in institutional gangs is often conducted by the low level members on the orders of the command further up.  Institutionalized gangs are typically oriented around an illegal commercial enterprise, most commonly the drug trade, although some gangs also deal in arms and engage in other criminal activities.  Another sign of the institutionalization of gangs is involvement in political action and inevitable reliance on official corruption to further or provide cover for the illegal enterprise.  Some of these

institutionalized gangs have a national or even international structure with presences in many neighborhoods of cities throughout the world.  Common examples of these gangs include the Bloods, Crips, Mara Salvatrucha 13, 18th Street, and the Latin Kings.  Prison gangs, discussed in depth below, are typically institutionalized.

Neighborhood gangs, on the other hand, are fundamentally unsupervised peer groups with little formal structure that are usually grouped together based on the geography of the neighborhood.  To be sure, such neighborhood "barrio gangs" have rivals and can be involved in violence and crime, but they seldom have a hierarchical, militarized structure or the stable, formal roles of institutionalized gangs.  The classic "barrio gang" is usually composed of adolescents who join the gang for a variety of often inter-related reasons, including acceptance into a local peer group, alienation from school or family, and the need for protection.  Importantly, these gangs do not have a lasting or formal management structure and criminal activity is typically unorganized.  They normally attract the allegiance of adolescents in the surrounding neighborhood through peer-to-peer encounters in local schools and other gathering locales.

The Justice Department estimates that there are more than three quarters of a million gang members in the U.S. at this time, with Latino gangs the most common.  Ten years ago, those figures were even higher.  In communities like Southwest Houston, gangs are commonplace.  This is not said to condone or sanction gang membership, but to explain that it is not surprising that Mr. Alvarez was involved in a neighborhood gang, and that the reasons for doing so are often the culmination of complicated familial and social dynamics, rather than a lack of moral character.  Further discussion of these social and familial factors in relation to Mr. Alvarez is set forth below.

Research indicates that the vast majority of Mexican gangs in the U.S. are neighborhood gangs rather than institutionalized gangs.  Studies involving Mexican-American gangs in East Los Angeles find that they do not have any formal hierarchy as Joan Moore and Diego Vigil have found.  Although no gang expert has yet conducted an in-depth study of the SWC, the gang appears to fit into this same "barrio gang" pattern.  My visit to the Southwest Houston area showed that the neighborhood ecology is typical of areas that produce "barrio gangs."  The neighborhood has clearly defined "defensible" spaces where local kids can safely come together to "hang out."  The gated apartment complexes that dominant the Southwest Houston area provide an ideal space for these sort of gangs to congregate.

Information about SWC obtained by interviewing Mr. Alvarez is fully consistent with the noted research and available documentation regarding SWC.  For example, Mr. Alvarez reported a lack of a formal hierarchy, describing SWC more as an informal association of "homies" split into cliques in five contiguous streets.  Like many barrio gang members, he paid no attention to

politics and said he did not know any Mexican politicians in Houston.  For institutionalized gangs, even members at the lower echelons of the gang generally have some knowledge of the political scene.

Demonstrating that the SWC was and is a neighborhood barrio gang rather than an institutionalized one would have assisted the defense team in counteracting the prosecution's prejudicial portrayal of Mr. Alvarez as a cold blooded killing soldier in an organized war against rival gangs.  Replacing a media-influenced image of the calculating and ruthless violence of gangs, with a fact-based assessment of the SWC and the reasons why Mr. Alvarez was involved with them, would have forced the jury to weigh Mr. Alvarez's culpability and mitigation based on concrete evidence.  Instead, due to the prosecution's one-sided and unchallenged portrayal, the jury was forced to rely on a far more sinister understanding of the SWC and Mr. Alvarez's alleged role in it.

By contrast, the gang known as Mara Salvatrucha 13 ("MS 13") has become one of the more well known institutionalized Latino gangs with chapters all over the United States and in several Central American countries.  It has a long and documented history of violence.  At Mr. Alvarez's trial the prosecution elicited testimony about MS 13 and alleged "associations" between that gang and the SWC in a transparent effort to associate SWC with the institutionalized terror of MS 13.  *See, e.g.,*  Testimony of Sgt. C. Purl, 18 Tr. 6.  SWC is not a gang like MS 13, nor am I aware of any documented evidence of anything other than loose, informal and intermittent ties between these two gangs.  While members of each may have been informally aligned or friendly, there is a documented, marked distinction between the two gangs and gang-types.  Also, unlike SWC, which is confined to a particular area of Houston, Texas, MS 13 is widespread and has presence in many neighborhoods through the world.  MS-13's various chapters have ties to international drug traffickers and, as Elana Zilberg reports, its members often move between countries.  Referencing MS 13 in the context of Mr. Alvarez's trial thus allowed the prosecution to play up (and on) common preconceived and generalized images of gangs that were inconsistent with the factual reality of the SWC.  Without making the important distinction between SWC and an infamous institutionalized gang such as MS 13, the jury was easily led to believe that Mr. Alvarez was a part of criminal enterprise of far grander in scale and reach than he actually was, thereby falsely likening his participation and role in it to something more akin to a mafia-style hit-man.

The prosecution also elicited testimony from Sgt. Purl about the overall size of the SWC that appears exaggerated, a fact also left unchallenged by the defense.  Sgt. Purl claimed that the SWC had more than 900 members.  Given the size of the neighborhood, Sgt. Purl's estimate seems significantly inflated.  Mr. Alvarez self-reported his estimate that there were, at most, a couple hundred people with the SWC.  Police estimates of gang size are notoriously inaccurate

and research in Los Angeles, Denver, and other cities have found gang data bases significantly overestimated the numbers of black and Latino youth in gangs.

### B.   THE PROSECUTION MISREPRESENTED THE NATURE OF MR. ALVAREZ'S VIOLENCE AND HIS ROLE IN THE GANG

Just as there are different categories of gangs, there are different categories of violence, which in turn have implications for expectations regarding future dangerousness as well as for the degree of moral reprehensibility.  Sociologists classify violence as "expressive" or "instrumental."

### 1.   EXPRESSIVE VERSUS INSTRUMENTAL VIOLENCE

Social scientists who study violence label as "instrumental" planned, calculated acts that seek to attain a specific goal toward a larger end, such as obtaining illicit profits or strategic geographical hegemony, or even outright elimination of a rival.  Expressive violence on the other hand, is violence that is mainly carried out in reaction to other emotional factors, and while it may also be planned, its purpose and reach is tied to more individualized circumstances.

In gang research, instrumental violence is associated with rational, business-like acts of eliminating rivals in a drug market. Leaders meet and plan assassinations or use gang members who function as "hit men" to carry out acts of violence. Expressive violence, as I have found in my studies in Milwaukee and Chicago, include bar room brawls, or fights or shooting over disputes about a woman.  In these situations, gang members lose control and their anger erupts. In gang retaliation cases I have studied in both Milwaukee and Chicago, violence is coded as "expressive" when the individuals involved have deep internalized emotional problems, often past trauma.

In Milwaukee, when I was coding hundreds of acts of violence by gang members during the height of the crack wars of the early 1990's, former gang members who assisted me were quick to make the distinction between someone who was a "hit man" who regularly carried out such instrumental violence, and those men who "lost control" after a homeboy was killed.  At times, such troubled people were consciously used by gang leaders to carry out shootings with little regard for personal consequences.  In my research on youth in organized armed violence in Chicago, this distinction was even clearer.

My studies of violence in a National Institute on Drug Abuse funded study of drug markets and violence and my study of youth in organized armed violence in Chicago both relied on the distinction between expressive and instrumental violence.  My analysis of Mr. Alvarez's spate of violence in the spring of 1998 for which he was ultimately arrested suggests that it was

an example of expressive violence triggered by trauma rather than instrumental violence associated with strategic, organized, gang-related goals and objectives.  These conclusions are supported by a review of available documentation, including the prosecution and defense presentations at trial, as well as my interview with Mr. Alvarez.

In the first place, there is no evidence that Mr. Alvarez was a professional "hit man" for his gang or a drug cartel or other organized criminal enterprise, nor is there any evidence that he was someone who was obsessed with violence throughout his life.  Secondly, evidence presented at trial and in the social history, as well as the recent report by trauma expert Dr. Frederic Sautter, indicates that there was a retriggering of deeply rooted emotional trauma shortly before Mr. Alvarez's spate of violence.  Defense trial expert, Dr. Laval, briefly alluded to some of this trauma when he mentioned that Mr. Alvarez's father had been killed in a Mexican blood feud, and noted the more recent murder of Mr. Alvarez's friend, Mauricio Rivas, shortly before the crimes.  What is absent from Dr. Laval's testimony specifically, and more generally from the defense presentation to the jury, is any effort to connect up Mr. Alvarez's association with the SWC gang, out of which the violence was perpetrated at least to some extent, to his overwhelming need since early childhood for safety, security, and a context in which to address and resolve the complicated issues of revenge and blood feuding that marked him in Mexico at a very early and vulnerable age.

Other factors point toward a finding of expressive rather than instrumental violence in the actions for which Mr. Alvarez is currently imprisoned and facing a death sentence.  Mr. Alvarez's violence occurred over a fairly short period of a few months, a characteristic common to expressive violence.  Documents and testimony about Mr. Alvarez's series of violent acts as presented by the prosecution during the sentencing phase confirm what Mr. Alvarez himself acknowledged to me: "For four months I became a different person."  Prior to the spate of violence, Mr. Alvarez did not have a significant violent history.  Reports of Mr. Alvarez through childhood and early teens indicate that he was a particularly quiet, reserved, and passive person. After he had become associated with the SWC, prior to the four-month period, Mr. Alvarez's violent actions are confined to relatively minor street fights, which led to a stint in boot camp and on probation.  The dramatic change that occurs after his first 9 years, and in relatively short period of time, fully confirms that Mr. Alvarez's violence was expressive rather than instrumental: a short-term emotional outburst, and a tragic result of linking his friend's recent violent death to those of his relatives.

## 2.  "HOMEBOYS" VERSUS "NEW JACKS"

Another way to classify gang members is by examining their moral values.  My research, published in *Criminology* and reprinted by that journal as among their best articles of the 1990's, differentiates gang members based on their values and categorizes them as "Homeboys" or "New

Jacks." A "Homeboy" is a gang member with conventional orientation who retains what we would consider a normal sense of morals and ethics, but who is drawn into gangs as a peer group and may violate his or her moral code as a part of the association with the gang. A "New Jack" has eschewed the traditional values of our society and more fits our ideas of a cold killer who has no remorse.

As a starting point, and perhaps contrary to popular perception, research on gangs has consistently found that most gang members do not suffer from personality disorders, have a wide variety of personalities, and come from many different types of families. My Milwaukee research, supporting other research on East Los Angeles gangs, supports this finding of the diverse nature of gang members. In other words, most youth who join gangs are not a bunch of "losers" or crazed monsters waiting for their chance to kill, but instead they represent a wide range of personality types drawn together by their common bonds as manifested by lack of adult supervision and the need for a protective and supportive community.

The results of the Minnesota Multiphasic Personality Inventory (MMPI) test performed on Mr. Alvarez by Dr. Laval failed to find evidence of personality disorder or extreme aggressiveness in Mr. Alvarez. Having looked for "anti-social personality disorder to explain the alleged behaviors/crimes", Dr. Laval instead found that "the anti-social personality scale [on the MMPI] was not elevated". Dr. Laval also identified and testified about Mr. Alvarez's remorse for his involvement in the crimes. I noted similar expressions of deep and sincere remorse during my evaluation of Mr. Alvarez.

Mr. Alvarez's remorse is consistent with the self-awareness that he has violated his own deeply held conventional values. In my interview with him he was emotional in describing to me how terrible he felt about his involvement in crimes that resulted in a loss of life. One difficult issue I always raise in talking to gang members who have been involved in fatal violence is to ask them their feelings about the loss of life. Some won't answer and give indications they have turned cold or are emotionally deadened; others respond with statements that are concerned only for themselves and their loved ones; still others are clearly trying to find an angle of how to "beat the case" (usually in a pre-trial setting). None of these descriptions fit Mr. Alvarez, who appeared to me as emotionally devastated. He knew his actions were wrong, openly regretted his involvement in the loss of life, and realized he would have to live with it the rest of his life.

Mr. Alvarez told me that he wanted to become a mechanic like his brothers and regretted his "weakness" after the murder of his friend. His conventional aspirations are important indicators of what is likely to happen in his life as he ages out of the "gang-banging" years. Although briefly mentioned in trial testimony, but not developed, while in high school Mr. Alvarez worked 5-6 hours per day at a job after school. At the time of friend Mauricio Rivas'

murder, Mr. Alvarez had a full time job. My research indicates that working people like Mr. Alvarez, if they are fortunate to escape death themselves or tragedies like the ones in this trial, they are likely to settle down, to marry, get a steady job, and to look back with shame and regret about the life they once led. This indicates that they retain conventional moral values, and therefore that persons such as Mr. Alvarez classified as "Homeboys" pose less of a risk for future violence than "New Jacks."

### C. THE FAILURE OF THE DEFENSE TO EXPLAIN AND CHARACTERIZE THE NATURE OF MR. ALVAREZ'S VIOLENCE AND GANG INVOLVEMENT PREVENTED THE JURY FROM UNDERSTANDING THE MITIGATING ASPECTS OF GANG INVOLVEMENT AND THE ACTUAL LIKELIHOOD OF FUTURE DANGEROUSNESS

Explaining the cause and nature of Mr. Alvarez's expressive violence to the jury could have helped them understand Mr. Alvarez's behavior to some extent. This understanding was necessary to mitigate his culpability and help the jury understand why he was unlikely to present a danger in the future. The prosecution tried to portray Mr. Alvarez as a "frontline soldier" in gang warfare, yet the research and evidence suggests that Mr. Alvarez was precisely the opposite. This mischaracterization of Mr. Alvarez's role in the gang and the nature of the violence he engaged in misled the jury into believing that he was a hardened and calculating killer and someone who was likely to pose a significant risk of future danger.

The characterization of his violence as expressive rather than instrumental would have helped the jury better assess his moral culpability. Society and the law recognize this distinction between provoked emotional violence and calculated violence through the lessened culpability that attaches to provoked murder as a different category than first degree or capital murder. Although the analysis of Mr. Alvarez's spate of violence may not necessarily fit the legal definitions of these terms, the analogy is useful in understanding how our society perceives a difference in kinds of violence.

People who carry out instrumental violence pose more of a risk for violent behavior in the future. They are cold, hardened aggressors, to whom violence is routine. Violence is a means of achieving a purpose and the damage the violence causes carries little deterrent value. They do not feel the guilt and remorse from acting outside society's norms that bring most people back within society's rules. People who carry out expressive violence, on the other hand, are much less likely to be violent in the future. For these people, the violence is a reactive outburst triggered by specific circumstances. Absent those events and circumstances, the propensity for violence decreases. Remorse and guilt plague these people and deter future violence. The distinction between Homeboys and New Jacks plays out in the same fashion.

The deep remorse Mr. Alvarez obviously feels for his involvement in the crimes, the victims, and his own family, support the interpretation of Mr. Alvarez's violence as expressive and triggered by his childhood traumas. This is significant since if Mr. Alvarez's violence was expressive, and not part of a paid professional hit or a career of lethal gang violence, there is no reason to expect that, given a controlled environment and aging, Mr. Alvarez would pose a significant future risk to society.

Mr. Alvarez's gang involvement is also strongly connected to the traumatic events of his childhood and his reaction to that trauma. This perspective is wholly lacking from the defense presentation at either phase of trial. Dr. Laval and the defense team failed to explain that many of the reasons that Mr. Alvarez was drawn into gangs directly relate to mitigating aspects of his upbringing. It is not surprising that Dr. Laval was unable to find a personality disorder or extreme aggressiveness in his testing. Mr. Alvarez was one of the many young people within the gang who joined because the gang was the neighborhood peer group and not because he was somehow obsessed with violence as a long-term, ongoing state of mind. The mitigating circumstances which made him vulnerable to gang involvement derive directly from the various aspects of extreme trauma he suffered as a child, as identified by Dr. Sautter in his report: the loss of his father at a young age to violence; his abandonment for years in Mexico when his mother and siblings began to immigrate; the deprivation of parental guidance and direction during his youth and formative early years; and the alienation of moving at the age of 14, to Houston, where he was thrust into a completely foreign environment where he did not even speak the language. These traumatic aspects of his youth, coupled with the strong gang presence in the poor neighborhoods where his family relocated in Houston, made his involvement in gangs comprehensible and wholly unremarkable.

Finally, seen in this light, Mr. Alvarez's final violent acts within the gang were *situational* and deeply tied to the tragic history of his family. Gang research could have been used to rebut the prosecution's unchallenged claim that "violence is nothing to this man."

### D.  RESEARCH CONTRADICTS THE PROSECUTION'S CONTENTION THAT MR. ALVAREZ WAS LIKELY TO BECOME A DANGEROUS, VIOLENT PRISON GANG MEMBER

The prosecution further tried to tap into the jury's existing fears of and stereotypes about gangs by characterizing Mr. Alvarez as likely to become a violent participant in prison gangs. This was, of course, particularly prejudicial, both because the public perception of such gangs corresponds to one of most institutionalized and militarized types of gangs, and because the jury's sense that society could not even be protected from Mr. Alvarez's violence even while he was incarcerated in prison.

Research shows that, contrary to what the prosecution presented and argued during the sentencing phase, Mr. Alvarez would be unlikely to become a member of a violent prison gang. My research has concluded that people like Mr. Alvarez, who fit the label of Homeboy and exhibit expressive violence, even those who commit extreme acts of expressive violence, settle in and adapt in prison. New Jacks, who see violence as a career and a means to an end, often become predators behind bars. Even in prison, the conventional values of Homeboys tend to lead them to turn to religion, pursue education, or find fulfillment in a prison occupation.

Gangs are omni-present in prisons and inmates are often forced to line up with one gang or another. What the defense did not realize is that a common reaction of some inmates to the predations of prison gangs is to unite with others from their neighborhood and refuse to join an established gang like La Familia, the Texas Syndicate, the Aryan Brotherhood, Crips or others.

My interview with Mr. Alvarez indicates that he fits the expectation developed through my gang research. Mr. Alvarez told me he would never join one of those gangs since "you have to be willing to kill someone if you are ordered." This sentiment is consistent with Mr. Alvarez's history of expressive, not instrumental violence and my categorization of him as a "Homeboy." Mr. Alvarez described to me a scenario I have observed in other South and Midwest prisons of loose associations of inmates from the same area and ethnic group, who may have had different gang affiliations on the street, but band together in prison for self-help and self-defense. As the research would anticipate, Mr. Alvarez indicated that formers members of the SWC and La Primera from southwest Houston, rivals on the street, cooperate in this way in prison.

Research in the Southwest and Western United States has reported on many prison gangs attempting, unsuccessfully, to control neighborhoods "claimed" by barrio gangs. Being in a barrio gang on the street does not automatically translate to joining one of the institutionalized, violent prison gangs.

Prison is a dangerous place and gangs are a basic form of inmate organization. But the defense's lack of understanding of the reality of gang prison life prevented them from presenting testimony that would have disputed what may have seemed to the jury as Mr. Alvarez's inevitable step from SWC to La Familia. Dr. Laval failed to show how existing research on prison gangs supported the defense's proposition that Mr. Alvarez was likely to avoid prison gang activity and thus cast doubt on the prosecution claims of "future dangerousness."

## II.  PRESSURES TO JOIN A GANG IN CERTAIN NEIGHBORHOODS

Gang members come from different kinds of families, and surprisingly research has consistently found a large percentage come from conventional families.  For individuals raised in conventional families, violence breaks conventional norms and is more likely to be situational, rather than an ingrained personal trait.

My own published research has looked at three different kinds of families of gang youth: (1) Street socialized families, where parents and relatives were in a gang or deeply involved with illicit activities or substance abuse; (2) Conventional families with few or no relatives who are involved with heavy substance use, criminal, or gang activities; and, (3) Declining families who are intermediate between the first types, but have been negatively affected by job loss or relocation.  Mr. Alvarez's family appears to fit in this third type.

In cities like Houston, some poor neighborhoods have become home to gangs and this significantly alters the environment for all youth who live in the area.  The affidavits of Joachim Cruz and Danielle Williamson, and my own interview with Mr. Alvarez, describe a typical pathway to gang membership.  Mr. Cruz relates how Mr. Alvarez was beaten up by black gang members after he moved to Houston and was living in a neighborhood where pressures to join a gang were intense.  Ms Williamson describes Mr. Alvarez as a bright, good student who "gradually drifted away" in "an atmosphere where gangs flourished."  In Bellaire High School, Mr. Alvarez's traumatic history of the murder of his father, grandfather, and uncle sadly came together with his fear for his own safety from gangs in a new city and in an ineffective school. Gang research through the ages has found that for youth like Mr. Alvarez, gang membership in such situations is "normal," though use of that term may be hard for an outsider to understand.

My research has sought to look at gang membership from the gang member's perspective.  Importantly, while the public sees gangs as a problem, the gang member sees it as a *solution* to his or her emotional needs.  Mr. Alvarez's history of family violence, the violence in his local environment, his loose ties to conventional institutions and the presence of a local "barrio gang" make his gang membership as understandable as it proved to be tragic.

## III.  NOT ALL VIOLENCE PERPATRATED BY GANG MEMBERS IS GANG VIOLENCE

In his opening statement, Prosecutor Ramirez indicated that the whole theory of the case is this was a gang retaliation-type shooting.  The problem here is that not all the violence perpetrated by people associated with gangs is gang-related violence, and also that all the acts of violence in the case were lumped together.  It is common for any violence conducted by a known

gang member to be characterized as gang violence, even if it is actually an unrelated personal dispute. Some of the evidence presented by the prosecution in the guilt and sentencing phases about Mr. Alvarez's violence suggests that not all the violence was gang-related. Gang violence serves some purpose to the gang, whether it is in furtherance of a gang's commercial enterprises, initiation rites for new members, or retaliation against rival gangs. Violence perpetrated by individuals for their own personal reasons, whether for monetary gain, in reaction to a situation, or to settle a personal dispute, is not necessarily gang violence.

There is no indication that Mr. Alvarez's violence can all be explained as the rational actions of an amoral gang hit man or a gang soldier carrying out orders. Much of his violence was an expression of rage, triggered by emotional trauma, and only some of it seems to have been "gang-related"; even there, the actions can easily be viewed as the result of intensely emotional triggering events.

The first charged incident, known as the Prestwood incident, where five carloads full of SWC and allied gang members conduct a drive-by shooting at a party where known rival gang members were present, is a clear example of gang violence. The purpose of the criminal activity appears to have been an attack on rival gang members who were responsible for the recent shooting death of an SWC member and close friend to the defendant. For Mr. Alvarez, however, his participation in this act can only be fully understood when viewed in light of not only his relationship to the deceased gang member, but also his own traumatic history of having experienced a brutal series of violent acts visited upon close family members, including his own father, when he was a small boy. On the other hand, some of the incidents presented during the sentencing phase, such as the Keane Street shooting and the Gulf Freeway shooting, appear to be senseless acts of violence that have no specific affiliation to gang activities. In these incidents, the evidence suggests that Mr. Alvarez acted in a blind rage of expressive violence. There appears to be no connection to rival gangs or gang-related purposes. These incidents further indicate that Mr. Alvarez was not engaged in systematic or amorally rational activities that advanced the SWC and was therefore not engaged in instrumental violence.

Likewise, there did not appear to be compelling evidence that the second charged crime, known as the Woodfair incident, was necessarily a gang-related murder. There was evidence that neither of the victims at Woodfair were gang members, which would support the explanation that this was a personal dispute rather than a gang hit. The geographic location of the Woodfair incident was some distance from the area where the Prestwood incident occurred, which seemed to be the heart of the LP-SWC conflict. This offers support to the theory that the second incident was not gang violence, but instead, violence committed by gang members.

Without a gang expert to counter the common assumption that all violence perpetrated by members of a gang is gang-violence or part of gang-warfare, the prosecution's theory that this

case was all about gang violence and/or ongoing gang warfare was left intact.  A gang expert could have established the fallacies upon which the prosecution's theory rested, and then assisted the defense in presenting the alternative – and far more likely – explanation that these crimes were all connected instead by an emotional outburst of violence triggered by trauma and exacerbated by the gang environment.

## CONCLUSION

In conclusion, I want to make clear that nothing in this report should be read as sanctioning or excusing the tragic violence in this case.  Instead, however, this report highlights the ways in which Mr. Alvarez's defense lawyers failed to confront the stereotypical and damaging presentation of gangs by the prosecution with research and an actual analysis of Mr. Alvarez's violence and involvement in the gang.  The defense was unable to make a convincing case for mitigation or harness any value from Dr. Laval's testimony since it lacked a basic understanding of gangs, who joins them and for what reasons, the nature of gang violence, and the reality of gang life in prison.

John Hagedorn
Senior Research Fellow
Great Cities Institute, Univ. of Illinois-Chicago
Associate Professor
Dept. of Criminal Justice, Univ. of Illinois-Chicago

# ATTACHMENT A

# Curriculum Vitae

*http://gangresearch.net*

| John M. Hagedorn, Ph.D. | Associate Professor | Senior Research Fellow |
|---|---|---|
| 721 W. Monrovia Ave. | Dept. of Criminal Justice | Great Cities Institute |
| Glendale, WI  53217 | Univ. of Illinois-Chicago | Univ. of Illinois-Chicago |
| 414-332-3746 | 1007 West Harrison Street | 512 S. Peoria  #400 |
| huk@uic.edu | Chicago, IL 60607-7140 | Chicago, IL 60607 |
| | FAX 312-996-8355 | 312-996-8361 |

## Professional Experience

<u>UNIVERSITY OF ILLINOIS-CHICAGO</u>  (1996-)

Great Cities Institute, Senior Research Fellow (2001- )
Founder, gangresearch.net (2000-)
Associate Professor, Criminal Justice (1999- );  Urban Planning (2005-)
Great Cities Institute, Scholar (2000-1; 2005-6)
Assistant Professor, Criminal Justice (1996-1999)

<u>UNIVERSITY OF WISCONSIN-MILWAUKEE</u>  (1991-1997)

Urban Research Center. Principal Investigator and Project Director of "Drug Posses, Gangs, and the Underclass in Milwaukee," and the "Homegirl Project.."

<u>MILWAUKEE COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICE</u>  (1988-1991)

Youth Program Coordinator. Designed and implemented a sweeping neighborhood-based reform of county social services.    o

<u>UNIVERSITY OF WISCONSIN-MILWAUKEE</u>   (1985-1988)

Project director of study of Milwaukee gangs at Urban Research Center.

<u>COMMUNITY RELATIONS-SOCIAL DEVELOPMENT COMMISSION</u> (1983-1985)

Director of Youth Diversion Project, Milwaukee's initial $500,000 gang intervention program funded by the City and County of Milwaukee and State of Wisconsin.

# Funded Research Grants and Contracts

- *Gentrification in Lawndale*: Competition for year-long qualitative methods seminar. Chicago Area Study: $20,000.
  *Children in Organized Armed Violence: Chicago.* .An eleven nation study, Rio Viva, Brazil. $5000.
- *The Conservative Vice Lord On Line Living History Museum.* Illinois Humanities Council. 2003. . $10,000.
- *Violence, Gangs, and the Re-division of Space in Chicago."* Harry Frank Guggenheim Foundation. $60,000, 2002-2003
- Jane Addams Substance Abuse Research Collaboration Grant. National Institute for Drug Abuse by Jane Addams School of Social Work. $1,125,925. Co-PI.
- *Gangs in the Global City: An International Conference*. The Chicago Seminar. Conference to place the understanding of gangs in a global framework. $10,000. 2002
- *The History of Gangs in Chicago*. UIC Institute for the Humanities. Seed grant beginning a study of gangs in Chicago. $4000.2001-
- *Undergraduate Research Conference on Gangs*. UIC School of Liberal Arts and Sciences. Conference to involve UIC undergraduates in gang research. 2000. $3000.
- *Center for the Study of Violence, Crime, and Drugs*. University of Illinois-Chicago. Office of the Vice Chancellor for Research. Principal Investigator of a seed grant to secure funding for a campus wide center for the study of violence. $100,000. 1999
- *The Eurogang Conference.* UIC Great Cities Institute. 1999. $2,500.
- *The Culture and Business of Drug Dealing*. Wisconsin Policy Research Institute: 1996-1997. Principal Investigator of a grant to compare the drug business in two inner city neighborhoods with dealing in the suburbs. $22,500.
- *Homegirl Project*. (R01 DA 07218-03). Principal Investigator of a National Institute on Drug Abuse two year grant to study patterns of drug use and dealing among Milwaukee female gangs. 1995-1997. $600,000
- *Drug Posses, Gangs, and the Underclass in Milwaukee*. (RO1 DA 07218-01). Co-Principal Investigator of a three year National Institute on Drug Abuse grant to study the patterns of drug use and dealing among inner city Milwaukee male gangs. 1991-1995. $1,000,000
- *Evaluation of Fighting Back Planning Process: Milwaukee's strategy to reduce drug and alcohol use.* Milwaukee County Fighting Back. 1992
- *Analysis of Milwaukee County Foster Care System*, with Deborah Schwartz. Milwaukee County Department of Human Services. 1992.
- *Outreach Plan*. Milwaukee Area Technical College, 1987.
- *Training grant*. National Center for Neighborhood Enterprises. 1986.
- *Training grant*. Wisconsin Council on Criminal Justice. 1986.
- *Staff training.* Community Relations-Social Development Commission: 1986.
- *Wingspread conference: "Understanding Youth Gangs: A Midwest Conference for Medium and Small Sized Cities"* Conference Coordinator. Milwaukee Foundation. 1987.
- *Study of Milwaukee gangs.* Milwaukee Foundation. 1985-6. Project Director of study that lead to publication of <u>People & Folks</u>.
- *Gang, alcohol , and drug treatment survey*. Wadari Foundation. 1985.
- *Policy Survey.* Youth Policy and Law Center. 1985.

# Selected Honors

- Hans Mattick Award for Distinguished Contributions to Criminology. Illinois Academy of Criminology. 2006.
- Great Cities Senior Research Fellow, University of Illinois-Chicago 2001-
- Social Science Research Council Working Group on "Youth in Organized Violence." 2004-2005.
- Distinguished Alumnus, University of Wisconsin-Milwaukee. 2000.
- Great Cities Scholar, University of Illinois-Chicago, 2000-2001; 2006.
- Teaching Recognition Award, University of Illinois-Chicago.  2000.

# Refereed Articles and Invited Essays

"Housing and Homicide."and Brigid Rauch.  Under Review, Journal of Urban Affairs.

 "Race Not Space: A revisionist history of Chicago gangs." the Journal of African American History.  90:4 pp 194-208.

"Gangs as Social Actors." Invited essay in  The Essential Criminology Reader Edited by. Stuart Hall, Boulder, CO. Westview,.  pp 141-152.. 2006.

"The Global Impact of Gangs". the Journal of Contemporary Criminology, James F. Short, Jr. special editor.  Pp 153-169. Vol 1 No 21 May 2005

"Gang Violence in the Post-Industrial Era." Invited Essay in Youth Violence: Crime & Justice 24:  An Annual Review of Research. Edited by Michael Tonry and Mark Moore. pp. 457-511.  University of Chicago. 1998.

"Cocaine, Kicks, and Strain: Patterns of Substance Use in Milwaukee Gangs." and Jose Torres and Greg Giglio.  Contemporary Drug Problems.  25:1 pp 113-145.  1998.

"Homeboys, New Jacks, and Anomie."  Journal of African American Men.Vol. 3. Issue 1. pp. 7-28. 1998.

"The Emperor's New Clothes: Theory and Method in Gang Research." Free Inquiry for Creative Sociology Vol. 24, No. 2.  pp. 111-122.  1996

"Neighborhoods, Markets, and Gang Drug Organization."  Journal of Research in Crime and Delinquency, Vol 31.  No. 3.  pp. 264-294.  1994.

"Homeboys, Dope Fiends, Legits, and New Jacks."  Criminology, Vol. 32  No. 2. pp. 197-219.  1994.

"Gangs, Neighborhoods, and Public Policy," Social Problems, Vol. 38  No. 4. pp.  529-542.  November 1991.

# Books

<u>A World of Gangs: : Armed Young Men and Gangsta Rap Culture</u>- ms. under review. Est. Publication 2007.

<u>Gangs in the Global City: Exploring Alternatives to Traditional Criminology.</u> Edited by John M. Hagedorn. Champaign.  University of Illinois Press, 2006.

<u>Female Gangs In America.: Essays on Girls, Gangs, and Gender</u>.  edited by  Meda Chesney-Lind and John M. Hagedorn.  Chicago. Lakeview Press. 1999.

<u>Forsaking Our Children: Bureaucracy and Reform in the Child Welfare System,</u> Chicago,  Lakeview Press, 1995.

<u>People And Folks: Gangs, Crime and the Underclass in a Rustbelt City</u>, with Perry Macon. Chicago, Lakeview Press, 1988; 1998

# Chapters in Edited Volumes

"The Global Impact of Gangs." in Jim Short, Edited, Why Study Gangs?  Alta Mira. Walnut Creek, CA.  2006. pp 181-192.

"Race, Space, and the Institutional Gang: The Chicago School Reconsidered." In John M. Hagedorn, editor, <u>Gangs in the Global City: Reconsidering Criminology</u>. Champaign. University of Illinois Press. 2006. pp 13-33.

Gangs in Late Modernity" In John M.  Hagedorn, editor, <u>Gangs in the Global City: Reconsidering Criminology</u>. Champaign. University of Illinois Press. 2006. pp 295-317..

Introduction: Alternatives to Traditional Criminology" In John M.  Hagedorn, editor, <u>Gangs in the Global City: Reconsidering Criminology</u>. Champaign. University of Illinois Press. 2006. pp. 1-10.

Children and Youth in Organized Armed Violence- USA.. In Luke Dowdney, edited, <u>neither War nor Peace:</u> <u>International comparisons of children and youth in organized armed violence</u>. 7Letras, Rio de Janiero. Brazil. 2005. pp312-330.

"Gangs and the Informal Economy." In Huff, C. Ronald, editor<u>, Gangs in America</u>, Third Edition Beverly Hills. Sage.  2001. pp 101-120.

"Globalization, Gangs, and Collaborative Research." in Klein, Malcolm W. Hans-Jurgen Kerner,  Cheryl . Maxson., and Elmar E.M. Weitekamp, <u>The Eurogang Paradox: Youth Groups and Gangs in Europe and America</u>, Amsterdam. Kluwer. 2001. pp 41-58.

"Fighting Female: The Social Construction of the Female Gang." in Meda Chesney-Lind and John M. Hagedorn, editors. <u>Female Gangs in America</u>, Chicago. Lakeview Press. 1999. pp 256-276

v

"Introductory Essays."  and  Meda Chesney-Lind. in Meda Chesney-Lind and John M. Hagedorn, editors. <u>Female Gangs in America</u>. Chicago. Lakeview Press. 1999.

"As American as Apple Pie: A Case Study of Gang Violence. " in Meredith W. Watts, editor,  <u>Cross-Cultural Perspectives on Youth and Violence.</u> JAI Press. Hartford, CN. 1998. pp. 79-98.

"Frat Boys, Bossmen, Studs, and Gentlemen: A Typology of Gang Masculinities,"  in Lee Bowker, editor, <u>Masculinities and Violence</u>, Beverly Hills, Sage. 1998. pp. 152-167.

"What Happens to Girls in the Gang?" and Joan Moore, in Ron Huff, editor, <u>Gangs in America</u>, Second Edition, Beverly Hills,  Sage. 1996. pp. 205-218.

"Back in the Field Again: Gang Research in the 1990s," in Ron Huff, editor, <u>Gangs in America</u>, First Edition, Beverly Hills, Sage. 1990. pp. 240-259.

## Invited Book Reviews

<u>Clean Streets: Controlling Crime, Maintaining Order, and Building Community.</u> by Patrick J. Carr. New York and London. New York University Press. Contemporary Sociology, In Press.

<u>The Crime Drop in America:</u>  Edited by Alfred Blumstein and Joel Wallman. Cambridge, University of Cambridge Press.  Theoretical Criminology 5:4 492-497. 2001.

<u>Gangs and Youth Subcultures: International Explorations .</u> edited by Kayleen Hazlehurst and Cameron Hazlehurst. Transaction.  Contemporary Sociology 28:5  609-610. 1999.

<u>Social Programs That Work</u>.  edited by Jonathon Crane.  New York. Russell Sage 1998. Contemporary Sociology 28:3. 297-298. 1999.

<u>Fighting Back: Neighborhood Anti-Drug Strategies.</u> By Robert C. Davis and Arthur J. Lurigio.   Addictions, 91: 12  1883. 1996.

 <u>Beggars and Thieves: Lives of Urban Street Criminals,</u> By  Mark A. Fleisher,  American Journal of Sociology, 102: 2. 626-627. September 1996.

<u>The American Street Gang: It's Nature, Prevalance, and Control</u>, By Malcolm W. Klein and <u>The Youth Gang Problem: A Community Approach</u>, By Irving A. Spergel. Contemporary Sociology, Vol. 25: 4. 533-535. July 1996.

<u>Street Kids, Street Drugs, Street Crime:  An Examination of Drug Use and Serious Delinquency in Miami</u>, by James A. Inciaridi,  Ruth Horowitz and Anne E. Pottieger. Crime, Law, and Social Change, 20:1. 73-76. July 1993.

## Encyclopedias and Other Reference Materials

"Rustbelt" Encyclopedia of Sociology. Edited by George Ritzer. NYC. Blackwell. In press

"Gangs and Politics" Encyclopedia of Youth Activism. Edited by Lonnie Sherrod. Greenwood Press. Westwood, CN. . 2006. Pp 264-268.

"Before all the Boys are Dead: Variations in Urban Violence." UIC Great Cities Institute Working Paper. http://www.uic.edu/cuppa/gci/publications/working papers/pdf/GCP-04-03 Before all the Boys.pdf 2004.

"Gang." Encyclopedia of Men and Masculinities. Michael S. Kimmel and Amy M. Aronson, Editors. Santa Barbara, CAABC-Clio. 2004; 329-330.

"Gang:" Encyclopedia of Community. Edited by Karen Christianson. Great Barrington, MA, .Berkshire Publishing Group. 2003.pp 517-522..

"Prison, Race, and Community:" Encyclopedia of Community . Edited by Karen Christianson. Great Barrington, MA, .Berkshire Publishing Group. 2003. 1099-1101.

"Female Gangs." Joan W. Moore and John M. Hagedorn. Office of Juvenile Justice and Delinquency Prevention. Washington, D.C. 2001.

"Gang." World Book Encyclopedia. 1994 to present.

"Six Sources on Gangs". Infography.. Fields of Knowledge. Springfield, Vermont. http://www.infography.com/content/818032524929.html

## Reprints

"What Happens to Girls in the Gang?" and Joan Moore, in Ron Huff, editor, Gangs in America, Second Edition, Beverly Hills, Sage. pp. 205-218. 1996.

       * in Rebecca Peterson, editor, Understanding Contemporary Gangs in America: An interdisciplinary Approach. Upper Saddle River, NJ, Prentice-Hall pp37-47

•   in Meda Chesney-Lind and John M. Hagedorn, editors, Female Gangs in America. Chicago. Lake View Press.

    Beggars and Thieves: Lives of Urban Street Criminals (review), By Mark A. Fleisher, American Journal of Sociology, 102: 2. 626-627. September 1996

      in The Criminal Justice Students' Writers' Manual. William A. Johnson, Jr., Richard P. Rettig, Gregory M. Scott, and Stephen M. Garrson, editors. Prentice Hall. Upper Saddle River, NJ. pp 221-224. 1999.

"Homeboys, Dope Fiends, Legits, and New Jacks." Criminology, Vol. 32 No. 2. pp. 197-219. 1994.

* in Frank R. Scarpetti and Amie L. Nielsen, editors,  <u>Criminology: A Collection of Classic and Contemporary  Readings</u>.   Roxbury Publishing Company, Los Angeles. 1998.

*in Werner Einstadter and Stuart Henry, editors, <u>Criminology: Readings in Contemporary Theory</u> New York University Press,  1997.

 *in Paul Cromwell, editor, <u>In Their Own Words</u>,  Roxbury Publishing Company,  1996.

*in John E. Conklin, editor, <u>Criminology in the 1990s</u>. Allyn Bacon. 1996

*in Delos H. Kelly, editor, <u>Deviant Behavior</u>,  Fifth Edition. St. Martins. 1995.

"Gangs, Neighborhoods, and Public Policy," Social Problems, Vol. 38   No. 4. pp.  529-542.  November 1991.

*in The International Library of Criminology, Criminal Justice, and Penology, 2nd Edition. Ashgate Publishing.
*in,  <u>Taking Sides: Issues in Family and Personal Relationships</u>, Fourth Edition. McGraw Hill.

* in G. Larry Mays, editor,  <u>A Reader on Gangs</u>, Nelson-Hall Publishing Company. 1996.

 * in Mike Maguire, editor, <u>Street Crime</u>, Dartmouth Publishing  Company. 1996.

* in Malcolm W. Klein, Cheryl L. Maxson, and Jody Miller, editors, <u>The Modern Gang Reader.</u> Roxbury Publishing Company. 1995

* in Robert L. and Diana S. Del Campo, editors, <u>Taking Sides: Clashing Views on Controversial Issues in Childhood and Society,</u>  Dushkin Publishing Group. 1995.

<u>People And Folks: Gangs, Crime and the Underclass in a Rustbelt City,</u> with Perry Macon. Chicago, Lakeview Press, 1988.

* Chapter Two: in Malcolm W. Klein, Cheryl L. Maxson, and Jody    Miller, editors, <u>The Modern Gang Reader.</u> Roxbury Publishing Company. 1995

*Chapter Five in Mary Vogel, editor,  <u>Crime, Equality and  the State</u>. London. Sage.  2003.

* Chapter Four: in Robert G. Culbertson and Ralph A. Weisheit,        editors, <u>Juvenile Delinquency: A Justice Perspective</u>, Second Edition,  Waveland     Press, 1990.

## Selected Non-Refereed Articles, Reports, and Essays

Articles on gangresearch.net

"Bobby Gore and Lawndale" North Lawndale Community News.  June 22, 2005. Vol 7 : 14.

"Housing and Homicide." Policy paper for the Coalition for the Homeless. Summer 2004. http://www.chicagohomeless.org/factsfigures/facts.htm

"neither War nor Peace:  Children in Organized Armed Violence: Chicago."Viva Rio. Rio de Janerio.  2004

"John Norquist's Legacy." Wisconsin Interest Vol. 13 No. 1 Winter 2004

"Building a Way to Stop Murder." Chicago Tribune, *Perspectives*, June 1, 2003.

"Gangs of…." Chicago Tribune, *Perspectives*, January 19, 2003.

"Why am I getting Mugged in Electron Alley?" Wisconsin Interest. Vol 11: No. 1 Winter 2002. 27-33.

"Murder in Milwaukee: The Homicide Rate is a Scandal And Most of the Ideas To Cut it Are Wrong." Wisconsin Interest. Vol 9 No.2  Summer 2000. 17-25

"I Do Mind Dying" Milwaukee Magazine,Vol 24 No. 2.  December, 1999.

"Girl Gangs: Are Girls Getting More Violent?" Streetwise Vol 8 No 2 November 1999.

"The Business of Drug Dealing in Milwaukee."  Wisconsin Policy Research Institute. Vol 11 No. 5.  Milwaukee. June 15, 1998.

"Final Report.  Drug Posse and Homegirl Studies."  National Institute on Drug Abuse. October 9, 1997.

"A Culture of Violence"  Editorial opinion. Milwaukee Journal-Sentinel. January 24 1997.

"What's Wrong with Milwaukee's Child Welfare System?" "Wisconsin Interest" Vol. 5: 1. Spring/Summer 1996.  41-46.

"War on Drugs steeped in discriminatory practices." Editorial opinion. Milwaukee Journal-Sentinel. September 10, 1995.

"Fighting Back Planning Process Evaluation: Final Report," and Edward Smith.  May 14, 1992.

"Pilot Foster Care Analysis: Final Report, " and Deborah Schwartz.  January 27, 1992.

"Monitoring Practices of Milwaukee County's Department of Social Services." Milwaukee County, 1989.

"Youth Gangs: Milwaukee and Los Angeles Compared," and Joan Moore. Research and Opinion, UWM Urban Research Center, 5:1, 1988.

"Milwaukee Gang Research Project: Final Report," and Joan Moore and Perry Macon. 1986.

"Gang Youth Perceptions of Drug Treatment Programs." Report to the Wadari Foundation, Milwaukee, 1985.

"A Policy Assessment Survey: Perceptions and Opinions of Wisconsin's Juvenile Justice System," and William Durkin, Lawrence Euler, Kaye Exo, and James Sprowls. 1985.

## Selected Academic Papers and Panels

46. A World of Gangs. Paper delivered at the School of the art Institute. April. Chicago

45. Gangsta Rap Culture – Paper delivered at Great Cities Institute.  April. Chicago.

44. Medillin and Chicago; A Social History; Paper delivered at the Social Science Research Council Workshop on Youth in Organized Violence, New York City, November 2005.

43. Institutionalized Gangs in Chicago. Paper delivered at the Social Science Research Council Workshop on Youth in Organized Violence, Pretoria, South Africa, December 2004.

42. "Variations in Urban Homicide. With Brigid Rauch. Presented at the City Futures Conference. Chicago. 2004..

41. "Housing and Homicide." Presented at the Conference on Chicago Research and Public Policy. Chicago. 2004.

40. "Armed Young Men": Presented at the Guns, Gangs, and Community Safety Conference, London, Luton University, 2004.

39. "Belfast and Chicago: Contested Cities." Presented at Queens University. Belfast, UK.. 2003.

38. "Chicago Gangs and Social Theory." Presented at Middlesex University. London, UK. 2003.

37. "Race and Institutionalized Gangs in Chicago and around the world." Presented at Luton University, UKLondon, UK. . 2003.

36. "Contested Cities" with David Perry.  Presented at the American Society of Criminology meetings, Chicago 2002.

x

35. "Race, Space, and the Institutional Gang." Presented at the Gangs in the Global City working conference. Chicago. 2002.

34. "Gangs and the Ghetto in Chicago" Presented at the Globalization and the Streets Conference. New York City. 2001.

33. "Female Gangs in Transition." Paper presented at the Eigth Biennial meeting of  the Society for Research on Adolescence.. Chicago ,IL. 2000

32. "Horatiotown and Algerville." Paper presented at the annual meetings of the American Society of Criminology.. Washington, D.C. 1998

31.  "Gangs, Collaborative Research, and the Informal Economy."  Paper  presented at "Youth Groups and Gangs in Europe: A Joint American/European Workshop." Sponsored by the US National Institute of Justice and the German and Dutch Ministries of Justice. Frankfurt, Germany. 1998.

30.  "Female Gangs: A Life Course Perspective." with Mary Devitt. Paper  presented at the annual meetings of the American Sociological Association. San Fransisco. 1998.

29. Author Meets Critics: "Homeless" by John Hagan.  American Sociological Association. San Francisco 1998.

28. "The Decline of Drug-Related Violence: A Case Study in Self Regulation and Social Learning." with Paul Goldstein. Paper presented at the annual meetings of the American Society of Criminology. San Diego. 1997.

27. "People & Folks Revisited: Some Limits of Social Disorganization Theory."  Paper presented at the annual meetings of the American Society of Criminology. San Diego. 1997.

26. Author meets Critics: "Violent Criminal Acts and Actors Revisited,  by Lonnie Athens."  Panel participant at the annual meetings of the American Society of Criminology. San Diego. 1997

25. "The Nature of the Informal Economy and its Implications for  Social Change." Paper delivered at the Midwest Radical Scholars Conference. Chicago, October, 1997.

24. "Doing Gender, Doing Business, and Doing Anomie: A Typology of Gang Violence. Paper presented at the Law and Socety Association annual meetings. St Louis. 1997.

23. "Informal Social Control of Gang Drug Violence." with Joan Moore.  Paper delivered at the annual meetings of the American Academy for the Advancement of Science. Seattle. February 1997

22. "Gang Masculinities." Paper delivered at the annual meetings of the American Society of Criminology, Chicago, November, 1996.

21. "Drug Use in Milwaukee Gangs," with Jose Torres and Greg Giglio. Paper delivered at the annual meetings of the American Society of Criminology, Chicago, November, 1996.

20. "Tactics and Strategy in Post-Industrial America,"  Paper delivered at the Midwest Radical Scholars Conference. Chicago, November, 1996.

19. "Fighting Female,"  Paper delivered at the annual meetings of the American Sociological Association, New York, August 1996.

18. "Gang Violence in Milwaukee."  Paper delivered at "Cross-Cultural Perspectives on Youth, Radicalism and Violence" conference, sponsored by the International Sociological Association and others. Milwaukee,  August 1996.

17. "Cui Bono? The Obligations of 1990s Underclass Research." Paper delivered at the annual meetings of the American Criminological Society, Boston, November 1995.

16. "A Sociologist's Use of Oral History." Paper delivered at the annual meetings of the Oral History Association, Milwaukee, WI., October 1995.

15. "Gangs, Neighbors, and Drug Dealing," and Joan Moore. Paper delivered at the Clifford Shaw Centennial Celebration, Chicago, October 1995.

14. "Homeboys, New Jacks, and Anomie," Paper delivered at the annual meetings of the American Sociological Association, Washington, D.C., August 1995.

13. "Presentational and Operational Data in Gang Research."  American Sociological Association Special Panel on Community Participation in Research, Los Angeles, August 1994.

12. "Gangs in the Community: Neighborhood Militia or Urban Terrorists?" and Joan Moore. Paper presented at the annual meetings of the Academy of Criminal Justice Sciences. Chicago IL, March 1994.

11. "Are Gangs Rational Organizations?" Paper presented at the  annual meetings of the Society for the Study of Social Problems, Miami, FL, August, 1993.

10. "Homeboys, Dope Fiends, Legits, and New Jacks."  Paper presented at the 44th annual meetings of the American Society of Criminology,  New Orleans, LA, November 1992.

9. "Deindustrialization, Neighborhood Processes, and Gangs." Paper presented at the Proceedings of the American Sociological Association. Washington, D.C., December 1990.

8. "Neighborhood Processes and Youth Gangs." Paper presented at the Proceedings of the American Sociological Association. Washington, D.C., December 1990.

7. "Survey of DSS Chips Staff: Final Report."  Milwaukee. University of Wisconsin Milwaukee Urban Research Center. 1990.

6. "Study of Youth Released from Residential Treatment, DayTreatment, and Group Homes in 1989." Milwaukee. Milwaukee County Department of Health and Human Services.  1989.

5. "Gangs as Quasi-Institutions." Paper presented at the annual meetings of the American Society of Criminology,  Chicago, October 1988.

4. "Ethnicity, Desegregation, and the Study of Gangs." Paper delivered at the annual meetings of the American Society for Criminology, Montreal, 1987.

3. "The Salience of Neighborhood for Black Gangs in an Epoch of Desegregation."  Paper delivered at the annual meetings of the Midwest Sociological Society, Chicago, 1987.

2. "Milwaukee and Los Angeles Gangs Compared," and Joan Moore. Paper delivered at the annual meetings of the Society for Applied Anthropology,  Oaxaca, Mexico, 1987.

1. "Strategy and Tactics in Gang Intervention." Presentation at Juvenile Violence-- Juvenile Justice Conference, Milwaukee, 1985.

## Selected Academic Projects-In-Work

- "Meddilin and Chicago A Social History" article being prepared with Francisco Guiterrez
- Us Vs. Them: projected ms on gangs and the criminal justice system

## Academic Peer Reviewer

*Academic Journals:*  Criminology, Social Problems, American Journal of Sociology, Contemporary Sociology, Sociological Inquiry, Sociological Perspectives; Environmental Psychology, Journal of African American Men, Free Inquiry for Creative Sociology, Journal of Research in Crime and Delinquency, Journal of Quantitative Criminology, Critical Criminology, Sociological Theory. Journal of Urban Affairs.

*Tenure Review*: University of California-Irvine, 2002; 2004;  University of Hawaii. 1996.

*Ms. Review*:  Oxford University Press; Univesity of Illinois Press; Temple University Press; Roxbury Press, Ohlinger Publishing Services, Sage, Allen and Bacon. Atomic Dog Publishing. Alta Mira Press.

*Referee*.  National Science Foundation.  Harry Frank Guggenheim Foundation,  W.T. Grant Foundation.

## Selected Presentations

"The relationship between housing and homicide in Chicago." Address to the Jewish Council on Urban Affairs. 2004.

 "Housing and Homicide." Presented at 25th Anniversary Celebration of the Nathaniel Voorhees Center. University of Illinois-Chicago. 2003. Chicago.

"Did the War on Drugs' Reduce Homicide Rates?" Presented at the National Strategy Forum, The Drug War: Fantasy, Reality, and Beyond. Chicago. August 23, 2002.

"Violence and the Informal Economy."  Presented at Workshop on Aggression, Trauma, and Violence at the University of Chicago. March,  29  2000.

"Murder, Drugs, and the Information Economy:  an urban political economy approach to variation in homicide rates." and Paul Goldstein. Lecture at UIC Great Cities Institute.  Chicago.  September 30, 1999.

"Gangs and the Informal Economy." Presentation to the Illinois Academy of Criminology.  Chicago, IL. May 8, 1998

"Race and Class in Chicago." Address at the School of the Chicago Art Institute. Chicago. December 15, 1997.

"Female Gangs in Milwaukee."  Address to the Wisconsin Gang Symposium, Kenosha. WI   November 1, 1996.

"Gangs, Culture, and Social Isolation." Address to the Illinois Academy of Criminology. Chicago, IL  October 16, 1996

"Gangs, Drugs, and Incarceration." Address to Governor's Task Force on Corrections. Milwaukee, WI. April, 1996.

"Rethinking Child Welfare Reform." Keynote address at the Wisconsin Family Based Services Association Annual Conference, Milwaukee. March 15, 1996.

"Real and Symbolic Reform." Address to the Milwaukee Child Welfare Project Steering Committee. Milwaukee.  December 15, 1995.

"Gangs, Drugs, and Public Policy," Keynote Address at Utah Valley State Gang Conference, Salt L:ake City, Utah.  April 11, 1994

"Gangs in Smaller Cities: Myths and Realities." Madison Area Technical College. April 7, 1994

"Urban Policy and Youth Gangs." Presentation to the US Conference of Mayors, Washington D.C.  April, 1990.

"The Scanty Evidence for Gang Diffusion."  Address to the Ohio Conference on Youth Gangs and the Urban Underclass,  Columbus, Ohio, 1988.

"Gang Programming and the Need for Collaborative Research." Presentation at the Wingspread Conference "Understanding Youth Gangs: A Midwest Conference for Medium and Small Sized Cities," Racine, Wisconsin, 1987.

"Positive Peer Training Program: Final Evaluation and Report. " Prepared for Career Youth Development, Wisconsin Council on Criminal Justice, and National Center for Neighborhood Enterprises, 1987.

"Effective Gang Programming." Keynote Address at "Youth Violence: A Community Problem," Franklin County, Ohio, 1987.

"Gang Experts and Real Research." Presentation and Keynote Address, "Cooperation V," Ohio Youth Services Network statewide conference, Columbus, OH. 1986.

<h1 style="text-align:center">Teaching Experience</h1>

<u>Assistant and Associate Professor:</u> University of Illinois-Chicago:

- Field Research: Gentrification in Lawndale  Crj 561; Soc  500       (Spring/Fall 2007)
- Changing Spaces in Chicago. GrC 495                                  (Summer 2006)
- Violence in America. CrJ 121.                                        (Spring 2005)
- Criminological Theory. CrJ 520.                                      (Fall 2004)
- Race, Class, and Gender CrJ 547.                                     (Spring 2004)
- Criminal Justice 492: Topics in Rule Breaking:
     "The History of Gangs in Chicago"                              Spring 2002,2003)
- Contested Cities: A Joint course with Queens
  University, Belfast,  Hebrew University, Jerusalem,
   and Humboldt University, Berlin.                                    (Spring, 2003)
- LAS 100  Introduction to UIC                                         (Fall 2001-2002)
- Criminal Justice 539: Seminar in Rule Breaking:  "Globalization,
     Justice and the City" (team taught with Dennis Judd)          (Fall 2001)
- Criminal Justice 539: Seminar in Rule Breaking:
     "Crime and the Informal Economy"                                 (Fall 1999)
- Criminal Justice 539: Seminar in Rule Breaking:
     "Why is the US Homicide rate Declining?"                         (Fall 1998)
- Criminal Justice 491: Topics in Rule Breaking:
     "Gangs, Drugs, and Violence"                                     (Fall 1997)
- Criminal Justice 102: Foundations of Criminal Justice:
     "Gangs and the Media"

                                                                      (Fall 1997-1999;
                                                                      2001-2004; 2006)

- Criminal Justice 240:  Criminal Justice Organizations.

                                                  (Spring1997,1998; Summer  2003-
                                                  4; Spring- Summer  2004; Fall
                                                  2006).

<u>Chicago Cluster:</u>   Instructor and co-organizer.
<u>Learning cluster/Links - Instructor</u>

<u>Adjunct Professor, Sociology</u> University of Wisconsin-Milwaukee:
- Sociology 241.  Criminology.  (Fall 1994)

<u>Instructor:</u>   University of St. Thomas.. Graduate seminar on gangs.  (1992-)

<u>Seminar:</u>  Beloit College. Urban Gang Research. 1990; 1992

<u>Instructor, Sociology:</u>  Milwaukee Area Technical College.
- Sociology 100.  (Spring, 1988)

<u>Instructor:</u>  Marquette University Equal Opportunities Program. (Spring 1988).

### Educational Innovations

Field Research Methods: Gentrification in Lawndale
Changing Spaces of Chicago – team taught course with David Stovall looking at 4 Chicago neighborhoods
*gangrsearch.net* 2000-.  Website featuring "research not stereotypes" on gangs, Average over one million hits per month.  Used as a resource on gangs worldwide.

Contested Cities -  2002- video-conferenced course  linking students from UIC, Hebrew University, Jerusalem, Queens University, Belfast, and Humboldt University Berlin.

Chicago Cluster- initiated course clusters on Chicago in conjunction with Gerald Graff.

Blended Course- CrJ 121 developed as a blended course, combining in person lectures with on line activities. Spring 2004; Spring 2006.

Changing Spaces in Chicago – interdisciplinary summer seminar with David Stovall

## Selected Professional Associations/Activities

Member:  Society for the Study of Social Problems, American Sociological Association, American Society of Criminology, Illinois Academy of Criminology.  World Congress of Criminology.

Program Committee: World Congress of Criminology. 2005.

Council member, Crime and Deviance Section, American Sociological Association; 1998-2000.

Expert Witness:  Houston, TX.  Georgia Resource Center;  Hennepin County, MN, Illinois Capital Resource Center, Ottawa County, MI, Milwaukee  County, WI. Cook County, IL. Shelby County, TN. Cobb County, GA.

Program Committee:  2003 and 1997 American Society of Criminology meetings.

Chair: Distinguished Scholar Award:  Crime and Delinquency Division of the Society for the Study of Social Problems. 1997

Office of the Illinois Attorney General: Gang Research Summit. 1997

National Institute on Drug Abuse Special Panel: "Drug Abuse, Violence, and HIV/AIDS." April 1996.

National Institute of Justice "Conference on The Future of Gang Research," 1995.

National Institute on Drug Abuse.  Peer Reviews, April 1995.

Speakers' Task Force on Gang Violence, Wisconsin State Assembly, 1992-1993.

Family and Youth Services Bureau, Administration for Children, Youth, and Families. Peer Reviews, June 1992;

Family and Youth Services Bureau, Administration for Children, Youth, and Families. Consultant: Research Forum on Youth Gangs, October-November, 1991.

Office of Substance Abuse Prevention Peer Review, High Risk Youth Grant Program, February-March, 1991.

*Other Selected Consultant Activities*

University of Texas-El Paso:" Gang, Drugs, and Violence Project;" City of Pueblo, Colorado; City of Appleton, WI.

*Mass Media Interviews*

Selected Radio and TV Interviews: CNN, BBC, Voice of America, NBC Nightly News, NPR "All Things Considered," WGN Extension 720 with Milt Rosenberg; Al Jazeera.

Selected Newspaper Interviews: New York Times, Chicago Tribune, Philadelphia Inquirer, Newsweek; Time, Christian Science Monitor; Chicago Reporter.

# Education

University of Wisconsin-Milwaukee

Urban Studies, Ph.D. 1993.
    *Dissertation*: The Altar of Bureaucracy: The Meaning of Reform in the Social
    Services.
Sociology, M.A. 1987
    *Thesis*: Origins, Structure, Adult Status, and Other Characteristics of 1980s
    Milwaukee Gangs.
Graduate work in Criminal Justice, 1985-1987
School of Education, B.S. 1985.

June 30, 2006