IN THE 338th JUDICIAL DISTRICT COURT
OF HARRIS COUNTY, TEXAS

_____ )
                                          )
                                          )
EX PARTE JUAN CARLOS ALVAREZ,             )
                                          )
                    APPLICANT             )  CAUSE NO.
                                          )  787007-A
                                          )
                                          )
                                          )
                                          )
_____ )

_____

**MOTION TO WITHDRAW HABEAS WRIT 787007-A AND TO SET TIME
TO FILE TRUE APPLICATION FOR POST-CONVICTION WRIT OF
HABEAS CORPUS PURSUANT TO ARTICLE 11.071, AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

_____

TO THE HONORABLE DISTRICT COURT JUDGE:

Applicant, Juan Carlos Alvarez, through his attorneys, respectfully asks this

Court to withdraw the document referred to as habeas writ 787007-A and to set a

time within which to file a true application for post-conviction writ of habeas

corpus.  Writ 787007-A is not a true application for writ of habeas corpus, as it

presents no claims cognizable at post-conviction and was prepared and filed by a

lawyer who was not competent under Article 11.071 to be appointed to as Mr.

Alvarez's attorney.  Since his lawyer was not a competent attorney under Article

11.071 at the time of appointment, Mr. Alvarez was denied his guaranteed right to competent counsel and was therefore effectively un-represented and denied a full and fair opportunity to litigate his habeas claims.  In support of this motion, Mr. Alvarez provides the following:

Leslie M. Ribnik was appointed to represent Mr. Alvarez in filing an application for writ of habeas corpus pursuant to Article 11.071 on October 14, 1999[1].  After obtaining an extension of time, on September 10, 2001, Mr. Ribnik filed an "Application for Post-Conviction Writ of Habeas Corpus Pursuant to Article 11.071 of the Code of Criminal Procedure," which became known as writ 787007-A.  On October 11, 2006, Mr. Ribnik notified the Court that he had been diagnosed with Parkinson's disease, a neurological disease that causes mental deterioration and dementia, and that his neurologist placed the onset of the disease many years beforehand.  Mr. Ribnik withdrew from his representation of Mr. Alvarez and Robert McGlasson was substituted as counsel for applicant.

An individual convicted of capital murder is entitled to "one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the [11.071] statute."  *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002).  Texas law guarantees applicants the right to be represented at

---

[1] Susan Crump, Mr. Ribnik's wife, was also appointed to be Mr. Alvarez's habeas counsel, and although her name appears on the initial application for writ of habeas counsel and the appointment, she does not appear to have ever interacted with the case.

the state post-conviction stage by competent counsel.  ("An applicant shall be represented by competent counsel unless the applicant has elected to proceed pro se […]" TEX. CODE CRIM. PROC. ANN. art. 11.071(2)(a) (Vernon Supp. 1997)). The Texas legislature explained in passing article 11.071 that "we are going to give you one very well-represented run at a habeas corpus proceeding",[2] but the Court of Criminal Appeals has clarified that "competent," for purposes of appointment of counsel in the context of art. 11.071, "concerns habeas counsel's qualifications, experience, and abilities at the time of his appointment." *Ex parte Graves*, 70 S.W.3d 103, 114 (Tex. Crim. App. 2002); *see also Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000).

Applicant has been denied his right to counsel under art. 11.071 and thereby denied his one full and fair opportunity to present his constitutional and jurisdictional claims.  The counsel appointed to him was so affected by a neurological disease that his qualifications, experience and abilities fell below the minimum requirements of competent counsel and effectively denied Mr. Alvarez his right to counsel.  In addition, counsel filed a document that cannot properly be characterized as a habeas corpus petition, as it presents no claim upon which any Court could grant relief in the post-conviction context.

---

[2] *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002), *quoting S.B. 440, Acts 1005, 74th Leg., codified at Tex.Code Crim. Proc. Art. 11.071 (Presentation by Representative Pete Gallego at second reading of S.B. 440 on the floor of the House of Representatives, May 18, 1995).*

ARGUMENT

A.    MR. ALVAREZ WAS DENIED HIS RIGHT TO COMPETENT
      COUNSEL BECAUSE MR. RIBNIK'S ABILITIES AT THE TIME OF
      APPOINTMENT WERE IMPAIRED BY PARKINSON'S DISEASE

Mr. Ribnik was diagnosed with Parkinson's disease on August 4, 2006.

Exhibit A, Affidavit of Leslie M. Ribnik dated October 8, 2006 at ¶4. Mr. Ribnik

withdrew from his representation of Mr. Alvarez on October 11, 2006 because the

effects of Parkinson's disease forced him to virtually end his legal practice. *Id*. at

¶6. The Parkinson's disease had already progressed to an intermediate stage,

indicating the onset of the disease had occurred years before. *Id*. at ¶4.

Since the progression of Mr. Ribnik's disease was not documented by a

neurologist throughout the years, it is necessary to rely on the opinion of a

neurologist about when and to what extent Parkinson's disease affected Mr.

Ribnik's mental competency as capital counsel. Dr. Michael Adelberg is a

neurologist who specializes in assessing how neurological injuries and conditions

impact mental competence relative to specific types of jobs and job requirements.

Exhibit B, Affidavit of Michael Adelberg, M.D. ¶¶2-4. Dr. Adelberg's assessment

determined that, based on the diagnosis in August 2006 of intermediate stage

Parkinson's disease, Mr. Ribnik was likely impaired by the effects of Parkinson's

disease dating back to the time of his appointment in October 1999, to such an

extent that he was not have been competent as habeas counsel. ("It is my

professional opinion that, as of the appointment date of October 14, 1999, it is probable that Mr. Ribnik was mentally impaired by the affects of Parkinson's disease to the degree that it made him unfit to serve in the capacity as habeas counsel for a capital appeal.")  Exhibit B, Affidavit of Michael Adelberg, M.D. ¶11.

Mr. Ribnik's neurological disease is accompanied by many symptoms that prevented him from providing competent post-conviction representation.  Dr. Adelberg explains: "It is now recognized that some degree of dementia is common in Parkinson's disease and that some degree of mental incapacity will likely be found in virtually any Parkinson's patient, including early and mild cases.  Other common features of Parkinson's disease that likely also have contributed to the impairment of Mr. Ribnik's mental competence as habeas counsel include one or more of the following: cognitive deterioration; apathy; drowsiness; depression; executive function problems, which impair judgment and attention; memory loss; interpersonal social problems; and bradyphrenia, a condition in which thoughts are slowed."  Exhibit B, Affidavit of Michael Adelberg, M.D. ¶12.  Mr. Ribnik confirmed that he has been suffering from, among other symptoms: bradykinesia (slowness of movement), bradyphrenia (slowness in thought processing), insomnia, loss of initiative, cognitive impairments, hallucinosis (a state of experiencing

hallucinations), and memory loss and disturbance.  Exhibit A, Affidavit of Leslie M. Ribnik dated October 8, 2006 at ¶5.

Capital post-conviction litigation is complex and demanding work that requires counsel to have the ability to manage large volumes of information, develop salient facts and navigate through a highly complex and complicated legal framework.[3]  Because of the high level of cognitive functioning required by the work, the mental deficiencies associated with Parkinson's disease would undoubtedly cause significant impairment in the abilities to function as competent counsel in a capital habeas corpus case.  As Dr. Adelberg explains, this is true even during the initial stages of the disease: "Given the high degree of cognitive functioning required by litigators in complex capital cases as discussed in ¶9, even the aspects of early dementia, which are relatively subtle, and other early consequences of Parkinson's would significantly impair a person's ability to function competently as counsel."  Exhibit B, Affidavit of Michael Adelberg, M.D. ¶¶ 9 and 12.  Mr. Ribnik acknowledged to the Court that he was "suffering from memory loss, both short term and long term, a noticeable loss of concentration, and a lessening of [his] ability to address and comprehend more complex facts and

_____

[3] As noted by the American Bar Association, "providing high quality legal representation in collateral review proceedings in capital cases requires enormous amounts of time, energy and knowledge. The field is increasingly complex and ever changing." ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, *revised* Feb. 2003, at 127 [hereinafter "ABA Guidelines"] (*available at*: http://www.abanet.org/legalservices/downloads/sclaid/indigentdefense/deathpenaltyguidelines2003.pdf).

propositions."  Exhibit A, Affidavit of Leslie Mr. Ribnik dated October 8, 2006 at ¶7.  He indicated that he had been experiencing all of these problems for some time.  *Id*.  The likelihood that Mr. Ribnik experienced cognitive impairment from the early stages of Parkinson's disease, and was therefore not competent to be appointed as counsel pursuant to art. 11.071, is supported by an examination of his performance as counsel and the writ he submitted for Mr. Alvarez.

B.    MR. ALVAREZ WAS DENIED REPRESENTATION BY COMPETENT COUNSEL WHEN MR. RIBNIK FAILED TO FULFILL EVEN THE MOST MINIMAL REQUIREMENTS OF CAPITAL HABEAS COUNSEL

The conclusion that Mr. Ribik was not competent counsel for Mr. Alvarez is supported by an examination of his performance as Mr. Alvarez's counsel.  Mr. Ribnik's impaired abilities prevented him from fulfilling even the most basic and fundamental responsibilities of capital habeas counsel.  Texas law regulating capital habeas counsel directs that "[o]n appointment, counsel shall investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."  TEX. CODE CRIM. PROC. ANN. art. 11.071(3)(a) (Vernon Supp. 1997).  Filing a habeas writ is a complicated and involved process that is based on external investigation and development of facts.  The ABA Guidelines and newly approved Guidelines and Standards for Texas Capital Counsel [hereinafter "Texas

Guidelines"][4] for the appointment and performance of capital attorneys set forth the abilities and duties required of habeas counsel.  The Texas Guidelines begin the description of habeas counsel's general duties with the warning that:

> Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal.  Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client.  Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.

Exhibit H, Texas Guidelines 12.2(B)(1)(a).

The Texas Guidelines set forth the specific responsibilities that detail what habeas counsel must do to prepare to file the state habeas writ.  These include, among others, the mandates that counsel:

- "conduct a searching inquiry to assess whether any constitutional violations may have taken place, including – but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence, coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct" (12.2(B)(1)(c))

---

[4] The Texas Bar Association's Guidelines and Standards for Capital Case Counsel were adopted by the State Bar Board of Directors on April 21, 2006. The excerpts of the Texas Guidelines which cover the responsibilities of capital habeas counsel are attached as Exhibit H.  The Texas Guidelines largely duplicate the ABA Guidelines, originally adopted in 1989 (and revised since then), that set forth that basic responsibilities and practices employed by competent habeas counsel for years.  The ABA Guidelines indicate that they are not aspirational, but instead "embody the current consensus about what is required to provide effective defense representation in capital cases." ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, *revised* Feb. 2003, at 7.

- "master the set of procedural rules and statutes that may restrict capital client's opportunity for federal habeas corpus review" (12.2(B)(1)(f))
- "establish a relationship of trust with the client" and "develop a relationship of trust with the client's family" (12.2(B)(2)(b))
- "keep the capital client informed of case developments" (12.2(B)(2)(c))
- "conduct a thorough and independent investigation of both the conviction and sentence" (12.2(B)(3)(a))
- "obtain and read the entire record of the trial"; "independently verify that the official record of all prior proceedings is complete, and to supplement if necessary"; "inspect the evidence and obtain the files of trial and appellate counsel"; and "interview prior counsel and members of the defense team" (12.2(B)(3)(b)
- "make an independent examination of all of the available evidence – both that which the  jury heard and which it did not" (12.2(B)(3)(d))
- "conduct a guilt-innocence phase investigation regardless of any admission or statement by the capital client about the facts of the crime, or overwhelming evidence of guilt" (12.2(B)(4)(a))
- "interview most, if not all, of the critical witnesses for the prosecution and investigate their background" (12.2(B)(4)(e))
- "assess all of the non-testimonial evidence and consider whether to perform independent forensic testing" (12.2(B)(4)(f))
- "interview potential witnesses who might challenge the prosecution's version of events" (12.2(B)(4)(g))
- "maintain copies of media reports about the case to determine the effects of pretrial publicity" (12.2(B)(4)(j))
- "conduct a mitigation investigation" (12.2(B)(5)(a))
- "not rely on his or her own observations of the capital client's mental status as sufficient to detect the array of conditions that could be of critical importance" (12.2(B)(5)(b))
- "retain an independent mitigation specialist […] to compile a comprehensive and well-documented psychosocial history of the client based on exhaustive investigation, interviews, and collection of documents" (12.2(B)(5)(c))
- "locate and interview the capital client's family members […] and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others" (12.2(B)(5)(f))

- "investigate prior convictions and unadjudicated offenses" (12.2(B)(5)(h))
- "demand on behalf of the capital clients all resources necessary to provide high quality legal representation, to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts" (12.2(B)(6)(a))
- "consider every legal claim potentially available" (12.2(B)(7)(b))
- "preserve issues calling for a change in existing precedent" (12.2(B)(7)(c))
- "attach all available proof to the application" and "plead all factual allegations with the greatest possible specificity" (12.2(B)(7)(d))

Exhibit H, Texas Guidelines.

Mr. Ribnik failed to fulfill almost all of these basic duties. In the 23 months spent preparing the original writ, Mr. Ribnik did not conduct any fact investigation in the case, let alone the external investigation and development of new facts that are required to identify cognizable post-conviction issues. In explaining what he did to prepare the writ he filed for Mr. Alvarez, Mr. Ribnik admits:

"Prior to filing the writ on September 10, 2001, I did not have the assistance of an investigator or mitigation specialist though I did not request funding for such. However, I had discussed the possibility of investigating grounds for mitigation with a mitigation specialist. Except for review of trial testimony and evidence, and the substance of my conversation with the specialist, but without further actual investigation, I did not pursue a mitigation investigation." ¶12

"I did not attempt to locate or interview any of Mr. Alvarez's extended family or conduct any other investigation of his life in Mexico." ¶13

"I did not interview any of the jurors from Mr. Alvarez's case." ¶ 14

"Prior to filing the writ on September 10, 2001, I did not hire any expert witnesses nor did I consult with any experts or have anyone evaluate Mr. Alvarez."  ¶15

Exhibit C, Affidavit of Leslie M. Ribnik, dated May 14, 2007.

A review of Mr. Ribnik's affidavit indicates that he duplicated the work of Mr. Alvarez's trial lawyers and direct appeal attorney by preparing to the writ based entirely on the record.  He reviewed the transcripts from trial, looked through the state's file, and requested the record from one (of three) of Mr. Alvarez's trial counsel.  Exhibit C, Affidavit of Leslie M. Ribnik, dated May 14, 2007 at ¶¶ 5, 6, and 10.  He did not review or develop any information other than that which the prior attorneys had used.  Even his record-based preparations were plagued by delay and missteps, which may have been caused in part by the cognitive impairments characteristic of early Parkinson's.  For instance, although Mr. Ribnik obtained from Mr. Alvarez a consent form to release records on October 26, 1999, he failed to use it to request trial counsel's file until February 16, 2001, a full 15 months later.  Exhibit C, Affidavit of Leslie M. Ribnik, dated May 14, 2007 at ¶¶ 4 and 10.  He also failed to request the files of the other attorneys[5] who had represented Mr. Alvarez as second-chair and during pre-trial litigation.

---

[5] The trial attorney, Frumencio Reyes, whose records he did obtain, only joined the case on August 6, 1999, a mere three weeks before voir dire started, and over a year after Mr. Alvarez was arrested.  Motion for Substitution of Counsel, filed under Case #786172 on August 6, 1999; Reporter's Record in cause 787007, Vol. V at 1.

Mr. Ribnik should have retained the services of an investigator and mitigation specialist, or failing to do that, have conducted the investigation himself.  Mr. Alvarez had extensive family in the Houston area, all of whom were available and eager to assist in any manner possible.  Mr. Ribnik never interviewed any family members about what sort of mitigating information existed and that Mr. Alvarez's trial counsel failed to explore.

As Araceli Alvarez, one of Mr. Alvarez's sisters, attested to in her affidavit:

"Mr. Ribnik never contacted me before he filed that document in September 2001.  I know that Mr. Ribnik also never contacted any other member of our family prior to September 2001." ¶5

"Had Mr. Ribnik contacted me, I gladly would have met with him and provided any information he requested, including information about Juan's childhood and life.  I know that everyone else in my family would also have done anything to help Mr. Ribnik with Juan's case." ¶6

"Mr. Ribnik stated that he could not do anything for Juan because of the evidence presented against him at trial.  He stated that he saw the case as a lost cause."  ¶8

"Mr. Ribnik said that he had not done, nor could he do any new investigation into Juan's case because he did not have funding to do so.  He explained to us that he was appointed by the state to defend Juan, but that he was not getting paid enough to be able to truly defend him." ¶9

Exhibit E, Affidavit of Naomi Terr, translating Exhibit D, Affidavit of Araceli Alvarez.

Another sister, Patricia Norma Marroquin, also attested to Mr. Ribnik's failure to establish a relationship with the family, interview them for mitigation purposes, or keep them updated about the case.  She stated that:

> "Mr. Ribnik never contacted me or any member of my family at any time before filing the document in September 2001." ¶10

> "I am one of nine siblings.  I am very close to all of my family, and keep in regular contact with them.  Most of us see one another or speak on a daily basis. I know that Mr. Ribnik never contacted any of my siblings or any other member of Juan's family prior to September 2001." ¶6

> "I would have been happy to meet with Mr. Ribnik to share with him any information I had about Juan and his life.  I know that everyone else in my family feels the same.  We all would have done anything to help Juan's lawyers with his case." ¶7

> "[Long after the A writ was filed] I called Mr. Ribnik several [] times. Each time I called I had the same experience.  I would leave a message and he would return my call several days later.  When he finally called, I would try to ask about Juan's case, but he would cut it short and end the call without explaining what was going on with the case." ¶10

> "Mr. Ribnik seemed very negative and said there was not much he could do to help with Juan's case.  Mr. Ribnik also spoke very slowly, in short sentences and without providing any detail.  He seemed to struggle to find words to say and he did not say very much." ¶15 (Describing Mr. Ribnik's actions at a meeting some time in 2003 after the writ was filed)

> Exhibit G, Affidavit of Naomi Terr, translating Exhibit F, Affidavit of Patricia Norma Marroquin.

Mr. Ribnik never contacted a wide cross section of friends, acquaintances, and teachers to determine what trial counsel could have and should have gleaned from them.  He never looked outside the record to determine whether there were any issues of misconduct related to the jury's, prosecution's, defense attorneys', or trial court judge's behavior leading up to and during trial.  Mr. Ribnik's failures to conduct any investigation of non-record claims falls far below the accepted standards of practice of state habeas counsel recognized and followed by competent and qualified counsel who provide quality representation to death row prisoners in habeas proceedings.

Mr. Ribnik's failures to hire an investigator and mitigation specialist[6] or to conduct the necessary investigation himself; to obtain funds to consult with forensics experts (despite the confusing presentation of forensics evidence used against Mr. Alvarez at trial); to have experts evaluate Mr. Alvarez's mental health status (since no complete psychological evaluation had ever been completed); to interview jurors; and to interview Mr. Alvarez's family, friends, teachers and acquaintances were devastating to Mr. Alvarez's habeas writ.  Without conducting

---

[6] Mr. Ribnik's was entirely responsible for these failures, as Texas law provides clearly for funds to be available for investigation, mitigation, and expert witness requirements in capital habeas cases. ("Not later than the 30th day before the date the application for a writ of habeas corpus is filed with the convicting court, counsel may file with the convicting court an ex parte, verified, and confidential request for prepayment of expenses, including expert fees, to investigate and present potential habeas corpus claims.") TEX. CODE CRIM. PROC. ANN. art. 11.071(3)(b) (Vernon Supp. 1997).

these basic investigations, Mr. Ribnik could not identify or present any cognizable post-conviction claims.[7]

Since the development of new facts through a thorough investigation outside the record form the basis of cognizable claims in a habeas writ, this failure effectively deprived Mr. Alvarez of competent counsel altogether.  Mr. Ribnik's work, muddled by the memory problems, slow thinking, and cognitive impairments of Parkinson's disease, consisted solely of reviewing the record and presenting what were essentially two direct appeal claims.  His failure to fulfill the fundamental responsibilities and duties of capital habeas counsel denied Mr. Alvarez a full and fair opportunity to present any constitutional or jurisdiction issues.

C.    MR. RIBNIK'S FAILURE TO ACT AS COMPETENT COUNSEL TO
      MR. ALVAREZ IS CLEAR FROM THE FACT THAT THE A WRIT HE
      FILED CONTAINS NO COGNIZABLE CLAIMS AND THEREFORE IS
      NOT A TRUE WRIT

Mr. Ribnik's failure to conduct the external investigation required to develop cognizable post-conviction claims and cognitive impairments likely caused by early Parkinson's disease resulted in his filing a writ that contained no cognizable

---

[7] Concerns have been raised elsewhere in other Texas capital habeas proceedings about Mr. Ribnik's failure to adequately investigate and prepare an application for writ of habeas corpus with cognizable claims.  *See, e.g.* Chuck Lindell, *Lawyer makes 1 case for 2 killers*, Austin American-Statesman, Feb. 26, 2006, at A1 (discussing the boiler-plate and generic record-based issues that dominate some of Mr. Ribnik's other capital writs); Chuck Lidell, *Sloppy lawyers failing clients on death row, Austin American-Statesman*, Oct. 26, 2006 (mentioning that the Texas Bar Committee on Legal Services to the Poor reviewed Mr. Ribnik's work on capital habeas cases and decided to take the extreme step of filing a grievance about him to the Bar).

claims, and therefore was not a true writ.  It is well-established that record-based claims are cognizable during the direct appeal and not cognizable in habeas proceedings (as stand-alone claims).  *See, e.g., Ex Parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998); Exhibit H, Texas Guidelines 12.2(B)(1)(a).  Mr. Ribnik's writ presented three claims, two of which were based on the same underlying record-based issue: one claim arguing error based on the lack of a burden of persuasion in the third special question of TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(e)(1) (Vernon Supp. 1997)[8] and two claims based on the violation of the Vienna Convention on Consular Relations [hereinafter "VCCR"].

Mr. Ribnik presented no claims that are properly cognizable in a post-conviction writ.  The first issue is a straight legal argument about jury instructions without even a single factual allegation specific to Mr. Alvarez's case.  Application For Post-Conviction Writ Of Habeas Corpus Pursuant To Article 11.071 Of The Code Of Criminal Procedure, Case No. 787007 at 2-24 [hereinafter "Application for Writ"].  The second issue alleges that the State violated the VCCR, a claim already presented on direct appeal, without providing any legal argument and virtually no facts that are specific to Mr. Alvarez.  Mr. Ribnik fails to even style the first two issues as anything besides record-based direct appeal claims.  For the third issue, Mr. Ribnik revisits the VCCR claim while using some of the language

___
[8] This issue is the identical issue present in some of Mr. Ribnik's other cases and which was discussed in the article raising concerns about Mr. Ribnik's representation of capital applicants.  *See* Lindell, *Laywer makes 1 case for 2 killers*, *supra* at n.7.

of "effective assistance of counsel" in the caption, but in the body it is found to be nothing more than a restatement of the second record-based VCCR claim. This claim fails to state the standard for ineffective assistance of counsel[9] or any legal basis whatsoever, fails to present any showing of prejudice, and fails to make any specific prayers for relief. Application for writ at 24-25. The presentation of each of these claims recalls the language of *Ex Parte Kerr*, which found that the filed "document was not, in fact, a true application for a writ of habeas corpus under article 11.071 because it did not attack applicant's capital murder conviction or death sentence." 64 S.W.3d 414, 419 (Tex. Crim. App. 2002). Even on the third claim in the application, while purporting to allege an ineffectiveness claim (which was actually a record-based direct appeal claim), Mr. Ribnik failed to attack the conviction or death sentence in the body of the claim.

Mr. Ribnik presents no cognizable claims upon which relief could be granted in the document known as the A Writ. The claims he presents are all procedurally defaulted or subject to the rules of *res judicata* since they either were presented on direct appeal [the VCCR claims] or could have been presented on direct appeal and were not [the jury instruction issue].

---

[9] That Mr. Ribnik failed to even plead the most basic case law of a habeas writ on a proper Sixth Amendment claim of ineffective counsel - the two-pronged test requiring a showing of deficient performance and prejudice to establish that counsel failed to provide reasonably effective assistance and that there is a reasonable probability that, but for counsel's errors, the result would have been different, *Strickland v. Washington*, 466 U.S. 668 (1984) - speaks volumes about his impaired abilities and competence as counsel.

Essentially, Mr. Alvarez had two direct appeals and has had no competent attorney to represent him in presenting post-conviction claims. An attorney with cognitive impairments traceable to a diagnosed neurological disease cannot be the one competent attorney envisioned by the Texas legislature or the Court of Criminal Appeals to assist a condemned man in his "one very well-represented run at a habeas corpus proceeding." Mr. Alvarez has had no true application for writ of habeas corpus filed on his behalf.

The Court of Criminal Appeals described art. 11.071, saying "this entire statute is built upon the premise that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002). Such an opportunity is all that applicant requests.

D.     SINCE THE A WRIT IS STILL PENDING BEFORE THE COURT, THE PROCEDURAL POSTURE OF THIS CASE PERMITS THE WITHDRAWAL OF THE WRIT

Applicant's claims differ from most cases that complain of deficient habeas counsel in several important ways. First, as discussed extensively above, Mr. Ribnik's neurological degenerative disease incapacitated him so that he did not have the requisite abilities to be competent counsel at the time of appointment. Second, the document Mr. Ribnik filed as a writ has not yet been denied (or

affirmed) by the Court of Criminal Appeals.  Applicant does not ask the Court to reopen an already completed habeas case.  Because the A-writ is still pending, it is possible to remedy the denial of Mr. Alvarez's right to counsel through the Court's discretion of rejecting or withdrawing a writ at this stage.  In an analogous situation where habeas counsel fails to file a timely writ, the Court of Criminal Appeals can set a new filing date for the application or appoint new counsel with a new filing date. TEX. CODE CRIM. PROC. ANN. art. 11.071(4A)(b)(2) and (3) (Vernon Supp. 1997).  In this case, while new counsel is not necessary owing to the undersigned's willingness to proceed absent an appointment from the Court, what is required is the setting of a reasonable time frame in which a properly filed and presented habeas corpus petition may be developed, investigated, and presented to the Court.

## CONCLUSION

Texas created a statutory right to representation in capital post-conviction proceedings by guaranteeing that applicants "shall be represented by competent counsel".  TEX. CODE CRIM. PROC. ANN. art. 11.071(a) (Vernon Supp. 1997); *Ex parte Graves*, 70 S.W.3d 103, 114; (Tex. Crim. App. 2002).  The Court of Criminal Appeals has clarified that this means that counsel "shall be 'competent' at the time he is appointed" and that competent refers to "qualifications, experience, and abilities." *Id.* Cognitively impaired by Parkinson's disease, Mr. Ribnik did

not have the abilities required at the time of his appointment to qualify as competent counsel.  Since Mr. Alvarez was represented by counsel who was not competent at the time of appointment, he was denied his right to competent counsel.  To remedy the violation of Mr. Alvarez's denial of competent counsel, Mr. Ribnik's document should be withdrawn and Mr. Alvarez should be entitled, through representation of competent counsel, to file a true writ of habeas corpus.

Applicant respectfully requests that this Court either set a hearing under art. 11.071(9)(a) to resolve the factual issue of Mr. Ribnik's failure to be the "competent counsel" required by art. 11.071(1)(a); withdraw the current 787007-A Writ and set a deadline of 180 days for applicant to file a proper and original application for habeas corpus, pursuant to article 11.071; or adopt the attached findings of fact and conclusions of law recommending that the CCA withdraw the writ and set a deadline for applicant to file a proper application.

Respectfully submitted,

_____
Robert L. McGlasson
Texas Bar No. 13634050
Attorney at Law
McGlasson & Associates, PC
1024 Clairemont Avenue
Decatur, Georgia 30030
(404) 314-7664 (phone)
(404) 373-9338 (fax)
rlmcglasson@comcast.net (e-mail)

# APPENDIX

Exhibit A:   Affidavit of Leslie M. Ribnik, dated October 11, 2006

Exhibit B:   Affidavit of Michael G. Adelberg, M.D.

Exhibit C:   Affidavit of Leslie M. Ribnik, dated May 14, 2007

Exhibit D:   Affidavit of Areceli Alvarez

Exhibit E:   Affidavit of Naomi Terr, translating Affidavit of Areceli Alvarez

Exhibit F:   Affidavit of Patricia Norma Marroquin

Exhibit G:   Affidavit of Naomi Terr, translating Affidavit of Patricia Norma Marroquin

Exhibit H:   Texas Bar Association's Guidelines and Standards for Capital Case Counsel, Excerpts related to Habeas Counsel

**EXHIBIT A**

State of Texas

County of Harris

### AFFIDAVIT OF LESLIE M. RIBNIK

1.      My name is Leslie M. Ribnik, and I am over the age of eighteen

and competent to attest to the matters set forth herein.

2.      I am an attorney licensed to practice law in the State of Texas.

I was admitted to the State Bar of Texas in 1989.

3.      I was appointed to represent the applicant in the capital habeas

corpus case of *Ex Parte Juan Carlos Alvarez*, Case No. ~~77,007~~ 787007. This case is

currently pending in the 338ᵗʰ District Court of Harris County, Texas.

4.      On August 4, 2006, I was diagnosed with Parkinson's Disease

at an intermediate stage by my neurologist here in Houston, Texas.  My

neurologist informed me that given the intermediate stage of the illness, the

onset was estimated to have been at least five to six years prior to that time.

Thus I would have been afflicted with this disease at least going back to the

year 2000.

5.      I have a number of symptoms of intermediate stage Parkinson's

Disease as confirmed by my neurologist.  These include, bradykinesia

(slowness of movement), bradyphrenia (slowness in thought processing),

festination (short, shuffling steps), cognitive impairments, hallucinosis (a

1

state of experiencing hallucinations), hypomimia (decreased facial

expression due to rigidity of facial muscles), memory loss and disturbance,

micrographia (small, cramped handwriting), ataxia (loss of balance),

postural tremors, resting tremors, muffled speech, insomnia, loss of

initiative, and fatigue.

     6.     On the date that I was diagnosed, my neurologist advised that I

should not continue to practice law as a litigator.  He told me that I should

not be dealing with complex problems, given the seriousness of the work he

knows I do.  In part due to his diagnosis and career recommendation, I

intend to retire from the practice of law as soon as practicable without

harming the interests of my current clients.

     7.     I have been experiencing each of the symptoms listed above for

some time now.  In addition to each of the physical symptoms listed above, I

have also been suffering from memory loss, both short term and long term, a

noticeable loss of concentration, and a lessening of my ability to address and

comprehend more complex facts and propositions.  For example, I have been

noticing that I will draft an argument based on legal research connecting

facts with legal propositions.  I will return to the work within 24 hours of

completing it initially, and not be able to comprehend the connection

between the facts and the propositions as written.

2

8.      I was sole counsel in a civil case in the 269th District Court that went to trial on July 14, 2006. During the trial the court reporter and judge frequently asked me to repeat what I was saying due to my affected speech.

9.      During that same trial, I had an angina attack, and the trial was abruptly halted so I could receive medical treatment. I was removed from the courtroom on a gurney and taken to the hospital in an ambulance.

10.     In February 2006 I was out to dinner with my wife and friends, and my wife became so frustrated with the slowness and clumsiness with which I was cutting my food that, much to my embarrassment, she reached over and started cutting my food for me. Other family members have indicated to me that they noticed some of the symptoms as much as five years before I was actually diagnosed.

11.     Even before being diagnosed with Parkinson's Disease, I had been contemplating concluding my criminal and civil litigation law practice, in part due to the various symptoms described above and their impact upon my ability to represent my clients.

12.     When I was diagnosed in August, I began a treatment regimen that included medication. I am currently taking Levodopa, Comtan, and Trazadone to treat the Parkinson's Disease. The Levodopa and Comtan work in combination to replace dopamine in my brain which is depleted due

to the disease. The Trazadone is a psychoactive compound with sedative and anti-depressant properties which has been prescribed to relieve insomnia.

13.     While there has been beneficial therapeutic effect from the medication, it is not consistent day to day or even hour to hour, and there is a noticeable wearing-off phenomena, i.e., waning of the effects of a dose of Levodopa prior to the time of the next dose ,resulting in decreased performance. On average I will have perhaps four productive hours of work in a single day. In addition, I have been experiencing auditory hallucinations secondary to the Levodopa treatment. I will hear the sound of murmuring voices or background noise and yet there is nothing present.

14.     In consideration of the above, it is my best professional opinion that it is the better practice and beneficial to my client that other counsel replace me in this case.

Further affiant sayeth not.

_____
Leslie M. Ribnik

Sworn to and subscribed before me
this 8 day of October , 2006.

_____
Notary Public

My commission expires:
12/16/09



DANALYNN RECER
Notary Public, State of Texas
My Commission Expires
December 16, 2009

4

**EXHIBIT B**

STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

**AFFIDAVIT OF MICHAEL G. ADELBERG, M.D.**

1.      My name is Michael G. Adelberg, M.D. I am over the age of

eighteen and competent to attest to the matters set forth herein.

2.      I completed an accredited residency program in neurology at the

University of California, Davis in 1978-1981.  I became board certified in

neurology in 1983 by the American Board of Psychiatry and Neurology, Inc.

I have been in the private practice of neurology, with a small amount of

general medical practice, since 1981. I have been licensed to practice

medicine and surgery by the State of California (California license

#G36797; DEA license #AA823378) continuously since 1977. I am a

member in good standing of the American Academy of Neurology. I am

certified as an expert medical witness ("Qualified Medical Examiner") by

the Division of Workers' Compensation, Division of Industrial Accidents,

State of California.

3.      I have served for about 3 years as the Secretary (third ranking

medical administrative officer) of "CPC Sierra Vista Hospital," a psychiatric

hospital in Sacramento. Since 1986, I have been the director of a medical

group, Adelberg Associates Medical Group.  As such, I have been

responsible for hundreds of thousands of medical-legal reports, prepared by part-time physicians on my staff (5-13 doctors at various times).  I have testified in criminal trials in California on roughly 15 occasions and qualified in all cases as an expert. The qualification has included, at times, psychiatry, general medicine, and neurology. I have never been penalized or disciplined by any state regulatory board with supervisory powers over doctors.

4.      In my practice I prepare medical-legal reports, usually for workers' compensation purposes. I am obliged to provide an opinion, in virtually all cases (numbering tens of thousands), as to whether an individual is or is not precluded, for medical reasons, from performing certain specified work duties. Since providing opinions on that topic is obligatory in most cases, my QME licensure means I am pre-qualified as an expert, for purposes of providing opinions on such issues in the workers' compensation courts, by the State of California. In this capacity, I have examined attorneys. I have acquired expertise on the requirements for various work duties by taking detailed work histories from some thousands of patients, and I have read tens of thousands of other experts' opinions, including those vocational rehabilitation specialists are experts in employment requirements.

5.     Over a third of the cases I evaluate have been jointly referred by both sides of the dispute, making me the arbitrator for all disputed medical issues. Only a handful of other California physicians could (until very recent law changes) make a comparable claim.

6.     All patients (about a thousand) I evaluate who have sustained neurologic injuries I evaluate for mental competency, relative to job requirements. To perform this I must and do possess the requisite expertise in job requirements, both generally and as they exist in any particular case. I am thoroughly familiar with the job requirements of litigation attorneys, having worked closely with them on at least 70 cases, of which at least 20 were criminal cases, all but one of which were major crimes, and almost all of which were capital cases. Having been retained as the attorney's selected expert in thousands of cases has obliged me to learn many details of the ordinary work practices and work requirements of at least 50 attorneys, as they carry out their legal duties in administrative law cases.

7.     Additionally, patients are sent to me from time to time for mental competency evaluations. Alleged incompetency may be due to any of a large number of general medical causes and/or more specific neurologic, psychologic, or psychiatric causes. In some of these cases, the disputes have been over competency at a past time, requiring retroactive analysis.

8.     I have been asked the attorneys of Juan Carlos Alvarez to provide an opinion as to the competency of Mr. Leslie Ribnik to serve as a post-conviction habeas counsel for a capital appeal, at the time of his appointment of October 14, 1999.  For purposes of providing my opinion, I am relying on (a) my clinical knowledge; (b) Mr Ribnik's birthdate as 06/24/53; (c) the information that Mr. Ribnik was diagnosed with Parkinson's disease at an intermediate stage on August 4, 2006; (d) that Mr. Ribnik is assumed to have been, earlier in his legal career, somewhere within the very broad range of average, between the 10th and 90th percentiles, in terms of general legal intelligence, as might have been scored by a panel of his peers knowing his work; and (e) the contents of abstracts of approximately 900 peer-reviewed medical journal reports, addressed specifically to the issue of dementia in Parkinson's patients.

9.     In addition to the reliance on the scientific peer-reviewed, medical literature about the symptoms and progression of Parkinson's disease, I considered the capability required by capital counsel and how much impairment of those capabilities would render an attorney unfit for the duty in question.  As a general matter, the mental abilities required by a person engaged in any complex litigation, including capital litigation, would include, among other things, these competencies: a high degree of abstract

reasoning; effective sustained attention to detail; the ability to review, absorb, organize, and effectively manage a large amount of information and documents; the ability to navigate a complex legal framework; the ability to make reasoned and accurate judgments quickly; and the stamina to focus on a large amount of work over a long periods of time.  Because these job requirements are relatively high, a relatively low level of incapacity from cognitive impairments from Parkinson's disease can have the effect of rendering an attorney unfit.

10.     With respect to assessing the competency of Mr. Ribnik to serve as post-conviction habeas counsel for a capital appeal, at the time of his appointment in October 1999, my comments are restricted solely to the *mental competence*. I am omitting any comments related to physical impairments or conditions. My comments from here on out bear on that specific topic: as of October 1999, was or was not Mr. Ribnik so mentally impaired, by virtue of his diagnosed Parkinson's disease, as to render him unfit to serve in the capacity as habeas counsel for a capital appeal?

11.     It is my professional opinion that, as of the appointment date of October 14, 1999, it is probable that Mr. Ribnik was mentally impaired by the affects of Parkinson's disease to the degree that it made him unfit to serve in the capacity as habeas counsel for a capital appeal.

12.     Parkinson's disease is a neurodegenerative disorder causing not only motor dysfunction but also cognitive, psychiatric, autonomic and sensory disturbances.  It is now recognized that some degree of dementia is common in Parkinson's disease and that some degree of mental incapacity will likely be found in virtually any Parkinson's patient, including early and mild cases. Other common features of Parkinson's disease that likely also have contributed to the impairment of Mr. Ribnik's mental competence as habeas counsel include one or more of the following: cognitive deterioration; apathy; drowsiness; depression; executive function problems, which impair judgment and attention; memory loss; interpersonal social problems; and bradyphrenia, a condition in which thoughts are slowed. Given the high degree of cognitive functioning required by litigators in complex capital cases as discussed in ¶9, even the aspects of early dementia, which are relatively subtle, and other early consequences of Parkinson's would significantly impair a person's ability to function competently as counsel.   By virtue of the dementia and other deficits present in comparable cases at the early stages of Parkinson's disease, Mr. Ribnik was deprived of certain mental capacities necessary for litigation competence.   As of the appointment date of October 14, 1999, the loss of capabilities more

probably than not reduced his capacity to a degree rendering him unable to competently perform the duties required of capital counsel.

13.    I can provide a more in-depth explanation of the basis of my opinion, including examples of the scientific literature I relied upon and a detailed explanation of their relevance, upon request.

Further affiant sayeth not.

Michael G. Adelberg

Sworn to and subscribed before me
this *14* day of *MAY*, 2007.



Notary Public

My commission expires: *Dec. 15, 2009*

STATE OF CALIFORNIA
COUNTY OF SACRAMENTO
Subscribed and sworn to (or affirmed)
before me on this *14* day of *MAY*, 20*07*
by *Michael G. Adelberg*.
personally known to me or proved to me
on the basis of satisfactory evidence to
be the person(s) who appeared before me.

Signature *Brandon F. Taylor*

7

**EXHIBIT C**

STATE OF TEXAS

COUNTY OF HARRIS

## AFFIDAVIT OF LESLIE M. RIBNIK

1.    My name is Leslie M. Ribnik, and I am over the age of eighteen and competent to attest

to the matters set forth herein.

2.    I am an attorney licensed to practice law in the State of Texas.  I was admitted to the

State Bar of Texas in 1989.

3.    I was appointed to represent Mr. Alvarez in the capital habeas corpus case of *Ex Parte*

*Juan Carlos Alvarez*, Case No. 77,007 on October 14, 1999.  I met with Mr. Alvarez on

October 21, 1999, October 26, 1999, and November 16, 1999, to discuss the facts and

circumstances of the underlying offense and the trial.

4.    During my October 26, 1999 visit with Mr. Alvarez, I obtained a release of records for

trial counsel's case file.

5.    In May of 2000, the statement of facts and transcript became available to me.  Between

May 28, 2000 and July 9, 2000 I reviewed the statement of facts and transcript.

6.    I requested the State's file on July 17, 2000.  Beginning on July 25, 2000, I spent 3 days

reviewing and making notes on the State's file at the District Attorney's Office.

7.    On August 15, 2000, I visited Mr. Alvarez in prison and reviewed with him matters

raised by my review of the statement of facts, transcript, and the State's file, including

evidence present in these sources.

8.    From October 18, 2000 onwards, I conducted legal research to develop points of error

evident from the case record.

1

9.     On October 22, 2000 I met with Mr. Alvarez's attorney on direct appeal, Mr. Skip Cornelius, and discussed possible points of error for direct appeal as well as habeas corpus review.

10.     On February 16, 2001, I requested Mr. Alvarez's trial file from his lead trial lawyer, Frumencio Reyes. I subsequently met with Mr. Reyes to receive the case file and at that time discussed the facts, circumstances, and legal arguments germane to Mr. Alvarez's case.

11.     The habeas writ was due to be filed in this case on June 10, 2001. On June 8, 2001 I filed for and obtained an extension until September 8, 2001, which fell on a Saturday and thus, by operation of law, the effective deadline for filing became September 10, 2001.

12.     Prior to filing the writ on September 10, 2001, I did not have the assistance of an investigator or mitigation specialist though I did not request funding for such. However, I had discussed the possibility of investigating grounds for mitigation with a mitigation specialist. Except for review of trial testimony and evidence, and the substance of my conversation with the specialist, but without further actual investigation, I did not pursue a mitigation investigation.

13.     While I did discuss the status of the case on one occasion of unrecorded date with six members of his immediate family, I did not attempt to locate or interview any of Mr. Alvarez's extended family or conduct any other investigation of his life in Mexico. My file reflects that on June 26, 2003, I met with Mr. Alvarez's mother and two siblings and discussed the status of the case.

14.     My file does not have a set of completed juror questionnaires from jury selection so I reviewed the case for possible juror claims based on the voir dire statement of facts.

2

Although I did discuss juror conduct with Mr. Alvarez, I did not interview any of the jurors from Mr. Alvarez's case.

15. Prior to filing the writ on September 10, 2001, I did not hire any expert witnesses nor did I consult with any experts or have anyone evaluate Mr. Alvarez.

Further affiant saith not.

This 14th day of May, 2007.

_____
Leslie M. Ribnik

Sworn to and subscribed before me

this 14th day of May, 2007.

_____
Notary Public
My commission expires:

Morris H. Moon
Notary Public
STATE OF TEXAS
My Comm. Exp.: 05-12-2010

**EXHIBIT D**

State of Texas

County of Harris

## AFFIDAVIT OF ARACELI ALVAREZ

1. Mi nombre es Araceli Álvarez. Tengo mas de dieciocho años de edad y soy competente para hacer esta declaración.

2. Soy la hermana de Juan Carlos Álvarez y una de nueve hermanos.

3. He vivido en Houston, Texas, desde aproximadamente 1990. Yo estaba en Houston durante el juicio de Juan para homicidio capital, y estaba presente durante las fases de culpabilidad y sentencia de su juicio.

4. Yo sé que Leslie Ribnik fue designado para representar a Juan en una de sus apelaciones y que el entrego un documento para esa apelación alrededor de Septiembre 2001.

5. El Sr. Ribnik nunca se comunicó conmigo antes de entregar ese documento en Septiembre 2001. Yo sé que el Sr. Ribnik tampoco se comunicó con ningún otro miembro de nuestra familia antes de Septiembre 2001.   A·A

6. Si el Sr. Ribnik se hubiera comunicado conmigo, con gusto me hubiera reunido con el y le hubiera dado cualquier información que me hubiera pedido, incluyendo información sobre la vida de Juan y su niñez.  Yo sé que todos los demás de mi familia también hubieran hecho cualquier cosa para ayudar al Sr. Ribnik con el caso de Juan.

7. La única vez que tuve contacto con el Sr. Ribnik fue alrededor de Marzo del 2003, cuando varios de mis hermanos y yo nos reunimos con el Sr. Ribnik y alguien del consulado de Mexico.  La reunión con el Sr. Ribnik fue muy breve.  No duró mas de 30 a 40 minutos.

8. Durante la reunión, el Sr. Ribnik dijo que no podia hacer nada por Juan debido a las evidencias presentaron contra el en su juicio.  El dijo que veía el caso como un caso perdido.

9. El Sr. Ribnik dijo que no había hecho, ni podía hacer ninguna nueva investigación en cuanto el caso de Juan porque no tenia suficientes fondos para hacerlo.  El nos explicó que estaba designado por el estado para defender a Juan, pero que no le estaban pagando suficiente para poder realmente defenderlo.

A. A

2

10. El Sr. Ribnik nunca nos preguntó ninguna pregunta sobre la vida de
Juan o su historia.  Con gusto hubiera hablado con los abogados de
Juan sobre estas cosas si se hubieran comunicado conmigo y
preguntado sobre esto.

Further affiant sayeth not.

_Araceli Alvarez_
Araceli Alvarez

Sworn to and subscribed before me
this 10th day of May, 2006 2007 N.T.

_Naomi E. T____
Notary Public

NAOMI TERR
Notary Public, State of Texas
My Commission Expires
OCT. 15, 2009

My commission expires: 10/15/2009

3

**EXHIBIT E**

State of Texas

County of Harris

**AFFIDAVIT OF NAOMI TERR**

NAOMI TERR, being duly sworn, deposes and says upon penalty of perjury thereof:

I understand and am fluent in both the Spanish language and the English language.  To the best of my knowledge and belief, the following statements in the English language have the same meanings as the statements in the Spanish language in the Affidavit of Araceli Alvarez, signed on May 10, 2007:

1. My name is Araceli Alvarez.  I am over the age of eighteen and competent to make this affidavit.

2. I am the sister of Juan Carlos Alvarez and one of nine siblings.

3. I have lived in Houston, Texas, since approximately 1990.  I was in Houston during Juan's trial for capital murder, and was present at both the guilt and sentencing phases of his trial.

4. I know that Leslie Ribnik was appointed to represent Juan for one of his appeals and that he filed a document for that appeal sometime around September 2001.

5. Mr. Ribnik never contacted me before he filed that document in September 2001. I know that Mr. Ribnik also never contacted any other member of our family prior to September 2001.

6. Had Mr. Ribnik contacted me, I gladly would have met with him and provided any information he requested, including information about Juan's childhood and life. I know that everyone else in my family would also have done anything to help Mr. Ribnik with Juan's case.

7. The only time I had any contact with Mr. Ribnik was sometime around March 2003, when several of my siblings and I met with Mr. Ribnik and someone from the Mexican consulate. The meeting with Mr. Ribnik was very brief. It lasted no more than 30 to 40 minutes

8. During the meeting, Mr. Ribnik stated that he could not do anything for Juan because of the evidence presented against him at trial. He stated that he saw the case as a lost cause.

9. Mr. Ribnik said that he had not done, nor could he do any new investigation into Juan's case because he did not have funding to do so. He explained to us that he was appointed by the state to defend Juan, but that he was not getting paid enough to be able to truly defend him.

2

10. Mr. Ribnik never asked us any questions about Juan's life or

background.  I gladly would have talked to Juan's lawyers about these

things if they had contacted me and asked about them.

Further affiant sayeth not.

Naomi Terr

Sworn to and subscribed before me
this ___11th___ day of May, 2007.

ANA HSIEH
MY COMMISSION EXPIRES
May 18, 2010

Notary Public

My commission expires: May 10, 2010

3

**EXHIBIT F**

State of Texas

County of Harris

## AFFIDAVIT OF NORMA PATRICIA MARROQUIN

1. Mi nombre es Norma Patricia Marroquín.  Tengo más de dieciocho años de edad y soy competente para hacer esta declaración.

2. Soy la hermana de Juan Carlos Álvarez.

3. Actualmente vivo en Houston, Texas, y he estado aquí desde aproximadamente 1990.  Yo estaba en Houston durante el juicio de Juan para homicidio capital.

4. Yo sé que Leslie Ribnik fue designado para representar a Juan en una de sus apelaciones.  Sé que entrego algún tipo de documento para Juan alrededor de Septiembre 2001.

5. El Sr. Ribnik nunca se comunicó con migo ni ningún miembro de mi familia en ningún momento antes de entregar el documento en Septiembre 2001.

6. Yo soy una de nueve hermanos.  Soy muy unida a todos mis familiares, y constantemente estoy en contacto con ellos.  La mayoría de nosotros nos vemos o nos hablamos a diario.  Sé que el Sr. Ribnik nunca se comunicó con ninguno de mis hermanos ni otro miembro de la familia de Juan antes de Septiembre 2001.

1

7. Yo hubiera estado feliz de reunirme con el Sr. Ribnik para darle cualquier información que tenía sobre Juan y su vida. Sé que todos los demás de mi familia sienten lo mismo. Todos hubiéramos hecho cualquier cosa para ayudar los abogados de Juan con su caso.

8. Yo estaba presente en las fases de culpabilidad y sentencia del juicio de Juan. Hay muchas cosas importantes que yo sé han pasado en la vida de Juan que no fueron mencionadas durante el juicio. Yo hubiera hablado con sus abogados sobre estas cosas si se hubieran comunicado conmigo y preguntado sobre eso.

9. No recuerdo exactamente cuando fue la primera vez que me comuniqué con el Sr. Ribnik, pero creo que fue alrededor de cuando el escándalo en cuanto el laboratorio del Departamento de Policía de Houston fue reportado en las noticias. Esto fue mucho después de Septiembre 2001. El Sr. Ribnik nunca intento comunicarse conmigo o otros miembros de la familia. Si no, alrededor del tiempo del escándalo con el laboratorio, yo le llame al Sr. Ribnik para preguntarle que estaba pasando con el caso de Juan. No me pude comunicar con el directamente, pero el me regreso la llamada varios días después. Nuestra conversación telefónica duró solamente unos segundos. Traté de obtener información sobre lo que estaba pasando

2

con el caso de Juan.  El rápidamente me respondió que estaba

trabajando en algo  que iba entregar a la corte y terminó la llamada.

10. Sobre un periodo de tiempo después del escándalo del laboratorio, yo

le llamé al Sr. Ribnik varias otras veces.  Cada vez que lo llamaba,

tenía la misma experiencia.  Yo le dejaba un mensaje y el me

regresaba la llamada varios días después.  Cuando por fin me llamaba,

yo le trataba de preguntar sobre el caso de Juan, pero el cortaba la

llamada y colgaba sin explicarme que estaba pasando con el caso.

11. Mi hermana Adelaida Álvarez también llamó al Sr. Ribnik varias

veces y tuvo la misma experiencia que yo.

12. La única vez que me reuní con el Sr. Ribnik en persona fue una vez

alrededor de Marzo 2003.  El Sr. Ribnik se reunió conmigo, otros

miembros de la familia de Juan, y alguien del consulado de México en

esa ocasión.

13. Le preguntamos al Sr. Ribnik si iba realizar nuevas investigaciones en

cuanto el caso de Juan.  El respondió que no podía porque no tenía

ningunos fondos para contratar un investigador.

14. En esa reunión, el Sr. Ribnik no nos preguntó ningunas preguntas

sobre Juan o su vida.

15. La reunión duro solamente como 30 minutos.  El Sr. Ribnik se veía
    muy negativo y dijo que no había mucho que podía hacer para ayudar
    con el caso de Juan.  El Sr. Ribnik también hablo muy lentamente,  en
    frases breves y sin dar ningunos detalles.  Pareció batallar para
    encontrar las palabras y no dijo mucho.

Further affiant sayeth not.

Norma Patricia Alvarez - MARROQUIN
N.M.

Sworn to and subscribed before me
this 10th day of May, 2007.

Notary Public

My commission expires: 10-15-2009

NAOMI TERR
Notary Public, State of Texas
My Commission Expires
OCT. 15, 2009

4

**EXHIBIT G**

State of Texas

County of Harris

## AFFIDAVIT OF NAOMI TERR

NAOMI TERR, being duly sworn, deposes and says upon penalty of perjury
thereof:

I understand and am fluent in both the Spanish language and the English
language.  To the best of my knowledge and belief, the following statements
in the English language have the same meanings as the statements in the
Spanish language in the Affidavit of Norma Patricia Marroquin, signed on
May 10, 2007:

1. My name is Norma Patricia Marroquin.  I am over the age of eighteen
   and competent to make this affidavit.

2. I am the sister of Juan Carlos Alvarez.

3. I currently live in Houston, Texas, and have been here since
   approximately 1990.  I was in Houston during Juan's trial for capital
   murder.

4. I know that Leslie Ribnik was appointed to represent Juan for one of
   his appeals.  I know that he filed an document of some kind for Juan
   sometime around September 2001.

1

5. Mr. Ribnik never contacted me or any member of my family at any time before filing the document in September 2001.

6. I am one of nine siblings. I am very close to all of my family, and keep in regular contact with them. Most of us see one another or speak on a daily basis. I know that Mr. Ribnik never contacted any of my siblings or any other member of Juan's family prior to September 2001.

7. I would have been happy to meet with Mr. Ribnik to share with him any information I had about Juan and his life. I know that everyone else in my family feels the same. We all would have done anything to help Juan's lawyers with his case.

8. I was present at the guilt and sentencing phases of Juan's trial. There are many important things that I know have happened in Juan's life that were not mentioned during the trial. I would have talked to his lawyers about these things if they had contacted me and asked about them.

9. I do not recall exactly when I first communicated with Mr. Ribnik, but I believe it was around the time that the Houston Police Department Laboratory scandal was reported in the news. This was long after

September 2001.  Mr. Ribnik never reached out to contact me or members of the family.  Rather, around the time of the lab scandal, I called Mr. Ribnik to ask about what was happening with Juan's case. I was not able to reach him directly, but he returned my call several days later.  Our phone conversation lasted only a matter of seconds.  I tried to get information about what was happening with Juan's case. He briefly responded that he was working on something he was going to file with the court and then ended the call.

10. Over a period of time after the lab scandal, I called Mr. Ribnik several more times.  Each time I called I had the same experience.  I would leave a message and he would return my call several days later.  When he finally called, I would try to ask about Juan's case, but he would cut it short and end the call without explaining what was going on with the case.

11. My sister Adelaida Alvarez also called Mr. Ribnik various times and had the same experience I did.

12. The only time I met Mr. Ribnik in person was one time around March 2003.  Mr. Ribnik met with me, other members of Juan's family, and someone from the Mexican consulate on that one occasion.

3

13. We asked Mr. Ribnik if he was going to conduct any new investigation into Juan's case.  He responded that he could not because he did not have any funding to hire an investigator.

14. At that meeting, Mr. Ribnik did not ask any of us questions about Juan or his life.

15. The  meeting lasted only about 30 minutes.  Mr. Ribnik seemed very negative and said there was not much he could do to help with Juan's case.  Mr. Ribnik also spoke very slowly, in short sentences and without providing any detail.  He seemed to struggle to find words to say and he did not say very much.

Further affiant sayeth not.

Naomi Terr

Sworn to and subscribed before me this 11th day of May, 2007.

Notary Public

ANA HSIEH
MY COMMISSION EXPIRES
May 18, 2010

My commission expires: May 18, 2010

4

**EXHIBIT H**

# STATE BAR OF TEXAS

### *GUIDELINES AND STANDARDS*
### *For*
### *TEXAS CAPITAL COUNSEL*

Adopted by the State Bar Board of Directors

April 21, 2006

1

# *GUIDELINES AND STANDARDS*
## *For*
## *TEXAS CAPITAL COUNSEL*

## <u>TABLE OF CONTENTS</u>

*Guideline*..................................................................................Page

**GUIDELINE 1.1 — OBJECTIVE AND SCOPE OF GUIDELINES** ........................ 3

**GUIDELINE 2.1 — ADOPTION AND IMPLEMENTATION OF A PLAN TO PROVIDE HIGH QUALITY LEGAL REPRESENTATION IN DEATH PENALTY CASES** ....................................................................................3

**GUIDELINE 3.1 — THE DEFENSE TEAM AND SUPPORTING SERVICES**...... 3

**GUIDELINE 4.1 — QUALIFICATIONS OF DEFENSE COUNSEL**.................... 4

**GUIDELINE 5.1 — WORKLOAD**.......................................................................... 5

**GUIDELINE 6.1 — MONITORING; REMOVAL**.................................................... 6

**GUIDELINE 7.1 —TRAINING**............................................................................ 6

**GUIDELINE 8.1 — FUNDING AND COMPENSATION** ...................................... 8

**GUIDELINE 9.1 — ESTABLISHMENT OF PERFORMANCE STANDARDS** ...... 9

**GUIDELINE 9.2 — APPLICABILITY OF PERFORMANCE STANDARDS**.......... 9

**GUIDELINE 9.3 — OBLIGATIONS OF COUNSEL RESPECTING  WORKLOAD**9

**GUIDELINE 10.1 — THE DEFENSE TEAM**........................................................ 10

**GUIDELINE 10.2 — RELATIONSHIP WITH THE CLIENT**................................. 11

2

# TABLE OF CONTENTS

**GUIDELINE 10.3-ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL**...........................................................12

**GUIDELINE 11.1 ─ TRIAL INVESTIGATION**......................................................13

**GUIDELINE 11.2 ─ THE DUTY TO ASSERT LEGAL CLAIMS** ........................ 16

**GUIDELINE 11.3 ─ THE DUTY TO SEEK AN AGREED-UPON DISPOSITION**...................................................................................................17

**GUIDELINE 11.4 ─ ENTRY OF A PLEA OF GUILTY** ...................................... 20

**GUIDELINE 11.5 ─TRIAL PREPARATION OVERALL** ..................................... 21

**GUIDELINE 11.6 ─ VOIR DIRE AND JURY SELECTION**................................. 21

**GUIDELINE 11.7 ─ THE DEFENSE CASE CONCERNING PENALTY** ........... 22

**GUIDELINE 11.8 ─ THE DUTY TO FACILITATE THE WORK OF  SUCCESSOR COUNSEL**..................................................................................................24

**GUIDELINE 12.1 DUTIES OF TRIAL COUNSEL AFTER CONVICTION** ......... 25

**GUIDELINE 12.2 - DUTIES OF POST-TRIAL COUNSEL** ................................26

**GUIDELINE 12.2(A) ─ DUTIES OF DIRECT APPEAL COUNSEL**...................26

**GUIDELINE 12.2(B) ─ DUTIES OF POST-CONVICTION COUNSEL**.............. 28

**GUIDELINE 12.2(C) ─ DUTIES OF CLEMENCY COUNSEL** ........................... 38

## GUIDELINE 12.2 - <u>DUTIES OF POST-TRIAL COUNSEL</u>

A.   Duties of Direct Appeal Counsel

    1.   Counsel should, upon being contacted by the court or client concerning representation in a capital appeal, immediately consult with the court and/or the clerk of the court to ascertain relevant information concerning relevant filing deadlines, in order to ensure that counsel's acceptance of the case permits counsel the maximum opportunity for proper representation.

    2.   Counsel should immediately contact trial counsel to obtain background information on the client, the nature of the issues presented and the possibility of filing a motion for new trial with regard to any issues that need to be raised in such proceeding.

    3.   Counsel should, upon acceptance of appellate representation, immediately inform the court and the prosecution of his representation by filing the appropriate designation of counsel with the court, along with the proper designation of the Clerk's Record and Court Reporter's Record as mandated by the Texas Rules of Appellate Procedure.

    4.   Counsel should immediately request the trial court to appoint habeas corpus counsel, under Article 11.071, Code of Criminal Procedure, to represent the client in the parallel capital habeas proceedings.  It is recommended that counsel on appeal contact qualified attorneys, certified by the Texas Court of Criminal Appeals for habeas representation, to determine their availability for representation and their desire to assist counsel in the particular case.

    5.   Counsel should consult and cooperate with habeas corpus counsel in order to maximize proper presentation of the respective appellate issues and habeas corpus issues to secure the best possible post-conviction review for the client.

    6.   Counsel should be cognizant of decisions with regard to capital murder issues from the United States Supreme Court, Fifth Circuit Court of Appeals, and from across the country, maintaining current

28

research capabilities, including law library facilities, online legal resources, and all other resources for presentation of all available issues to the Court.

7.   Counsel must recognize that errors are often committed by the clerk in preparation of the clerk's transcript, and by the court reporter in compiling the reporter's transcript, therefore counsel must ensure that the record is true, correct and complete in all respects. If errors or omissions are found, objections to the record must be immediately filed with the trial or appellate courts, to obtain corrections or hearings to insurer reliability of the record.

8.   Counsel should fully review the appellate record for all reviewable errors, preparing a well researched and drafted appellate brief which conforms with Court of Criminal Appeals rules and policies, ensuring that the brief is filed in a timely manner, timely notifying the Court of Criminal Appeals of his desire to present oral argument in the case, if appropriate.

9.   Counsel should be prepared to prepare and file a Reply Brief in opposition to any brief filed by the District Attorney's Office within a timely manner.

10.  Should counsel desire to present oral argument to the Court of Criminal Appeals, counsel should be familiar with the rules and policies of the Court concerning arguments, and ensure that his argument presented is geared to issues that are worthy of presentation under current standards, and not wasteful of the Court's time.

11.  Counsel should be prepared to file a Motion for Rehearing with the Court of Criminal Appeals should the conviction be affirmed, or conversely, be prepared to defend against the State's Motion for Rehearing, should the Court of Criminal Appeals reverse the conviction on original submission.

12.  Counsel should be prepared to research, prepare and file a Petition for Writ Of Certiorari in the United States Supreme Court should the conviction be affirmed, or ensure that counsel is obtained or appointed to seek certiorari to review, should original appellate counsel not be prepared to proceed with such representation.

29

13. Should appellate relief be denied by the Court of Criminal Appeals and/or United States Supreme Court, counsel on appeal should consult with habeas counsel to ensure that federal habeas corpus counsel is assigned for future representation of the client.

B.    Duties of Habeas Corpus Counsel

1.    General Responsibilities

a.    Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.

b.    Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation.   Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case.

c.    Habeas corpus counsel must treat the habeas corpus stage as both the first and last meaningful opportunity to present new evidence to challenge the capital client's conviction and sentence.  Therefore, counsel has a duty to conduct a searching inquiry to assess whether any constitutional   violations may have taken place, including – but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence, unreliable jailhouse informant testimony, coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct.

30

d.   Because state habeas corpus is the first opportunity for a capital client to raise challenges to the effectiveness of trial or direct appeal counsel, state habeas corpus counsel should not accept the appointment if he or she represented the client at the capital murder trial or on direct appeal of the capital conviction and death sentence.

e.   Habeas corpus counsel should assume that any meritorious issue not contained in the first state application for writ of habeas corpus will be waived or procedurally defaulted in subsequent federal habeas corpus litigation, or barred by strict rules governing successive state habeas corpus applications.  State habeas corpus counsel's lack of diligence, mistakes, missteps, and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court.

f.   Habeas corpus counsel must master the set of procedural rules and statutes that may restrict the capital client's opportunity for federal habeas corpus review, including the federal statute of limitations found in the Antiterrorism and Effective Death Penalty Act. State habeas corpus counsel's failure to understand AEDPA's implications may result in the unwitting forfeiture of a capital client's right to federal habeas corpus review.

g.   Attorneys seeking to qualify to receive state habeas corpus appointments should be required to satisfactorily complete a comprehensive training program. At least once every two years, attorneys seeking to remain on the state habeas corpus appointment roster should be required to successfully complete a specialized training program that focuses on the representation of death row inmates in state and federal post-conviction proceedings.

2.   Client Communication

a.   Without exception, habeas corpus counsel has a duty to meet the capital client face-to-face as soon as possible

31

after appointment. Counsel, or some member of the defense team, should make every effort to establish a relationship of trust with the client.  It is also essential for counsel or some member of the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

b.   Habeas corpus counsel has a duty to keep the capital client informed of case developments, the progress of the investigation, potential legal issues, and litigation deadlines.  Although some strategic decisions require the client's knowledge and agreement, others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

c.   It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she wishes to be executed, or wants to challenge only the conviction but not the sentence.   Counsel must try to identify the source of the client's feelings about these matters. Counsel should consult lawyers, clergy, mental health professionals, the client's family or others who have worked with similarly situated death row inmates.

d.   Habeas corpus counsel should be familiar enough with the capital client's mental condition to make a reasoned decision – fully documented, for the benefit of actors at later stages of the case –whether to assert the position that the client is not competent to waive further proceedings.

e.   Habeas corpus counsel should make appropriate efforts to determine whether any foreign country might consider the capital client to be one of its nationals.  Unless predecessor counsel has already done so, counsel representing a foreign national should immediately advise the client of his or her right to communicate with the relevant consular office; and obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's conviction and sentence.

32

3.  The Duty to Investigate

    a.  Because habeas corpus counsel must review what are, in essence, two different trials, providing quality representation in capital cases requires counsel to conduct a thorough and independent investigation of both the conviction and sentence.  Habeas corpus counsel must promptly obtain the investigative resources necessary to examine both phases, including the assistance of a fact investigator and a mitigation specialist, as well as any appropriate experts.

    b.  Habeas corpus counsel must obtain and read the entire record of the trial, including all transcripts and motions. Counsel has an obligation to independently verify that the official record of all prior proceedings is complete, and to supplement it if necessary.  Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what is missing as well as what is present. Counsel should interview prior counsel and members of the defense team.

    c.  Because the mental vulnerabilities of many death row inmates increase the possibilities for error, habeas corpus counsel  must take seriously the possibility of the capital client's innocence, carefully analyze the quality of the prosecution's case in aggravation, and investigate all possible defenses and potentially mitigating evidence.

    d.  In short, habeas corpus counsel has a duty to make an independent examination of all of the available evidence – both that which the jury heard and that which it did not – to determine whether the jurors made a fully informed resolution of the issues at both guilt and punishment.

4.  The Guilt-Innocence Phase Investigation

    a.  Habeas corpus counsel should conduct a guilt-innocence phase investigation regardless of any admission or

statement by the capital client about the facts of the crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be examined. Instead, counsel must independently investigate the circumstances of the crime and all evidence inculpating the client. Counsel should not assume the accuracy of the evidence admitted at trial.

b.   Informal discovery requests should be made to law enforcement and the district attorney for additional documentation not contained within the district clerk's file, such as: witness statements; police reports; physical evidence; search and arrest warrant documents; and any other information immediately available to permit commencement of the habeas investigation.

c.   Should the State not maintain a complete open file policy, formal discovery motions should be pursued to the Court for resolution and ruling.  Counsel should further be aware that requests may be made for disclosure of District Attorney files through the Texas Attorney General's Open Records Division.

d.   The assistance of a fact investigator with specialized training is indispensable to discovering and developing the facts that must be unearthed in habeas corpus proceedings.

e.   Habeas corpus counsel's obligation to reinvestigate the case will require counsel to interview most, if not all, of the critical witnesses for the prosecution and investigate their backgrounds. Counsel must determine if a witness's testimony bears scrutiny or whether motives for fabrication or bias were left uncovered at the time of trial.

f.   Habeas corpus counsel must also assess all of the non-testimonial evidence and consider whether to perform independent forensic testing, either because some technology, such as DNA testing, was unavailable at the time of trial, or because trial counsel failed to ensure that the necessary testing took place.

34

g.   Habeas corpus counsel should seek out and interview potential witnesses who might challenge the prosecution's version of events, including eyewitnesses or other witnesses having purported knowledge of events surrounding the offense; potential alibi witnesses; witnesses familiar with aspects of the capital client's life history that might affect the likelihood that the client committed the offense or the degree of culpability for the offense.

h.   Habeas corpus counsel must attempt to obtain evidence and information in the possession of the prosecution or law enforcement authorities, including police reports, autopsy reports, photos, video or audio tape recordings, and crime scene and crime lab reports, together with the raw data forming the basis of any reports or conclusions, and any other physical evidence.  Counsel should pursue such evidence and information through public information act requests to the appropriate government agencies, or through informal and  formal discovery.

i.   Habeas corpus counsel has a duty to conduct additional investigation to determine whether racial discrimination tainted the imposition of the death penalty or the composition of the jury. Counsel should investigate whether minorities or women were underrepresented on the jury lists from which grand and petit juries were drawn.

j.   Habeas corpus counsel should maintain copies of media reports about the case to determine the effects of pretrial publicity, as well as to review the public statements of potential witnesses and other trial participants.

5.   The Mitigation Investigation

a.   Habeas corpus counsel must conduct a mitigation investigation regardless of the expressed desires of the capital client.  Counsel may not conclude that a mitigation investigation would be futile, because counsel cannot responsibly advise a client about the merits of different

35

courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation.

b.    Habeas corpus counsel should not rely on his or her own observations of the capital client's mental status as sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance.  For that reason, at least one member of the defense team should be qualified to screen for mental or psychological disorders or defects and recommend further investigation of the client if necessary.

c.    Habeas corpus counsel should retain an independent mitigation specialist as a member of the defense team as soon    as possible after appointment. The mitigation specialist should have the ability to: (i.) compile a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation, interviews, and collection of documents; (ii.) analyze the significance of the information in  terms  of  impact  on development, including effect on personality and behavior; (iii.) find mitigating themes in the client's life history; (iv.) identify the need for assistance from mental health experts; (v.) assist in locating appropriate experts;   (vi.)   provide social history information to experts to enable them to conduct competent and reliable evaluations; and (vii.) work with the defense team and experts to develop a comprehensive and cohesive case in mitigation that could have been presented at trial.

d.    Habeas corpus counsel's mitigation investigation should include a review of the capital client's (i.) medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays,  and  neurological damage); (ii.) family and social history (including physical, sexual, or emotional abuse; family history of mental illness,

36

cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); (iii.) educational history (including achievement, performance, behavior, and activities) and special educational needs (including cognitive limitations and learning disabilities); (iv.) military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services); (v.) employment and training history (including skills and performance, and barriers to employability); and (vi.) prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

e.  Note: Counsel should be advised that, in obtaining a prisoner's records from the Texas Department of Corrections, Institutional Division, some records can be found at the main Classification Division of the TDC in Huntsville, but also, other records are separately maintained at the Polunsky Unit, the Death Row facility, therefore any investigation or subpoena of records needs to be directed at both locations.

f.  Habeas corpus counsel should locate and interview the capital client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others.

g.  Habeas corpus counsel should obtain releases for securing confidential records relating to all potentially relevant information about the capital client, his or her siblings and parents, and other family members, including but not

37

limited to school records, social service and welfare records, juvenile dependency or family court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, and death records, alcohol and drug abuse assessment or treatment records, and INS records.

h.   Habeas corpus counsel must also investigate prior convictions and unadjudicated offenses that the prosecution presented as aggravating circumstances, or that otherwise came into evidence.  If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a prior conviction or unadjudicated offense.

6.   Making a Record

a.   Habeas corpus counsel must demand on behalf of the capital client all resources necessary to provide high quality legal representation, to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts. Because counsel should not have to disclose privileged communications or strategy to the prosecution in order to secure these resources, counsel must insist upon making such requests ex parte and in camera. If resources are denied, counsel should make an adequate record to preserve the issue for further review.

b.   Habeas corpus counsel must ensure that there is a complete record for every issue raised, including objections, motions, statements of grounds, oral and written arguments of both sides, discussions among counsel and the court, evidence proffered and received, rulings of the court, reasons given by the court for its rulings, and any agreements reached between the parties. If a court refuses to allow a proceeding to be recorded, counsel should state the objection to the court's refusal and, at the first available opportunity, make a record of what transpired in the unrecorded proceeding.

38

      c.    Habeas corpus counsel must file a written request for an evidentiary hearing on all disputed factual issues and provide the trial court with an in-depth explanation of why a hearing is necessary.

7.  Presenting Legal Claims

      a.    Habeas corpus counsel must evaluate each potential claim in light of the near certainty that any claim not presented in the first state application for writ of habeas corpus will be waived or otherwise defeated by defenses such as procedural default or failure to exhaust. For this reason, counsel must be especially sensitive to the need to preserve all potential issues for later review by including them in the first state application for writ of habeas corpus.

      b.    Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim before deciding not to include it in the first state application for writ of habeas corpus.

      c.    Habeas corpus counsel has a duty to preserve issues calling for a change in existing precedent.  Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices and long-standing precedent.

      d.    Habeas counsel should attach all available proof to the application (affidavits, documentary evidence, etc.) even though doing so is not technically required by state law. Failing to attach proof in state court will likely waive the client's   ability to present it in federal court.  When proof is unavailable, habeas counsel should plead all factual allegations with the greatest possible specificity.

      e.    Habeas corpus counsel should consider the possible advantages to the capital client of asserting legal claims whose basis has only recently become known or available to counsel.  Counsel should supplement claims previously

made with additional factual or legal information that comes to counsel's attention, even if it occurs after the first state application for writ of habeas corpus has been filed.

8.  Negotiating a Settlement

a.  Habeas corpus counsel has an obligation to take all steps that may be appropriate in the exercise of professional judgment to achieve an agreed-upon disposition of the case. If a negotiated disposition would be in the best interest of the capital client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.

b.  Habeas corpus counsel should consider making overtures to members of the victim's family–possibly through an intermediary, such as a clergy member, victim liaison, or representative of an organization such as Murder Victim's Families for Reconciliation–to ascertain their current feelings about the death penalty and the possibility of settling the case.

9.  Facilitating Federal habeas Corpus Review

a.  State habeas corpus counsel must file a motion for appointment of federal habeas counsel in federal district court immediately after the conclusion of state habeas corpus proceedings, as required by Section 2 of Article 11.071.  Any delay in filing this motion may deprive the capital client of the right to federal review.

b.  If state habeas corpus counsel does not intend to continue representing the capital client in federal habeas corpus proceedings, state habeas corpus counsel must not cease acting on the capital client's behalf until the federal district court has formally appointed new counsel.  State habeas corpus counsel's duty includes monitoring the case in federal district court and, if necessary, urging the federal

40

district court to appoint federal habeas corpus counsel as soon as possible after the termination of state habeas corpus proceedings.

c.   Even after state habeas corpus counsel has been formally replaced, he or she owes a continuing duty of complete fidelity to the capital client. State habeas corpus counsel has a responsibility to cooperate with successor counsel in evaluating state habeas corpus counsel's representation of the client.

d.   State habeas corpus counsel's continuing duty to safeguard the interests of the capital client and cooperate fully with successor counsel includes, but is not limited to, maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the  litigation; providing the client's files, as well as information regarding all aspects of the representation, to successor counsel; sharing potential further areas of legal and factual research with successor counsel; and cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

C.   Duties of Clemency Counsel

1.   Clemency counsel should be familiar with the procedures for, and permissible substantive content of, a request for clemency. Clemency counsel should timely contact the Texas Board of Pardons and Paroles to determine the current and present rules and regulations for seeking clemency in death penalty cases. Counsel are advised that these rules and regulations change on a regular basis, thus this immediate contact is absolutely necessary to ensure preparation and filing of proper documents that will be considered by the Board.

2.   Clemency counsel should conduct an investigation in accordance with GUIDELINE 12.2.

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused the foregoing pleading to be served by hand delivery to Ms. Ann Lee Dulevitz, Post Conviction Writs Division, Harris County District Attorney's Office, 1201 Franklin St., Suite 600, 77002.

This the ـــــ day of May, 2007.


_____
Jared Tyler