CAUSE NO. 787007_____

|  |  |  |
|---|---|---|
| | § | IN THE DISTRICT COURT OF |
| EX PARTE | § | |
| | § | HARRIS COUNTY, TEXAS |
| JUAN CARLOS ALVAREZ | § | |
| | § | 338TH JUDICIAL DISTRICT |

**APPLICATION FOR POST-CONVICTION WRIT OF**
**HABEAS CORPUS PURSUANT TO ARTICLE 11.071 OF**
**THE CODE OF CRIMINAL PROCEDURE**

TO THE HONORABLE COURT:

JUAN CARLOS ALVAREZ, Applicant, by and through his attorneys of record LESLIE

M. RIBNIK and SUSAN CRUMP, files this Application for a Post-Conviction Writ of Habeas

Corpus Pursuant to Article 11.071 of the Code of Criminal Procedure, and in support show the

following:

I.

Applicant is currently being held in confinement by Gary Johnson, Director of the

Institutional Division of the Texas Department of Criminal Justice, at the Polunsky Unit in

Livingston, Polk County, Texas.

On September 22, 1999, Applicant was convicted by a jury of the offense of capital

murder in Cause No. 787007, styled The State of Texas v. Juan Carlos Alvarez, in the 338th

District Court of Harris County, Texas. Punishment was assessed at death.

II.

On October 14, 1999, the Court of Criminal Appeals appointed the undersigned counsel

Leslie M. Ribnik and Susan Crump for the purpose of representing Applicant on a writ of habeas

1

corpus. On or about October 27, 2000, Applicant's original brief in support of his direct appeal was filed with and received by the clerk of the Court of Criminal Appeals. On April 26, 2001, the State's original brief in response was filed with and received by the clerk of the Court of Criminal Appeals. A petition for writ of habeas corpus must be filed not later than the forty fifth day after the state filed its original brief, i.e., in this case, not later than Sunday, June 10, 2001. On June 8, 2001, petitioner, by and through his counsel, filed in this court a Motion for Extension of Time to File Application for Writ of Habeas Corpus whereby he sought a ninety day extension to file his application. On the same day the court granted the motion extending the deadline to on or before September 8, 2001. September 8, 2001, is a Saturday. By operation of Texas Rule of Appellate Procedure 4.1(a), the deadline for filing became Monday, September 10, 2001.

## III.

Petitioner is illegally confined and restrained in his liberty by Gary Johnson, Director of the Institutional Division of the Texas Department of Criminal Justice.

## IV.

**ARTICLE 37.071, TEX. CODE. CRIM. PROC. IS UNCONSTITUTIONAL
IN VIOLATION OF APPLICANT'S RIGHT TO DUE PROCESS
UNDER THE FIFTH AND FOURTEENTH AMENDMENTS
AND IN VIOLATION OF THE NOTICE AND JURY TRIAL
GUARANTEES OF THE SIXTH AMENDMENT**

## A.

TEX. CODE. CRIM. PROC. Article 37.071 defines the procedure for guiding a jury to a sentencing decision of life imprisonment or death for a capital defendant. Article 37.071(b)(1) &

2

(2) directs:

> On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
>
> (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party . . ., whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

Each of these issues must be proved by the state beyond a reasonable doubt. TEX. CODE CRIM.

PROC. ART. 37.071(2)(c). A "Yes" answer to these issues must be unanimous while a "No"

answer must be by the agreement of ten or more jurors. TEX. CODE CRIM. PROC. art.

37.071(2)(d)(2). If the issues submitted under art. 37.071(b) are answered in the affirmative by

the jury, then it shall answer the following issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. art. 37.071 (2)(e)(1). A "No" answer to this issue must be

unanimous while a "Yes" answer must be by the agreement of ten or more jurors. TEX. CODE

CRIM. PROC. Art. 37.071(2)(f). If a jury returns affirmative findings to the (b)(1) and (b)(2)

issues and a negative finding to the subsection (e)(1) issue, the court shall sentence the defendant

to death. If a jury returns a negative finding to either the subsection (b)(1) or (b)(2) issues or

returns an affirmative finding to the subsection (e)(1) issue or is unable to answer any issue under

subsections (b)(1) , (b)(2), or (e)(1), then the court shall sentence the defendant to life

imprisonment. TEX. CODE CRIM. PROC. 37.071(2)(g).

3

003042

The legislature omitted to assign or define a burden of proof for the Art. 37.071(2)(e)(1) "mitigation" issue.

B.

Generally in a criminal case the prosecution bears both the production burden and the burden of persuasion.

In *Lawton v. State*, 913 S.W.2d 542 (Tex.Crim.App. 1995), the defendant alleged that Article 37.071(2)(e) was facially unconstitutional because it did not assign a clear burden of proof as to mitigating circumstances and that the lack of a clear burden of proof created an unconstitutional uncertainty in the Texas scheme of capital punishment, citing to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The Court wrote :

> We concede that the Texas legislature has not assigned a burden of proof regarding mitigating evidence. We also concede that *the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case.* Appellant complains that this violates the federal constitution. However, we are unaware of any constitutional requirement that the burden of proof regarding mitigating evidence be placed on either party, and to the extent the burden is on the appellant, we note that it is not unconstitutional to so place the burden. (Citing *Walton v. Arizona*, 497 U.S. 639, 649-651, 110 S.Ct. 3047,3054-3056, 111 L.Ed.2d 511 (1990)) [emphasis added].

The court went on to say:

> Appellant's argument confuses the federal constitution's demand that death eligibility be narrowed to a reasonably clear and well defined group of offenses, as in *Furman*, with its demand that individual jurors be allowed to make individualized, well reasoned, moral responses in determining whether factors exist which mitigate against the imposition of the death sentence, as in *Penry* 492 U.S. at 302, 109 S.Ct. At 2937-2938(1989). See *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (discussing the constitution's apparently conflicting demands). The federal constitution's requirement of clarity in defining death eligibility is not applicable to provisions which allow the jury to consider and give effect to mitigating evidence. *Gregg v.* Georgia 428

4

U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). In short, Furman dealt with the untrammeled discretion to impose the death sentence, but the untrammeled discretion to afford life to a death eligible defendant does not offend the United States Constitution.

Id. at 558. *See also, Williams v. State,* 937 SOIT 479, 491 (Tex.Crim.App. 1996) which held

that no burden of proof was required with respect to "aggravating circumstances that might be

considered in conjunction with Texas' open-ended mitigation issue." (Also citing to *Tuilaepa*).

As part of an analysis in connection with an Eighth Amendment vagueness review of

certain sentencing factors in the California capital sentencing procedure., *Tuilaepa* addressed two

different decisions to be considered in deciding capital punishment; "the eligibility decision" and

the "selection decision."

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both) As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of murder; it must apply to a subclass of defendants convicted of murder. Second the aggravating circumstance may not be constitutionally vague.

> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. 'What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.' That requirement is met when the jury can consider relevant mitigating evidence of the character and the record of the defendant and the circumstances of the crime.

> The eligibility decision fits the crime within a defined classification. Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.' The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability. The objectives of these two inquiries can be in some tension, at least when the inquiries occur at the same time. 512 U.S. at 971-973,

003044

114 S.Ct. 2634-2635.

However, nothing in *Tuilaepa* requires that the eligibility/selection dichotomy be imported into

a due process analysis; and nothing *in Tuilaepa* addresses burden of production and burden of

persuasion. Rather *Tuilaepa* stands for the proposition that the punishment-determination

procedure should be one where the jury is free to determine the weight to be given myriad

sentencing factors. 512 U.S. at 978-980, 114 S.Ct. at 2638-2639.

C.

The inclusion of the third "mitigation" issue was the legislature's response to the United

States Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct.2934, 106

L:.Ed.2d 256 (1989) [hereinafter, "*Penry I*"]. In this capital case, a mentally retarded defendant

was found guilty and sentenced to death upon the jury's affirmative answer to three "special

issues":

(1) whether the conduct of the defendant that caused the death of the deceased was committed

deliberately and with the reasonable expectation that the death of the deceased or another would

result; (2) whether there is a probability that the defendant would commit criminal acts of

violence that would constitute a continuing threat to society; and (3) if raised by the evidence,

whether the conduct of the defendant in killing the deceased was unreasonable in response to

provocation, if any, by the deceased. The jury had been instructed that the "State bore the burden

of proof on the special issues and that before any issue could be answered 'yes,' all 12 jurors

must be convinced by the evidence beyond a reasonable doubt that the answer to that issue

should be 'yes.'" 492 U.S. at 311. Penry argued that "on the facts of this case, the jury was

unable to fully consider and give effect to the mitigating evidence of his mental retardation and

6

abused background in answering the three special issues." 492 U.S. at 315. Relying on *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973(1978 ) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869 71. L.Ed.2d 1 (1982), the court ruled that the special issues did not provide a vehicle for the jury to give mitigating effect to *Penry's* evidence of mental retardation and childhood abuse. Even though Penry was permitted to introduce and argue the significance of his mitigating evidence to the jury, the absence of instructions informing the jury that it could consider and give effect to mitigating evidence of mental retardation and abused background by declining to impose the death penalty, the court concluded that "the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." 492 U.S. at 328. The court explained:

> Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987). Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence. *Woodson,* 428 U.S. at 304, 305, 96 S.Ct., at 2991, 2992. 'Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime.' *California v. Brown, supra,* 479 U.S., at 545, 107 S.Ct., at 841 (emphasis in the original).

> Upon retrial in 1990, three special issues identical to the issues described *supra* in *Penry I,* and worded without any mention of mitigating evidence, were submitted to the jury along with

7

a catchall "supplemental instruction"[1] on mitigating evidence. In *Penry v. Johnson,* __ U.S. __, 121 S.Ct. 1910, __ L.Ed.2d __ (2001) (hereinafter *Penry II*), the Court wrote that "*Penry I* did not hold that the mere mention of 'mitigating circumstances' to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may 'consider' mitigating circumstances in deciding the appropriate sentence. Rather, the key under *Penry I* is that the jury be able to 'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'" The Court found the "supplemental instruction" which made mention of mitigating evidence was an "ineffective and illogical" mechanism for jurors to give effect to mitigating evidence. The "supplemental instruction" did not cure the constitutionally infirm special issues which were merely repeated in *Penry II*. To give effect to mitigating evidence and the "supplemental instruction," the jurors were obliged to answer the special issues by ignoring the verdict form instructions that a "yes" answer was *appropriate only when supported "by the evidence beyond a reasonable doubt" or that a "No"* answer was appropriate only when at least ten jurors had a reasonable doubt as to the matter inquired about in the special issue. In other words, this possible inconsistency went to the heart

---

[1] "You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues."

003047

of the reliability question addressed in *PenryI.*

In sum, the concern of the Supreme Court in all these cases has been guiding the jury to weighing aggravating and mitigating circumstances in a reasonably moral way. However, in the absence of an allocated burden of proof, there can be no rational balancing. The legislature invites each jury in a Texas capital case to set its own standards of proof in deciding the mitigating issue. This leaves the defense in the de facto strategic position of having to prove this issue proving beyond a reasonable doubt, (the highest standard), because the defense has the most severe consequences at risk. This is totally contrary to the normal allocation of burden of proof in the rest of criminal jurisprudence. This leads to a lack of consistency across cases and across forums. No two defendants can ever know the same standard that they have to satisfy in order to prevail on the mitigating issue. If this is not enough of a constitutional infirmity, it becomes even more egregious when considered in the light of other Due Process cases.

D.

By failing to require the prosecution to carry the burden of persuasion on the mitigation special issue, Appellant urges that Fifth and Fourteenth Amendment due process is violated.

The Due Process Clause, both in its Fifth and Fourteenth Amendment forms, has been the subject of several cases which must be considered.

In *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court was confronted with a state statute that required a defendant, who was charged with murder, which carried a life sentence, to prove by a preponderance that the killing was committed in the heat of passion due to sudden provocation by the victim in order to reduce the homicide to voluntary manslaughter, which carried a lesser sentence. The Court held that the Due Process

9

Clause of the Fourteenth Amendment was violated because the prosecution must prove each and every element of the crime beyond a reasonable doubt, that is, prove in this case that the killing was not done in the heat of passion due to sudden provocation by the victim. Because the state statute made the distinction between murder, with its more severe punishment, and voluntary manslaughter, with its less severe punishment, "while refusing to require the prosecution to establish beyond a reasonable doubt the fact upon which its turns," the state had denigrated Due Process interest.

In Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the Court was confronted with the question whether a federal carjacking statute violated the Fifth Amendment Due Process Clause because after a finding of guilt, it allowed the trial judge to impose a higher sentence than the crime as indicted permitted if the judge determined, among other possibilities, by a preponderance of the evidence, that the carjacking involved serious bodily injury to the victim. The Court found that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, *any fact* (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. . . .The constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishments; these are the safeguards going to the formality of notice, the identity of the factfinder, and *the burden of proof*." (Footnote 6) (emphasis added).

Shortly thereafter, the Court was confronted with a case in which the defendant pled guilty to possession of a firearm. *Apprendi v. New Jersey*, 530 U.S. 466 (2000). After the state

10

filed a motion for enhancement, the trial judge found that the defendant committed the crime for a racially motivated purpose and increased his sentence beyond the possible range for possessing a firearm without a racially motivated purposes. In reversing the case, the Court held that in state prosecutions, the Due Process Clause of the Fourteenth Amendment required that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Citing Footnote 6 of *Jones*). The Court also endorsed the *Jones* statement that

> It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established beyond a reasonable doubt. 526 U.S. at 252-253.

The fact that the applicable state statute made the decisive factual issue on punishment, that of racial motivation, part of the punishment question rather than an element of the criminal offense did not affect the Court's analysis. (How the fact issue was classified did not matter).

*Jones and Apprendi* are only common sense readings of *Mullaney v. Wilber*. In all three cases, the Court found that state statutes violated Due Process by allowing the trial judges to make additional factual findings at punishment which increased the defendants' possible sentences beyond that which was available under their indictments, (*Jones* and *Apprendi*), or by requiring the defendant to carry the burden of proof by showing that the killing was committed in the heat of passion due to a sudden cause, which would reduce a murder to a voluntary manslaughter, thus mitigating the potential punishment for the crime alleged in the indictment (*Mullaney*). In other words, Due Process in this regard can be extended to mitigating as well as aggravating factors if they are relied upon to increase a defendant's punishment beyond that

11

which is available after conviction at guilt/innocence.

E.

The Texas Capital Murder statutes are set up so that a finding of guilt in a capital case does not, in and of itself, mean that the defendant will be sentenced to death. A sentence of death is not possible until the jury determines that the three punishment issues are answered unanimously in favor of death.

As described above, the prosecution has the burden of proof beyond a reasonable doubt on the first two punishment issues, those of "future dangerousness" and "parties". As referenced above, the Court of Criminal Appeals has also conceded that as regards the mitigation issue, *"the burden is implicitly placed upon [defendant] to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case." Lawton,* 913 S.W.2d at 557. The overall capital sentencing procedure, therefore, is as follows: the jury finds the defendant guilty of capital murder. If there are no further factual findings during the punishment stage of the trial, the defendant must be sentenced to life imprisonment. In other words, a unanimous pro-death answer to all three of these factual findings are necessary and part of the process of obtaining a higher punishment, which fits the *Apprendi* requirement that they be an "issue upon which a factual determination raises the maximum punishment which is available." To that degree, both *Jones* and *Apprendi* require that the prosecution should the burden of proof on all three issues, including the one regarding mitigation, which was not done in this case.

That does not mean that the prosecution must bear both the burden of producing evidence of mitigation and the burden of disproving it beyond a reasonable doubt. In *Mullaney v. Wilber,*

12

for example, that burden would be split: that defense producing evidence of heat of passion and adequate cause, and the prosecution, during the guilt/innocence phase being required to disprove it beyond a reasonable doubt. This shifting burden is not unusual to criminal law, and occurs, for example, in all cases under the Texas Penal Code where there is a defense, as opposed to an affirmative defense, to a crime. See Tex. Pen. Code section 2.03. To the extent that the defense would benefit by an affirmative answer to the mitigation issue, it is incumbent upon the defense to produce some evidence of the existence of mitigating factors or circumstances. However, once the defense has satisfactorily produced some mitigating evidence on the issue, Due Process requires that the prosecution should bear the burden of persuading the jury that there is no mitigating evidence sufficient to warrant leniency. This is an appropriate allocation of the burden of proof because ultimately the issue addresses the appropriateness of a death sentence and the personal culpability of the defendant, which is not something the defense should be constitutionally required or expected to prove.

13

V.

## THE STATE VIOLATED ARTICLE 36
## OF THE VIENNA CONVENTION IN THE
## ARREST AND CONVICTION OF APPLICANT
## AND APPLICANT IS ENTITLED TO A NEW TRIAL

A.

Applicant is a citizen of the United Mexican States. Applicant was detained and arrested

and confined pending trial. While Applicant was informed of his rights as described in TEX.

CODE CRIM. PROC. Art. 15.17(a) and Art. 38.22(2)(a),  at no time from the moment of the

initial detention through the time of trial did any law enforcement agent or authority inform him

of his rights under Article 36 of the Vienna Convention on Consular Relations, April 24, 1963,

21 U.S.T. 77, 596 U.N.T.S. 261 ("Vienna Convention"). Applicant was thereby denied the right

to communicate with and obtain assistance from a consular officer of the United Mexican States.

As a result of interrogation by officers of the Houston Police Department incriminating evidence

was obtained for use against Applicant in the ensuing criminal proceeding, including physical

evidence and an incriminating statement. Applicant asserts that the evidence was obtained

illegally in violation of the Vienna Convention and was illegally used against him at trial thereby

denying him Due Process under the Fifth and Fourteenth Amendments of the United States

constitution. TEX. CODE CRIM. PROC. art. 38.23 mandates:

> No evidence obtained by an officer or other person in violation of any provisions of the
> Constitution or laws of the state of Texas, or of the Constitution or laws of the United

14

003053

States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

The Vienna Convention is a law of the United States and of Texas.

B.

Article 36 of the Vienna Convention provides in pertinent part:

1.    With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officials shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officials of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, **without delay, inform the consular post** of the sending State if, within its consular district, a national of that State **is arrested** or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody, or detention shall also be forwarded by the said authorities without delay. **The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;**

(c) consular officials shall have the right to visit a national of the sending State who is in prison, custody , or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have

15

the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2.   The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, **subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.**

Vienna Convention on Consular Relations, April 24, 1963, TAIS 6820, 21 U.S.T. 77, 596 UMTS 261 (emphasis added) (hereinafter "Vienna Convention"). In the language of the Vienna Convention, the "sending State" refers to the country that establishes a consular post in another country. The "receiving State" refers to the country that receives the sending State's consular representative. Thus, in the instant case, Mexico is the sending State and the United States is the receiving State.

Both the United States and Mexico are parties to the Vienna Convention which was ratified without any reservation by the United States on December 29, 1969.

C.

In *Rocha v. State,* 16 S.W.3d 1 (Tex.Crim.App. 2000) the Texas Court of Criminal Appeals held that the exclusionary rule of Article 38.23 did not apply to treaties. However, the court did qualify its holding saying; "Finally, holding that Article 38.23 does not apply to treaties does not preclude the application of a federal exclusionary rule. If the United States Supreme

16

Court decides that all jurisdictions in the United States must enforce Vienna Convention /violations through an exclusionary rule, then this Court would be bound, under the Supremacy Clause, to give effect to that holding.

At the time *Rocha* was decided, the United States Supreme Court had not ruled definitively or articulated a clear position on the enforceability of individual Article 36 claims. Although the Supreme Court addressed Article 36 in *per curiam* opinions in *Breard v. Greene*, 523 U.S. 327,375-378 (1998) and in *Federal Republic of Germany v. United States*, 526 U.S. 111, 112 (1999), both cases arose in the context of a provisional order of the IC. Prior to the IC's definitive resolution of the issue in *LaGrand Case (F.R.G. v. U.S.)*, 2001 I.C.J. (Judgment of June 27, 2001) (hereinafter "*LaGrand*"), there had been considerable debate over the binding effect of IC *provisional* measures; it was accepted that a final judgment of the IC was binding even though a provisional order might not be, and, under the U.N. charter, an advisory opinion of the IC is likewise not binding. Thus, the Supreme Court's response to a provisional order has little bearing on the (present or future) application of *LaGrand*. In addition, neither *Breard* nor the Supreme Court *per curiam* in *LaGrand* was a signed opinion resulting from the Court's normal briefing, argument and deliberations process. The Court itself noted in *Breard* that "[it] is unfortunate that this matter comes before us while proceedings are pending before the IC that might have been brought to that court earlier." *Breard*, 523 U.S. at 378. The Court maintained that it was required to "decide questions presented to it on the basis of law," *id.*, despite Justice Breyer's view, expressed in dissent, that "several of the issues raised . . . Are of sufficient difficulty to warrant less speedy consideration' and that " the nature of [Breard's claim, were we to accept it, [may] create a 'watershed rule of criminal procedure.'" *Id.* At 380. It is, moreover,

17

well-settled that decisions like *Breard* , denying *certiorari,* lack precedential value. Finally, the

Supreme Court was not squarely presented with, and did not issue a holding, regarding, either the

individual nature of the right secured by Article 36 or whether state procedural default rules may

bar consideration of an Article 36 claim mot previously raised in the courts. In any event, *Breard,*

was based entirely on federal law issues, including the federal "last in time" doctrine, which rests

on the notion that a treaty and a statute are on a par as sources of federal law so that the later-

adopted will control in the case of conflict.


### D.

The *LaGrand* decision is the first definitive holding by a tribunal of ultimate binding

authority regarding a violation of a foreign national's Article 36 rights. The IC definitively held:

(1)     Article 36, paragraph 1, creates "individual rights" for a detained foreign national

        to receive notification of his right to receive assistance from the consular officials

        of his own government, without delay following his detention and prior to trial,

        *LaGrand* ¶77;

(2)     this right is separate and distinct from, and not cumulative of, rights accorded

        under the laws and constitutions of the United States and its constituent state (Id. ¶

        91);

(3)     relief for an Article 36 violation does not require a showing of prejudice (Id. ¶74);

(4)     waiver may not be invoked by a State that has failed to provide a defendant his

        Article 36 notice of the right to receive consular assistance (Id. ¶60); and

(5)     neither the United States, nor any of its constituent states, may apply its

18

procedural default rules to deprive a foreign national of the opportunity to

challenge his conviction and sentence on the ground that he was deprived of his

rights under Article 36 to notice and to seek and obtain consular assistance from

his own government without delay (Id. ¶¶ 90-91).

D.

The United States and its constituent states are bound to follow *LaGrand* for the

following reasons:

(1)    the United States signed and ratified the Optional Protocol to the Vienna

Convention and thereby recognized that the IC's "interpretation or application of

the convention" is authoritative. Preamble; art. I. [2] Under Article 94 of the United

---

[2]    The Optional Protocol makes the IC the final arbiter of the Convention's
interpretation. The Optional Protocol provides:

The States parties to the present Protocol and to the Vienna Convention on
Consular Relations, hereinafter referred to as "the Convention," adopted by the
United Nations Conference held at Vienna from 4 March to 22 April 1963,

Expressing their wish to resort in all matters concerning them in respect of
any dispute arising out of the interpretation or application of the
Convention to the compulsory jurisdiction of the International Court of
Justice, unless some other form of settlement has ben agreed upon by the
parties within a reasonable period,

Have agreed as follows:

Article I

Disputes arising out of the interpretation or application of the Convention shall lie
with the compulsory jurisdiction of the International Court of Justice and may
accordingly be brought before the Court by an application made by any party to
the dispute being a Party to the present Protocol.

003058

Nations Charter, the United States has also "undertaken to comply with the decision of the International Court of Justice in any case to which it is a party." U.N. Charter art. 94, para. 1. [3] As a party to the *LaGrand* case the United States must comply with the ICJ's interpretation of Article 36 in that case.[4] Having acceded through the Optional Protocol to the ICJ's overriding authority to interpret Article 36, the United States must abide by the Interpretation in *LaGrand* with respect to nationals of all signatories.

2.    Under priciples of *stare decisis* cases which raise the same issues on the same, or sufficiently similar, material facts, the prior determination of legal issues prevails. As the most recent, thorough, and factually relevant and authortative decison regarding Article 36, it governs the outcome of Applicants case.

3.    Issue preclusion applies to make *LaGrand* binding on the United States in

---

[3]    The International court of Justice issues two types of opinion: binding and non-binding. Non-binding decisions are the result of advisory opinion that are issued upon request of parties designated by the U.N. Charter. Binding Decisions only result from 'contentious' cases, which arise when one State brings an action against another State involving a disputed claim arising under international law. Furthermore, IC jurisdiction is "compulsory"where the dispute concerns"the interpretation of a treaty." IC Statute, art. 36. Para. 2. See also Optional Protocol, art I. Since the *LaGrand* decision arose from a contentious case in which IC jurisdiction was compulsory, it is binding on the United States. Indeed, the decision is the most authoritative type of ruling issued under contemporary standards of international law.

[4]    The Statute of the International Court of Justice, which is incorporated by reference in the U.N. Charter, *see* U.N. Charter art. 92, provides that a decision"has no binding force except between the parties and in respect of th[e] particular case," art. 59. As discussed in this section, this does not affect the force of the decision as applicable law in this case. Furthermore, the Optional Protocol is not so limited.

20

Applicant's case. As a party to *LaGrand*, the United states as had a full and fair opportunity to litigate each of the issues that were decided by the ICJ in *LaGrand* with respect to the interpretation of Article 36 and that Applicant relies upon here.

4.      The *LaGrand* decison is binding on the United States by virtue of the paramount international law rule of *pacta sunt servanda* -- treaties must be observed -- which under a long line of U.S. Supreme Court decisions, "is a part of the law of the land." *The Nereide,* 13 U.s. (9 Cranch ) 388, 423 (1815) (Chief Justice Marshall); *The Paquete Habana,* 175. U.S. 677, 700 (1900) ("[i]nternational law is part of our law"). *See also* Detlev F. Vagts, The United States and Its Treaties: Observance and Breach, 95 Am.J. Int'l L. 313 (2001) (tracing the development and application of international law theoiries as a rule of decision for U.S.Courts.

### E.

Texas is bound to comply with *LaGrand* to the same extent as the United States because Article I, §1, of the Texas Constitution and the Supremacy Clause of Article VI of the U.S. Constitution make treaties of the United States the law in Texas. "That the general, great and essential principles of liberty and free government may be recognized and established, we declare: Texas is a free and independent State, subject only to the constitution of the United States, and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self government, unimpaired to all the States." TEX. CONST. art.I, § 1.

"[A]ll Treaties made, or which shall be made, under the Authority of the United States,

003060

shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, §2, cl.2.

Under the Supremacy Clause, at the time self-executing treaties such as the Vienna Convention come into force for the United States they become the law of its constituent states. *See* Restatement at §111(3), §115, cmt.c.  The obligations imposed by Article 36 of the Vienna Convention thus take precedence over Texas laws and rules to the extent that the application of the latter would conflict with Article 36, which is a treaty obligation of the United States.

F.

In *Arizona v. Fulminante,* 499 U.S. 279, 307-308, 111 S.Ct. 1246, 1252-1254, 113 L.Ed.2d 302 (1991), the Supreme Court distinguished between "stuctural defects" in the constitution of the trial mechanism, which defy analysis by "harmless error" standards and, on the other hand, trial errors which occur during the presentation of the case to the jury, and which may therefore be qualitatively assessed in the context of the other evidence presented.  Automatic reversal is the appropriate remedy for structural error it is the sort of error that affects the "framework within which the trial proceeds rather than simply error in the trial process."  499 U.S. at 310. Denial of counsel has long been recognized as structural error requiring reversal. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

The individual alien's Article 36 rights are an indispensable complement and adjunct to the procedural rights and protection afforded by U.S. courts. And just so, the consular assistance anticipated by Article 36  is also analogous to and can be seen as an indispensable complement to or adjunct of the representation provided by counsel to a foreign national facing criminal

22

proceedings. The consul is in a unique position to assist the foreign detainee facing criminal

charges in a strange land with little familiarity with its criminal justice system and possibly

language difficulties.  Consular officials are in a unique position to prevent false understandings

and prevent actions which may result in prejudice to the defendant. *Ledezma v. Iowa,* 626 N.W.

2d 134, 152 (Iowa 2001).

      The federal courts have recognized that foreign defendants pose special problems for our

justice system that implicate due process concerns. *See, e.g., Davis v. United States*, 512 U.S.

452, 460, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (recognizing that "requiring a clear assertion

of the right to counsel might disadvantage some suspects who -- because of fear, intimidation,

lack of linguistic skill, or a variety of other reasons -- will not clearly articulate their right to

counsel although they actually want to have a lawyer present"); *United States v. Duarte-*

*Higareda,* 113 F.3d 1000, 1003 (9th Cir. 1997) (Acknowledging that a "language barrier, like . . .

mental illness, is a 'salient fact' was known to the district court and put the court on notice that

[the defendant's]  waiver 'might be less than knowing and intelligent;").

      Without the assistance of consular officials the injury is "not only to the individual alien,

but also to the equity and efficacy of our criminal justice system." *United States v. Li,* 206 F.3d

56, 78 (1st Cir 2000) (Torruella, C.J., concurring and dissenting).

003062

VI.

### APPLICANT WAS DENIED EFFECTIVE ASISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO CHALLENGE THE ADMISSIBILITY OF EVIDENCE OBTAINED IN VIOLATION OF THE VIENNA TREATY

On August 19, 1999, trial counsel filed a very short Motion to Suppress Violation of International Treaty. [Tr. I A, 409-411]. The motion recited that Applicant was not warned of his tights under the Vienna convention. However, *no specific, general, or even nebulous relief was prayed for.*

On August 23, 1999, during a hearing on pretrial motions the Motion to Suppress Violation of International Treaty was addressed. Trial counsel identified the relief he was seekng by telling the court, " It's going towards -- we're asking for the indictment to be quashed or set aside as a result of him not being given the right to consult with his counsel[sic]." [IV SOF 18:21-24.] After the court pointed out that the motion did not plead to dismiss the indictment and the Assistant District Attorney related that informally trial counsel said that the relief sought was the indictment being set aside, trial counsel offered to amend the motion. [IV SOF 19:2-9.] No other action was taken by trial counsel on the basis of violation of Applicant's rights under the Vienna convention.

The Motion should be taken as an acknowledgment by the trial counsel that he was aware of the Vienna Convention. However he failed to pursue it as a basis for suppression of evidence

24

illegaly obtained or as a ground for setting aside the indictment or any other relief.Thereby trial

counsel failed to render less than objectively reasonable assistance of counsel.

VII.

WHEREFORE, Applicant prays for the Court, upon review of the issues, to recommend

that, relief be granted in the form of a new trial, on guilt as well as punishment; and to accept

this application for writ of habeas corpus and let issue a writ of habeas corpus.


Respectfully submitted,


_____

*Leslie M. Ribnik*
TBN 16826330
P. O. Box 271507
Houston, Texas 77277
713.665.0771 (O)
713.592.6073 (F)
ribnik@swbell.net (E-Mail)


_____

Susan W. Crump
TBN 05186300
P. O. Box 271507
Houston, Texas 77277
713.665.0771 (O)
713.592.6073 (F)

ATTORNEYS FOR APPLICANT
JUAN CARLOS ALVAREZ


25

003064

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Application for Post-Conviction Writ of Habeas Corpus Pursuant to Article 11.071 of the Code of Criminal Procedure was delivered by hand the Harris County District Attorney, Post-Conviction Writ Section, 201 Fannie, Houston, Texas 77002, on this the 10th day of September, 2001.

Leslie M. Ribnik

003065

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR POST-CONVICTION
WRIT OF HABEAS CORPUS PURSUANT TO
ARTICLE 11.071 OF THE CODE OF CRIMINAL PROCEDURE


STATE OF TEXAS          *
                        *
COUNTY OF HARRIS        *


On this day, LESLIE M. RIBNIK appeared before me, the undersigned notary public, and after I administered an oath to him upon his oath, he said:

"My name is Leslie M. Ribnik. I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge And are true and correct.

I am the attorney for Juan Carlos Alvarez, the applicant in the Petition for Post Conviction Writ of Habeas Corpus Pursuant to Article 11.071 of the Code of Criminal Procedure to which this Affidavit is attached. I prepared said Petition. I have reviewed the allegations contained therein with Juan Carlos Alvarez and the allegations are true according to him."

FURTHER AFFIANT SAITH NOT.


_____
Leslie M. Ribnik


SWORN TO AND SUBSCRIBED before me by Leslie M. Ribnik on this the _____ day of September, 2001.


_____


27

003066

NOTARY PUBLIC in and for
The State of Texas

003067