# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **JUAN CARLOS ALVAREZ,** | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **4:09-CV-03040** |
| | § | |
| **WILLIAM STEPHENS,** | § | **THIS IS A CAPITAL CASE.** |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## PETITIONER'S SUPPLEMENTAL BRIEF ADDRESSING THE IMPACT OF THE MOST RECENT STATE COURT PROCEEDINGS ON MR. ALVAREZ'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Robert L. McGlasson*
Texas Bar No. 13634050
Attorney at Law
1024 Clairemont Ave.
Decatur, GA 30030
TEL: 404-314-7664
FAX: 404-879-0005
Email: rlmcglasson@comcast.net

Skyla V. Olds
California Bar No. 241742
Admitted *Pro Hac Vice*
Attorney at Law
P.O. Box 682
Boyes Hot Springs, CA 95416
(510) 915-4168 (phone)
(707) 205-1492 (fax)
Email: skyla.olds@gmail.com

 Counsel For Petitioner Juan Alvarez
*Attorney in Charge

# I.    PROCEDURAL HISTORY

Juan Alvarez was arrested on June 20, 1998 and charged in a felony complaint with capital murder on July 2, 1998.  CR. 2.[1]  The trial court appointed John Denninger to represent Mr. Alvarez on August 19, 1998 and Barry Hards to sit as second chair on December 18, 1998.  CR. 322, 5. Frumencio Reyes was substituted as lead counsel on August 12, 1999 and Mr. Denninger remained on the case as second chair.  CR. 512.  Jury selection for Mr. Alvarez's capital case started on August 23, 1999, only eleven days after Mr. Reyes took over as lead counsel.  The State commenced the presentation of its guilt phase case on September 13, 1999 and rested on September 21, 1999.  The ill-prepared defense presented its entire guilt phase case in less than two hours on September 21, 1999.  CR. 546-47.

The jury returned a verdict finding Mr. Alvarez guilty of capital murder on September 22, 1999.  CR. 549.  Mr. Alvarez's penalty trial started on October 4, 1999 and lasted three days.  After deliberating over lunch for two and half hours, the jury answered the special sentencing questions such that Mr. Alvarez was sentenced to death.  CR. 556.

---

[1] Citations in this Petition are as follows: "CR. _" refers to the "Clerk's Record" in this

The Texas Court of Criminal Appeals ["CCA"] appointed R.P. Skip Cornelius to represent Mr. Alvarez on direct appeal. CR. 555. Mr. Cornelius missed the June 9, 2000 deadline for the filing of Mr. Alvarez's opening direct appeal brief, and the CCA issued an admonishment. Nearly two weeks later, on June 21, 2000, Mr. Cornelius requested and obtained an extension of time to file the brief. Four months later, after securing additional extensions, Mr. Cornelius filed Mr. Alvarez's direct appeal brief on October 30, 2000. The State filed its response on April 26, 2001. Mr. Cornelius waived the right to present oral arguments in support of the appeal. The CCA denied Mr. Alvarez's direct appeal on October 30, 2002 in an unpublished opinion. *Alvarez v. State*, No. 73,648 (Tex. Crim. App. Oct. 30, 2002) (not designated for publication).

While the case was pending on direct appeal, on December 14, 1999, the CCA appointed Houston attorney Leslie Ribnik to represent Mr. Alvarez in his state habeas proceedings.[2] Counsel Ribnik filed an application for writ of habeas corpus on September 10, 2001. The State filed an answer to the writ on December 21, 2001.

---

[2] Susan Crump, Mr. Ribnik's wife, was jointly appointed to represent Mr. Alvarez but no billing was submitted for her work, and the files contains no indication of any participation in representing Mr. Alvarez on her part, and all pleadings submitted on Mr. Alvarez's behalf were signed exclusively by Mr. Ribnik.

On March 25, 2005, Mr. Ribnik filed a supplemental brief requesting review and reconsideration of Mr. Alvarez's conviction and death sentence on the basis that, although Mr. Alvarez is a Mexican national, the authorities never advised him of his compulsory right to consular notification and assistance pursuant to article 36 the Vienna Convention on Consular Relations ["VCCR"]. The CCA ultimately determined that this was supplemental briefing to a claim in the original petition, rather than a successor petition.

On August 4, 2006, Mr. Ribnik was formally diagnosed with Parkinson's Disease; he had been experiencing conditions and effects from the disease for a number of years. Exh. 79,[3] Affidavit of Leslie Ribnik (October 8, 2006). As a result, the undersigned, attorney Robert McGlasson, substituted in for Mr. Ribnik as state habeas counsel on October 11, 2006. After reviewing case files and work conducted by prior habeas counsel Ribnik, and in reliance on Texas state law regarding the right to competent counsel in state habeas corpus proceedings, *see, e.g., Ex parte Kerr*, 64

---

[3] Exhibits to this Supplemental Brief maintain the exhibit numbers used in Mr. Alvarez's Amended Petition (Instrument No. 18) to prevent undue confusion. Citations to Exhibits 1-77 refer to the Exhibits to the Amended Petition (Instrument No. 18), all of which are incorporated herein by express reference. The new exhibits attached to this Supplemental Brief are numbered Exhibits 78-90. A full list of exhibits submitted in the Amended Petition and the additional exhibits attached here is set forth in the Index following this brief.

S.W.3d 414, 419 (Tex. Crim. App. 2002); *Ex parte Graves*, 70 S.W.3d 103, 114 (Tex. Crim. App. 2002); *Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000), on May 15, 2007, current habeas counsel filed a Motion to Withdraw Mr. Ribnik's Application for Writ of Habeas Corpus based on the fact that counsel Ribnik had not been competent to represent Mr. Alvarez at the time of his appointment because of his un-medicated and undiagnosed Parkinson's Disease. The state court never addressed this motion.

As directed by the state district court, on the same date, the parties filed proposed findings of facts and conclusions of law related to the initial state habeas writ. Respondent additionally filed an opposition to the motion to withdraw a few days later.

On February 7, 2008, the State filed Respondent's Amended Finding of Facts. On that same date, Mr. Alvarez filed a Motion for Evidentiary Hearing, Reply in Support of Application for Writ of Habeas Corpus and Motion Renewing Request for an Evidentiary Hearing to Resolve Controverted Material Facts, Motion Requesting Permission to Participate as *Pro Hac Vice* Counsel and Motion Supporting Applicant's Motion to Participate as Pro Hac Vice Counsel. The state court never ruled on any of these filings submitted by Mr. Alvarez.

The state court then requested both parties to submit proposed findings of facts by April 24, 2008. Prior to that, Mr. Alvarez filed a Motion for Discovery and Preservation of Evidence on April 17, 2008. On April 23, 2008, Respondent filed Amended Proposed Findings of Facts and Mr. Alvarez filed Applicant's Incomplete Proposed Finding of Facts and Conclusions of Law on April 24, 2008.

On May 23, 2008, the court issued Findings of Facts and Conclusions of Law, and an Order sending all documents related to Mr. Alvarez's case, 787007-A to the Texas Court of Criminal Appeals pursuant to Article 11.071 of the Texas Code of Criminal Procedure. The court did not rule on any of the Petitioner's other pending motions or pleadings.

On September 24, 2008, in *Ex Parte Juan Carlos Alvarez*, WR-62,426-01, the Texas Court of Criminal Appeals issued an Order denying relief on Application for Writ of Habeas Corpus Cause No. 787007 in the 338th District Court Harris County. The CCA adopted the habeas court's findings of fact and conclusions of law, except for findings #47 through #73 and conclusions #14 through #19.

On September 17, 2009, Mr. Alvarez filed a petition for writ of habeas corpus in this Court (Instrument. No.1). He also requested that this Court stay the proceedings and hold the petition in abeyance while he

exhausted an application in state habeas corpus proceedings related to *Brady* and DNA issues (Instrument No.5). The federal petition contained claims that were virtually identical to those set forth in the state exhaustion petition filed thereafter. On April 13, 2010, this Court entered an order (Instrument No. 12) granting Petitioner's motion to stay the case and hold it in abeyance, to permit Petitioner to return to state court to file an application for writ of habeas corpus related to the Brady DNA issues.

On April 23, 2010, Mr. Alvarez filed an Application for Writ of Habeas Corpus by a Person Sentenced to Death pursuant to Texas Code of Criminal Procedure Article 11.071, § 5 in the 338th Judicial District Court of Harris County, Texas, presenting four claims arising from false evidence and testimony presented by the State at his trial through lab technicians at the Houston Crime Lab. On May 11, 2010, the 338th District Court forwarded the Application to the CCA to determine whether the Application met the requirements of § 5 of Texas Code of Criminal Procedure Article 11.071.

On July 21, 2010, Mr. Alvarez submitted to the CCA a Supplemental Filing In Support of Application for Writ of Habeas Corpus providing additional information about a factually indistinguishable case that the CCA had recently determined met § 5 requirements. On September 15, 2010, the

CCA held that the allegations failed to satisfy the requirements of Article 11.071, § 5(a) and dismissed the Application as an abuse of the writ pursuant to Tex. Code Crim. Proc. Art. 11.071, § 5(c).  On October 21, 2010, Mr. Alvarez filed a motion requesting the CCA to reconsider the dismissal.   On November 17, 2010, the CCA denied the motion for rehearing.

On January 5, 2011, this Court entered an order reopening the federal habeas case and setting a briefing schedule (Instrument No.17).  Pursuant to the agreed scheduling order, Mr. Alvarez filed an amended federal petition for writ of habeas corpus on April 4, 2011.  Respondent filed an Answer on September 1, 2011.  On December 19, 2011, Mr. Alvarez filed a Reply to Respondent's Answer.

On May 22, 2012, this Court ordered Respondent to respond to two arguments raised in Petitioner's Reply that requested a stay of proceedings based on *Ex Parte Medina*, 361 S.W.3d 633 (Tex. Crim. App. 2011) (which had been decided in the interim period after the parties had returned to federal court), and/or excusal of procedural default based on recent U.S. Supreme Court case developments in *Martinez* and *Maples*.  Respondent filed a Supplement Brief addressing these issues on June 20, 2012. (Instrument No. 33).

On June 6, 2013, this Court stayed and held in abeyance the federal habeas proceedings to permit Mr. Alvarez to return to stay court to litigate the issue of initial habeas counsel Mr. Ribnik's deficient performance under *Ex Parte Medina, supra*, 361 S.W.3d 633. (Instrument No. 35). The Order held that the "circumstances of state habeas counsel's performance is [] an issue best addressed in the first instance by the Texas courts in light of *Trevino*." *Id.* at 4. The Court noted that the Texas courts "should have the first opportunity to consider whether Mr. Ribnik's alleged incompetency falls within the purview of *Medina* before this Court decides whether *Trevino* authorizes de novo federal review." *Id.*

Mr. Alvarez proceeded to litigate funding issues and prepare a successor petition to file in state court. After exhausting funding litigation, on October 16, 2014, Mr. Alvarez filed his un-funded successive state habeas application in the 338th District Court (Cause No. 787007-D).

On April 29, 2015, the CCA dismissed Mr. Alvarez's subsequent state habeas application, holding that Mr. Alvarez failed to satisfy the requirements of Tex. Code Crim. Proc. 11.071 § 5(a). *Ex Parte Juan Carlos Alvarez*, WR-62,426-04 (Tex. Crim. App. Apr. 29, 2015). In a concurring opinion joined by two other Justices, Justice Yearly observed that Mr. Alvarez had alleged adequate facts to establish the ineffective assistance of

both trial counsel and initial post-conviction habeas counsel, demonstrating that the claim was a substantial one that has some merit. He concluded that in this case, the federal court "may conduct their own review *de novo*, not deferentially (since there is no state decision on the merits to defer to), under *Martinez/Trevino*." *Ex Parte Juan Carlos Alvarez*, WR-62,426-04, Concurring Opinion at 2-3. The concurring opinion also endorsed the suggestion made by Mr. Alvarez that Texas jurisprudence should be reconsidered, and in particular, that the CCA should revisit *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), in light of recent United States Supreme Court decisions in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S.Ct. 1911 (2013). *Id*. at 1.

On July 15, 2015, Mr. Alvarez filed a Motion to reopen these federal habeas proceedings. (Instrument No. 47). On June 24, 2015, this Court ordered the Clerk to reopen the proceedings. (Instrument No. 48).

On July 13, 2015, the Court entered a Scheduling Order, (Instrument No. 50), directing that Petitioner file a supplemental brief addressing the effect of the most recent state court proceedings on the pending federal habeas litigation within ninety days of the order. Mr. Alvarez requested and obtained two extensions. This brief is timely filed. (*See* Instrument No. 57).

## II.    ARGUMENT

### A.    Claims of Ineffective Assistance of Trial Counsel in the Amended Petition are Not Procedurally Defaulted

Mr. Alvarez's position has been and continues to be that claims of ineffective assistance of trial counsel (Claims I and II), set forth in the Amended Petition (Instrument No. 18), are not procedurally defaulted. The factual and legal bases for these claims were fairly presented in state court in the initial state habeas proceedings, and any procedural default that would apply due to a ruling by the CCA was not an adequate and independent state bar. The arguments presenting this position are set forth in Petitioner's Reply Brief (Instrument No. 31) in Section IV, pp 25-38. They are re-alleged here and incorporated fully by reference.

### B.    If the Court finds the IAC Claims are Procedurally Defaulted, Initial State Habeas Counsel's Ineffective Representation Constitutes Cause to Excuse Procedural Default and the Claims Should be Reviewed *De Novo*

#### 1.    The impact of *Martinez* [4] and *Trevino* [5] on Mr. Alvarez's defaulted ineffective assistance of trial counsel claims

In *Martinez*, the U.S. Supreme Court held that ineffective state habeas counsel shall constitute cause to excuse the default of substantial ineffective-

---

[4] *Martinez v. Ryan*, 132 S.Ct. 1309 (2012).

[5] *Trevino v. Thaler*, 133 S.Ct. 1911 (2013).

assistance-of-trial-counsel claims. *Martinez*, 132 S.Ct. at 1316. This *Martinez* rule reflects an equitable judgment by the U.S. Supreme Court that capitally-sentenced state prisoners must be afforded full and unfettered access to at least one court to meaningfully challenge their convictions and sentences on the grounds that their trial counsel were ineffective under the Sixth Amendment. *See Martinez*, 132 S.Ct. at 1316 (expressing its concern that "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim . . . [a]nd if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims"). *Martinez* applies when, because of either a lack of initial-review state habeas counsel or ineffective state habeas counsel, a state prisoner was effectively denied access to the state courts to investigate and raise these claims, necessitating, in the Supreme Court's opinion, access to the federal courts to do so. *Id*. at 1318.

In reaching its decision that ineffective state habeas counsel shall constitute cause to excuse the default of substantial ineffective-assistance-of-trial-counsel claims, the Supreme Court repeatedly referenced the necessity of competent counsel to perform initial-review investigation and litigation of trial-counsel ineffectiveness claims in the state courts. *Id*. at 1312

("'defendants pursuing first-tier review . . . are generally ill equipped to represent themselves' because they do not have a brief from counsel or an opinion of the court addressing their claim of error") (*quoting Halbert v. Michigan*, 545 U.S. 605, 617 (2005)); *id.* at 1317 ("[t]o present a claim of ineffective assistance at trial in accordance with the State's procedures, then, a prisoner likely needs an effective attorney"); *id.* ("[t]he [unrepresented] prisoner, unlearned in the law, may not comply with the State's procedural rules or may misapprehend the substantive details of federal constitutional law.") (citations omitted).  As the Court noted, "[w]hile confined in prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record." *Id*.

Because "[t]he right to the effective assistance of counsel at trial is a bedrock principle in our justice system," then, the Supreme Court carved out the exception to *Coleman*[6] under which state habeas counsel's failure to reasonably investigate and scrutinize the quality of trial counsel's performance opens the door for federal counsel to do so, in an initial-review posture.  *See Ex parte Alvarez*, Case No. 62,426-04 (Tex. Crim. App. Apr. 29, 2015) (not designated for publication) (Yeary, J., joined by Johnson and

---

[6] *Coleman v. Thompson*, 501 U.S. 722 (1991).

Newel, JJ., concurring) ("Suffice it to say that I am persuaded that, should this Court refuse to reach the merits of Applicant's claim of ineffective assistance of trial counsel, the federal courts may do so, and indeed may conduct their own review *de novo*, not deferentially (since there is no state decision on the merits to defer to), under *Martinez/Trevino*.").

Under *Martinez* and *Trevino*, the federal courts were thus designated as the appropriate—***and the only guaranteed***—venue for initial review of Texas prisoners' trial counsel ineffectiveness claims when state habeas counsel ineffectively waived those claims in state court. The federal court may refuse *de novo* review of those claims only if it finds, after adequate time and resources have been afforded the petitioner to fully develop and present facts and argument on the issue of cause and prejudice under *Martinez* and *Trevino*, that the allegations are insubstantial, or if it finds that state habeas counsel did not perform below an objective standard of reasonableness.

The U.S. Court of Appeals for the Fifth Circuit has laid out a three-step process for determining whether cause and prejudice has been established to excuse the procedural default of trial counsel ineffectiveness claims raised in federal collateral proceedings. To establish cause and prejudice, a petitioner must demonstrate: (1) that counsel in initial-review

state collateral proceedings was deficient, meaning their performance fell below an objective standard of reasonableness; (2) that the underlying ineffective-assistance-of-trial-counsel claim is substantial, meaning it has "some merit"; and (3) that the petitioner suffered prejudice as a result of the unreasonable performance of his trial counsel. *Canales v. Stephens*, 765 F.3d 551, 567-68 (5th Cir. 2014).

With regard to the first prong of a *Martinez* cause argument, the Fifth Circuit has held that state habeas counsel's performance falls below an objective standard of reasonableness when counsel's failure to pursue a collateral mitigation investigation was not based on a strategic decision. *Id.* at 569. As Mr. Alvarez will demonstrate, counsel Ribnik's failure to conduct **any new** investigations on Mr. Alvarez's behalf was not the result of reasoned, strategic decision-making. Rather, Ribnik conducted no investigations on Mr. Alvarez's behalf because this was his standard *modus operandi* at the time of his appointment, and not because of any case-specific strategy or reasoning: Ribnik had a well-established practice in his capital habeas work of copying his prior writs verbatim, and raising non-case-specific, record-based claims. And, he was suffering from a debilitating neurological disease that even further limited the extent and quality of his advocacy.

With regard to the Fifth Circuit's second prong of a *Martinez* cause

argument, this Court must find that Mr. Alvarez's ineffective-assistance-of-

trial-counsel claims have "some merit". *Id*. at 570.  He need not prove the

validity of the claims, but merely that they show promise.  As Mr. Alvarez

has demonstrated in his prior pleadings, incorporated herein by express

reference and discussed, *infra*, trial counsel failed to adequately represent

Mr. Alvarez at both the guilt and penalty phases of his trial, conducting

almost no meaningful investigations before attempting to confront the

State's case at both phases of trial.  *See* section II.B.3, *infra*.  Moreover, their

failure to conduct meaningful investigations prejudiced Mr. Alvarez, such

that there is a reasonable probability that, had counsel conducted the

investigations that have now been conducted by the undersigned, "at least

one juror would have struck a different balance."  *Wiggins*, 539 U.S. at 537;

*id*.  In short, section II.B.3, *infra*, more than amply demonstrates that there is

"some merit" to Mr. Alvarez's trial ineffectiveness claims, and that they are

"adequate to deserve encouragement to proceed further."  *Miller-El v.

Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473,

484 (2000)).  Indeed, the CCA's concurring opinion conceded this very

point.  *Ex Parte Juan Carlos Alvarez*, WR-62,426-04, Concurring Opinion

at 2-3.

Finally, in order to demonstrate the ineffectiveness of state habeas counsel, the Fifth Circuit held in *Canales* that petitioners must demonstrate some prejudice resulting from trial counsel's deficient performance. *See Canales*, 765 F.3d at 568, 571. This is a mixed question of law and fact, requiring factual development in this Court. *Id.*; *see also Canales v. Stephens*, Case No. 2:03-cv-00069 (E.D. Tex. Sept. 21, 2015) (granting funds to investigate Mr. Canales' *Wiggins* claim for the prejudice analysis because "the implication of the Fifth Circuit's [remand] order is that Canales should be permitted to develop the factual basis of his claim"). This Court should, therefore, determine prejudice only after granting adequate time and resources to enable Mr. Alvarez to fully develop and present his trial and state habeas counsel ineffectiveness claims.

Importantly, Mr. Alvarez need only demonstrate a "reasonable likelihood" that the result of the state habeas proceeding would have been different had Ribnik investigated and presented the trial counsel ineffectiveness claims presented herein. *See Martinez*, 132 S.Ct. at 1318 (expressly applying the *Strickland* standard to this prong of the cause and prejudice analysis). It would place a heavier burden on Mr. Alvarez than the Supreme Court contemplated in *Martinez* to require a showing of actual prejudice – *i.e.* to require Mr. Alvarez to demonstrate that he is entitled to

relief on his ineffective-assistance-of-trial-counsel claims as an element of

*Martinez* cause. *See Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014)

("To establish ineffective assistance of state habeas counsel, Newbury must

show both that habeas counsel's performance – in failing to present to the

state habeas court the evidence that he presented for the first time in federal

court – was deficient and that he was prejudiced by the deficient

performance – that is, that there is a reasonable probability that he would

have been granted state habeas relief had the evidence been presented in the

state habeas proceedings.") (*citing Strickland*, 466 U.S. at 687).[7]

Once this Court determines that Mr. Alvarez has established cause

and prejudice under *Martinez*, it must consider the merits of his defaulted

ineffective-assistance-of-trial-counsel claims in an initial-review posture,

allowing full factual development and considering the claims under a *de*

---

[7] To the extent *Canales* can be interpreted as requiring a showing of *actual* prejudice resulting from state habeas counsel's unreasonable failure to investigate and raise the ineffective-assistance-of-trial-counsel claims raised for the first time in federal habeas— *see Canales*, 765 F.3d at 568 ("To excuse procedural default fully, Mr. Canales would then be required to prove that he suffered prejudice from the ineffective assistance of his trial counsel.")—Mr. Alvarez asserts this standard is incorrect under the plain language of *Martinez*, is inconsistent with prior Fifth Circuit precedent, and is inconsistent with the standard employed by other Circuit Courts. *See Martinez*, 132 S.Ct. at 1318; *Newbury*, 756 F.3d at 872; *Claborune v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014); *Glenn v. Wynder*, 743 F.3d 402, 409-11 (3d Cir. 2013); *Juniper v. Zook*, 2015 U.S. Dist. LEXIS 101473 at *13-14 (E.D. Va. 2015). *See also* Bohnert, Allen L., Wrestling with Equity: Identifiable Trends as the Federal Courts Grapple with the Practical Significance of *Martinez v. Ryan* and *Trevino v. Thaler*, 43 Hofstra L. Rev. 945, 950-51 (Summer, 2015) ("[W]hether they have done so explicitly or implicitly, courts in the Third, Fifth, Sixth, Ninth and Eleventh Circuits have articulated and/or applied an approach that melds the traditional "cause" inquiry and the traditional "actual prejudice" inquiry in the *Martinez/Trevino* context.").

*novo* standard of review. *See Ward v. Stephens*, 777 F.3d 250, 256 (5th Cir. 2015) ("The standard of review we apply depends on the state court's treatment of the federal claim. . . . For claims that are not adjudicated on the merits in the state court, however, we do not apply the deferential scheme laid out in § 2254(d) and instead apply a *de novo* standard of review.") (citations and quotations omitted); *Canales*, 765 F.3d at 571; *Allen v. Stephens*, 2015 U.S. App. LEXIS 12777 at *18 (5th Cir. 2015) (not designated for publication); *Rayford v. Stephens*, 2015 U.S. App. lEXIS 8445 at *32 (5th Cir. 2015) (not designated for publication).

Although *Martinez* does not address the right to competent counsel to conduct initial-review litigation of ineffectiveness claims in federal court, the same considerations that led the Supreme Court to conclude that competent counsel is necessary to conduct initial-review litigation in state court apply equally to initial-review litigation in federal court. A capital prisoner in federal habeas requires competent counsel to interpret federal constitutional law, comply with the federal rules, and uncover the facts necessary to test whether he received constitutionally adequate representation at trial. *See Martinez*, 132 S.Ct. at 1317; *see also McFarland v. Scott*, 512 U.S. 849, 854-55 (1994) ("[T]he right to appointed counsel

adheres prior to the filing of a formal, legally sufficient habeas corpus petition.").

Moreover, it was not necessary for the Supreme Court to address the post-*Martinez* right to competent federal court representation to pursue initial review of defaulted ineffectiveness claims in federal habeas. Unlike in the various state courts throughout the country, where state prisoners are guaranteed varying degrees of representation on collateral review (if they are guaranteed representation at all, *see Martinez*, 132 S.Ct. at 1319), 18 U.S.C. § 3599 has long guaranteed to capitally convicted state prisoners representation by conflict-free and otherwise competent counsel to conduct all appropriate federal habeas investigations and litigation. *See McFarland*, 512 U.S. at 859 (18 U.S.C. § 3599 guarantees provides capital defendants "a mandatory right to qualified legal counsel in [federal habeas] proceedings"); *Martel v. Clair*, 132 S. Ct. 1276, 1284–85 (2012) (Section 3599 "grants federal capital defendants and capital habeas petitioners enhanced rights of representation.").

The impact of *Martinez* on § 3599 was merely to broaden the scope of that statutorily guaranteed representation to include the investigation and litigation of defaulted claims relating to the ineffective assistance of trial counsel. *Compare Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005) (prior

to *Martinez*, a district court did not abuse its discretion in denying investigatory and expert funds "when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred…"), *with Mendoza v. Stephens*, 783 F.3d 203, 203 (5th Cir. 2015) (post-*Martinez*, appointing supplemental, conflict-free counsel to represent petitioner in district court to "establish cause for the procedural default of any ineffective-assistance-of-trial-counsel claims pursuant to *Martinez* and *Trevino* that he may raise, and [litigate] whether those claims merit relief."). Accordingly, post-*Martinez* and *Trevino*, Mr. Alvarez has the statutory right under § 3599 to the full range of competent representation contemplated by the Congress and the Supreme Court for capitally-convicted state prisoners with regard to his defaulted trial counsel ineffectiveness claims and his *Martinez* cause arguments. This includes the right to reasonably necessary resources to investigate his ineffectiveness claims and cause arguments, and the right to representation at a hearing to establish the bases for those claims and arguments.

Thus *Martinez* and *Trevino* provide a clear roadmap for this Court going forward: the Court must initially consider Mr. Alvarez's arguments that, on the face of the current record, he has established Mr. Ribnik's ineffectiveness in state habeas proceedings and sufficient merit to his

underlying trial counsel ineffectiveness claims to permit full and *de novo* merits review of his purportedly defaulted trial ineffectiveness claims. If so, Mr. Alvarez must be permitted adequate time and resources to fully investigate, develop, and present the trial claims to this Court in a full and fair evidentiary hearing.

If, however, the Court determines that the current record is insufficient to establish Mr. Ribnik's ineffectiveness in state habeas proceedings – because Mr. Alvarez has heretofore been denied any meaningful opportunity to investigate, develop and present this argument in any other court – he must be given such opportunity here. This will require the granting of time and resources sufficient to provide him a full and fair opportunity to present his position to this Court. It will require a full and fair evidentiary hearing in this Court, so that Mr. Alvarez will be allowed to fully present his state habeas counsel ineffectiveness argument.

> **2.** **Mr. Ribnik was deficient, as his performance fell below an objective standard of reasonableness**

As noted above, the current record is more than sufficient to establish that Leslie Ribnik provided ineffective assistance in his representation of Mr. Alvarez in state habeas proceedings in this case. The concurring opinion in the CCA agrees, while at the same time urging the Court to reconsider its existing law, which apparently provides no meaningful avenue of relief for

the ineffective representation provided by attorneys such as Mr. Ribnik. His incompetence in this case is best appreciated in the context of the underlying system in place at that time in Texas for the provision of state habeas counsel in capital cases.

In an effort to comply with AEDPA, the State of Texas created a procedure for the CCA "under rules and standards adopted by the court, [to] appoint competent counsel" for indigent death row inmates for state post-conviction appeals. TEX. CODE CRIM. PROC. art. 11.071 § 2(d) (amended 1999). Such counsel, the statute provided, "shall investigate expeditiously . . . the factual and legal grounds for the filing of an application for a writ of habeas corpus." *Id*. § 3(a).

The system that was set up for appointing attorneys to capital cases, however, failed to ensure that the attorneys were "competent". In fact, the State Bar of Texas Task Force on Habeas Counsel Training and Qualification, which studied the system and ultimately helped prompt the Legislature to create the Office of Capital Writs, observed that a new appointment system was necessary because the existing system had "resulted in a list containing lawyers who were, at best, unqualified to serve as capital habeas counsel and at worst, lawyers who . . . filed habeas writs copied verbatim from writs filed in other cases, lawyers who filed writs with

absolutely no cognizable claims, lawyers who were serving suspensions from the practice of law for neglecting their clients and even lawyers who were deceased." Ex. 89, State Bar of Texas Task Force on Habeas Counsel Training and Qualification, Task Force Report, April 27, 2007, at 8.

Mr. Alvarez was unfortunately one of the capital defendants saddled with just the kind of attorney cited in the Report, filing habeas writs copied verbatim from writs filed in other cases, and writs with absolutely no cognizable claims. Mr. Ribnik was appointed to represent Mr. Alvarez despite a pre-existing incompetent practice: prior to his appointment in this case Mr. Ribnik routinely failed to conduct the necessary investigations to develop cognizable habeas claims; and he followed that practice in this case. Moreover, by the time of his representation of Mr. Alvarez, Mr. Ribnik was also cognitively impaired by a debilitating neurological condition.

In this case, Mr. Ribnik filed an "application for writ of habeas corpus" containing three claims: the first claim was identical to claims Mr. Ribnik filed in at least two other state habeas petitions (*see infra*, for Mr. Resendiz and Mr. Will); it contained no facts specific to Mr. Alvarez or his case, no newly discovered evidence, and nothing besides a straight legal argument that could have been raised at trial and on direct appeal. The other two claims sought relief based on the State's violation of Mr. Alvarez's rights as

a Mexican national under the Vienna Convention on Consular Relations and trial counsel's ineffectiveness for failing to challenge the admissibility of evidence obtained in violation of Mr. Alvarez's Vienna Convention rights, but likewise contained no facts or arguments that were not based entirely on the trial record. The first of these two claims had already been raised and rejected by the CCA on direct appeal. There were no exhibits or other evidence presented to support these claims.

Filing a habeas writ is a complicated and involved process that is, or at least should be, based not only on a review and mastery of the existing trial record, but also on a full investigation of all aspects of the case, the prosecution, and the defense representation, and the development of facts wholly outside the record. The ABA Guidelines and the Guidelines and Standards for Texas Capital Counsel [hereinafter "Texas Guidelines"][8] set forth the abilities and duties required for the appointment and performance of habeas counsel. The Texas Guidelines begin the description of habeas counsel's general duties with the warning that:

---

[8] The Texas Bar Association's Guidelines and Standards for Capital Case Counsel were adopted by the State Bar Board of Directors on April 21, 2006. The Texas Guidelines largely duplicate the ABA Guidelines, originally adopted in 1989 (and revised since then), which set forth the basic responsibilities and practices employed by competent habeas counsel for years. The ABA Guidelines indicate that they are not aspirational, but instead "embody the current consensus about what is required to provide effective defense representation in capital cases." ABA Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases, revised Feb. 2003, at 7.

Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record- based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.

Texas Guidelines 12.2(B)(1)(a).

The Texas Guidelines set forth the specific responsibilities that detail what habeas counsel must do to prepare to file the state habeas writ. These mandate that counsel:

- "conduct a searching inquiry to assess whether any constitutional violations may have taken place, including – but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence, coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct" (12.2(B)(1)(c));
- "master the set of procedural rules and statutes that may restrict capital client's opportunity for federal habeas corpus review" (12.2(B)(1)(f));
- "establish a relationship of trust with the client" and "develop a relationship of trust with the client's family" (12.2(B)(2)(b));
- "keep the capital client informed of case developments" (12.2(B)(2)(c));
- "conduct a thorough and independent investigation of both the conviction and sentence" (12.2(B)(3)(a));
- "obtain and read the entire record of the trial"; "independently verify that the official record of all prior proceedings is complete, and to supplement if necessary"; "inspect the evidence and obtain the files of trial and appellate counsel"; and "interview prior counsel and members of the defense team" (12.2(B)(3)(b);
- "make an independent examination of all of the available evidence – both that which the jury heard and which it did not" (12.2(B)(3)(d));

- "conduct a guilt-innocence phase investigation regardless of any admission or statement by the capital client about the facts of the crime, or overwhelming evidence of guilt" (12.2(B)(4)(a));
- "interview most, if not all, of the critical witnesses for the prosecution and investigate their background" (12.2(B)(4)(e));
- "assess all of the non-testimonial evidence and consider whether to perform independent forensic testing" (12.2(B)(4)(f));
- "interview potential witnesses who might challenge the prosecution's version of events" (12.2(B)(4)(g));
- "maintain copies of media reports about the case to determine the effects of pretrial publicity" (12.2(B)(4)(j));
- "conduct a mitigation investigation" (12.2(B)(5)(a));
- "not rely on his or her own observations of the capital client's mental status as sufficient to detect the array of conditions that could be of critical importance" (12.2(B)(5)(b));
- "retain an independent mitigation specialist [...] to compile a comprehensive and well-documented psychosocial history of the client based on exhaustive investigation, interviews, and collection of documents" (12.2(B)(5)(c));
- "locate and interview the capital client's family members [...] and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others" (12.2(B)(5)(f));
- "investigate prior convictions and unadjudicated offenses" (12.2(B)(5)(h));
- "demand on behalf of the capital clients all resources necessary to provide high quality legal representation, to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts" (12.2(B)(6)(a));
- "consider every legal claim potentially available" (12.2(B)(7)(b));
- "preserve issues calling for a change in existing precedent" (12.2(B)(7)(c));
- "attach all available proof to the application" and "plead all factual allegations with the greatest possible specificity" (12.2(B)(7)(d)).

Texas Guidelines at 12.2(B).

Section 3 of the Texas Code of Criminal Procedure underscores this duty to develop facts and claims outside the record before filing a habeas application. TEX. CODE CRIM. PROC. art. 11.071 § (3)(a) (habeas counsel must "expeditiously" investigate, "before and after the appellate record is filed," the "factual and legal grounds" for filing a habeas application). *See Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000) (art. 11.071 "requires" investigation).

Mr. Ribnik failed to fulfill these fundamental duties. In the 23 months he had to investigate, prepare and file Mr. Alvarez's initial state habeas application, Mr. Ribnik did not conduct *any* fact investigation in the case, let alone the external investigation and development of new facts that are required to identify cognizable post-conviction issues. Mr. Ribnik has acknowledged his failure in this case:

> Prior to filing the writ on September 10, 2001, I did not have the assistance of an investigator or mitigation specialist though I did not request funding for such. However, I had discussed the possibility of investigating grounds for mitigation with a mitigation specialist. Except for review of trial testimony and evidence, and the substance of my conversation with the specialist, but without further actual investigation, I did not pursue a mitigation investigation.
>
> I did not attempt to locate or interview any of Mr. Alvarez's extended family or conduct any other investigation of his life in Mexico.
>
> I did not interview any of the jurors from Mr. Alvarez's case.

> Prior to filing the writ on September 10, 2001, I did not hire any expert witnesses nor did I consult with any experts or have anyone evaluate Mr. Alvarez.

Exh. 78, ¶¶ 12-15, Affidavit of Leslie M. Ribnik (May 14, 2007).

A review of Mr. Ribnik's affidavit indicates that he merely duplicated the work of Mr. Alvarez's trial lawyers and direct appeal attorney by preparing the writ based entirely on the record. He reviewed the transcripts from trial, looked through the state's file, and requested the case files from one (of three) of Mr. Alvarez's trial counsel. Exh. 78, Affidavit of Leslie M. Ribnik, (May 14, 2007) at ¶¶ 5, 6, and 10. He did not review or develop any information other than that which the prior attorneys had used. Even his record-based preparations were plagued by delay and missteps, which may have been caused in part by the cognitive impairments characteristic of early Parkinson's. For instance, although Mr. Ribnik obtained from Mr. Alvarez a consent form to release records on October 26, 1999, he failed to use it to request Mr. Alvarez's file from one of his trial attorneys until February 16, 2001, a full 15 months later. Exh. 78, Affidavit of Leslie M. Ribnik (May 14, 2007) at ¶¶ 4 and 10. He failed entirely to request the files of the other attorneys who had represented Mr. Alvarez.

Mr. Ribnik should have retained the services of an investigator and mitigation specialist, or at the least conducted the investigation himself. Mr.

Alvarez had extensive family in the Houston area, all of whom were available and eager to assist in any manner possible. Mr. Ribnik never interviewed any family members about what sort of mitigating information existed, information trial counsel also failed to develop. The extensive mitigation information later discovered and detailed in the claims below show exactly how significant this failure to investigate was to Mr. Alvarez's case.

As Araceli Alvarez, one of Mr. Alvarez's sisters, attested to in her affidavit:

> Mr. Ribnik never contacted me before he filed that document in September 2001. I know that Mr. Ribnik also never contacted any other member of our family prior to September 2001.
>
> Had Mr. Ribnik contacted me, I gladly would have met with him and provided any information he requested, including information about Juan's childhood and life. I know that everyone else in my family would also have done anything to help Mr. Ribnik with Juan's case.
>
> …
>
> Mr. Ribnik stated that he could not do anything for Juan because of the evidence presented against him at trial. He stated that he saw the case as a lost cause."
>
> Mr. Ribnik said that he had not done, nor could he do any new investigation into Juan's case because he did not have funding to do so. He explained to us that he was appointed by the state to defend Juan, but that he was not getting paid enough to be able to truly defend him.

Exh. 80, ¶¶ 5-6, 8-9, Affidavit of Araceli Alvarez and Translation Affidavit

of Naomi Terr.

Another sister, Norma Patricia Marroquin, also attested to Mr.

Ribnik's failure to establish a relationship with the family, interview them

for mitigation purposes, or keep them updated about the case:

> Mr. Ribnik never contacted me or any member of my family at any time before filing the document in September 2001.
>
> I am one of nine siblings. I am very close to all of my family, and keep in regular contact with them. Most of us see one another or speak on a daily basis. I know that Mr. Ribnik never contacted any of my siblings or any other member of Juan's family prior to September 2001.
>
> I would have been happy to meet with Mr. Ribnik to share with him any information I had about Juan and his life. I know that everyone else in my family feels the same. We all would have done anything to help Juan's lawyers with his case.
>
> …
>
> "[Long after the A writ was filed] I called Mr. Ribnik several [] times. Each time I called I had the same experience. I would leave a message and he would return my call several days later. When he finally called, I would try to ask about Juan's case, but he would cut it short and end the call without explaining what was going on with the case.
>
> …
>
> Mr. Ribnik seemed very negative and said there was not much he could do to help with Juan's case. Mr. Ribnik also spoke very slowly, in short sentences and without providing any detail. He seemed to struggle to find words to say and he did not say

very much.  [Describing Mr. Ribnik's actions at a meeting some time in 2003 after the writ was filed.]

Exh. 81, ¶¶ 6-7, 10, 15, Affidavit of Norma Patricia Marroquin and Translation Affidavit of Naomi Terr.

Mr. Ribnik never contacted a wide cross section of friends, acquaintances, and teachers to determine what trial counsel could have and should have gleaned from them.  He never looked outside the record to determine whether there were any issues of misconduct related to the jury's, prosecution's, defense attorneys', or trial court judge's behavior leading up to and during trial.  Mr. Ribnik's failures to conduct any investigation of non-record claims falls far below the accepted standards of practice of state habeas counsel recognized expressly set forth in the ABA and Texas Guidelines.

Mr. Ribnik's failure to hire an investigator and mitigation specialist or to conduct the necessary investigation himself; his failure to obtain funds to consult with forensics experts (despite the confusing presentation of forensics evidence used against Mr. Alvarez at trial); his failure to have experts evaluate Mr. Alvarez's mental health status (since no complete psychological evaluation had ever been completed); his failure to interview jurors; and his failure to interview Mr. Alvarez's family, friends, teachers and acquaintances, all were devastating to the quality of Mr. Alvarez's state

habeas proceedings. Without conducting these basic investigations, Mr. Ribnik could not identify or present any cognizable post-conviction claims, despite the availability of the substantial claims presented in these federal habeas corpus proceedings.

No claim of case-specific strategy can or does justify Mr. Ribnik's work in Mr. Alvarez's case. In fact, the type of representation he provided to Mr. Alvarez replicates the representation he provided all of his other capital state habeas clients.

Mr. Ribnik was admitted to the Texas Bar on November 3, 1989. Thereafter he was appointed to represent capitally convicted defendants in their state habeas proceedings in ten cases, including that of Mr. Alvarez. Mr. Ribnik was appointed in seven of these cases prior to his appointment to represent Mr. Alvarez on December 14, 1999.[9] After being appointed to represent Mr. Alvarez, Mr. Ribnik accepted appointment in two additional cases.[10]

A quick review of the nature and extent of the work he routinely performed in all of these cases more than establishes that the "minimalist,"

---

[9] These capital defendants are James Richard Dickerson, Hector Garcia-Torres, Shelton Denoria Jones, Michael Wayne Richard, Michael Durwood Griffith, Jorge Villanueva, and James Lewis Jackson.

[10] Angel Maturino Resendiz and Robert Gene Will.

record-claim-only approach he adopted in Mr. Alvarez's case was not strategically adopted or suited for this case. Instead, a pattern of this exact same approach emerges from even a cursory glance at applications for writs of habeas corpus that Mr. Ribnik prepared in all of his capital state habeas cases prior to his representation of Mr. Alvarez.

Mr. Alvarez has not had the resources available to fully investigate Mr. Ribnik's prior work, and has requested the resources to do so prior to the final disposition of this writ in a funding request. (Instrument Nos. 51, 58). However, even from the limited review so far possible, it is apparent that in all of Mr. Ribnik's state habeas cases, including Mr. Alvarez's, he consistently failed to conduct extra-record investigation or present any claims cognizable in post-conviction proceedings. His standard approach to preparing a habeas petition appears to have been to review the trial record, review the state's files, and talk with the defendant. The claims prepared for these cases are straight, record-based legal arguments that could have and should have been presented on direct appeal. The claims lack newly investigated facts, fail to contain any trial counsel ineffectiveness allegations that include any assertion, let alone evidence, of prejudice (a necessary aspect of any claim of ineffectiveness), and fail to reveal any investigation of guilt or penalty phase witnesses.

Concerns over Mr. Ribnik's competence in his capital state habeas corpus work have been widespread. *See, e.g.* Chuck Lindell, "Lawyer makes 1 case for 2 killers", Austin American-Statesman, Feb. 26, 2006, at A1 (discussing the boiler-plate and generic record-based issues that dominate some of Mr. Ribnik's other capital writs); Chuck Lidell, "Sloppy lawyers failing clients on death row", Austin American-Statesman, Oct. 26, 2006 (mentioning that the Texas Bar Committee on Legal Services to the Poor reviewed Mr. Ribnik's work on capital habeas cases and decided to take the extreme step of filing a grievance about him to the Bar). Exh. 88, Newspaper Articles. The same non-cognizable claim that Mr. Ribnik filed in the two referenced cases is one of the three claims that he presented in Mr. Alvarez's petition.

As in this case, Mr. Ribnik's deficient representation of Mr. Resendiz extended beyond the failure to file a writ of habeas corpus with cognizable claims. After representing Mr. Resendiz in the abysmal state habeas proceedings, Mr. Ribnik was appointed in March 2004 to file a federal habeas petition. On May 3, 2005, Mr. Ribnik filed a federal habeas petition with a single issue – the same issue he presented in Mr. Alvarez's, Mr. Will's, and Mr. Resendiz's state habeas petitions – containing no facts or arguments specific to the defendant. The Respondent filed a motion for

summary judgment of dismissal and the District Court ordered Mr. Ribnik to respond within 30 days.  Mr. Ribnik never filed a response, and the petition was dismissed.  Mr. Ribnik then failed to file a notice of appeal under Rule 4(a)(5)(A) until days after the deadline.  The federal district court observed that "Ribnik's unilateral action deprived his client of appellate review" and that Mr. Resendiz had "received ineffective assistance of counsel during federal habeas proceedings".  Exh. 82, *Resendiz v. Dretke*, November 22, 2005.  Consequently, because of Mr. Ribnik's ineffective assistance of counsel, Mr. Resendiz never received state or federal review of whatever claims he may have had.  He was executed on May 10, 2006.

Mr. Ribnik was appointed to represent Hector Garcia Torres on February 20, 1998, after another state habeas attorney had already filed a habeas corpus application devoid of any cognizable claims.  Mr. Ribnik failed to seek any funds for investigation, and failed to supplement the record with any new facts developed during his representation of Mr. Torres.  He was eventually removed from the case on April 4, 2006.  Exh. 84, *Ex Parte Hector Garcia*, Supplemental Application for Writ of Habeas Corpus Excerpt.

Mr. Ribnik filed an application for writ of habeas corpus for Michael Richard on April 3, 1998.  The writ presented only two issues and both were

based entirely on the trial record. The claims were not cognizable in post-conviction proceedings and presented no extra-records facts. On May 15, 2007, Mr. Ribnik withdrew from representing Mr. Richard during his federal habeas appeals because of his Parkinson's Disease. The Fifth Circuit had simultaneously rejected a request to file a successive petition in the case and ruled that appointment of new counsel was therefore unnecessary. Mr. Richard was left with no attorney and was executed a few months later on September 25, 2007. Exh. 85, Michael Richard Materials.

Mr. Ribnik was also appointed to represent Robert Gene Will in state habeas proceedings in 2002. On October 19, 2003, he filed an application for writ of habeas corpus containing only two claims. The majority of the writ was identical to the writ that Mr. Ribnik filed in Mr. Resendiz's case, and included the same first claim presented in Mr. Alvarez's writ. Both of Mr. Will's claims were entirely record-based and not cognizable in post-conviction proceedings. As in all of these cases, Mr. Ribnik had failed to conduct any factual investigation as required to develop cognizable claims at this stage of proceedings. Exh. 86, *Will v. Thaler*, Emergency Motion for Relief Excerpt.

During his representation in several of these cases, as presented in the state court proceedings in this case, Mr. Ribnik was additionally impaired

during his representation of Mr. Alvarez by Parkinson's Disease. Shortly

after Mr. Ribnik was diagnosed with an intermediate stage of Parkinson's on

August 4, 2006, he withdrew as counsel from all of his capital cases. *See*,

*e.g.*, Exh. 79, Affidavit of Leslie Ribnik (October 8, 2006), Exh. 84, Ex

Parte Hector Garcia, Supplemental Application for Writ of Habeas Corpus

Writ, Exh. 85, Michael Richard Materials, Exh. 86, *Will v. Thaler*,

Emergency Motion for Relief Excerpt. Shortly thereafter, on December 18,

2006, the Texas Court of Criminal Appeals removed Mr. Ribnik from the

list of attorneys approved to handle state habeas death penalty cases. *See*

Exh. 90, Letter from Abel Acosta, Chief Deputy Clerk, Texas Court of

Criminal Appeals to Sammy Khalil (Mar. 12, 2012).

After Mr. Ribnik withdrew from Mr. Alvarez's case, undersigned

counsel consulted with a neurologist, Dr. Michael Adelberg, who specializes

in assessing how neurological injuries and conditions impact mental

competence relative to specific types of jobs and job requirements. Dr.

Adelberg's assessment determined that, based on the diagnosis in August

2006 of intermediate stage Parkinson's disease, Mr. Ribnik was likely

impaired by the effects of Parkinson's disease dating back to the time of his

appointment in Mr. Alvarez's case in October 1999, to such an extent that he

would not have been competent as habeas counsel. Exh. 87, Affidavit of

Michael Adelberg, M.D. ¶11 ("It is my professional opinion that, as of the appointment date of October 14, 1999, it is probable that Mr. Ribnik was mentally impaired by the affects of Parkinson's disease to the degree that it made him unfit to serve in the capacity as habeas counsel for a capital appeal.").

Capital post-conviction litigation is complex and demanding work that requires counsel to have the ability to manage large volumes of information, develop salient facts and navigate through a highly complex and complicated legal framework. Because of the high level of cognitive functioning required by the work, the mental deficiencies associated with Parkinson's disease would undoubtedly cause significant impairment in the ability to function as competent counsel in a capital habeas corpus case. As Dr. Adelberg explained, this is true even during the initial stages of the disease: "Given the high degree of cognitive functioning required by litigators in complex capital cases as discussed in ¶9, even the aspects of early dementia, which are relatively subtle, and other early consequences of Parkinson's would significantly impair a person's ability to function competently as counsel." Exh. 87, Affidavit of Michael Adelberg, M.D. ¶12.

Petitioner has so far been denied any resources to hire and consult with an expert to determine the full impact of Mr. Ribnik's Parkinson's

disease, its deleterious effects on his cognitive abilities, and how it impaired his representation of Mr. Alvarez. When undersigned counsel for Mr. Alvarez consulted with Dr. Adelberg in 2006, he did not conduct any interview with Mr. Ribnik or other relevant individuals, and he was unable to review any of Mr. Ribnik's medical records or evaluate Mr. Ribnik personally. Just as in the state exhaustion proceedings, Mr. Alvarez has requested resources in these federal proceedings to conduct this investigation in order to develop how Mr. Ribnik's Parkinson's affected Mr. Ribnik's competency to represent Mr. Alvarez. (Instruments No. 51, 58).

Since the development of new facts through a thorough investigation outside the record forms the basis for cognizable claims in a habeas writ, Mr. Ribnik's failure to conduct *any* non-record factual investigations effectively deprived Mr. Alvarez of initial-review counsel in the state courts. Mr. Ribnik's work, muddled by the memory problems, slow thinking, and cognitive impairments of Parkinson's disease, consisted solely of reviewing the record and presenting what were essentially three direct appeal claims. His failure to fulfill the fundamental responsibilities and duties of capital habeas counsel denied Mr. Alvarez a full and fair opportunity to present any cognizable constitutional habeas claims.

This evidence more than amply demonstrates that Mr. Ribnik was ineffective under the two-prong *Strickland* standard, the requisite showing for *Martinez* cause. Nonetheless, should this Court be unpersuaded by the record, Mr. Alvarez is entitled to develop these facts more fully at a hearing, after conducting reasonably necessary investigations.

### 3. The underlying ineffective-assistance-of-trial-counsel claims are substantial and Mr. Alvarez was prejudiced by them

The existing record is also equally clear that Mr. Ribnik's abject failure to adequately represent Mr. Alvarez in state habeas corpus proceedings prejudiced the outcome in those proceedings, because substantial ineffective-assistance-of-trial counsel claims were waived. In short, and as the law set forth in *Martinez* and *Trevino* requires counsel here to show, there is clearly "some merit" to the underlying trial ineffectiveness claims presented herein, which Mr. Ribnik wholly overlooked.

Indeed, as noted above, when Mr. Alvarez's successive state habeas application was denied by the CCA on April 29, 2015, Justice Yearly observed in a concurring opinion signed by three Justices:

> I will not dwell on Applicant's present claim any further than to say that he alleges specific facts that are adequate to establish, if true, both: 1) the ineffective assistance of his trial counsel—at least in failing to investigate the existence of substantial mitigating evidence as required under *Wiggins v. Smith*, 539 U.S. 510 (2003) (if not otherwise); and 2) the ineffective

assistance of his initial post-conviction habeas attorney in failing to conduct the mitigation investigation that trial counsel should have conducted so that initial state habeas counsel would be able to plead and prove ineffective assistance of trial counsel in Applicant's initial writ application. Applicant has **"demonstrate[d] that [his] underlying ineffective-assistance-of-counsel claim is a substantial one, which is to say that [he has] demonstrate[d] that the claim has some merit."** *Martinez*, 132 S.Ct. at 1318, 1320, 1321; *Trevino*, 133 S.Ct. at 1914, 1921. Suffice it to say that I am persuaded that, should this Court refuse to reach the merits of Applicant's claim of ineffective assistance of trial counsel, the federal courts may do so, and indeed may conduct their own review *de novo*, not deferentially (since there is no state decision on the merits to defer to), under *Martinez/Trevino*.

*Ex Parte Juan Carlos Alvarez*, WR-62,426-04, Concurring Opinion at 2-3. (emphasis added). The existing record fully supports the CCA's observations and conclusions.

The underlying trial IAC claims presented in Mr. Alvarez's Amended Petition are indeed "substantial ones" that have "some merit." The full extent of the deficient performance of trial counsel and the consequential prejudice are set forth in Claims I and II of the Amended Petition. These claims, and the exhibits upon which they rely (including Exhibits 1-3, 5-8, 12-31, 44-49, 52, and 53), are incorporated herein by express reference. A summary of the primary trial IAC claim is set forth here.

Mr. Alvarez was represented at trial by a lead attorney who represented Mr. Alvarez for a mere 11 days prior to the commencement of

the trial. Unsurprisingly, trial counsel failed to make reasonable efforts to investigate, prepare, and present evidence on Mr. Alvarez's behalf during the pretrial, guilt, and penalty phases of his trial. Trial counsel's lack of familiarity with and attention to Mr. Alvarez's case throughout the trial was illustrated by his recurring failure to call witnesses by the proper name and to remember the name of the victims in arguments. (Counsel explained to the jury about one of the victims: "I can't remember his name—but the one that was with Ms. Varela at the time he got shot." XXIV R. 42).

Lead counsel also slept through portions of the trial. Affidavit of trial juror Joseph Millspaugh, Exh.11 ¶ 7 ("The lead lawyer, Mr. Reyes, who did all the questioning of witnesses, shocked us jurors by repeatedly falling asleep during the trial. He did this on a number of occasions, when the State was presenting its case and witnesses, and he was clearly asleep and not hearing what the witnesses were saying.").

During the pre-trial representation, trial counsel's deficient performance included failure to: avoid accepting a case that he had no time to adequately prepare for (representing Mr. Alvarez for a mere 11 days prior to trial commencing); assemble a proper defense team (no mitigation specialist was ever retained); review the state's case (lead counsel never even reviewed the prosecution's file in the case); ensure that a full and

complete investigation of all aspects of the case was conducted for both phases of trial (an investigator conducted only *six hours* of investigation in the case); file fact-specific pretrial motions; and prepare for and conduct an adequate *voir dire* during jury selection.

At the guilt-innocence phase of trial, trial counsel's deficient performance included his failure to: investigate facts or call witnesses to rebut the State's vulnerable theory of the case; object to gang references and mischaracterizations elicited by the State; retain experts or otherwise investigate and rebut the unreliable, inconsistent and unsupported use of forensic evidence (ballistic evidence from both scenes did not support the prosecution's theory that Mr. Alvarez was the fatal shooter at each crime scene); object to improper arguments; effectively cross-examine prosecution witnesses (counsel failed to use available forensic evidence that contradicted the testimony of the two key state witnesses who were present during the crimes); preserve objections; investigate, call or prepare various defense witnesses; present mental health and drug intoxication evidence; and request proper jury instructions.

At the penalty phase, trial counsel was equally unprepared. The entire defense presentation at sentencing lasted a mere five and a half hours. Trial counsel presented evidence from seven witnesses, all in a cursory and rote

manner that failed to elicit the powerful evidence of mitigation, including evidence of cognitive impairments and trauma, which was available and subsequently developed by undersigned counsel. In penalty phase closing argument, trial counsel only mentioned two facts in mitigation: that an expert had indicated that Mr. Alvarez did not pose a future danger, and that Mr. Alvarez was young. No other mitigating evidence or factors were identified from evidence presented at trial or discussed in argument.

Additional penalty phase deficiencies included counsel's failure to: investigate penalty phase theories, evidence, facts, and claims, including Mr. Alvarez's family background, education, mental health and cognitive impairments, and drug use history; uncover Mr. Alvarez's long-standing organic brain damage and post traumatic stress disorder; investigate the state's evidence in aggravation; effectively cross-examine prosecution witnesses regarding aggravating evidence; challenge the State's misleading use of gang affiliation with a competent expert witness qualified to evaluate issues related to gangs; retain a social historian, mental health expert or penalty phase investigator; obtain and present life history documents, evidence, witnesses, and testimony; prepare a competent closing argument; object to improper jury instructions; or request proper jury instructions.

These failures were prejudicial.  Competent trial representation would have resulted in a completely different trial at both phases.  Undersigned counsel conducted a preliminary investigation to uncover evidence that should have been presented at trial.  Although unable to conduct the thorough investigation that Mr. Alvarez is entitled to, in the Amended Petition undersigned counsel presented reports from several relevant experts, and declarations from thirty-three family members, friends, acquaintances, and teachers who provided important details about Mr. Alvarez's life.

These witnesses would have provided the following information to the jury:

Mr. Alvarez's life began in the small village of San Gabriel, in the Mexican State of San Luis Potosi.  Mr. Alvarez grew up in a home rife with domestic violence, infidelity, and abject poverty.  His own family was involved in a violent family feud with another clan, which culminated in the murders of Mr. Alvarez's father, grandfather, and paternal uncle.  These deaths shattered the family and devastated young Juan Alvarez.  He was only seven years old when he arrived at the scene of his father's dead body lying on the ground just after he was murdered.  Juan was terrorized by the death and became fearful and withdrawn.

After their father's death, while the family was in mourning, the feuding clan stepped up their harassment of Mr. Alvarez's family. Without their father, the head of the household, the Alvarez family struggled to survive, and everyone felt unsafe, always fearful of the constant terrorizing intimidation by the feuding family. The Alvarez family finally fled San Gabriel in the middle of the night, and headed for Monterrey, Mexico. Juan Alvarez was only eleven years old.

In Monterrey, the immediate fear of retaliation and violence from the feuding family responsible for his father's death was eased. Instead, however, the family began to disintegrate, as older members of the family abandoned the younger ones, leaving Monterrey for the United States in search of jobs and money.

Mr. Alvarez's mother was the first to leave, when she moved to Texas to find work to support her children. Juan Alvarez remained in Monterrey for about three years without his mother or a consistent adult guardian to raise him during the critical age of 11-14. He was passed around to various primary care givers, ranging from his older sisters, his aunt, a sister-in-law, and a sister-in-law's mother. Mr. Alvarez's mother eventually came to bring him back to Texas with her. He was anxious and fearful of moving to a completely new place.

When Mr. Alvarez finally immigrated to Houston, he was thrust into a disorienting and dangerous environment. He did not speak English, and his family could not afford to live in a safe neighborhood. He moved into a small apartment overcrowded with relatives, but still lacked meaningful supervision, since most of the parental figures worked long hours to support the family. His mother and older sister worked as live-in domestics in wealthier neighborhoods and could only come home on the weekends.

The neighborhood was fraught with gang violence and Mr. Alvarez was largely left unprotected and vulnerable. About a year after he arrived, Mr. Alvarez was brutally attacked by a group of high school boys and was severely beaten while they called him racist names and mocked him. Mr. Alvarez's friend, who witnessed the beating, informed the school about the incident but no one intervened to protect him. Mr. Alvarez continued to live in fear and the constant presence of the threat of violence.

All of these conditions left Mr. Alvarez highly vulnerable to the lure and safety of the protection of a local gang. One of his teachers witnessed a change in Mr. Alvarez as he was drawn into the social setting of the gang. She noticed that he was having some difficulties and appeared to gradually drift away while his grades declined and he became withdrawn.

Mr. Alvarez began to spend time with the only peer group available to provide a sense of safety, family, and community – the local neighborhood gang – and it was in the gang that he re-experienced the debilitating trauma of standing by helplessly as someone close to him was senselessly murdered. A few months prior to the crimes that resulted in his capital prosecution, Mr. Alvarez's friend Maurizio Rivas was murdered. As a trauma expert reports, the death of Mr. Alvarez's friend Maurizio Rivas was likely the triggering event that lead to the anomalous spate of violence that Mr. Alvarez was involved in, and which culminated in this capital prosecution.

Although the jury heard in passing that Mr. Alvarez's friend had been killed shortly before the crimes, the jury did not have the context of Mr. Alvarez's experiences in Mexico and Houston that was necessary to understand the especially damaging impact his friend's death would have on him, and therefore why that death would provided a particularly mitigating factor at that point in Mr. Alvarez's life. Trial counsel failed to understand the importance of this event and how it interacted with Mr. Alvarez's emotional trauma, and failed to help the jury understand Mr. Alvarez's involvement in a gang and the role that his friend's death played in the subsequent events.

Throughout all of these personal upheavals, the repeated abandonments, rotating parental figures, the emotional and cultural disorientation of being uprooted and starting a life in a new place, Mr. Alvarez was described as quiet, reserved, respectful, generous, and a good person.  The people who knew Juan Alvarez throughout each stage of his life describe him with a consistency that would have undoubtedly struck a sympathetic chord with the jury, allowing them to appreciate the crimes for what they were in Juan's life: not the acts of a predatory person with a predilection for violence, but rather an aberrational reaction brought on by an acutely and uniquely traumatic loss of yet another deeply important person in his life.  It was trial counsel's duty to help the jury understand both the circumstances and events which led to his participation in the violence, and also to understand who he was outside the context of this spate of violence.

Experts evaluated Mr. Alvarez and determined that he suffers from Post-Traumatic Stress Disorder, Major Depressive Disorder, and serious organic brain damage.  The jury was never informed of these conditions.

Dr. Frederic Sautter, an expert in trauma and its effects, evaluated Mr. Alvarez and determined that he met the DSM-IV criteria for post-traumatic stress disorder (PTSD), and that he had been suffering from PTSD since the

age of about ten years old up through the present, and that Mr. Alvarez met all of the criteria for a DSM-IV Axis I diagnosis of Major Depressive Disorder.

An expert such as Dr. Sautter could have explained to the jury just how the trauma effects played into Mr. Alvarez's reaction to witnessing his close friend's death, including acts of violence that led to his conviction for capital murder. The information would have placed a seemingly inexplicable series of tragic and violent behaviors into a larger framework that would have helped the jury understand how and why Mr. Alvarez may have "snapped" at the time of his friend's brutal and violent death.

Dr. Ricardo Weinstein conducted a neuropsychological evaluation of Mr. Alvarez. He discovered that Mr. Alvarez suffers from significant brain dysfunction that impaired his ability to plan and organize his behavior in a goal-directed manner. The brain dysfunction impaired his judgment, impulse control, and ability to foresee consequences of his behavior.

Gang expert John Hagedorn evaluated Mr. Alvarez and the use of gang evidence at his trial, as well as information regarding the gang to which Mr. Alvarez was alleged to have been involved, and his role in that gang. The State presented aggravating evidence of Mr. Alvarez's role in a gang and the nature of his violence that was damaging and misleading. An expert

such as Dr. Hagedorn could have provided the jury with information to confront and rebut the mischaracterization by the State and explain the mitigating nature of Mr. Alvarez's gang involvement and the implications for his lack of future dangerousness. The gang that Mr. Alvarez was involved with was not one that was engaged in criminal enterprises, but rather a neighborhood gang, which was made up of unsupervised peer groups with little formal structure that adolescents joined out of the need for protection and acceptance.

Mr. Alvarez's trial IAC claims attack the reliability of both his conviction and sentence. Had trial counsel not rendered ineffective assistance, and had the jury learned the information provided by the thirty-three social history witnesses and the three expert witnesses whose evidence was provided for the first time in these proceedings, the jury would not have found Mr. Alvarez guilty of capital murder and would not have sentenced him to death.

C.     **If the Court determines that Mr. Alvarez failed to establish cause and prejudice under *Martinez* on the basis of his pleadings alone, Mr. Alvarez is entitled to funding to conduct an adequate investigation and an evidentiary hearing to prove the elements of *Martinez***

As recognized by the dissenting Justices of the CCA and argued extensively in prior funding motions (Instrument Nos. 51 and 58), Mr.

Alvarez believes that the existing record establishes that his trial counsel ineffectiveness claims are substantial, and that Leslie Ribnik was ineffective in failing even to countenance the claims, let alone consider, investigate and present them in state habeas corpus proceedings. This satisfies *Martinez* and *Trevino*. If this Court agrees, then the next step would be to allow Mr. Alvarez sufficient time and resources to fully develop his trial counsel ineffectiveness claims, followed by an evidentiary hearing and the Court's *de novo* review of the merits.

If the Court determines that the existing record is inadequate in any respect regarding the relevant *Martinez* inquiry, either as to Mr. Ribnik's ineffectiveness, or the assertion that the underlying trial ineffectiveness claims have "some merit", then the next step should be to allow Mr. Alvarez sufficient time and resources to investigate, prepare and present facts supporting these *Martinez* prongs at an evidentiary hearing before the Court. In this event, Mr. Alvarez urges the Court to fully consider the arguments presented in Instruments No. 51 and 58, seeking the necessary investigative and expert funds to prove the allegations, and requests the opportunity to present factual support and legal evidence that he has met his burdens in an evidentiary hearing.

Respectfully Submitted,

/s/ Robert L. McGlasson

Robert L. McGlasson*
Texas Bar No. 13634050
Attorney at Law
1024 Clairemont Ave.
Decatur, GA 30030
TEL: 404-314-7664
FAX: 404-879-0005
Email: rlmcglasson@comcast.net

Skyla V. Olds
California Bar No. 241742
Admitted *Pro Hac Vice*
Attorney at Law
P.O. Box 682
Boyes Hot Springs, CA 95416
(510) 915-4168 (phone)
(707) 205-1492 (fax)
Email: skyla.olds@gmail.com

Counsel For Petitioner Juan Alvarez
*Attorney in Charge

**Certificate of Service**

I hereby certify that a true and correct copy of the foregoing

PETITIONER'S SUPPLEMENTAL BRIEF ADDRESSING THE IMPACT

OF THE MOST RECENT STATE COURT PROCEEDINGS ON MR.

ALVAREZ'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS been

served by CM/ECF upon counsel for Respondent:

>Mr. Stephen M. Hoffman, Esq.
>Office of the Texas Attorney General
>300 W. 15th Street, 8th Floor
>Austin, Texas 78701
>Telephone: (512) 936-1400
>Email: stephen.hoffman@oag.state.tx.us

This 14th day of December, 2015.

>/s/ Skyla V. Olds