UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN CARLOS ALVAREZ, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:09-CV-3040 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## <u>MEMORANDUM AND ORDER</u>

In 1999, a Texas jury convicted Juan Carlos Alvarez of capital murder and sentenced him to death. After availing himself of state appellate and habeas review, Alvarez filed a federal petition for a writ of habeas corpus. Respondent Lorie Davis has filed an answer. Having reviewed the extensive pleadings, the record, and the applicable law, the Court finds that Alvarez has not shown an entitlement to habeas relief. The Court, therefore, will deny his petition. The Court will not certify any issue for appellate consideration.

## BACKGROUND

In 1998, the State of Texas charged Alvarez with capital murder committed "during different criminal transactions but pursuant to the same scheme and course of conduct . . . ." Clerk's Record at 4. The State argued at trial that Alvarez, a member of the Southwest Cholos street gang, participated in two shootings related to tension with a rival gang, La Primera: (1) the June 6, 1998, murder of Michael Aguirre and his brother, Adrian Aguirre, at an apartment complex on Prestwood Street in Houston, Texas ("the Prestwood shooting") and (2) the June 17, 1998, shooting of José "Joey" Varela and Hugo Perez at an apartment complex on Woodfair Street in Houston, Texas ("the Woodfair shooting"). With regard to each murder, the State based

its case on eyewitness accounts, co-participant testimony, forensic evidence, and Alvarez's statement to the police.

*The Prestwood Shooting*

On June 6, 1998, a group of people celebrated a birthday party outside an apartment complex frequented by individuals associated with local street gangs. After a procession of five cars rolled up to the apartment complex, gunshots rang out. Bullets struck numerous people and killed two men, Adrian Aguirre and Michael Aguirre. Bullet casings found in the street were consistent with having been fired from an assault rifle and a .380.

Eyewitness testimony established Alvarez's identity as one of the gunmen. Miguel Reyes, a Southwest Cholos gang member, testified at trial that Alvarez directed and participated in the Prestwood shooting. Reyes met up with Alvarez, who was known as "El Chuco," and the men went to look for members of La Primera. As they traveled to various locations and met up with other members of the Southwest Cholos, Alvarez rode as a passenger in his maroon, four-door vehicle. Reyes explained that gang members then drove in a five-car procession to the Prestwood apartment complex, with Alvarez saying that they would "shoot at the guys from La Primera; at whomever." Tr. Vol. 19 at 191-93. The gang members found a large number of men in the parking lot clothed in white, the color worn by members of La Primera gang. Alvarez opened his car door, put a weapon similar to an AK-47 to his shoulder, and walked to the front of the vehicle. Alvarez opened fire. Only one other gang member, Santos "Spooky" Flores, shot at the men. [1]

---

[1] The police arrested Reyes a few days after the shooting in the company of Flores. A gun forensically tied to the murder was found in the front seat of the car in which he was driving. The State charged Reyes with engaging in organized crime in connection with the shootings, but agreed to reduce the charge to aggravated assault for his testimony. Tr. Vol. 20 at 12-14.

Forensic evidence confirmed Alvarez's involvement in the crime. The police recovered bullets forensic evidence showing that 7.62mm and .380 bullets had been fired at the scene. The victims had been killed by bullets fired from either a .38 or .357 revolver that was never recovered. The police eventually recovered a Russian Norinco assault rifle (often mistaken for an AK-47) from Alvarez's closet which fired 7.62mm rounds. Ten spent casings recovered from the scene matched Alvarez's weapon.

Alvarez provided the police a videotaped statement which suggested his involvement in the Prestwood shooting. In that statement, Alvarez professed his membership in the Southwest Cholos. He admitted that he used his car in the Prestwood shooting. He admitted that he knew that his fellow gang members would fire at what they believed were members of a rival gang. Alvarez admitted that he had furnished the assault rifle for the drive-by shooting, but denied firing a weapon himself. [2]

### The Woodfair Shooting

Witnesses also tied Alvarez to the Woodfair shooting. Flores' girlfriend testified that she saw him and Alvarez loading weapons before the Woodfair shooting. Alvarez carried a shotgun and assault rifle. They left in Alvarez's car. When the two men returned later that night, Alvarez had what appeared to be blood stains on his shirt.

Brandy Varela, sister of sixteen-year-old victim José Varela, testified that on June 17, 1998, she went outside her apartment to see her brother and his friend Hugo Perez. As her brother took a jack to help some men with a flat tire, she sensed someone coming toward her.

---

[2]     The State of Texas charged fellow gang member Flores with the offense of felony murder for his role in the Prestwood shootings. Flores provided the police a statement that, in a manner similar to the statement given by Alvarez, spread blame to his fellow gang memebrs: "[Flores] does not deny he was at the scene of the shooting, but contends that he was not involved in the shooting." *Santos Flores v. State*, 2001 WL 842020, at *1 (Tex. App. – [Hou] July 26, 2001). Flores told the police that Alvarez and Reyes "did all the shooting." *Id*. Flores's confession did not come before the jury in Alvarez's case.

She turned around and saw a man she later identified as Alvarez holding a shotgun. Alvarez yelled "Southwest Cholos, puto" and fired. She ran. A neighbor heard the gunshots and saw a man carrying a shotgun get into a car similar to that owned by Alvarez. When Brandy Varela returned she found the two men dead. José Varela had been killed by shotgun wounds to the face and back.

The police recovered a shotgun from Alvarez's apartment. Kristi Kim, a DNA analyst with the Houston Police Department Crime Lab, testified that the blood on the shotgun had DNA patterns consistent with Jose Varela's blood.

In his statement, Alvarez denied firing a weapon at the Woodfair shooting. The State, however, used several of his admissions to suggest his involvement in the crime, such as that: his maroon Nissan Altima was used in the shooting; his wife drove and he rode in the front seat to the location; they carried a shotgun and assault rifle; and he knew gang members planned on shooting somebody, most likely a member of the La Primera gang. The State used these admissions to argue that, even if Alvarez did not pull the trigger, he was guilty of capital murder under Texas' law of parties. Clerk's Record at 481.[3]

### The Defense

Frumencio Reyes and John L. Denninger represented Alvarez at trial.[4] The defense faced a daunting challenge in representing Alvarez: eyewitnesses had identified him as a shooter, gang members pointed to him as the one who ordered the violent acts, ballistic evidence tied him to the crimes, and his own statements confirmed some involvement. The State's choice to proceed

---

[3]      Under Texas' law of parties "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminal responsible, or by both." TEX. PENAL CODE 7.01.

[4]      The trial court appointed Denniger and Barry Hards to represent Alvarez. Shortly before trial, Alvarez retained Reyes to serve as lead counsel. Hards did not represent Alvarez as trial.

under Texas' law of parties allowed for Alvarez's conviction even if the defense could prove that he never fired a shot.

The defense only called two witnesses in the guilt/innocence phase, both of whom testified about the police's interaction with Alvarez and his wife that led to his arrest. The defense used that testimony to argue that police overbearing rendered his statement involuntary. The defense tried to poke holes in the State's case by challenging the credibility of various witnesses, strongly emphasizing their self-serving willingness to spread blame for the killings.

The jury found Alvarez guilty of capital murder.

*Punishment Phase*

The jury decided Alvarez's fate by answering three special issue questions:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Juan Carlos Alvarez, would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that Juan Carlos Alvarez, the defendant himself, actually caused the death of M. Aguirre and J. Varela, on the occasion in question, or if he did not actually cause the death of M. Aguirre and J. Varela, that he intended to kill M. Aguirre and J. Varela, or that he anticipated that a human life would be taken?

### Special Issue No. 3

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Juan Carlos Alvarez, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 500-502.

The State presented evidence in the punishment phase showing Alvarez's long, and

escalating, history of violent acts.  Alvarez had previously been convicted of aggravated assault with a deadly weapon for another crime for which he received eight years deferred adjudication. Alvarez had also committed other unadjudicated aggravated assaults.  The State called witnesses to describe Alvarez's repeated commission of other drive-by shootings, including one resulting in death.  The State presented strong evidence of Alvarez's gang violence, often carried out randomly and with little regard for bystanders.  The State's evidence provided a strong case for the jury to find that Alvarez would be a future societal danger.

The defense called six witnesses.  A corrections officer testified that Alvarez was quiet and did not usually cause any problems.  Four family members provided testimony about Alvarez's background.  Family members explained that Alvarez's family lived in San Potosi, Mexico, until his father was killed.  The family moved to Monterrey, and eventually moved to Houston, though Alvarez himself did not follow immediately.  Alvarez learned English.  Alvarez worked hard, helped provide for his family, did not abuse substances, was responsible, got along well with others, and was quiet.  Alvarez revisited the trauma of his father's death a second time when a friend was killed.

Dr. Ramon Laval, a psychologist, testified for the defense.  Dr. Laval met with Alvarez three times before trial and administered various testing instruments.  Testing revealed that Alvarez was depressed and did not deal well with feelings such as anger or sadness.  Alvarez, however, did not suffer from any mental illness.  Dr. Laval testified that Alvarez's response to the killing of a friend ultimately led to the murders for which the jury convicted him.  Dr. Laval testified that Alvarez was remorseful for his actions and would not pose a threat when incarcerated.

The jury answered Texas' special issue questions in a manner requiring the imposition of

a death sentence.

# PROCEDURAL HISTORY

The trial court appointed R. P. Cornelius to represent Alvarez on direct appeal from his conviction and sentence. Appellate counsel raised thirty-nine points of error in the Texas Court of Criminal Appeals.[5] The Court of Criminal Appeals affirmed in a lengthy unpublished opinion. *Alvarez v. State*, No. 73,648 slip op. (Tex. Crim. App. Oct. 30, 2002) (hereinafter cited as "Opinion at ___").

The trial court appointed Leslie M. Ribnik and Susan Crump to represent Alvarez on state habeas review.[6] Under the signature of both attorneys, Alvarez filed a state application for a post-conviction writ of habeas corpus on September 10, 2001. Alvarez's initial state habeas application raised three grounds for relief and spanned twenty-five pages.[7] On March 25, 2005, state habeas counsel filed a pleading captioned as a "supplemental brief.[8]

---

[5]     Alvarez exhausted claims 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21 from his federal petition on direct appeal.

[6]     The trial court appointed Leslie M. Ribnik and Susan Crump to represent Alvarez. Alvarez provides no information about the division of work between the attorneys. Unless necessary to distinguish one attorney, the Court will refer to both attorneys conjointly as "state habeas counsel." Alvarez assumes that Mr. Ribnik had primary, and almost exclusive, responsibility over the state habeas proceedings. Absent some contrary indication in the record, and in consideration of the fact that Ms. Crump signed pleadings in this case, the Court must assume that both attorneys worked on Alvarez's behalf. Additionally, Alvarez's amended federal habeas petition alleges that "[t]he Government of Mexico has been actively involved in Mr. Alvarez's defense since learning about his case" during the time Mr. Ribnk represented Alvarez and "has invested substantial resources in his defense." These resources have apparently included "counsel to assist Mr. Alvarez's postconviction lawyer in developing legal claims" and "retain[ing] a mitigation specialist[.]" (Instrument No. 18 at 172). The record is not clear whether these resources were available to Mr. Ribnik as he prepared the initial habeas application

[7]     Alvarez exhausted federal claims 2, 3, and 22 in his initial state habeas application.

[8]     Interplay between the trial-level court and the Court of Criminal Appeals signaled some confusion as to whether Alvarez's supplemental brief inserted new claims into the habeas proceedings. Texas law generally limits state habeas review to the claims raised and briefed in an inmate's initial habeas application. Texas law treats pleadings filed outside a statutorily set period as a new habeas action. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(f). The state trial-level habeas court construed the pleading to be a successive state habeas application and forwarded it to the Court of Criminal Appeals. The Court of Criminal Appeals eventually clarified that the supplemental brief was only an addendum to the initial habeas application: "the document does not assert additional claims, nor does it expand upon a claim already raised. Therefore, the trial court erred in declaring the document a subsequent application. The argument and authorities raised in the document should be considered; to the extent they are

On October 11, 2006, Mr. Ribnik notified the Court that he had been diagnosed with Parkinson's disease. Mr. Ribnik withdrew from representing Alvarez and the attorneys who now represent him on federal habeas review ("federal habeas counsel") substituted in as counsel of record. Through federal habeas counsel, Alvarez then filed a motion to withdraw the initial state habeas application. State Habeas Record at 235-54. The state courts apparently ignored that motion. Alvarez subsequently filed a lengthy Reply in Support of Application for Writ of Habeas Corpus. State Habeas Record at 390. The reply intended to "provide[] further evidentiary support for the legal claims raised in Mr. Alvarez's application for a writ of habeas corpus." State Habeas Record at 395. In doing so, the reply transformed a bare-bones, two-page ineffective-assistance-of-trial-counsel claim from the initial application that focused on counsel's failure to litigate a fulsome Vienna Convention claim into an intricate *Strickland* claim that exhaustively criticized nearly all facets of trial representation.[9]

After accepting submissions from each party, the lower state habeas court entered proposed findings and conclusions. The lower court's recommendation extensively discussed the claims from the initial habeas application and also addressed the arguments from the supplemental brief. In 2008, the Court of Criminal Appeals adopted most of the findings and conclusions and denied state habeas relief. *Ex parte Alvarez*, No. 62,426-01 (Tex. Crim. App. Sept. 24, 2008) (unpublished). The Court of Criminal Appeals did not adopt any findings or conclusions relating to the supplemental pleading.

Federal habeas review followed. Alvarez filed a lengthy federal petition for a writ of

---

appropriate, in conjunction with the claim already before the trial court." *Ex parte Alvarez*, No. WR-62,426-01 (Tex. Crim. App. June 6, 2007).

[9]     Alvarez justified expanding the scope of his *Strickland* claim by arguing that a successful Vienna Convention challenge would have brought about assistance from the Mexican Consulate, which in turn would have guaranteed effective trial representation in all areas. State Habeas Record att 443.

habeas corpus in 2009 raising twenty-two claims, many of which contained detailed sub-arguments:

1. Trial counsel provided constitutionally ineffective representation in the pretrial, guilt/innocence, and punishment phases of his trial.
2. Trial counsel ineffectively litigated the violation of Alvarez's rights under the Vienna Convention on Consular Relations.
3. The State of Texas denied Alvarez the right to consular assistance.
4. The State of Texas violated Alvarez's rights under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose problems with forensic testing in the police department crime laboratory.
5. The prosecution knowingly presented false testimony relating to evidence from the crime laboratory.
6. The presentation of evidence relating to DNA evidence amounted to prosecutorial misconduct.
7. The prosecution engaged in misconduct by maintaining and relying on evidence handled in the unprofessional conditions of the crime laboratory.
8. The trial court violated Alvarez's constitutional rights by allowing the introduction of extraneous offenses without engaging in any assessment of reliability or specifying a burden of proof.
9. The prosecutor repeatedly engaged in acts of misconduct.
10. The trial court unconstitutionally prevented the defense from presenting mitigating evidence.
11. The trial court erred by preventing the introduction of evidence during the cross-examination of a police officer.
12. The grand jury that indicted Alvarez underrepresented Hispanic persons.
13. The trial court unconstitutionally refused to instruct the jury on a lesser-included offense.
14. The trial court violated Alvarez's rights by refusing to suppress his videotaped statement to police officers.
15. The trial court should have suppressed evidence seized from Alvarez's home.
16. The trial court erred by disallowing cross-examination of a prosecution witness.
17. The trial court erred in admitting into evidence photographs of Alvarez apparently flashing gang signs.
18. Texas' manner of putting mitigating evidence before the jury violates the Constitution.
19. Texas' use of the "10/12 Rule" during penalty deliberations violated Alvarez's rights.
20. Texas fails to provide a punishment jury with sufficient information about the consequences of its answers to the special issues.
21. Application of Texas' law of parties in the penalty phase violated Alvarez's constitutional rights.
22. Texas' capital sentencing scheme deprived Alvarez of a fundamentally unfair trial.

(Instrument No. 1).

Alvarez's federal petition raised several constitutional claims for the first time. The

Court stayed the federal proceedings in 2010 to allow Alvarez an opportunity to exhaust his federal claims. (Instrument No. 12). Alvarez filed a subsequent state habeas action ("2010 habeas application") raising four grounds for relief: (1) the State suppressed information about problems with the testing of DNA evidence in violation of *Brady v. Maryland*; (2) the prosecution adduced false testimony through HPD Crime Lab analyst Christy Kim; (3) the prosecution committed misconduct through, and suppressed impeachment evidence regarding, testimony from Kim; and (4) the State engaged in misconduct by relying on the unreliable findings of the HPD Crime Lab.[10] The Court of Criminal Appeals dismissed Alvarez's successive state habeas action as an abuse of the writ. *Ex parte Alvarez*, No. 62,426-02 (Tex. Crim. App. Sept. 15, 2010).[11]

Alvarez returned to federal court and filed an amended petition. (Instrument No. 18). In 2011, Respondent filed an answer to the petition. (Instrument No. 22). Respondent argued that procedural law precluded federal consideration of many claims. Respondent also argued that none of Alvarez's claims merited federal habeas relief.

In his reply, Alvarez argued that, if his claims have not been exhausted, the Court should again stay and abate this case to allow state-court review because his state habeas counsel provided ineffective representation. (Instrument No. 31 at 38-46). Because the Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012) had recently decided that a state habeas attorney's representation can overcome a federal procedural bar, this Court in 2013 again stayed this case to

---

[10] The claims in the 2010 habeas application corresponded to claims three through seven from Alvarez's federal habeas petition.

[11] Alvarez requests funds for additional investigative efforts. (Instrument No. 58). Alvarez has not shown good cause for the allocation of additional funds and additional investigation is not reasonably necessary for a fair adjudication of his claims.

allow state court review.[12]  The Court ordered Alvarez to "expeditiously seek state court relief"
on his unexhausted claims.  (Instrument No. 35 at 4).  Alvarez did not immediately file another
state habeas application.  Instead, Alvarez sought funding at the trial-court level to investigate
and prepare habeas claims.  After the trial court denied all funds for the preparation of a
successive state habeas application and the Court of Criminal Appeals refused to intervene,
Alvarez finally filed a successive state habeas application ("2014 habeas application") raising
eleven claims.[13]  The Court of Criminal Appeals again held that Alvarez's successive application
amounted to an abuse of the writ.  *Ex parte Alvarez*, No. 62,426-04 (Tex. Crim. App. April 29,
2015)

This Court reopened the case.  The parties have now briefed whether developments in
habeas law provide an avenue for consideration of Alvarez's procedurally deficient claims.
(Instrument Nos. 61, 64).  Alvarez also moves for funds to develop the factual basis of some
claims.  (Instrument No. 58).  This case is ripe for adjudication.

## LEGAL STANDARDS AND PROCEDURAL LAW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's
conviction and sentence.  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v.
Estelle*, 463 U.S. 880, 887 (1983).  "Society's resources have been concentrated at [a criminal
trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence
of one of its citizens."  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v.
Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a

---

[12]     The Court observes that *Martinez* only provides relief from a procedural bar for ineffective-assistance-of-trial-counsel claims.  *See Davila v. Davis*, 137 S. Ct. 2058, 2070 (2017).

[13]     Alvarez's 2014 habeas application raised grounds for relief encompassing claim one from his federal petition.

defendant's rights are to be determined"). The States, therefore, "possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Federal habeas law honors as "a foundational principle of our federal system" that "[s]tate courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 15 (2013); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing AEDPA's "presumption that state courts know and follow the law"). Given this required deference to the state-court system, several principles circumscribe both the nature of federal habeas review and the availability of federal habeas relief.

As an initial matter, AEDPA "unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010) (quoting 28 U.S.C. § 2254(a)). Accordingly, "federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quotation omitted); *see also Corcoran*, 562 U.S. at 16; *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). "[O]nly noncompliance with federal law . . . renders a State's criminal judgment susceptible to collateral attack in the federal courts." *Corcoran*, 562 U.S. at 5.

How an inmate has litigated his federal constitutional claims determines the course of federal habeas adjudication. Under the exhaustion doctrine, AEDPA precludes federal relief on constitutional challenges that an inmate has raised for the first time in federal court. *See* 28 U.S.C. § 2254(b)(1). To comply with exhaustion, a petitioner must "fairly present his legal claim to the highest state court in a procedurally proper manner." *Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015) (quotation omitted). It is not enough for an inmate to make

"[v]ague or fleeting references to principles of constitutional law," *Canales v. Stephens*, 765 F.3d 551, 577 (5th Cir. 2014), or raise a "somewhat similar state-law claim," *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Instead, a petitioner must "present the state courts with the same claim he urges upon the federal courts." *Pickard v. Connor*, 404 U.S. 270 (1971)

As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate claims in compliance with state procedural law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Failing to follow state procedural law may bar federal review in two primary ways. First, "[a] federal habeas court has no power to review a state court's decision not to address a prisoner's federal claims if the state court made that decision on the basis of independent and adequate state procedural grounds." *Moses v. Davis*, 673 F. App'x 364, 367 (5th Cir. 2016) (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)); *see also Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2062 (2017) ("Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground."). Second, a "[p]rocedural default . . . occurs when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004) (quotation omitted).

Respondent contends that the operation of adequate and independent state procedural law precludes federal consideration of several claims. A petitioner has the burden to overcome a procedural bar. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). A petitioner meets this burden by showing: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably

resulted' in the conviction of one who is 'actually innocent[.]'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review. "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quotation omitted). Under AEDPA's rigorous requirements, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2).

To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's decision. *See White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). AEDPA review exist only to "guard against extreme malfunctions in the state criminal justice systems . . . ." *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376 (2015) (quotation omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S.

370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

An inmate's compliance with 28 U.S.C. § 2254(d) does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (observing that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). A habeas petitioner meeting his AEDPA burden must still comply with weighty jurisprudential tenets, such as the harmless error doctrine and the non-retroactivity principle, that bridle federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). Thus, any error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict,'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)), or would not require the creation of new constitutional law, *see Banks*,

536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).

With those standards in mind, the Court turns to the issues presented in Alvarez's federal petition. Given the unique procedural posture of the claims that Alvarez exhausted in each state proceeding, the Court will consider separately the grounds for relief he exhausted on direct appeal, in his initial state habeas action, and in his subsequent state habeas proceedings.

## CLAIMS RAISED ON DIRECT REVIEW

Alvarez raised claims eight through twenty-one on direct appeal from his conviction and sentence. Still, Respondent contends that Alvarez did not fully exhaust some of the claims in state court.[14] Also, Respondent argues that the Court of Criminal Appeals applied Texas procedural law to bar some of those issues from review. Respondent asserts that none of the claims Alvarez exhausted on direct appeal merit federal habeas relief.

## I. Claims Routinely Raised in Capital Cases (claims eight, eighteen, nineteen, and twenty)

As an initial matter, Alvarez raises four claims commonly advanced by capital inmates on federal habeas review. With regard to each claim, federal courts have repeatedly considered, and rejected, similar constitutional arguments. Given the well-established law, the Court will summarily deny claims eight, eighteen, nineteen, and twenty.

Alvarez's eighth claim complains that the trial court violated his constitutional rights by allowing the prosecution to present evidence of his extraneous offenses without "conduct[ing] any pretrial review of such evidence to determine reliability, or require the State to prove the

---

[14] For instance, when Alvarez raised claims nine and thirteen in state court he did not brief any federal constitutional basis for his arguments. Exhaustion requires that the claim be presented to the state court within a federal constitutional framework. *See Scott v. Hubert*, 635 F.3d 659, 667 (5th Cir. 2011). A claim is fairly presented when the petitioner "asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation." *Kittelson v. Dretke*, 426 F.3d 306, 315 (5th Cir. 2005) (internal quotation marks omitted).

existence of such evidence beyond a reasonable doubt. (Instrument No. 18 at 226).[15] The Supreme Court has never barred the use of unadjudicated offenses in the penalty phase of a capital murder trial nor held the admission of those offenses to any standard of proof. *See Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005). The Fifth Circuit has repeatedly and consistently held that Texas' use of unadjudicated, extraneous offenses in the penalty phase does not offend the Constitution. *See Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001); *Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir. 1996); *Muniz v. Johnson*, 132 F.3d 214, 224 (5th Cir. 1998); *Williams v. Lynaugh*, 814 F.2d 205, 207-08 (5th Cir. 1987).

Alvarez's eighteenth claim asserts that, because the trial court followed state law and defined mitigating evidence as "evidence that a juror might regard as reducing the defendant's *moral blameworthiness*," Tex. Code Crim. Pro. art. 37.071 § 2(f)(4) (emphasis added), the jury could not consider all his mitigating evidence. The Fifth Circuit has held that Texas' definition of mitigating factors "encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley*, 242 F.3d at 260). The Fifth Circuit has rejected similar attacks on Texas' description of mitigating evidence. *See Blue v. Thaler*, 665 F.3d 647, 666 (5th Cir. 2011); *Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007); *Jackson v. Dretke*, 181 F. App'x 400, 412–13 (5th Cir. 2006); *O'Brien v. Dretke*, 156 F. App'x 724, 735-36 (5th Cir. 2005).[16]

---

[15] Respondent correctly observes that claim eight is also procedurally barred.

[16] The Supreme Court itself has broadly used the term "moral blameworthiness" to describe that which a jury considers in effectuating the mitigation inquiry. *See Schriro v. Landrigan*, 550 U.S. 465, 499 (2007); *South Carolina v. Gathers*, 490 U.S. 805, 818 (1984). Specifically, the Supreme Court has used the term to describe how a jury gives effect to good character evidence that is not "directly relevant" to the crime. *Gathers*, 490 U.S. at 818. The language from Texas' special issue echoes language in *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), where the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the

In his nineteenth and twentieth grounds for relief, Alvarez alleges that TEX. CODE CRIM. PRO. art. 37.071 § 2(d)(2), (f)(2), violates the Constitution because it requires capital jurors to be instructed that a "no" answer to the two issues provided by § 2 (b)(1) and (2)[17] requires the agreement of ten or more of the jurors, while a "yes" answer requires the unanimous agreement of the jurors. A yes answer to the two questions requires "(e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b), it shall answer the following issue. . . ," which asks the jury to find if mitigating circumstances would warrant a life sentence without parole instead of death. Art. 37.071 § 2(e)(1). Art. 37.071 §2(f)(2) requires "(f) The court shall charge the jury that in answering the issue submitted under

---

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." "Far from rejecting the current scheme regarding mitigation, . . . the Supreme Court implicitly endorsed it" in *Penry v. Johnson,* 532 U.S. 782 (2001). *Oliver v. Quarterman*, 254 F. App'x 381, 387 (5th Cir. 2007).

[17] Section 2(b)(1) and (2) read

2(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

Section 2 (d) (2) reads

2(d) The court shall charge the jury that:

(1) . . . ;

(2) it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree. . . .

Subsection (e) of this article, the jury: (1) shall answer the issue 'yes' or 'no'; (2) may not answer the issue 'no' unless it agrees unanimously and may not answer the issue 'yes' unless 10 or more jurors agree." The federal courts have repeatedly and regularly rejected virtually indistinguishable arguments regarding this statutory requirement, known as the "10-12" or "12-10" Rule. *See Parr v. Thaler*, 481 F. App'x 872, 878-79 (5th Cir. 2012); *Blue*, 665 F.3d at 669-70; *Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir. 1994). In addition, both the Supreme Court and the Fifth Circuit have rejected Alvarez's argument that a jury must know of the effects of a holdout juror, a circumstance implicated by Texas' rule. *See Jones v. United States*, 527 U.S. 373, 382 (1999); *Blue*, 665 F.3d at 669-70; *Turner v. Quarterman*, 481 F3d 292, 300 (5th Cir. 2007); *Webb v. Collins*, 2 F.3d 93, 95-96 (5th Cir.1993).

As federal precedent clearly rejects claims eight, eighteen, nineteen, and twenty, and Alvarez does not provide a compelling reason to distinguish that precedent, the Court finds that he has not shown the availability of habeas relief.

## II. Prosecutorial Misconduct (claim nine)

In claim nine, Alvarez accuses the prosecution of repeatedly engaging in misconduct. "In habeas corpus proceedings, [this Court] review[s] allegedly improper prosecutorial statements under a strict standard." *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000). "Prosecutorial misconduct is not a ground for relief unless it casts serious doubt upon the correctness of the jury's verdict." *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001). "[T]he appropriate standard of review for [a prosecutorial misconduct] claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*,

477 U.S. 168, 181 (1986) (quotation marks and internal citations omitted). A federal court must "[f]irst initially decide whether or not the prosecutor made an improper remark." *United States v. Gallardo-Trapero,* 185 F.3d 307, 320 (5th Cir. 1999). Under Texas law, permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App. 1992). Then, a viable prosecutorial misconduct claim requires three considerations: "1) the magnitude of the prejudicial effect of the [prosecutorial action]; 2) the efficacy of any cautionary instruction given by the judge; and 3) the strength of the evidence supporting the conviction." *Styron*, 262 F.3d at 449. "Only where improper prosecutorial [actions] substantially affect the defendant's right to a fair trial do they require reversal." *Id.* When state court has decided an inmate's prosecutorial misconduct claim, AEDPA prevents federal courts from "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (quoting *Renico v. Lett*, 559 U.S. 766, 779 (2010)).

Alvarez highlights ten specific instances of alleged misconduct which he argues "are not exhaustive, but merely serve to demonstrate that, when considered individually or in the aggregate, it is clear that Mr. Alvarez did not receive a fair trial." (Instrument No. 18 at 239). Alvarez, however, only complained to the state courts about a few specific examples of misconduct. The Court will only consider the prosecutorial-misconduct arguments that Alvarez exhausted on direct appeal. In state court Alvarez accused the trial prosecutor of engaging in misconduct by:

1. showing gruesome photographs to the victim's sister (appellate claim 11);

2. asking a witness about whether someone had identified Alvarez (appellate claim 12);

3. striking at Alvarez over trial counsel's shoulder (appellate claim 20);

4. arguing outside the record and threatening the jury with sequestration (appellate claim 22);

5. arguing outside the record that other gang members could shoot jurors (appellate claim 23);

6. giving personal opinions of evidence (appellate claim 24); and

7. attacking Alvarez's race in the punishment phase (appellate claim 32).[18]

The Court of Criminal Appeals found that Alvarez defaulted consideration of his twelfth appellate claim under TEX. R. APP. P. 38.1 by not adequately briefing it. Opinion at 26. Also, the Court of Criminal Appeals concluded that Alvarez did not make an adequate contemporaneous objection at trial to the complaint in his thirty-second claim, resulting in a procedural default under TEX. R. APP. P. 33.1(a). Opinion at 39. Both Texas' adequate-briefing and contemporaneous-objection rules provide an adequate basis to bar federal habeas review. *See Leachman v. Stephens*, 581 F. App'x 390, 395 (5th Cir. 2014); *Roberts v. Thaler*, 681 F.3d 597, 608 (5th Cir. 2012). The remainder of Alvarez's prosecutorial-misconduct arguments are properly before the Court, and subject to AEDPA deference.

With regard to at least one allegation, the trial court instructed the jury to disregard the prosecutor's comments when trial counsel objected (appellate claim 22). Also, when trial counsel objected that the prosecution argued outside the record (appellate claim 24), the trial court told jurors to base their decision on the evidence. "[J]uries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quotation omitted). Considering the prosecutor's comments in context — especially in light of the trial judge's instructions, the length of the trial, and the overwhelming evidence of guilt — the Court

---

[18] In addition, Alvarez exhausted some allegations of prosecutorial misconduct that he does not specifically discuss in his federal habeas petition. The Court will not address issues Alvarez has not briefed.

summarily finds that the state courts were not unreasonable in finding that those comments did not infect the trial with unfairness. *See Norris v. Davis*, 826 F.3d 821, 832 (5th Cir. 2016).

While the trial court did not instruct the jury to disregard the other exhausted instances of alleged misconduct, Alvarez has not shown that the state court was unreasonable in denying relief. Alvarez claimed that the trial court should have granted a mistrial when the prosecution showed a gruesome photograph of one victim to his sister who was testifying. When the victim's sister "broke into tears," trial counsel objected and asked for a mistrial. The trial court, while expressing displeasure at the State's tactic, allowed the prosecution to question the witness about the photograph for the purposes of identification. The Court of Criminal Appeals observed that the prosecutor did not introduce the photograph into evidence and "neither mentioned the outburst in jury argument nor made any other efforts to exacerbate its effect." Opinion at 26. Because "[t]he trial court, who was in the best position to assess [the witness'] response and demeanor, determined that a mistrial was not warranted[,]" the trial court found no abuse of discretion. Given the trial court's unique vantage point of the photograph and its effect on the witness, the Court of Criminal Appeals was not unreasonable to defer to the lower court's decision.

Alvarez also complains that the prosecutor engaged in misconduct by telling jurors: "I am sure they would like for you not to use your common sense not to make inferences from the evidence, not to deduce things from the facts that you do hear." Tr. Vol. 24 at 60. The trial court overruled the defense's objection. The Court of Criminal Appeals found that "[t]he challenged comment did not accuse defense counsel of manufacturing evidence, contrast the ethical obligations of prosecutors and defense attorneys, or cast aspersion on defense counsel's veracity." Opinion at 35 (quotation omitted). Instead, the Court of Criminal Appeals found that

"[t]he challenged argument was not an attack on defense counsel, and could have been interpreted as an answer to the argument of opposing counsel." Opinion at 35. Alvarez has not shown that the appellate court's interpretation of the comment was unreasonable.

Finally, Alvarez complains that the prosecutor argued outside the record that other gang members could shoot jurors. (appellate claim 23). During closing argument, the prosecutor said: "Woe be it to anyone in southwest Houston who's out after dark wearing a white T-shirt. You might get shot. You might get ambushed by one of the defendant's buddies with the Southwest Cholos." Tr. Vol. 24 at 53. The trial testimony amply discussed high levels of tension between gangs, including that the victim's gang that customarily wore white, and that the victim's clothing strongly contributed to the random incident that caused his death. With that background, the Court of Criminal Appeals held that "[i]t is a reasonable deduction from the evidence of ongoing gang warfare that this type of situation could happen again. The comment did not fall outside the bounds of permissible jury argument." Opinion at 28.

Alvarez invites the Court not only to review each specific instance of alleged misconduct, but find "collectively and cumulatively" that the prosecution's statements and arguments violated the Constitution. (Instrument No. 18 at 243). Alvarez did not exhaust a cumulative-error argument with regard to this claim in state court. Nevertheless, this Court's review of the record reveals that the State did not cross the line from zealous advocacy into misconduct. The State may have struck hard blows, but not foul ones. *See Berger v. United States*, 295 U.S. 78, 88 (1935). Alvarez has not shown that the prosecution violated his rights. The Court, therefore, denies his prosecutorial misconduct claim.

## III.    Limitations on Mitigating Evidence (claim ten)

Alvarez's tenth claim argues that the trial court impermissibly prevented the defense from

presenting evidence through an expert witness, clinical psychologist Dr. Ramon Laval. The

defense retained Dr. Laval as a mental-health expert to develop mitigating evidence. Dr. Laval

met with Alvarez on several occasions prior to trial and administered two personality tests.

While the testing did not uncover any mental illness, Tr. Vol. 27 at 150-52, Dr. Laval formed the

opinion that Alvarez's potential for future dangerousness would decrease over time. Tr. Vol. 27

at 152.

The defense called Dr. Laval as a witness in the penalty phase. When trial counsel asked

Dr. Laval what factors contributed to his conclusion that Alvarez would not be a future threat, he

testified: "Age has been a very important factor that has been found statistically to relate to

dangerousness. And statistically speaking as people age . . . ." Tr. Vol. 27 at 153. At that point,

the prosecutor objected: "Those are hearsay studies that are ruled inadmissible in other Courts. I

object to that. That's the part of the basis for his -- I object. That's irrelevant." Tr. Vol. 27 at

153-54. The trial court sustained the prosecutor's objection.

Alvarez contends that the Constitution guaranteed his right to present testimony about

the mitigating effects of age on a capital inmate's dangerousness, and presumably the scientific

research supporting Dr. Laval's expert opinion. When Alvarez raised this claim on direct appeal,

the Court of Criminal Appeals found that he failed to preserve error:

> The trial court's judgment regarding the admissibility of expert testimony is
> subject to an abuse of discretion standard of review. *Lagrone v. State*, 942
> S.W.2d 602 616 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997). We note
> that pursuant to Tex. R. Evid. 703 experts are allowed to base an opinion upon
> facts or data that are not admissible, *e.g.* hearsay, if they are of a type reasonably
> relied upon by experts in the particular field in forming opinions or inferences on
> the subject. *Aguilar v. State*, 887 S.W.2d 27 29 n.8 (Tex. Crim. App. 1994).
> Laval generally stated that age was a factor that was statistically related to future
> dangerousness but did not say how this factor specifically pertained to [Alvarez].
> *See Rachal v. State*, 917 S.W.2d 799 815-18 (Tex. Crim. App.), *cert. denied*, 519
> U.S. 1043 (1996). [Alvarez] failed to make an offer of proof of Dr. Laval's
> excluded testimony, and we have held that "error in the exclusion of evidence

may not by urged unless the proponent perfected an offer of proof or a bill of exceptions." *Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 837 (2000); Tex. R. Evid. 103(a)(2). We cannot say that the trial court abused its discretion in sustaining the state's objection to Laval's testimony.

Opinion at 33. Under Texas law, failing to make an offer of proof does not preserve error for appellate review. *See Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999). An inmate must show what the excluded "testimony would have been, or an offer of a statement concerning what the excluded evidence would show," otherwise "nothing is presented for review." *Id.* "Failure to preserve an issue for appeal constitutes an independent and adequate state ground upon which to base a procedural bar to federal review." *Rosales v. Cockrell*, 48 F. App'x 103 (5th Cir. 2002) (relying on the state court's application of Tex. R. Evid. 103(a)(2)). Alvarez's failure to preserve error results in a procedural bar to federal review.

Even if he had not procedurally defaulted claim ten, Alvarez has not shown an entitlement to habeas relief. Respondent argues that, if the Court could reach the merits, Alvarez has not substantiated this claim nor shown that the exclusion of Dr. Laval's testimony harmed the defense.[19] Alvarez's failure to make an offer of proof not only results in a procedural bar, it precludes anything but speculation as to what Dr. Laval's testimony would have been had he been allowed to continue. Dr. Laval identified age as "a factor that was statistically related to future dangerousness, but did not say how this factor specifically pertained to [Alvarez]."

---

[19] The Supreme Court has held that the Constitution requires that a capital sentencer "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record, and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 605 n.12 (1978). Despite this loose language, the Supreme Court has refused to limit "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 605 n.12. *Lockett* and its progeny never preempted or federalized a state's ability to exclude some evidence under its traditional evidentiary framework. *See Nevada v. Jackson*, ___ U.S. ___, 133 S. Ct. 1990, 1992 (2013) ("Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."); *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) ("The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing procedures."); *Skipper v. South Carolina*, 476 U.S. 1, 7 n.2 (1986) ("We do not hold that all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating.").

Opinion at 33. Texas state law discourages expert testimony that is "general and not particularized" to an individual capital defendant. *Rachal v. State*, 917 S.W.2d 799, 817 (Tex. Crim. App. 1996). Alvarez did not make an offer of proof about what scientific-based testimony Dr. Laval could provide concerning the correlation between Alvarez's age and his propensity toward violence. With that omission, Alvarez has not shown how the studies that informed Dr. Laval's opinion were relevant to a mitigating feature in his life.

More importantly, the trial court did exclude all evidence about Alvarez's age. Respondent observes that "[t]he prosecutor's objection only went to hearsay (based on the studies) and relevance. Had he wanted to, counsel could have simply asked Laval his opinion on whether Alvarez's propensity for violence would have decreased over time." (Instrument No. 20 at 122). Trial counsel then could have asked Dr. Laval about what information contributed to that opinion, after which he could presumably have discussed Alvarez's age.

Even so, the jury knew that Alvarez was only twenty-one when he killed. Trial counsel told jurors that a life sentence would place Alvarez in prison for forty years at a minimum. Tr. Vol. 28 at 24-25. Trial counsel's closing argument emphasized that Alvarez's propensity for violence would decrease over time. Tr. Vol. 28 at 27. Even if Alvarez had preserved error, he has not shown that jurors would have responded differently if that information came through Dr. Laval.

Accordingly, claim ten is procedurally barred and, alternatively, Alvarez has not shown error of constitutional dimension in the trial court's limitation on Dr. Laval's testimony.

## IV.    Limitations on Evidence in the Guilt/Innocence Phase (claim eleven)

During the guilt/innocence phase of trial, a police officer testified that Alvarez's girlfriend Jessica Trevino provided more than one statement to the police. The defense wanted

to question the police officer about her various statements, and then introduce them into evidence during cross-examination. The trial court, however, sustained the State's objection to the various statements coming before the jury. Tr. Vol. 23 at 107-116. On state appellate review, Alvarez argued that the trial court should have allowed him to introduce the statements into evidence under the statement-against-interest exception to Texas' hearsay rules. The Court of Criminal Appeals found under state law that the trial court did not err in disallowing the introduction of additional statements by Trevino.

Alvarez's claim on federal habeas review differs fundamentally from that he presented in state court. Alvarez's state appellate argument focused on state law and only briefly mentioned that the suppression of Trevino's statement violated federal constitutional principles, but without citing any federal law. Alvarez's federal claim, in contrast, relies heavily on federal constitutional law, specifically jurisprudence relating to *Green v. Georgia*, 422 U.S. 95 (1979). In *Green*, the Supreme Court found a constitutional due process violation when the trial court excluded a witness' testimony that Green's co-defendant stated that he, not Green, committed the murder. Alvarez's state briefing did not rely on *Green* or expound on any federal aspect of his claim. To satisfy exhaustion, an inmate may not make vague and fleeting references to federal law in his state court briefing. Instead, "a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." *Gray v. Netherland,* 518 U.S. 152, 162-63 (1996); *see also Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) ( "A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial

fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement."). Because Alvarez did not alert the state courts to his reliance on *Green* and related constitutional principles, he did not put his federal arguments before the state courts in an actionable manner. Alvarez did not exhaust claim eleven for the purposes of federal habeas review.

Even if the Court could consider Alvarez's federal arguments, the Fifth Circuit has given *Green* a "narrow reading." *Neal v. Puckett*, 286 F.3d 230, 242 (5th Cir. 2002); *see also Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir. 1983) ("We think that *Green* is limited to its facts, and certainly did not federalize the law of evidence . . . [although] certain egregious evidentiary errors may be redressed by the due process clause.").[20] The Supreme Court said that a defendant is not denied a fair opportunity to defend himself "whenever critical evidence favorable to him is excluded." *Montana v. Egelhoff,* 518 U.S. 37, 53 (1996). *Green* made clear that state rules of evidence are applicable, and do not necessarily require the admission of otherwise inadmissible evidence unless that evidence is both necessary to the defense and carries sufficient independent indicia of reliability. *See Simmons v. Epps*, 654 F.3d 526, 543 (5th Cir. 2011). Under *Green*, federal relief will be warranted only when the excluded evidence "is a crucial, critical, highly significant factor in the context of the entire trial." *Johnson v. Puckett*, 176 F.3d 809, 821 (5th Cir. 1999).

While possibly helpful to the defense, the excluded statements in this case were not

---

[20]     Respondent argues that *Green* only applies to the sentencing phase of trial. While *Green* applies to sentencing, it only extended relevant precedent that governed hearsay introduced in the guilt/innocence phase. In *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), the Supreme Court held that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *See Simmons v. Epps*, 654 F.3d 526, 542 (5th Cir. 2011) (observing that *Green* extended *Chambers* to capital sentencing). However, both *Chambers* and *Green* recognize that a federal habeas court's review of state-court evidentiary rulings "is limited to determining whether a trial judge's error is so extreme that it constituted a denial of fundamental fairness." *Jackson v. Johnson*, 194 F.3d 641, 656 (5th Cir. 1999).

highly relevant to any critical issue. The trial court's ruling excluded Trevino's first police statement in which she blamed the shootings on someone other than Alvarez. This Court honors the state court's factual determination that the excluded statements "lacked the necessary indicia of trustworthiness. Trevino was [Alvarez's] girlfriend and was living with him at the time of the shootings. Her statements were not spontaneous; rather, they were made in response to custodial interrogation after [Alvarez] became a suspect." Opinion at 21. "More importantly, Trevino admitted that she did not tell the truth in her first statement and changed her story in the second statement." Opinion at 21. In that respect, the evidence excluded here differs fundamentally from that in *Green*. Also, with the State's reliance on Texas' law of the parties, Trevino's first statement would not measurably have changed how the jury viewed Alvarez's guilt.

Even if the Court could fully consider Alvarez's federal claim, he has not shown that he merits federal habeas relief.

## V.     Racial Composition of the Grand Jury (claim twelve)

Alvarez claims that the State violated several constitutional provisions because the grand jury that indicted him did not represent a fair cross-section of the community. Alvarez specifically identifies the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments as creating the legal background for his challenge to the manner in which Texas selects grand jurors.

Trial counsel filed a pre-trial motion to set aside the indictment because the grand jury underrepresented Hispanics, the jury commission had no Hispanic members, and the process disproportionally excluded Hispanics from jury service. Clerk's Record at 315-30, 420-39. Alvarez bases his claim on a comparison of surnames showed that only 447 of 3,614 grand jury members in the decade before trial appeared to be of Hispanic origin, a number lower than one would expect given the Hispanic population in Harris County. Alvarez attributes this disparity to

the "key man" system where judges select the grand jury commissioners, who in turn select grand jurors.

The Constitution does not tolerate racial discrimination at any point in the criminal justice system. In *Castaneda v. Partida*, 430 U.S. 482 (1977), the Supreme Court defined the requirements for a prima facie showing of an equal protection violation in the grand jury context: first, that the excluded group is "a recognizable, distinct class, singled out for different treatment"; second, the defendant must prove the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time"; third, a selection procedure that is "susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." Upon showing of this prima facie case, "the burden then shifts to the State to rebut that case." *Id*. at 495.

When Alvarez raised this claim on direct review, the Court of Criminal Appeals assumed that he had met the first and third prongs of the *Casteneda* test. The Court of Criminal Appeals, however, found that he had not met the second prong because he based his claim on "'Spanish surnamed persons who served on a grand jury in Harris County . . . ." Opinion at 4. The Court of Criminal Appeals relied on prior precedent which held that "'use of general population figures and Spanish surnames involves a degree of uncertainty' and that '[t]he population of persons eligible to serve on grand juries is a better baseline figure from which to gauge discrimination than the general population." Opinion at 4 (quoting *Ovalle v. State*, 13 S.W.3d 774, 779 (Tex. Crim. App. 2000)).

On federal review, Alvarez continues to make unsupported allegations about the number of individuals on voter registration lists with "Spanish-sounding" surnames. Early federal cases

treated a Spanish surname and Hispanic heritage as synonymous. *See Castaneda*, 430 U.S. at 486 (assuming "that all the persons of Spanish language or Spanish surname were Mexican-Americans"); *Hernandez v. State of Tex.*, 347 U.S. 475, 481 (1954) ("[J]ust as persons of a different race are distinguished by color, these Spanish names provide ready identification of the members of this class.").[21]  Recent cases, however, have called that assumption into question.  In another context, the Fifth Circuit has found that "[t]he use of 'Spanish-surname' [identification] is novel and highly problematic . . . because of its tendency to misidentify Hispanic persons as non-Hispanic and vice-versa." *Rodriguez v. Bexar County, Tex.*, 385 F.3d 853, 867 (5th Cir. 2004).  "[W]ithout a strict showing of its probativeness, Spanish-surname data are disfavored." *Id.*  Simply, "[s]tereotypical ethnic or religious characterizations of surnames are unreliable and only tenuous indicia of a jury's makeup." *United States v. Gelb*, 881 F.2d 1155, 1161-62 (2nd Cir. 1989); *see also United States v. Bucci*, 839 F.2d 825, 834 (1st Cir. 1988); *United States v. Sgro*, 816 F.2d 30, 33 (1st Cir. 1987).  The Fifth Circuit has found that "[s]uch evidence is clearly insufficient for establishing the actual number of Hispanic grand jurors and, by extension, the ratio between Hispanic and non-Hispanic grand jurors." *Vasquez v. Thaler*, 505 F. App'x 319, 334 (5th Cir. 2013); *see also Paredes v. Quarterman*, 574 F.3d 281, 290 (5th Cir. 2009) (rejecting as "irrelevant" and "unreliable" grand jury data consisting of a table "purporting to show the number of people with Hispanic names").  Alvarez, therefore, has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## VI.  Lesser-Included-Offense Instruction (claim thirteen)

---

[21]     At least two faulty assumptions plague the earlier cases: (1) all persons with a "Spanish surname" are Mexican-American to the exclusion of ancestry from the many other Spanish-speaking nations; and (2) persons bearing a "Spanish surname" have not received that name through interracial marriage or a mixed racial heritage.

The State of Texas charged Alvarez under TEX. PENAL CODE 19.03(a)(7), which allows a capital murder conviction if "the person murders more than one person" under two disjunctive circumstances: "(A) during the same criminal transaction; or (B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." The indictment in this case specified that the two murders occurred during "different criminal transactions" but "pursuant to the same scheme and course of conduct." Clerk's Record at 4. At the close of the guilt/innocence phase, trial counsel unsuccessfully requested that the trial court deliver a lesser-included-offense instruction on murder. Tr. Vol. 23 at 123-24. The trial court's instructions only allowed the jury two options: convict Alvarez of capital murder for two killings during the "same scheme or course of conduct" or acquit him. Clerk's Record at 481. Alvarez's federal habeas claim argues that the trial court violated his constitutional rights by not allowing the jury to convict him of simple murder because the two killings were not "part of the same scheme or course of conduct . . . ." (Instrument No. 18 at 273).

On direct appeal, Alvarez raised a similar claim but based it on a completely different, and erroneous, factual premise. Alvarez's eighteenth appellate claim argued that the jury could have found that he did not commit the two killings as "the result of the same criminal transaction and therefore found against the State on the issue of capital murder." Appellant's Brief at 52.[22] The Court of Criminal Appeals found that the State prosecuted Alvarez for "killing Aguirre and Varela 'during different criminal transactions but pursuant to the same scheme and course of conduct.'" Opinion at 28. Thus, "even if the jury could have rationally found that Aguirre and Varela were not murdered during the same criminal transaction as [Alvarez] alleges, they could

---

[22] As described by the Court of Criminal Appeals, Alvarez argued that he "was entitled to a charge on the lesser-included offense of murder because the jury could have rationally found that he did *not* murder more than one person during the 'same criminal transaction.'" Opinion at 28 (citing Tex. Penal Code 19.03(a)(7)(A)).

still have convicted him of capital murder under the theory alleged in the indictment." Opinion at 28-29. Alvarez's appellate arguments, therefore, did not comply with the requirement that he show "some evidence . . . that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense." *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993) (citation omitted).

Alvarez now cures the defect in his appellate argument by focusing on the trial court's failure to offer the jury an alternative to the crime for which he stood trial. Alvarez did not give the Court of Criminal Appeals an opportunity on direct review to consider the precise argument he raises in his federal habeas petition. When this Court stayed the case and allowed him to exhaust all state remedies, the Court of Criminal Appeals found that Alvarez abused the writ by attempting to raise his federal claim in a successive habeas action. Accordingly, this claim is procedurally barred from federal review. Alvarez has not shown that he can overcome the procedural bar.

Alternatively, the Court finds that Alvarez's claim lacks merit. In *Beck v. Alabama,* 447 U.S. 625, 627 (1980), the Supreme Court held that the death penalty may not be imposed "when the jury was not permitted to consider a verdict of guilty of a lesser included non-capital offense, and when the evidence would have supported such a verdict."[23] "In deciding whether a jury

---

[23] *Beck* specifically criticized an all-or-nothing policy where a jury faced only two choices: either convict a defendant of a capital crime or release him into society. *See Schad v. Arizona,* 501 U.S. 624, 647 (1991); *Spaziano v. Florida,* 468 U.S. 447, 455 (1984). Some question exists as to whether Texas' post-*Furman* capital procedure implicates the same concerns present in *Beck. See Howell v. Mississippi,* 543 U.S. 440, 445 (2005) (finding that limiting *Beck* "finds some support in [Supreme Court] cases"); *Hopkins v. Reeves,* 524 U.S. 88, 98-99 (1998) (distinguishing *Beck* from those cases where the jury "did not have to consider the dilemma faced by *Beck*'s jury; its alternative to death was not setting respondent free, but rather sentencing him to life imprisonment"); *Schad,* 501 U.S. at 646 ("Our fundamental concern in *Beck* was that a jury . . . might . . . vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all"). Because the Fifth Circuit, however, has avoided ruling on this argument, *see Foster v. Dretke,* 2006 WL 616980 (5th Cir. Mar.13, 2006) (unpublished), and Texas has unconditionally applied *Beck* to all inmates who have received a death sentence, the Court will apply *Beck* to Alvarez's claim.

could rationally acquit on the capital crime and convict for the noncapital crime, [this Court] must turn to Texas law." *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995). Two factors entitle a Texas defendant to a lesser-included-offense instruction. First, "the proof for the offense charged includes the proof necessary to establish the lesser-included offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (quotation omitted). Second, there must be "some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty *only* of the lesser-included offense." *Id.* (quotation omitted and emphasis added); *see also Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir. 2005) ("A defendant is entitled to the instruction if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime.").

Respondent convincingly argues that Alvarez has failed to meet the second part of the test. The defense at trial did not challenge the relationship between the killings but, relying on Alvarez's description of the crimes in his police statement, disputed his commission of the killings. The defense did not argue, and presented no evidence to support his newly minted argument, that he was guilty of simple murder because the two killings were not committed pursuant to the same scheme or course of conduct.

In contrast, the evidence strongly connected the two killings. Respondent contends that "[t]he evidence that Alvarez and his companions committed these crimes as part of a gang-related dispute was overwhelming. There were pictures of Alvarez making gang signs; Reyes testified that he was a gang member; his accomplices were gang members; and Alvarez yelled the name of his gang as he shot at Perez. But most importantly, Alvarez himself stated on videotape that he believed both to be gang-related." (Instrument No. 22 at 130). Even if Alvarez had raised this claim in a procedurally actionable manner, he has not shown that he merits

federal habeas relief.

## VII. Suppression of Alvarez's Confession and Items Seized from his Home (claims fourteen and fifteen)

Alvarez raises two claims relating to the constitutional integrity of his police statements and the search of his apartment. Alvarez exhausted both claims on direct appeal. Federal habeas relief is only available to Alvarez if he shows that the state court's decision rejecting his arguments was contrary to, or an unreasonable application of, federal law.

### A.     Statements to the Police

Alvarez argues that several factors rendered his confession involuntary, including that the police: broke his will after hours of interrogation by different officers; informed him that his girlfriend, whom the police had interviewed privately, had implicated herself; and confronted him with the findings from searching his apartment. Also, Alvarez contends that his status as a foreign national rendered his confession involuntary.

Trial counsel filed a motion to suppress Alvarez's statements. Clerk's Record at 420. Trial counsel litigated the motion in a suppression hearing. Neither Alvarez nor his girlfriend testified in that hearing. Based on the state court hearing and the resultant fact findings, the Court of Criminal Appeals summarized the circumstances surrounding Alvarez's videotaped statement as follows:

> On September 13 1999 the trial court conducted a *Jackson v. Denno*[24] hearing to determine whether [Alvarez's] statements were voluntary. Officer Todd Miller testified that, at 9:15 p.m. on June 20, 1998, a Harris County magistrate signed a warrant to arrest [Alvarez] (also known as "El Chuco") for the offense of engaging in organized crime. A patrol unit stopped [Alvarez's] car in southwest Houston at approximately 10:00 p.m. [Alvarez's] girlfriend Jessica (also known as "Jesusita") Treviño was a passenger in the car. [Alvarez] was arrested handcuffed, placed in the back of Officer Brown's car, and transported to the Houston Police Department Homicide Division Office. Miller asked Treviño if

---

[24]     378 U.S. 368, 376 (1964).

she would voluntarily come down to talk to them at the police station. Treviño was "very eager to cooperate and felt like she was going to be helping [Alvarez] out" and rode to the homicide division in Miller's car. They all arrived at the homicide division at approximately 10:30 p.m.

Sergeant George Alderete testified that he met with [Alvarez] in an interview room on the sixth floor-shortly after 11:00 p.m. Officer Beth Kruezer-Halling met with Treviño in a separate interview room on the same floor. At 11:18 p.m. [Alvarez] gave Alderete written consent to search the apartment that he shared with Treviño, his mother, and his sister.

Prior to taking [Alvarez's] written statement, Alderete read [Alvarez] his *Miranda* warnings and [Alvarez] indicated that he understood. Alderete began entering [Alvarez's] written statement into the computer at 1:25 a.m. on June 21, 1998. In his written statement, [Alvarez] implicated other gang members in a number of murders and drive-by shootings, but denied any involvement in the crimes. [Alvarez] signed the statement in the presence of Officer Michael Wright and Sergeant James Waltman at approximately 3:15 a.m. Wright testified that [Alvarez] acknowledged that he had read the statement that he had not been promised anything or coerced to give the statement and that he had made the statement voluntarily and wanted to sign it.

Alderete did not wear a weapon during the interview. [Alvarez] was not handcuffed and was offered food and drink and the opportunity to use the restroom. [Alvarez] stated that he had eleven years of education and appeared to read and speak English very well. Alderete spoke to [Alvarez] in mixed Spanish and English, and [Alvarez] understood what was being said in both languages. [Alvarez] never invoked any of his legal rights or asked Alderete to terminate the interview.

Treviño and [Alvarez's] mother also gave consent to search their apartment. While Alderete was interviewing [Alvarez], the police searched the apartment and found a shotgun and an assault rifle. Alderete informed [Alvarez] that the weapons had been recovered from his residence and that Treviño had implicated herself. [Alvarez] then asked to see Treviño. Alderete allowed Treviño to enter [Alvarez's] interview room shortly after 4:05 a.m. Treviño was crying and upset during their encounter, but [Alvarez] was calm and unemotional. Treviño and [Alvarez] embraced and talked for several minutes, and Alderete heard [Alvarez] tell Treviño to "go ahead and tell the truth." After Treviño left, [Alvarez] agreed to give a videotaped statement and accompanied Alderete to a video-equipped room. At the beginning of the videotape, Alderete again read [Alvarez] his warnings. [Alvarez] then gave a statement wherein he denied shooting anyone, but admitted being in the car while other gang members committed two drive-by shootings.

[. . .]

[Alvarez] asserts that he was "broken" after being subjected to hours of interrogation by two different officers switching off, four separate interrogations and a confrontation with his crying and upset girlfriend/wife who the police said had implicated herself. Neither [Alvarez] nor Treviño testified at the suppression hearing. Alderete testified at the hearing that he "was pretty much the one that did the interviews with [Alvarez]," although Investigator Halling may have had some contact with him. Alderete also stated that he permitted the meeting between [Alvarez] and Treviño; at [Alvarez's] request and denied using Treviño to pressure and manipulate [Alvarez]. He further testified that he did not threaten, coerce, or persuade [Alvarez] to make his videotaped statement, raise his voice or yell at him during the interview, or promise him anything in exchange for his statement. The trial court made findings of fact based on the evidence adduced at the hearing and concluded that: [Alvarez] was arrested pursuant to a lawfully issued arrest warrant; Alderete's interrogation of [Alvarez] was neither unreasonably nor unduly prolonged; [Alvarez's] written and videotaped statements were freely and voluntarily made and were not the product of any improper police conduct; [Alvarez] voluntarily waived his rights under [Texas Code of Criminal Procedure] Article 38.22, Section 2(a) prior to making any statement; and, [Alvarez's] videotaped statement was admissible at trial. The trial court's findings and conclusions are supported by the record of the suppression hearing. We defer to the trial court's findings that [Alvarez] knowingly waived his rights and that his videotaped statement was both voluntary and admissible.

Opinion at 5-8 (footnote in original). After reviewing the suppression hearing testimony, the

Court of Criminal Appeals deferred to the lower court's findings with regard to Alvarez's

statement:

[Alvarez] was arrested pursuant to a lawfully issued arrest warrant. Officer [Alderete's] interrogation of [Alvarez] was neither unreasonably nor unduly prolonged; [Alvarez's] written and videotaped statements were freely and voluntarily made and were not the product of any improper police conduct; [Alvarez] voluntarily waived his rights under Article 38.22 Section 2a. prior to making any statement; and [Alvarez's] videotaped statement was admissible at trial.

Opinion at 9.[25] This Court defers to the state court findings unless Alvarez disproves them by

clear and convincing evidence. *See* 28 U.S.C. § 22544(e)(1).

Alvarez renews his argument that he did not confess under his own free will. Alvarez

---

[25]     In conjunction with his Vienna Convention arguments, the state habeas court found that Alvarez's "statements were freely and voluntarily given." State Habeas Record at 1119.

again highlights: the long period of interrogation, the police search before being informed of his *Miranda* rights, being told that his girlfriend had implicated herself, the private meeting between Alvarez and his girlfriend, and his status as a foreign national. Alvarez contends that the trial court compounded the constitutional error by refusing to instruct jurors to consider the voluntariness of his statements. In doing so, however, Alvarez merely reurges the arguments he propounded in state court; he does not provide any clear and convincing evidence to overcome the state court findings that he freely and voluntarily confessed.

The police delivered *Miranda* warnings at least twice before Alvarez confessed. Alvarez makes strident statements about the length of interrogation that allegedly broke his will, but the interrogation did not last an unusually lengthy amount of time before Alvarez provided a written statement. Nothing in the record suggests that Alvarez's status as a foreign national rendered him unable to understand the police's questioning, to exercise his rights, or to comprehend the legal protections he waived. Taken as a whole, Alvarez has not pointed to any inherently overbearing circumstances surrounding the police's taking of his statements. Given the factual background developed in the suppression hearing, and with the lack of additional material testimony at trial showing that the police coerced him into confessing, Alvarez has not shown that the trial court erred by not instructing jurors to consider the voluntariness of his confession.

With that factual predicate, Alvarez has not shown that the state court's decision that the police did not coerce his confession was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court will deny Alvarez's fourteenth ground for federal relief.

### B. Police Search

Alvarez argues that the trial court committed constitutional error by not suppressing

evidence the police seized. While Alvarez makes the cursory statement in his federal habeas petition that the seizure violated several federal constitutional provisions, Alvarez only challenged the seizure under the Fourth Amendment in state court. Federal habeas review does not encompass Fourth Amendment challenges to allegedly illegal searches and seizures. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnote omitted). The existence of state processes allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's use of those processes, serves the policies underlying *Stone*'s exclusionary rule and bars federal habeas corpus consideration of claims. *See Caver v. State of Alabama*, 577 F.2d 1188, 1192-93 (5th Cir. 1978). The *Stone* bar "applies to all claims arising under the Fourth Amendment." *Hughes v. Dretke*, 412 F.3d 582, 596 (5th Cir. 2005). As Alvarez has not shown any defect in the process for litigating Fourth Amendment claims in state court, *Stone* bars federal consideration of his fifteenth ground for relief.[26]

## VIII.   Limitations on Cross-Examination (claim sixteen)

Alvarez complains that the trial court denied his constitutional rights by refusing to admit into evidence two items during the guilt/innocence testimony from Southwest Cholos gang member Miguel Reyes. Reyes testified that Alvarez took a lead role in planning and carrying out the drive-by on Prestwood Avenue. Reyes gave detailed testimony about gang activity, and provided an eyewitness insight into one of the murders charged in the indictment. Tr. Vol. 19 at

---

[26]     Even if Alvarez raised a cognizable habeas claim, the Court of Criminal Appeals found no error in "the trial court's determination that [Alvarez] freely and voluntarily consented to the search" of his apartment. Opinion at 891. Alvarez has not shown that the state court's decision was unreasonable.

174-213; Vol. 20 at 8-14. The State elicited from Reyes that, while he had been charged with engaging in organized crime and with aggravated assault, he would only receive a sentence for the aggravated assault as a result of his truthful testimony. Tr. Vol. 20 at 12-14.

In what was apparently an attempt to discredit Reyes' testimony, trial counsel sought to introduce written statements that Reyes made regarding the Prestwood shooting. The defense wanted to introduce documents into evidence to show that Reyes previously told police officers that Alvarez fired out the window of the car as they drove by, as opposed to his trial testimony that Alvarez got out of the car to shoot into the crowd. *Compare* Tr. Vol. 19 at 196 *with* Tr. Vol. 20 at 57. Also, Reyes' two accounts of the incident differed in which order the cars proceeded to the drive-by. *Compare* Tr. Vol. 19 at 193-94 *with* Tr. Vol. 20 at 124-25. Trial counsel asked Reyes questions about the difference between the statements. The trial court, however, sustained the State's objection and denied admission of the written statements into evidence. Tr. Vol. 20 at 135-37.

The defense also tried to submit into evidence plea papers from Reyes' conviction for engaging in organized criminal activity. Tr. Vol. 20 at 133. The trial court did not allow them to come into evidence. Tr. Vol. 20 at 133.

On federal habeas review, Alvarez lists a variety of constitutional provisions he alleges were violated by the limitations on cross-examination.[27] Alvarez based his state appellate claim primarily on the Texas rules of evidence, but also argued that he "was denied the right to properly cross-examine the witness which denied [him] a fair trial and due process." The Court of Criminal Appeals found no error in not admitting the written statements for two reasons.

---

[27] Specifically, Alvarez argues that the trial court violated "his right to a fair trial and to present his defense, to confront and cross-examine witnesses, to due process, the effective assistance of counsel, to be free from cruel and unusual punishment, and to equal protection of the laws, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution." (Instrument No. 18 at 290).

First, citing TEX. R. EVID. 103(a)(2) which requires an offer of proof to preserve error, the court observed that "[t]he statements were not admitted into evidence and defense counsel made no offer of proof through which we might now review the excluded evidence." Opinion at 19. Second, the court found that "defense counsel asked Reyes questions regarding the subject matter of those statements and elicited answers to those questions from him. Even if the trial court erred in sustaining the state's objection, [Alvarez] was not harmed because defense counsel successfully elicited testimony concerning the same subject." Opinion at 19.

Alvarez's failure to preserve error results in a federal procedural bar of that portion of his claim. *See Rosales v. Cockrell*, 48 F. App'x 103, at *5 (5th Cir. 2002). Even if this claim were fully available for federal review, this Court must defer to the trial court's finding that the written statements were inadmissible. Federal constitutional rights, such as the right to confront and to cross-examine, are "not absolute" and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). Alvarez has not shown that the state court erred in applying its own evidentiary law to preclude admission of the written statements. In addition, as trial counsel elicited testimony about any differences between the statements, and Alvarez has not shown that any other vital information was contained in the written statements, the state courts properly found no harm in excluding them from the jury's consideration. The trial court provided Alvarez an opportunity to confront and cross-examine Reyes; he has not shown that the written statements contained any information beyond the contours of the trial testimony.

Likewise, the Court of Criminal Appeals found no error in the exclusion of Reyes' plea papers under Texas Rule of Evidence 613(b). Reyes' testimony showed that, depending on his truthful testimony, he could receive a sentence for the aggravated assault alone. With that

testimony, the state court found that state law did not allow the admission of the plea papers. Aside from the failing to show federal constitutional error in the application of state evidentiary law, Alvarez has not shown that the excluded evidence differed from the trial testimony. The Court, therefore, finds that the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. §2254(d)(1).

## IX.     Introduction of Gang-Related Evidence (claim seventeen)

Alvarez contends that the State's use of photographs during the guilt/innocence phase violated numerous constitutional protections. The Court of Criminal Appeals described the allegedly objectionable photographs: "[Alvarez] asserts that the trial court improperly admitted into evidence at the guilt/innocence phase five photographs which depict [him] making gang hand signs, and two photographs which show [his] girlfriend Treviño making gang hand signs. The photographs were contained in a photo album which was found on the floorboard of the passenger side of the vehicle that [Alvarez] was driving at the time of his arrest." Opinion at 15. Alvarez argued that the photographs were not relevant to the murder and that the possibility of unfair prejudice substantially outweighed their probative value.

On direct appeal, Alvarez only based his complaints on state law. Alvarez did not exhaust any issue based on the United States Constitution. Federal habeas relief generally only lies for violations of the federal constitution or federal law. Absent an extreme due process violation, the improper application of state law cannot serve as the basis for habeas relief. The Court of Criminal Appeals found under state law that the photographs were admissible:

> The photographs at issue further the state's theory of the case and are relevant to show the context of the gang rivalries in which the offenses occurred. Defense counsel argued at trial that the photographs were cumulative because witnesses had already testified that [Alvarez] was a gang member. We disagree. The photographs went a step further than witness testimony and offered a visual depiction of [Alvarez's] membership in and commitment to the gang. The

probative value of the photographs was not substantially outweighed by any unfair prejudice. The trial court did not abuse its discretion in admitting the photographs.

Opinion at 16. Alvarez has not shown any federal due process violation in the state court's interpretation of its own law. Moreover, Alvarez has not shown any harm. The jury heard extensive testimony of Alvarez's involvement in gang culture and his willingness to commit violent crimes in the name of his gang. The jury heard about his own declaration of gang membership before he pulled the trigger of a shotgun in one of his killings. While the visual confirmation of gang membership was a reminder of his devotion to that lifestyle, it in no way impinged on the fundamental fairness of his trial proceedings. Even if Alvarez had exhausted the federal aspects of this claim, he has not shown that the introduction of the photographs requires federal habeas relief.

## X.  Alvarez's Personal Responsibility for the Murders (claim twenty-one)

In claim twenty-one Alvarez challenges the trial court's punishment-phase instruction addressing Texas' law of parties. In the punishment charge, the trial court instructed jurors that "in this punishment phase of trial you should not consider the instructions given you in the first phase of trial that relate to the law of the parties and the responsibility of parties for the acts of others in the commission of offenses. You shall consider only the conduct and state of mind of this defendant in determining what your answers to the Special Issues shall be." Clerk's Record at 491. Because "[t]he law of parties may not be applied" to Texas' special issue questions, Texas juries commonly receive similar instructions "to prevent jury confusion" and to remove any "risk . . . that the jury may mistakenly apply the law of parties if party liability was an issue during the guilt/innocence phase of the trial." *Martinez v. State*, 899 S.W.2d 655, 657 (Tex. Crim. App. 1994); *see Jasper v. Thaler*, 765 F.Supp.2d 783, 826 (W.D. Tex. 2011) (reviewing a

case where the trial court issued a jury charge similar to that in the instant case); *Fuller v. Dretke*, 2005 WL 4688015, *7 (E.D. Tex. 2005) (unpublished) (same); *Varga v. State*, 2003 WL 21466926, at *11 (Tex. Crim. App. 2003) (unpublished) (same); *Fuller v. State*, 2000 WL 35432767, at *3 (Tex. Crim. App. 2000) (unpublished) (same). The relevant special issue, called an "anti-parties charge," is given "for the purpose of 'ensuring that a jury's punishment-phase deliberations are based solely upon the conduct of that defendant and not that of another party.'" *Solomon v. State*, 49 S.W.3d 356, 371 (Tex. Crim. App. 2001) (quoting *Martinez*, 899 S.W.2d at 657). The jury then had to answer the second special issue which asked if Alvarez ""actually caused the death of M. Aguirre and J. Varela, on the occasion in question, or if he did not actually cause the death of M. Aguirre and J. Varela, that he intended to kill M. Aguirre and J. Varela, or that he anticipated that a human life would be taken?"

Allowing a conviction on party liability raises questions about individual sentencing. Alvarez complains that the trial court's instructions violated the requirement from *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987) that "the death penalty [cannot] be imposed in a felony murder case if the defendant was a minor participant in the crime and neither intended to kill nor had shown reckless indifference to human life." *Hopkins v. Reeves*, 524 U.S. 88, 94 (1998). Alvarez argues that by allowing the jury to assess his punishment if he only "anticipated" the killings, he did not fulfill the two *Enmund/Tison* requirements that (1) he played a major role in the criminal activities and (2) he displayed reckless indifference to human life. The Supreme Court has clarified that:

> when a federal habeas court reviews a claim that the death penalty has been imposed on one who has neither killed, attempted to kill, nor intended that a killing take place or lethal force be used, the court's inquiry cannot be limited to an examination of jury instructions. Rather, the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the

defendant's culpability has been made. If it has, the finding must be presumed correct . . . and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence.

*Cabana v. Bullock*, 474 U.S. 376, 387–88 (1986); *see also Gongora v. Thaler*, 710 F.3d 267, 293 (5th Cir. 2013). Alvarez contends that the error was compounded in this case because the relevant special issue asked if he "caused the death" of the victims "on the occasion in question," when the indictment required his conviction in two different criminal transactions.[28]

The Court of Criminal Appeals summarily denied this claim on direct appeal because it had "previously rejected [that] contention . . . ." Opinion at 41. The Fifth Circuit has also found that similar instructions required the jury to find individual liability in the punishment phase. *See Ramirez v. Dretke*, 398 F.3d 691, 697 (5th Cir. 2005); *Campbell v. Dretke*, 117 F. App'x 946 (5th Cir. 2004); *Belyeu v. Scott*, 67 F.3d 535, 543 (5th Cir.1995); *Andrews v. Collins*, 21 F.3d 612, 630-31 (5th Cir.1994). Furthermore, "th[e] structure of the punishment phase reasonably lead[s] the jury to assume the law of the parties was not applicable during this phase." *Westley v. Johnson*, 83 F.3d 714, 723 (5th Cir. 1996). The jury instruction plainly allowed for Alvarez's death sentence if he "actually caused the death" of the victims. While providing for his death sentence if he only anticipated the murders, the circumstances of this case easily allowed for the jury to make the requisite *Tison* finding of his participation in the offense with reckless indifference to human life. Alvarez's own police statement and his statements to others show the required specific intent. Forensic evidence confirmed that Alvarez most probably fired rounds at both locations. The State's punishment phase argument drew the jury's attention to Alvarez's

---

[28]  Trial counsel requested that the trial instructions use the plural to refer to the occasions. Tr. Vol. 27 at 196-201. The State strongly objected because any alteration would not match the statutory language.

own involvement in the crime, rather than that of any co-conspirators. The record suggests that the jury based its punishment-phase decision on Alvarez's personal responsibility and conduct.

Alvarez did not dispute his participation in the offenses at trial and the evidence showed that he obviously displayed reckless indifference to human life, thus fulfilling the *Enmund/Tison* requirements. Alvarez has not shown that the Court of Criminal Appeals rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. §2254(d)(1).

## CLAIMS RAISED IN THE INITIAL STATE HABEAS APPLICATION

During the initial round of state habeas review, Alvarez raised grounds for relief similar to federal claims one, two, three, and twenty-two. Respondent argues that Alvarez either did not exhaust, or did not sufficiently exhaust, those federal claims in the state court proceedings. Alternatively, Respondent asserts that any exhausted claims do not merit federal habeas relief under AEDPA standards. The Court will review the procedural and constitutional adequacy of those arguments below.

## I.     Ineffective Assistance of Trial Counsel (claim one)

In his first claim, Alvarez raises numerous complaints relating to trial counsel's representation. Alvarez claims that trial counsel provided deficient, prejudicial representation "throughout all phases of the pre-trial, trial, and post-trial proceedings in this case." (Instrument No. 18 at 44). Alvarez's briefing contains numerous sub-arguments, some of which contain their own tertiary contentions, that allege error. These arguments impute error in every step of the trial proceedings. Alvarez asserts that "any one of [the sub-claims] could stand on its own evidence of trial counsel's ineffectiveness . . . ." (Instrument No. 18 at 46).

Alvarez's briefing contains numerous criticisms of trial counsel's efforts, ranging from general observations about investigative efforts to specific allegations of error. Some of

Alvarez's contentions consist merely of broad pronouncements of bad lawyering, untethered from specific information about what counsel should have done. The narrative approach in Alvarez's lengthy pleadings creates difficulty in distilling which alleged infractions by trial counsel may merit federal habeas relief. In reviewing Alvarez's *Strickland* claim, therefore, the Court will discuss the issues he has listed in section headings. To the extent that Alvarez's petition imputes other errors to counsel, the Court has reviewed the pleadings, the record, and the relevant state court decision and finds no error, nor any reasonable probability of a different result, under either an AEDPA or *de novo* standard.

Before considering Alvarez's complaints about his attorneys' representation, however, this Court will review whether how he raised those allegations in state court provides an avenue for plenary federal review.

A.      **Exhaustion of Remedies and AEDPA Review**

Alvarez first challenged trial counsel's representation in his initial state habeas application. The *Strickland* claim in Alvarez's initial state habeas application, however, was cursory and focused on trial counsel's efforts to litigate his rights under the Vienna Convention.[29] Through federal habeas counsel, Alvarez then unsuccessfully filed a motion to

_____

[29]      Alvarez faults all facets of state habeas counsel's representation and declares that counsel performed "no investigations on Alvarez's behalf" but had a practice of only "copying his prior writs verbatim, and raising noncase-specific, record-based claims." (Instrument No. 59 at 15). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690). This standard not only gives counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id.* at 196. Here, the Constitution and federal law do not place specific requirements on the hours a habeas attorney must spend working on a habeas case or the number of claims he must raise. Professional organizations provide guidelines outlining an attorney's expected duties, but they are "'only guides'" to what a diligent attorney should do. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (quoting *Strickland*, 466 U.S. at 688). The law only "imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000).

The record in this case does not support Alvarez's accusation that state habeas counsel made no effort to investigate new claims. State habeas counsel repeatedly visited Alvarez in prison. Counsel spent time reviewing the State's file and consulted with Alvarez about the information he derived therefrom. State habeas counsel discussed

withdraw the initial state habeas application. State Habeas Record at 235-54. Federal habeas counsel subsequently filed a "Reply in Support of Application for Writ of Habeas Corpus and Motion Renewing Request for Evidentiary Hearing to Resolve Controverted Material Facts." State Habeas Record at 390. The reply enhanced the *Strickland* arguments from Alvarez's initial habeas application through a novel extension of his Vienna Convention claim. Alvarez's reply drew a line from the alleged Vienna Convention violation to the performance of his trial attorneys: "If Mr. Alvarez's Vienna Convention Art. 36 rights had not been violated, and had Mr. Alvarez's trial counsel properly asserted those rights, obtained the assistance of the Mexican Government and litigated the violation of his Vienna Convention right, the Mexican Government would have provided substantial critical legal assistance and resources to Mr. Alvarez" which "would have changed the outcome of trial at either or both phases." State Habeas Record at 339. Alvarez used his Vienna Convention claim as a springboard to present a robust *Strickland* argument substantially similar to that he advances on federal habeas review. In fact, portions of the reply are the same word-for-word as arguments made in Alvarez's federal petition. Federal habeas counsel attached many of the same voluminous exhibits to the reply which also appear in the federal petition. State Habeas Record at 446-1055. The breadth of allegations contained in Alvarez's reply, even though piggybacking on his *Strickland* claim initially centering on the Vienna Convention, covers the same ground as Alvarez's first federal ground for relief.

The fact that the expansion of the *Strickland* claim happened in a reply has raised

---

with a mitigation investigator the possibility of developing more mitigating evidence, but ultimately decided not to pursue that investigation. State habeas counsel investigated the factual basis for raising new habeas claims, including those involving *Brady* and DNA issues, and filed various motions to support the investigation. State habeas counsel moved for the taking of depositions and interrogatories. State habeas counsel filed a 200-page supplement addressing the Vienna Convention arguments containing numerous attachments. State habeas counsel extensively litigated the procedural basis for judicial consideration of the supplement. However, that is not to overstate state habeas counsel's efforts. Reviewing the record and pleadings after initial state habeas counsel withdrew easily show that many issues evaded review in the first part of state habeas representation raising new issues. Sill, Alvarez has not shown that state habeas counsel was ineffective under *Strickland* on any ground.

procedural questions in state and federal court. The State filed proposed findings and conclusions that addressed the *Strickland* allegations in Alvarez's reply. State Habeas Record at 1087-94, 1097-1101. The trial court signed the State's proposal without alteration. The Court of Criminal Appeals, however, did not adopt the portions of that recommendation relating to the issues raised in Alvarez's reply because they "relate[d] to arguments rather than new claims." *Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sept. 24, 2008).

Alvarez argues that state habeas counsel exhausted his federal *Strickland* claim by "present[ing] the legal theory of ineffective assistance of counsel in his state habeas petition." (Instrument No. 18 at 28).[30] Respondent argues that the *Strickland* claim was "not properly presented to the state courts." (Instrument No. 64 at 26). Respondent bases this contention on two arguments. First, Respondent contends that Alvarez did not raise his *Strickland* claim "through a properly-filed state habeas application or direct appeal . . . ." (Instrument No. 64 at 26). Instead, Respondent contends that Alvarez's *Strickland* claims regarding "the quality of his trial and appellate representation were piggy-backed onto the [Vienna Convention] claim, and thus can only be addressed in that context." (Instrument No. 64 at 28). Second, Respondent apparently considers Alvarez's habeas reply to have constituted a successive habeas action, because "an untimely amendment adding new claims is not allowed under the statute governing habeas corpus petitions seeking relief from a death sentence." (Instrument No. 64 at 26).

Respondent's arguments, however, do not reflect the reality of the state court proceedings. While Respondent may now assert that the *Strickland* arguments were not before the state courts, the State responded to them on state habeas review, the state trial level court

---

[30] On state habeas review, however, Alvarez argued that the application filed by state habeas counsel "contains no cognizable claims," presumably including the issues he renews in his federal habeas petition. State Habeas Record at 249.

considered them to be validly raised, and the Court of Criminal Appeals did not dismiss them as an abuse of the habeas writ. Despite Respondent's contention that the *Strickland* arguments were a new claim, the Court of Criminal Appeals explicitly drew a distinction, calling them "arguments rather than new claims." *Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sept. 24, 2008). Because Alvarez briefed the substance of his *Strickland* claim in state court, and both the parties and litigants considered them to be procedurally viable, Respondent's exhaustion arguments are not persuasive.

Alvarez's argument that he exhausted his *Strickland* claim in state court carries two consequences for federal review. First, Alvarez's claims are subject to a "highly deferential" federal review. *Harrington*, 562 U.S. at 105. Alvarez confirms that the state habeas court "denied [his *Strickland* claim] on the merits," (Instrument No. 31 at 30), a concession that sets the course for federal review. Because the "claim has been adjudicated on the merits by a state court," Alvarez "must overcome the limitation of § 2254(d)(1)." *Pinholster*, 563 U.S. at 185. Second, insofar as Alvarez makes additional allegations or raises evidence for the first time in federal court, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster,* 563 U.S. at 181.[31]

Alvarez faults trial counsel's representation at the pre-trial, guilt/innocence, and

---

[31]     Alvarez's allegations of ineffective habeas representation do not allow him to present new arguments or evidence for already-exhausted claims.. "*Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted." *Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir.2014). Because "[t]he Texas courts adjudicated [Slater's ineffective-assistance] claim on the merits . . . *Martinez* and *Trevino* are inapposite." *Villanueva v. Stephens*, 619 F. App'x 269, 276 (5th Cir. 2015); *see also Allen v. Stephens*, 619 F. App'x 280, 290 (5th Cir. 2015). "Thus, once a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state habeas court." *Escamilla*, 749 F.3d at 395.

punishment phases of trial.[32]  The Court will examine each section of the trial separately. Taken together, Alvarez has not shown that the state court's rejection of this claim was contrary to, or an unreasonable application of, federal law.

### B.    Trial Counsel's Pre-Trial Representation

Under the section entitled "pretrial," Alvarez lists the following errors: (1) changes in pretrial representation deprived counsel of adequate time and resources for effective representation; (2) trial counsel Reyes should not have accepted representation with the short time remaining before trial; (3) trial counsel did not assemble an adequate defense team; (4) trial counsel did not engage in an adequate investigation or preparation for trial; and (5) trial counsel ineptly litigated pre-trial motions.[33]

The Court rejects some of these complaints summarily. In many respects, Alvarez's complaints about pre-trial representation merge with his other allegations of error.  To the extent that he alleged counsel should have conducted a "full and complete investigation of all aspects of

---

[32]    Insofar as Alvarez makes specific allegations about trial counsel's handling of issues related to the Vienna Convention, the Court's discussion of the substantive Vienna-Convention claim precludes habeas relief on any related *Strickland* claim.

[33]    Alvarez has described those claims as follows:

During the pre-trial representation, trial counsel's deficient performance included failure to: avoid accepting a case that he had no time to adequately prepare for (representing Mr. Alvarez for a mere 11 days prior to trial commencing); assemble a proper defense team (no mitigation specialist was ever retained); review the state's case (lead counsel never even reviewed the prosecution's file in the case); ensure that a full and complete investigation of all aspects of the case was conducted for both phases of trial (an investigator conducted only six hours of investigation in the case); file fact-specific pretrial motions; and prepare for and conduct an adequate voir dire during jury selection.

(Instrument No. 59 at 43-44).  Alvarez's briefing hints at other allegations of ineffective representation.  Alvarez complains that trial counsel should have used more peremptory strikes, but does not show that any juror who sat at trial was not impartial.  Alvarez also claims that trial counsel should have more effectively tried to suppress his police statements and items taken from the search and seizure at his apartment, yet trial counsel unsuccessfully litigated a suppression motion. On direct appeal, the Court of Criminal Appeals found no error in the trial court's failure to suppress.  Opinion at 5-8, 10-11.  Alvarez has not raised any new evidence or testimony that trial counsel should have put before the trial court that would have changed the appellate court's decision on that issue.

the case," he must link putative investigative failures to specific evidence or defensive theories that trial counsel omitted. Complaints about needing more time only join the issue of constitutional error when alleging defensive efforts that could not reach fruition due to a shortage of time.

Alvarez faults the attorney he retained for taking on such a serious case with so little time to prepare before trial. Despite Alvarez's contention that the attorney he retained should not have accepted representation so near to trial, trial counsel sought a short continuance, which the trial court granted. Clerk's Record at 52-54. Alvarez himself chose to replace his legal counsel close to the start of trial. Trial counsel provided an affidavit on state habeas review saying that he would have liked more time to prepare for trial, but that the trial court refused a longer continuance. (Instrument No. 1. Exhibit 4). Alvarez's arguments ignore the fact that, despite replacing lead counsel, second-chair counsel had been on the case for some time and represented him at trial.

Alvarez also faults trial counsel for not assembling an adequate defense team by not hiring a dedicated mitigation specialist. Alvarez's trial attorneys, however, employed an investigator and a psychological expert whose efforts resulted in mitigating evidence similar to that Alvarez adduces on federal review. Moreover, Alvarez has not shown that standards of practice at the time of trial in 1998 required a reasonable attorney to hire an investigator specifically assigned to uncover mitigating evidence. *See Braziel v. Stephens*, No. 3:09-CV-1591-M, 2015 WL 3454115, at *7 (N.D. Tex. May 28, 2015) (observing that "'mitigation specialists' had not yet become a commonly available resource" by 2001). Alvarez also faults lead counsel for not reviewing the prosecutor's file, but has not shown that his trial attorneys did not possess adequate information after members of the defense team made "many trips to the

Assistant District Attorney's office to review the open pending files . . . ." (Instrument No. 1, Exhibit 34). Alvarez concedes that co-counsel reviewed the prosecutor's files. (Instrument No. 1 at 61).

Alvarez also complains that trial counsel should have conducted an "adequate" voir dire, but the Constitution does not "require a defense attorney to ask specific questions at voir dire." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). Alvarez does not show how a more-robust questioning of jurors would have resulted in a different, or more favorable, jury panel, much less would have caused a reasonable probability of a different result.

Trial counsel filed numerous motions before trial. Alvarez, however, argues that trial counsel "were ineffective for inadequately litigating pre-trial motions." (Instrument No. 18 at 68). Alvarez argues that trial counsel filed a suppression motion that was too general and which did not adequately challenge the voluntariness of his conviction, did not file a motion attacking the adequacy of the consent that resulted in the search of his apartment, did not sufficiently challenge the alleged underrepresentation of Hispanic potential jurors, insufficiently requested a continuance, and failed to litigate additional funding motions.[34] Trial counsel generally made efforts to litigate the issues contained in this subargument. Alvarez's allegations of error make broad declarations, but provide few verified specifics that would provide for a detailed review of trial counsel's efforts. In addition, the record does not show that, had trial counsel more zealously litigated the indicated motions there would have been a reasonable probability of a different result. Alvarez has not shown, under either a *de novo* or AEDPA standard, that trial

---

[34] Without identifying which jurors did not serve or should not have served at trial, Alvarez also makes broad statements about trial counsel's handling of jury selection. Alvarez's lack of detail precludes the Court from making any detailed review of trial counsel's performance or any evaluation of actual prejudice.

counsel failed to provide constitutionally adequate assistance before trial. The state habeas court was not unreasonable in finding that Alvarez has not shown that trial counsel's pre-trial efforts were deficient or that actual prejudice flowed from trial counsel's alleged deficiencies.

### C. Trial Counsel's Guilt-Innocence Phase Representation

Alvarez's federal habeas petition makes two broad complaints about trial counsel's representation in the guilt/innocence phase: (1) trial counsel ineffectively presented opening arguments and (2) trial counsel failed to challenge weaknesses in the prosecution's case and present a defense. (Instrument No. 18 at 76, 77). Subsequent briefing clarifies that trial counsel's alleged deficiencies in the guilt/innocence phase:

> At the guilt-innocence phase of trial, trial counsel's deficient performance included his failure to: investigate facts or call witnesses to rebut the State's vulnerable theory of the case; object to gang references and mischaracterizations elicited by the State; retain experts or otherwise investigate and rebut the unreliable, inconsistent and unsupported use of forensic evidence (ballistic evidence from both scenes did not support the prosecution's theory that Mr. Alvarez was the fatal shooter at each crime scene); object to improper arguments; effectively cross-examine prosecution witnesses (counsel failed to use available forensic evidence that contradicted the testimony of the two key state witnesses who were present during the crimes); preserve objections; investigate, call or prepare various defense witnesses; present mental health and drug intoxication evidence; and request proper jury instructions.

(Instrument No. 59 at 44).

The Court can summarily reject some of Alvarez's arguments of ineffective representation at the guilt phase. For instance, Alvarez argues that trial counsel raised a due process challenge the State's use of a different theory when prosecuting a co-defendant. However, the use of inconsistent theories by the State in different trial does not give rise to a constitutional claim. *See United States v. Frye*, 489 F.3d 210, 214 (5th Cir. 2007). Alvarez's complaint that trial counsel chose not to deliver an opening argument is of no constitutional moment because there are "countless ways to provide effective assistance in any given case."

*Strickland*, 466 U.S. at 689. Alvarez also contends that trial counsel should have made efforts to show that the shootings were unrelated to gang violence. Alvarez now suggests that a personal dispute may have caused him to kill, but Alvarez's police statements showed his knowledge that the victims were gang members. Alvarez, in fact, yelled the name of their gang as he committed the Prestwood shooting. Alvarez also argues that trial counsel should have objected to the prosecution's mention of race in the closing summation. Counsel did make an objection to the prosecution's statement, just not the same that Alvarez urges on federal habeas review. Perhaps trial counsel could have made a different objection, but the record does not indicate that it would have made any greater difference from the objection lodged by counsel.

Some elements of Alvarez's arguments require greater discussion. Alvarez emphasizes the ballistics evidence in this case and argues that trial counsel ineptly tested the State's evidence. Alvarez bases his argument on the fact that bullets from Alvarez's gun did not kill the two victims in the Prestwood shooting. Both Prestwood victims died from an unrecovered revolver. An accomplice testified that Alvarez fired an assault rifle at the Prestwood shooting. Even without trial counsel emphasizing the point, the State's forensic examiner testified that the Prestwood victims were shot by a revolver, a point which harmonized with Alvarez's police statement which related that someone else shot such a weapon. Still, whether Alvarez personally shot the Prestwood victims, the jury instructions allowed for his conviction under Texas' law of parties. The evidence overwhelmingly showed Alvarez's role in the offense. Even if trial counsel had placed greater emphasis on the ballistics evidence, there would not be a reasonable probability of a different result.

Alvarez additionally faults trial counsel for not disputing trial counsel's handling of forensic evidence relating to the shooting of the Woodfair victim for which he was not indicted.

A witness testified that Alvarez fired twice at that victim, but forensic evidence showed wounds from two different weapons. Despite calling the witness' testimony somewhat into question on that point, the evidence still allowed the jury to find that Alvarez shot the victim for which he was indicted, Varela, with a shotgun. Alvarez has not shown that trial counsel provided constitutionally inadequate representation, especially because the jury had the underlying evidence before it.

Insofar as Alvarez raises additional and subsidiary complaints about trial counsel's guilt/innocence phase representation, the Court finds that he has not shown that the state habeas court's rejection of the claim was unreasonable. Alternatively, the Court would deny relief even if considered under a *de novo* standard. The State presented an overwhelming case for Alvarez's guilt, particularly in light of its reliance on Texas' law of parties. Alvarez raises different approaches, objections, and theories that another attorney may have employed. The Court's review of the record, however, does not indicate that any alleged error, whether individually or in connection with others, would have created a reasonable probability of a different result. The Court will deny that portion of Alvarez's *Strickland* claim that addresses the guilt/innocence phase of trial.

**D.      Trial Counsel's Penalty Phase Representation**

Alvarez raises a detailed argument about trial counsel's representation in the penalty phase.[35] The defense called a boot camp instructor, psychologist Dr. Ramon Laval, and five

---

[35]      In subsequent briefing, Alvarez specifies that counsel provided deficient representation by not advancing the following arguments relating to trial counsel's representation:

> At the penalty phase, trial counsel was equally unprepared. The entire defense presentation at sentencing lasted a mere five and a half hours. Trial counsel presented evidence from seven witnesses, all in a cursory and rote manner that failed to elicit the powerful evidence of mitigation, including evidence of cognitive impairments and trauma, which was available and subsequently developed by undersigned counsel. In penalty phase closing argument, trial counsel only mentioned two facts in mitigation: that an expert had indicated that Mr. Alvarez did not pose a

family members to testify in the punishment phase. Alvarez contends that trial counsel failed to present mitigating evidence of (1) organic brain damage; (2) childhood poverty, abandonment, loss of loved ones, violence, and terror; (3) his good character; (4) post-traumatic stress disorder; (5) expert testimony about gang life. Trial counsel continued this deficient representation into closing arguments. Also, Alvarez claims that trial counsel slept during the penalty phase.

As an initial matter, trial counsel provided an affidavit on state habeas review, affirming that the defense "had numerous meetings with family members to determine the mental and emotional state of Mr. Alvarez." State Habeas Record at 75. Those meetings provided a springboard for the defense case, which took a direction plotted out by Alvarez, his family, and trial counsel.[36] While Alvarez did not clarify on state habeas review what role he played in fashioning the defense, any review of the matters put before the jury exists in light of Alvarez's apparent election or endorsement of the strategy.

In his briefing, Alvarez makes broad statements about trial counsel not calling enough punishment witnesses. Neither the duration of the defense's case nor the number of defense witnesses called alone provide an actionable ineffective assistance claim. Those arguments are actionable only insofar as Alvarez ties them to specific witnesses, evidence, and theories which

---

future danger, and that Mr. Alvarez was young. No other mitigating evidence or factors were identified from evidence presented at trial or discussed in argument. Additional penalty phase deficiencies included counsel's failure to: investigate penalty phase theories, evidence, facts, and claims, including Mr. Alvarez's family background, education, mental health and cognitive impairments, and drug use history; uncover Mr. Alvarez's long-standing organic brain damage and post-traumatic stress disorder; investigate the state's evidence in aggravation; effectively cross-examine prosecution witnesses regarding aggravating evidence; challenge the State's misleading use of gang affiliation with a competent expert witness qualified to evaluate issues related to gangs; retain a social historian, mental health expert or penalty phase investigator; obtain and present life history documents evidence, witnesses, and testimony; prepare a competent closing argument; object to improper jury instructions; or request proper jury instructions.

(Instrument No. 59 at 44-45).

[36]    Trial counsel explained: "I planned the strategy of the trial with members of the family and Mr. Alvarez himself." State Habeas Record at 75.

could have provided the defense with a case that could have brought about a different result. Relatedly, Alvarez must do more than fault trial counsel's defense against the State's case, he must affirmatively show what trial counsel should have done instead. Relatedly, a mere allegation that trial counsel questioned witnesses "in a cursory and rote manner" only gains traction through specifics, such as that the trial defense omitted "evidence of cognitive impairments and trauma . . . ."[37]

Alvarez first faults trial counsel's handling of mental-health mitigation evidence. Alvarez contends that trial counsel should have put forth evidence that he suffered from organic brain damage and PTSD. Trial counsel employed a psychologist, Dr. Laval, who repeatedly interacted with Alvarez before trial. The results of his testing did not suggest any mental or psychotic disorder. While Alvarez now provides an affidavit in which a psychologist identifies the possibility that he suffers from both disorders, trial counsel hired an expert who performed various tests and did not detect the presence of organic brain damage or PTSD. Nothing in the record suggests that trial counsel could not rely on Dr. Laval's expertise. Alvarez has not shown that, given the information before trial counsel and the results provided by his expert, a reasonable trial attorney should have made a more-thorough investigation into mental-health issues.

Alvarez next faults trial counsel for not presenting any evidence of his childhood poverty, abandonment, loss of loved ones, experience with violence, and feelings of terror. On state habeas review, Alvarez amassed a large number of affidavits from family, friends, and others

---

[37] In that regard, Alvarez complains that trial could should have focused more on "Mr. Alvarez's family background, education, mental health and cognitive impairments, and drug use history; uncover Mr. Alvarez's long-standing organic brain damage and post-traumatic stress disorder, . . . retain a social historian, mental health expert or penalty phase investigator; [and] obtain and present life history documents evidence, witnesses, and testimony . . . ."

who provided background information about his formative years and the factors that turned him to violent gang life. Alvarez summarizes those affidavits as follows:

> These witnesses would have enabled the jury to see Mr. Alvarez as the quiet and reserved but generous and caring person that he was prior to the retriggering of emotional trauma that lead to a heretofore uncharacteristic spate of tragic violence in the Spring of 1998. They would have helped the jury to understand the devastating events of Mr. Alvarez's life: growing up in poverty in the desert of Mexico where his father was senselessly murdered in a family feud, a feud which also claimed the lives of his uncle and grandfather a short time later; living a life subsumed with fear, sleeping on the roof of the house as a protection against violent attacks; a dramatic escape from their home village in the middle of the night in which Juan and his family were forced to flee for their own safety and leave most of their belongings behind forever; being left behind in Mexico with no parental guidance or direction as first his mother, and then each of the older siblings, left the country to seek work to provide for the family and left him in the care of the  remaining siblings, who were themselves still children; coming to Houston, years after his mother and most of his older siblings, and feeling the alienation and isolation of being a 14 year old from another country who did not speak the language; being thrust into the violent and gang-dominated neighborhoods and schools of southwest Houston where the options available to young men like Mr. Alvarez are few and far between; and finally, being drawn into the only peer group available to provide a sense of safety, family, and community – the local neighborhood gang – and re-experiencing the debilitating trauma of standing by helplessly as a friend was senselessly murdered.

(Instrument No. 18 at 101).

For the most part, however, trial counsel placed the same information before jurors, though lacking the same detail as the affidavits. From the evidence adduced by trial counsel, the jurors could understand that Alvarez had witnessed fatal violence to those he loved, transforming Alvarez into a quiet, withdrawn, and emotionally introverted person. Family members provided, albeit in outline form, information about Alvarez's unsettled childhood with a move to Monterrey and eventually, after a lengthy separation from his mother, a move to the United States. Dr. Laval explained to jurors that Alvarez joined a gang and lived a violent life because of his unresolved feelings about his father's death. Tr. Vol. 27 at 154-55. Additionally, gang life provided Alvarez support and security. Tr. Vol. 27 at 156. Jurors knew that the murder of

Alvarez's close friend retriggered the traumatization he had suffered from his father's killing, leading to a motivation for his gang violence. Even though the trial expert arrived at the conclusion in a different way than the gang expert who provided a report on state habeas review, Dr. Laval told jurors that Alvarez likely would not continue gang violence while incarcerated.

To be sure, the information contained the affidavits submitted on state habeas review provide much greater detail about Alvarez's background and include information not present in the trial record, such as details about the circumstances leading up to his father's murder and the family's poor economic status. Still, the evidence presented at trial travels much the same pathways and reaches the same end – an explanation for Alvarez's gang membership, descent into violence, and ultimate commission of the murders.

Similarly, Alvarez faults trial counsel for not providing the jury with sufficient information about his good character. The affidavits on state habeas review provided numerous details about positive character traits possessed by, and redeeming actions done by, Alvarez. Alvarez, however, fails to credit trial counsel's choice to have witnesses describe how Alvarez helped his family, his hard working character, his lack of substance abuse, his responsible nature, and his friendliness. Alvarez has not shown how the additional details would have influenced the jury more than that adduced by trial counsel.

Alvarez contends that trial counsel should have made a better closing argument and requested different jury instructions. Trial counsel addressed several themes, but focused most strongly on the jury's answer to the future dangerousness issue. Alvarez wishes that trial counsel had highlighted the mitigation special issue instead, especially in the context of the new evidence presented on state habeas review. However, there is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer

neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). "[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5-6. "Judicial review of a defense attorney's summation is therefore highly deferential . . . ." *Id.* at 6. Alvarez has not shown that the state habeas court was unreasonable for rejecting this claim and thereby implicitly finding that trial counsel's chosen summation was within the broad range of permissible strategy.

Finally, Alvarez claims that lead counsel Reyes slept in the penalty phase.[38] Alvarez bases his argument on affidavits from two jurors who said they observed Reyes nodding off and sleeping during questioning. State Habeas Record at 591, 596. The Constitution's guarantee of an effective legal representation presumes one who is awake. In one case, the Fifth Circuit found constitutional error when an inmate's only attorney slept during trial, effectively leaving him without legal representation. *See Burdine v. Johnson,* 262 F.3d 336 (5th Cir. 2001). In that case, the Fifth Circuit presumed prejudice under *United States v. Cronic,* 466 U.S. 648, 659 (1984). The Fifth Circuit, however, did not "adopt a per se rule that any dozing by defense counsel during trial merits a presumption of prejudice." *Burdine*, 262 F.3d at 349. Courts do not presume prejudice when more than one attorney represents a defendant. *See Hall v. Thaler*, 504 F. App'x 269, 277-78 (5th Cir. 2012) ("The court correctly held that Hall is not owed a presumption of prejudice as was found in *Burdine* . . . because Hall was represented at trial by two attorneys."); *Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005) (finding that, even though one attorney apparently fell asleep, "because another competent attorney

---

[38] Alvarez does not identify at what points trial counsel slept, and the record is completely silent on the matter. As he raises his sleeping-lawyer claim as a subheading under the section for punishment-phase issues, the Court assumes that he intends to argue that trial counsel slept in the punishment proceedings, though the result would be the same if he asserted that counsel slept through portions of the entire trial.

provided zealous representation during those interludes, we need not address the issue of [the sleeping lawyer's] ineffective assistance").  To merit relief, an inmate must show that co-counsel did not actively participate at trial, that the times lead counsel was asleep left him without adequate representation, and that counsel's inaction in those moments harmed the defense.  *See Hall*, 504 F. App'x at 277.

Here, the record shows that co-counsel actively participated in the punishment defense. Co-counsel made various objections, questioned experts on voir dire, cross-examined witnesses, argued before the jury, and was otherwise an active participant at trial.  Alvarez asks for additional factual inquiry on this claim, but has not shown that he could provide any insight as to when lead counsel allegedly slept.  Alvarez's sleeping-lawyer claim lacks sufficient factual allegations to merit additional inquiry.  Because Alvarez's pleadings make no effort to allege facts beyond that contained in the juror's affidavit, and he has not shown any ability to do so, the state habeas court's rejection of this claim was not unreasonable.

Alvarez has shown that he did not receive perfect representation at trial or on appeal. The Constitution, however, does not set such a high bar for our criminal justice system. In each instance above, Alvarez has not shown that the state courts were unreasonable for rejecting his claim that trial counsel provided deficient representation.  In addition, taking the effect of his allegations of deficient punishment-phase performance either individually or cumulatively, Alvarez has not shown that trial counsel's representation prejudiced the defense.  While Alvarez's *Strickland* claim relies on important evidence, much of which is cumulative of the trial defenses chosen by Alvarez and his trial counsel, a reviewing court must contrast that with the evidence the State presented at trial.  Alvarez admitted his involvement in the killings, although he downplayed his role in them.  Those killings, however, were only single episodes in Alvarez's

much broader history of violence.  Alvarez had participated in other drive-by shootings, leaving others wounded or dead.  Alvarez had committed other crimes such as burglary and aggravated assault.  Alvarez has rejected opportunities to reform his character.  Given the escalating level of his violence and his wanton disregard for the welfare of bystanders to gang warfare, the state habeas court would not be unreasonable in finding no *Strickland* prejudice flowing from counsel's representation.

## II.      Claims Two and Three

Alvarez is a native and citizen of Mexico.  Alvarez asks this Court to vacate his capital conviction and death sentence because Texas did not strictly comply with the requirements of the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77.  The Vienna Convention "provides that if a person detained by a foreign country so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State of such detention, and inform the detainee of his right to request assistance from the consul of his own state."  *Medellín v. Texas*, 552 U.S. 491, 499 (2008) (internal quotation omitted); *see also* Vienna Convention, Art. 36(1)(b).  "In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338-39 (2006).  Alvarez's second and third federal claims argue that the State of Texas did not give notice of, and trial counsel did not adequately act to preserve his rights under, the Vienna Convention.

Recent years have seen much legal interest in the interplay between Vienna Convention rights, international law, the American criminal justice system, and the principles of federalism that define the rule of dual sovereigns in this Nation.  International law has emphasized the

importance of strict compliance with the Vienna Convention. The United States ratified the Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 325 ("Optional Protocol"), that placed the resolution of Vienna Convention disputes within the compulsory jurisdiction of the International Court of Justice ("ICJ").[39] In 2004, the ICJ issued a decision ordering the United States to review and reconsider the conviction of 51 Mexican nationals on death row (including Alvarez) who may not have received the full protection of the Vienna Convention. *See* Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.), 2004 I.C.J. 12 (Judgment of Mar. 31) ("*Avena*"). Alvarez asks this Court to recognize *Avena* and give effect to his Vienna Convention rights by granting habeas relief.

State court litigation in this case contemplated the question of whether some remedy exists because of the Vienna Convention violation. Trial counsel filed a pre-trial "Motion to Suppress Violation of International Treaty" arguing that the police failed to advise him as a native and citizen of Mexico about his Vienna Convention rights on his arrest, but did not ask for any specific relief. Clerk's Record at 409.[40] In a later hearing, trial counsel unsuccessfully asked the trial court to set aside the indictment because of the treaty violation. Tr. Vol. 18 at 21-24. On direct appeal, Alvarez argued that the trial court should have suppressed his police statement because the police had not advised him of the Vienna Convention rights. The Court of

---

[39] "The United States has since given notice of its withdrawal from the Optional Protocol in which it agreed to be bound by the ICJ decision." *Leal Garcia v. Quarterman*, 573 F.3d 214, 217 n.14 (5th Cir. 2009); *see also Sanchez-Llamas*, 548 U.S. at 339; *Gomez v. Quarterman*, 529 F.3d 322, 327 n.2 (5th Cir. 2008).

[40] Trial counsel filed a motion to suppress evidence on grounds other than a Vienna Convention violation. Clerk's Record at 415-19. On direct appeal, the Court of Criminal Appeals observed that "the trial court found that [Alvarez] voluntarily executed a consent to search his apartment during the interview with [a police officer]; [Alvarez] lived at the apartment with his sister, his mother, and [his girlfriend]; [the police officer] obtained additional consent to search the apartment from [Alvarez's girlfriend]; [Alvarez's] mother also signed a consent to search the apartment and everyone who gave consent to search the apartment did so as a result of their own free will without the use of force coercion threats persuasion or promises of any kind." With that background the Court of Criminal Appeals found that "[t]he record supports the trial courts determination that [Alvarez] freely and voluntarily consented to the search." Opinion at 10-11.

Criminal Appeals succinctly observed that, as it had previously held that the "exclusionary rule does not apply to treaties," the "suppression of evidence is not an available remedy for a violation of the Vienna Convention." Opinion at 9.

The state habeas court found that, because trial counsel did not obtain a ruling on his motion to suppress based on international law, Alvarez's Vienna Convention claim was "procedurally barred based on a lack of a timely objection." State Habeas Record at 1129. The state courts unquestionably found that it did not merit state habeas relief.[41] Alvarez has not

---

[41] On habeas review, Alvarez argued that trial counsel provided deficient representation by not specifically requesting the suppression of evidence based on the Vienna Convention violation.[41] Subsequent state habeas briefing, however, created some confusion, at least initially, about the substance of Alvarez's habeas claim. During the pendency of Alvarez's state habeas application, state habeas counsel filed a "Supplemental Brief Relating to Vienna Convention Claim Raised in Post-Conviction Application for Writ of Habeas Corpus." Because of the ICJ proceedings during the pendency of state habeas review, state habeas counsel filed the supplemental application to argue that Texas should give effect to the *Avena* decision. The trial court, construing the late filed document as a subsequent habeas application, forwarded it on to the Court of Criminal Appeals. The Court of Criminal Appeals subsequently issued an order stating that Alvarez's "supplemental brief was not a subsequent application" because it did not "assert additional claims, nor does it expand upon a claim already raised." The Court of Criminal Appeals directed the lower court "considered [it] to the extent appropriate in conjunction with the claim already before the trial court." The trial-level habeas court considered the full extent of the allegations in the supplemental brief as if they were grounds for relief. The state habeas court found that, because trial counsel did not obtain a ruling on his motion to suppress based on international law, Alvarez's Vienna Convention claim was "procedurally barred based on a lack of a timely objection." State Habeas Record at 1129. The trial court issued explicit and detailed factual findings discussing Alvarez's allegation that the Mexican consulate could have helped prepare for trial and rejecting the claim that trial counsel should have presented additional mitigating evidence. State Habeas Record at 1121-25. The state habeas court provided various reasons for denying the *Strickland* claim relating to the Vienna Convention on the merits. First, Alvarez "did not disclose his Mexican citizenship prior to giving his statement" and "trial counsel did not pursue the issue of consular notice as a matter of strategy, based on the state of the law at the time of trial and the abundance of evidence against" Alvarez. State Habeas Record at 1116. Second, the Court of Criminal Appeals on direct appeal "considered and rejected [Alvarez's] allegation that his confession should have been suppressed due to the failure to inform him of his rights provided by the Vienna Convention." State Habeas Record at 116. Third, the Supreme Court in *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2681-82 (2006) held that "suppression of a confession is not an appropriate remedy where foreign nationals are not informed of their right to notify a consulate pursuant to the Vienna Convention." State Habeas Record at 1116. Also, the Supreme Court held that Vienna Convention protections are already "provided by constitutional and statutory requirements already in place, including the right to an attorney and protection against compelled self-incrimination." State Habeas Record at 1117. Fourth, state law held that a Vienna Convention violation did not require the suppression of a confession. State Habeas Record at 1118. Finally, Alvarez "was provided all of the statutory and constitutional protections afforded citizens of the United States." State Habeas Record at 1118. With those findings, the state habeas court concluded that: (1) "[t]rial counsel cannot be considered ineffective for making a reasonable, strategic decision not to pursue the Vienna Convention violation as grounds for suppression"; and (2) "[c]ounsel cannot be considered ineffective based on the lack of a meritless objection to the admission of [Alvarez's] statements and search based on an alleged violation of the Vienna Convention." State Habeas Record at 1096-97. The Court of Criminal Appeals did not adopt those findings and the associated conclusions, but still denied relief. *Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sept. 24, 2008).

shown that that state habeas court's rejection of his claim was contrary to, or an unreasonable application of, federal law. Alvarez's arguments focus heavily on the ICJ's *Avena* decision. The federal government has acted to enforce the *Avena* decision. In February 2005, former President George W. Bush issued a Memorandum to the United States Attorney General directing the States to comply with the *Avena* decision ("presidential declaration"). The State of Texas, however, objected that the presidential declaration upset the balance of federalism that undergirds federal/state relations. Eventually, the Court of Criminal Appeals dismissed successive habeas actions raising Vienna Convention claims as an abuse of the writ by finding that neither the *Avena* judgment nor the President's memorandum supplanted state procedural law. *See Ex parte Medellín*, 223 S.W.3d 315, 322-23 (Tex. Crim. App. 2006).

In *Medellin v. Texas*, 552 U.S. 491 (2008), the United States Supreme Court affirmed Texas' reliance on federalism, holding that: (1) the ICJ judgment in *Avena* did not constitute "binding federal law" that would preempt state procedural law, such as Texas' abuse-of-the-writ limitations; and (2) the President lacked authority to make the *Avena* judgment binding on the state courts. The Supreme Court rendered the *Medellín* decision against a backdrop of other cases in which it held that international obligations under the Vienna Convention did not supplant the independence of the States. *See Sanchez-Llamas*, 548 U.S. at 351-52; *Breard v. Greene*, 523 U.S. 371, 375-76 (1998).[42] In short, the Supreme Court has not subjugated state law

---

[42]     For example, in *Breard v. Greene*, 523 U.S. 371 (1998), the Supreme Court considered the effect of the procedural default doctrine on a prisoner's Vienna Convention claim. Recognizing that federal courts "should give respectful consideration to the interpretation of an international treaty rendered by an international court," the Supreme Court nonetheless found that, "absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State." *Id.* at 375. The Supreme Court noted that "[t]his proposition is embodied in the Vienna Convention itself, which provides that the rights expressed in the Convention 'shall be exercised in conformity with the laws and regulations of the receiving State,' provided that 'said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.'" *Id.* at 375 (quoting Vienna Convention, Article 36(2)). The Supreme Court held that the procedural default doctrine could bar consideration of a Vienna Convention claim. *See id.* at 375-76. The Supreme Court supported this finding by recognizing that the procedural default doctrine applied even to claims brought

to international treaties in the Vienna Convention context. For that reason, the state habeas court's finding of procedural default bars federal consideration of his Vienna Convention claim.

Precedent likewise precludes federal habeas relief on Alvarez's Vienna Convention claim. There is no dispute that the State of Texas did not inform Alvarez of his Vienna Convention rights. When Alvarez raised a Vienna Convention claim in his initial round of habeas review, as a remedy he asked the state courts to suppress his custodial statement and vacate his conviction. Alvarez's state habeas proceedings complained strongly that the suppression of evidence was a remedy for any Vienna Convention violation. The Supreme Court, however, has held that it lacks authority to require the state courts to enforce that remedy. *Sanchez–Llamas,* 548 U.S. at 345; *see also Rocha v. Thal*er, 619 F.3d 387, 407 (5th Cir. 2010); *United States v. Jimenez-Nava*, 243 F.3d 192, 198–200 (5th Cir. 2001). Texas state law holds that "suppression is not an appropriate remedy for violations of the Vienna Convention[.]" *Sierra v. State*, 218 S.W.3d 85, 88 (Tex. Crim. App. 2007); *see also Rocha v. State*, 16 S.W.3d 1, 19 (Tex. Crim. App. 2000). Even if trial counsel had made the rejected objection, neither state nor federal law would have provided for the requested remedy.

Aside from not assigning a remedy to any Vienna Convention violation, federal law has not recognized Vienna Convention claims as a viable basis for federal habeas corpus relief. The federal writ of habeas corpus is only available when a petitioner shows that the state court judgment was "contrary to, or involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States*[.]" 28 U.S.C. § 2254(d)(1) (emphasis added). Alvarez premises his Vienna Convention claim on the assumption that

---

under the United States Constitution – a document "'on full parity with a treaty.'" *Id.* at 376 (quoting *Reid v. Covert*, 354 U.S. 1, 8 (1957)).

criminal defendants can enforce that international treaty in the domestic courts. The pertinent question, however, is whether clearly established federal law requires that domestic courts be the forum for protecting those rights. "The Vienna Convention binds the United States as a matter of international law, but does not bind the individual states of the Union unless and until Congress passes enabling legislation enacting its provisions." *Leal Garcia v. Quarterman*, 573 F.3d 214, 218 n.19 (5th Cir. 2009); *see also Sanchez-Llamas*, 548 U.S. at 346-47. As it now stands, Vienna Convention violations are "enforceable by one member-nation against another, which is why Mexico took the *Avena* suit to the ICJ." *Leal Garcia*, 573 F.3d at 218 n.19. The Supreme Court to date has found "it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights." *Sanchez-Llamas*, 548 U.S. at 343; *see also Medellin*, 552 U.S. at 507 n.4 (finding it "unnecessary to resolve whether the Vienna Convention is itself 'self-executing' or whether it grants [a defendant's] individually enforceable rights"); *Breard*, 523 U.S. at 376 (stating that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest" but leaving the resolution of that issue to the lower courts). Alvarez concedes that the Supreme Court has "left open the question of whether domestic remedies could be provided for violations of the Vienna Convention or for constitutional claims related to the Vienna Convention." (Instrument No. 18 at 188). As such, no clearly established Supreme Court precedent provides for relief on Alvarez's Vienna Convention claim.

In the absence of contrary Supreme Court authority, Fifth Circuit precedent binds this Court's analysis. Because the preamble to the Vienna Convention explains that it is "not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States," the Fifth Circuit has "held that Article 36 of the Vienna

Convention does not create an individually enforceable right." *Medellin v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004); *see also Cardenas v. Stephens*, 820 F.3d 197, at *1 (5th Cir. 2016); *Ramos v. Davis*, 653 F. App'x 359, 365 (5th Cir. 2016); *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001).

Because the Supreme Court has not yet recognized an individually enforceable right under the Vienna Convention, this Court could only recognize such right by creating new constitutional law. The nonretroactivity principle in *Teague v. Lane*, 489 U.S. 288 (1989), denies habeas courts the ability to create new law. *See Breard*, 523 U.S. at 377 (suggesting that a Vienna Convention claim would fall under *Teague*'s non-retroactivity principle); *Plata v. Dretke*, 111 F. App'x 213, 216 (5th Cir. 2004) (finding that the petitioner "ha[d] not shown that the district court's denial of his [Vienna Convention] claim as *Teague*-barred is debatable"); *Flores v. Johnson*, 210 F.3d 456, 457-58 (5th Cir. 2000) (citing *Breard* to *Teague*-bar a Vienna Convention claim). Alvarez has not shown under existing law that the Vienna Convention creates a right which can form the basis for habeas relief. *See Maldonado v. Thaler*, 389 F. App'x 399, 404 (5th Cir. 2010) (rejecting the same claim presented using nearly word-for-word identical arguments).

Even if procedural law and non-retroactivity principles did not mandate the denial of this claim, and the Court were to assume that the Vienna Convention created an enforceable individual right, Alvarez would still have to prove concrete harm. *See Breard*, 523 U.S. at 377; *Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996). Alvarez argues that international law, as interpreted by the ICJ, does not require a showing of prejudice for Vienna Convention violations. *See F.R.G. v. United States*, 2001 ICJ 466 (June 27). The Supreme Court, however, has suggested that an inmate would need to show more than speculative harm flowing from any

Vienna Convention violation, specifically when "provided with effective legal representation[.]" *Medellin v. Dretke*, 544 U.S. 660, 665 (2005). When a Vienna Convention claim is "properly raised and proven, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Breard*, 523 U.S. at 377.

Alvarez contends that the Mexican Consulate would have taken immediate steps to assist his case, most notably in the ability "to fully and effectively investigate Mr. Alvarez's family history and neurological condition, both of which were necessary in order to provide Mr. Alvarez with a proper defense." (Instrument No. 18 at 166). Alvarez asks this Court to assume that informing him of his Vienna Convention rights would have resulted in different trial representation by attorneys who would not have committed any errors he now imputes to trial counsel. Such a showing of harm is speculative.

In sum, the Vienna Convention itself does not articulate a specific remedy for its violation. *See Jimenez-Nava*, 243 F.3d at 199. While Alvarez asks this Court to void his conviction and sentence because of a Vienna Convention violation, no Supreme Court or Fifth Circuit precedent requires that result. Even if issuance of the federal habeas writ is an appropriate remedy for a procedurally adequate Vienna Convention claim showing actual harm, that is not the case before the Court. Procedural law bars full federal consideration of Alvarez's Vienna Convention claim, no federal precedent provides for relief, and the circumstances of this case do not persuasively show that the violation harmed his defense. The Court denies claims two and three.

## III.    Burden of Proof in Punishment Phase (claim twenty-two)

In claim twenty-two Alvarez complains that Texas' capital sentencing scheme improperly

shifts to the defense a burden to prove the existence of mitigating evidence. On state habeas review, Alvarez argued that the failure to assign a burden of proof on the punishment-phase issues violated the fifth, sixth, and fourteenth amendments. State Habeas Record at 2. The state habeas court found that Alvarez "fails to show that the mitigation special issue is allegedly infirm as a matter of federal constitutional writing because of its lack of a burden of proof." State Habeas Record at 1126.

Alvarez argues again on federal review that Texas' capital-punishment scheme "impermissibly shifts the burden of proof on mitigation to the defendant." (Instrument No. 18 at 325). The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). The Fifth Circuit has repeatedly found that Texas' scheme that implicitly requires the defense to bear a burden on the mitigation special issue complies with constitutional requirements. *See Jasper v. Thaler*, 466 F. App'x 429, 441 (5th Cir. 2012); *Carty v. Quarterman*, 345 F. App'x 897, 907 (5th Cir. 2009); *Berkley v. Quarterman*, 310 F. App'x 665, 673 (5th Cir. 2009); *Ortiz v. Quarterman,* 504 F.3d 492, 504-05 (5th Cir. 2007); *Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir. 2007); *Oliver v. Quarterman*, 254 F. App'x 381, 386 (5th Cir. 2007); *Granados v. Quarterman,* 455 F.3d 529, 537 (5th Cir. 2006); *Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir. 2005). Sound, consistent precedent precludes federal habeas relief on claim twenty-two.

### CLAIMS RAISED IN THE 2010 AND 2014 HABEAS APPLICATIONS

Alvarez's federal petition raises claims he exhausted in his 2010 and 2014 state habeas applications. The Court of Criminal Appeals dismissed both the 2010 and 2014 applications as an abuse of the writ under Tex. Code Crim. Pro. art. 11.071, § 5(a). "A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a

procedural bar' in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x. 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)). Alvarez must show that the claims he exhausted in the 2010 and 2014 applications are procedurally available for federal review before the Court addresses their merits.

Alvarez raised claims four through seven in his 2010 and 2014 applications, all of which involve the State's presentation of DNA evidence at Alvarez's trial. Kristi Kim, a DNA analyst with the HPD Crime Lab, extracted blood samples from the shotgun and assault rifle that the police recovered at Alvarez's apartment. Ms. Kim testified that those samples exhibited DNA patterns consistent with the victim José Varela's blood. Ms. Kim specified that she did not mean that the blood in fact came from the Varela, but explained the blood *could have come* from him. Tr. Vol. 22 at 118. During the pendency of state habeas review, an audit of the DNA/Serology section of the HPD Crime Lab revealed several areas of noncompliance with the DNA lab procedures established by the Federal Bureau of Investigation. State habeas counsel acted on the possibility of error in the DNA testing. Through counsel's efforts, in April 2003 the trial court ordered the release of the DNA evidence to an independent laboratory. A subsequent report confirmed the victim's DNA profile was found on the shotgun and the rifle. (Instrument No. 18, Exhibit 64). State habeas counsel did not move to amend his state habeas application or otherwise raise any issue relating to the DNA testing.

Meanwhile, the HPD crime lab came under scrutiny. In another case, the Court of Criminal Appeals has described the subsequent investigation into the HPD laboratory's handling of DNA evidence as follows:

> As a result of problems discovered with the HPD Crime Lab, a team headed by Michael R. Bromwich was chosen to further investigate and evaluate the Crime Lab's practices, both past and present. The report, published on June 13, 2007, contained numerous scathing criticisms of the Crime Lab's serology/DNA section.

"On the whole," the serology/DNA section's "work did not meet the generally accepted forensic science principles that existed at the time and posed major risks of contributing to miscarriages of justice in extremely significant cases."

Bromwich attributed this failure to budgetary problems, incompetent leadership, and lack of training for the DNA analysts. "[U]ntil the public crisis engulfed the Crime Lab, it was never provided adequate financial support to hire and train the number of criminalists necessary to handle the Lab's ever-increasing workload." The DNA section was in "shambles—plagued by a leaky roof, operating for years without a line supervisor, overseen by a technical leader who had no personal experience performing DNA analysis and who lacked the qualifications required under the applicable Federal Bureau of Investigation ('FBI') standards, [and] staffed by underpaid and undertrained analysts." Training was one of the first areas in which funding was cut when the HPD Crime Lab's budget became tight. The lab was populated by civilian, as opposed to law enforcement, employees, and as such, was marginalized within HPD. Until the 2002 audit, the HPD Crime Lab did not submit to reviews by outside agencies and never sought to achieve accreditation. As a result, HPD's analysts became isolated from the rest of the forensic science community. Although the person with supervisory control over the DNA section certified that internal audits conforming to FBI quality assurance standards found that those standards were met, the outside audit found to the contrary.

Bromwich characterized the HPD DNA analysts as "woefully undertrained." "The problems we observed in the historical DNA cases," he further explained, "are not attributable to individual rogue analysts who departed from the Crime Lab's approved practices. On the contrary, the widespread and serious deficiencies in the historical Crime Lab were consistent with the Crime Lab's accepted and understood practices." Consequently, "[f]lawed practices and embedded misunderstandings . . . became accepted by analysts within the DNA/Serology Section as the correct way of doing things. These misunderstandings infected the work of the Section's analysts from the analysis through the trial testimony." Bromwich found "the same types of major issues across all the Crime Lab's DNA work, regardless of the analyst or the DNA typing system used."

*Ex parte Napper*, 322 S.W.3d 202, 22-21 (Tex. Crim. App. 2010). The Bromwich report specifically criticized work performed by Ms. Kim, as well of that of another HPD crime lab employee:

Those reports are extremely critical of the past work of two key witnesses in applicant's trial—Kristy Kim, a criminalist, and James Bolding, the head of the crime lab. For example, the reports note that both were associated with cases in which the crime lab reported conclusions that were inconsistent with the actual

testing performed by the analysts. In one case, testing performed by Kim excluded the defendant as a donor to the sample, but Kim nevertheless reported that the defendant could have been a contributor. In another case, Bolding allegedly altered the results of blood-typing work on the basis of a scientifically unjustifiable explanation, gave misleading testimony regarding the statistical significance of his reported conclusion, and gave false testimony about his credentials.

*Ex parte Campbell*, 226 S.W.3d 418, 421–22 (Tex. Crim. App. 2007).

Based on that record, Alvarez raises four related claims in his federal habeas petition. First, Alvarez claims that the prosecution failed to disclose the serious problems in the crime lab, and particularly errors in the DNA testing (claim four). Second, because Ms. Kim's report identified the blood on the rifle and shotgun as coming from Mr. Varela and one other donor, but at trial she never discussed the fact that the testing identified two donors, Alvarez contends that the State violated his rights by allowing the DNA analyst to provide false testimony under *Napue v. Illinois*, 360 U.S. 264, 269 (1959). (claim five). Third, because the Bromwich report identified Ms. Kim and another person as "personally perform[ing] the analytical work in many of the most problematic cases" the special commission reviewed, (Instrument No. 18, Ex. 65), Alvarez contends that the State violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing Ms. Kim's "extensive history of performing incompetent work for the HPD crime lab." (Instrument No. 18 at 216) (claim six). Fourth, Alvarez argues that the State engaged in prosecutorial misconduct by relying on the deficient HPD crime lab. (claim seven).

Alvarez raised these claims in his 2010 state habeas application, which the Court of Criminal Appeals found to be an abuse of the writ.[43] Alvarez does not make any attempt to show

---

[43] Alvarez raised a state-law claim on direct appeal about the chain of custody and evidentiary foundation for the DNA testimony. Alvarez did not exhaust the factual complaints nor the legal arguments in that proceeding that he raises in federal court.

cause and prejudice to overcome the procedural bar. Instead, Alvarez contends that Texas' abuse-of-the-writ rule is not regularly applied, disqualifying it as a valid basis to preclude federal review. Alvarez bases his complaint on a case in which the Court of Criminal Appeals allowed an inmate to litigate a successive habeas application based on the HPS lab scandal. *Ex parte Alix*, No. 50,786-02 (Tex. Crim. App. June 23, 2004). Alvarez's case is distinguishable, however, because the operative facts underlying his successive claims were available to him during the course of his initial state habeas action. Alvarez's original state habeas attorneys had the DNA evidence retested and decided not to litigate any related claims. *See Hogue v. Johnson*, 131 F.3d 466, 488 (5th Cir. 1997) ("[T]he question [is] whether the rule 'is strictly or regularly applied evenhandedly to the vast majority of similar claims'"). Accordingly, the operation of Texas state procedural law forecloses federal review of claims four through seven.

The Court observes, however, that Alvarez has shown a strong basis for federal habeas relief. Alvarez bases his four related federal claims on various constitutional principles, each with different elements but common features. Alvarez claims that the prosecution suppressed information about the HPD crime lab under *Brady*, presented false testimony about the HPD crime lab under *Napue*, or committed misconduct by relying on results from the HPD crime lab. For the alleged *Brady* and *Napue* violations, the record does not suggest that the prosecution team or police department was aware of the systemic problems at the HPD crime lab at the time of trial. The record shows that the State took affirmative steps to disclose the problems with the crime lab soon after they came to light. Further, much of what Alvarez terms false testimony was mere inconsistency, and he has not shown that the State was aware of any falsity. Finally, Alvarez's claims require either a showing of (1) materiality, that is, a reasonable probability that,

absent the alleged constitutional error, the result of the proceeding would be different[44] or (2) that the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Under those standards, Alvarez has not shown that the alleged errors made a difference at trial.

Alvarez's complaint centers on the HPD crime lab's identification of one victim's blood. Alvarez describes the blood evidence as "the lynchpin tying Mr. Alvarez to the murder of Jose Varela." (Instrument No. 18 at 203). Otherwise, "evidence against Mr. Alvarez consisted primarily of unreliable testimony of lay witnesses (e.g. Brandy Varela) and a largely exculpatory statement by Mr. Alvarez that was hotly contested in terms of voluntariness and reliability." (Instrument No. 18 at 205). Even though Alvarez emphasizes that the original results allowed for another person's blood to also be present on the weapons, retesting confirmed that the police found a victim's blood on weapons found in Alvarez's apartment -- weapons resembling those that witnesses identified as being used in the killings.[45] This information tied Alvarez to the crime, but was not the lynchpin in his conviction. Arguing that blood from a second person, and speculating that the blood belongs to a co-participant in the gang violence, does not meaningfully alter the evidentiary picture considered by Alvarez's jury. Alvarez himself conceded that he was at the scene of the shootings. Testimony showed that he provided the car and weapon used in the shooting. He helped plan, organize, and direct the shootings. The jury instructions allowed for his conviction as a party, meaning that the jury did not have to find that he pulled the trigger himself. Still, the State presented strong eyewitness testimony proving that he repeatedly fired

---

[44] "[T]he materiality standard under *Napue* is essentially identical to the analysis performed under *Brady*." *United States v. Dvorin*, 817 F.3d 438, 452 (5th Cir. 2016).

[45] Ms. Kim testified that the blood on the shotgun and rifle matched Mr. Varela, a finding confirmed by retesting. (Instrument No. 18, Exhibit 64).

weapons during each episode. Alvarez has not shown a probability of a different result stemming from, or that unfairness permeated his trial because of, the alleged errors. Even if Alvarez had put these claims before the Court in a procedurally proper manner, he has not shown a strong basis for federal habeas relief.

## CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal. *See* 28 U.S.C. § 2253(c); Fed.R.App.P. Rule 22(b). Even though Alvarez has not sought a Certificate of Appealability ("COA"), this Court can consider the issue *sua sponte. See Alexander*, 211 F.3d at 898. The Court must address whether the circumstances justify an appeal before issuing a final judgment. *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Settled precedent forecloses relief on Alvarez's claims. Because Alvarez has not shown under the appropriate standard that any issue deserves appellate review, this Court will not certify any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Alvarez has not shown an entitlement to federal habeas relief. This Court **denies** Alvarez's petition and **dismisses** this case **with prejudice**. The Court **denies** all remaining requests for relief. No Certificate of Appealability will issue in this case.

SIGNED at Houston, Texas, this 25th day of October, 2017.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE